# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
ADRIANA M CASTRO, M.D., P.A.; and    :
SUGARTOWN PEDIATRICS, LLC;    :   Case No.:  2:11-cv-07178 (JLL) (MAH)
on behalf of themselves and all others similarly  :
situated,    :   <u>ECF CASE</u>
:
              Plaintifs,    :   Motion Day: May 21, 2012
:
    vs.    :
:
SANOFI PASTEUR INC.,    :
:
              Defendant.    :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM IN SUPPORT OF
# <u>SANOFI PASTEUR'S MOTION TO DISMISS</u>

Bradley I. Ruskin (admitted *pro hac vice*)
Jennifer R. Scullion (admitted *pro hac vice*)
Jessica L. Sonenshein (admitted *pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036

John P. Barry
PROSKAUER ROSE LLP
One Newark Center
Newark, New Jersey 17102
T: (973) 274-3200
F: (973) 274-3299
E: jbarry@proskauer.com

Colin R. Kass (admitted *pro hac vice*)
Rhett R. Krulla (admitted *pro hac vice*)
John F. Nader (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004

*Attorneys for Defendant Sanofi Pasteur Inc.*

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   RELEVANT FACTS ................................................................................... 4

III.  THE NAMED PLAINTIFFS LACK ANTITRUST INJURY BECAUSE THEY
      FAILED TO ALLEGE COERCION. ........................................................ 10

IV.   PBG MEMBERS LACK ANTITRUST STANDING TO CHALLENGE THE
      DISCOUNT STRUCTURE THAT THEIR PBGS NEGOTIATED. .............. 14

      A.   Plaintiffs' Injuries Are Derivative Contractual Injuries, Not Direct
           Antitrust Injuries. ........................................................................ 16

      B.   Plaintiffs' "Economic Freedom" Has Not Been Restrained. ................ 19

      C.   Allowing Suit Would Frustrate Goals of the Antitrust Laws. ............. 21

      D.   There Are More Direct Plaintiffs Who Are Better Parties to Enforce the
           Antitrust Laws. ............................................................................. 23

V.    PLAINTIFFS FAILED TO ALLEGE THAT PBGS WERE COERCED OR
      THAT SANOFI'S VACCINES ARE "INDISPENSABLE." .......................... 25

VI.   PLAINTIFFS FAILED TO ALLEGE MARKET FORECLOSURE. ............. 28

VII.  CONCLUSION ........................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
369 F.3d 732 (3d Cir. 2004)................................................................ passim

*Abraham v. Intermountain Health Care Inc.*,
461 F.3d 1249 (10th Cir. 2006) ................................................................12

*Acme Mkts., Inc. v. Wharton Hardware & Supply Corp.*,
890 F. Supp. 1230 (D.N.J. 1995) ................................................ passim

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983)................................................................ passim

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)................................................................11

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983) ................................................................30

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998)................................................2, 11, 19

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)................................................................28

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)................................................9, 12, 26

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) ................................................................16

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986)................................................................11, 30

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) (en banc) ................................................11

*City of Pittsburgh v. W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998)................................................14, 15

*Davies v. Genesis Med. Ctr.*,
994 F. Supp. 1078 (S.D. Iowa 1998) ................................................13

*Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp.*,
   905 F.2d 769 (4th Cir. 1990) ................................................................12

*Henke Enters, Inc. v. Hy-Vee Food Stores, Inc.*,
   749 F.2d 488 (8th Cir. 1984) ...............................................................19

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*,
   949 F.2d 874 (6th Cir. 1991) ...............................................................14

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)........................................................................20, 24

*In re Hypodermic Prods. Antitrust Litig.*,
   2007 WL 1959224 (D.N.J. 2007) (Linares, J.) .............................13, 27

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993).................................................................15

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ...........................................................13

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
   2005 WL 1396940 (S.D. Ohio 2005)......................................................28

*Jame Fine Chems., Inc. v. Hi-Tech Pharm Co.*,
   2007 WL 927976 (D.N.J. 2007) .............................................................28

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)....................................................................... 1, 10, 27

*Johnson v. Univ. Health Servs., Inc.*,
   161 F.3d 1334 (11th Cir. 1998) ............................................................19

*Kochert v. Greater Lafayette Health Servs., Inc.*,
   463 F.3d 710 (7th Cir. 2006) ................................................................14

*LePage's v. 3M, Inc.*,
   324 F.3d 141 (3d Cir. 2003) (en banc)......................................... passim

*Marchese v. Cablevision Systems Corp.*,
   2011 WL 149917 (D.N.J. 2011) (Linares, J.) ..................................10, 11

*Masimo Corp. v. Tyco Healthcare Group*,
   2006 WL 1236666 (C.D. Cal. 2006),
   *aff'd*, 2009 WL 3451725 (9th Cir. 2009).............................................4, 28

*McCarthy v. Recordex Serv., Inc.*,
   80 F.3d 842 (3d Cir. 1996)..............................................................20, 21

*McDonald v. Johnson & Johnson,*
    722 F.2d 1370 (8th Cir. 1983) ......................................................17, 20, 21

*Orion Pictures Distrib. Corp. v. Syufy Enters.,*
    829 F.2d 946 (9th Cir. 1987) ...................................................................17

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.,*
    920 F. Supp. 455 (S.D.N.Y. 1996)...........................................................28

*R.W. Int'l. Inc. v. Borden InterAmerica, Inc.,*
    673 F. Supp. 654 (D.P R. 1987).................................................................18

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,*
    614 F.3d 57 (3d Cir. 2010).................................................................. passim

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.,*
    392 F. Supp. 2d 118 (D.P.R. 2005)..........................................................29

*Roland Mach. Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984) (Posner, J.) ...............................................28

*Sanderson v. Culligan Int'l Co.,*
    415 F.3d 620 (7th Cir. 2005) (Easterbrook, J.)....................................4, 28, 30

*Schachar v. Am. Acad. of Ophthalmology, Inc.,*
    870 F.2d 397 (7th Cir. 1989) (Easterbrook, J).....................................4, 30

*SmithKline Corp. v. Eli Lilly & Co.,*
    575 F.2d 1056 (3d Cir. 1978).................................................................3, 27

*Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.,*
    57 F.3d 1317 (4th Cir. 1995) .................................................................23

*Todorov v. DCH Healthcare Auth.,*
    921 F.2d 1438 (11th Cir. 1991) .............................................................14

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
    959 F.2d 468 (3d Cir. 1992)...........................................................2, 12, 27

*Viacom Int'l Inc. v. Tele-Communications, Inc.,*
    1994 WL 561377 (S.D.N.Y. 1994)..........................................................30

*W. Parcel Express v. United Parcel Serv. of Am., Inc.,*
    190 F.3d 974 (9th Cir. 1999) ...................................................................29

*W. Penn Allegheny Health Sys. Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010)........................................................................5

**OTHER AUTHORITIES**

P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 749d4 (rev.ed. 1995) ....................4, 26

P. Areeda & H. Hovenkamp,  ANTITRUST LAW, Vol. II, ¶ 749d2 (rev.ed. 1995)...................10, 11

P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 749d3 (rev.ed. 1995) ........................12

P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 381 (rev.ed. 1995) .............................17

ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002) ...............................18

Restatement (2d) of Agency § 220 (1958)...................................................................................21

Thomas A. Lambert, *Evaluating Bundled Discounts*, 89 Minn. L. Rev. 1688 (2005) .................26

## I.   INTRODUCTION

Two physicians filed a class action to challenge the discounts their physician buying groups negotiated with Defendant Sanofi Pasteur Inc.  The physicians, however, do not claim that the discounts are not big enough.  They claim instead that they should be entitled to the same discounts even if they are unwilling to purchase the same volume of vaccines from Sanofi.  That may be their desire, but it is not an antitrust claim.

The plaintiffs purport to model their claims on the Third Circuit's inapposite decision in *LePage's v. 3M, Inc.*, 324 F.3d 141 (3d Cir. 2003).  There, the court held that bundling of multiple products may violate the antitrust laws if the defendant's products were "***indispensable***" and the effect of the bundled discounts would be to eliminate rivals, allowing the defendant to "later ***recoup*** the profits it has [initially] forsaken" once there was "no competition by others." *Id.* 156, 162.[1]

*LePage's*, however, does not help the plaintiffs here because their claims fail right out of the box, for four separate and independent reasons.

*First*, the *named plaintiffs* failed to allege that they were coerced into purchasing vaccines from Sanofi, and thus, they lack antitrust injury.  Plaintiffs allege only that they purchased vaccines from Sanofi, including a meningitis vaccine sold under the brand name Menactra[®].  But plaintiffs do not allege that Sanofi "force[d] [them] into the purchase of a … product that [they] either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  This fatally undermines their standing, since the Sherman Act is "not designed to preclude" "package sales" that "may be used

---

[1] Unless otherwise noted, all emphasis added and all internal citations, quotation marks, and brackets omitted.  References to the complaint refer to the operative First Consolidated Amended Class Action Complaint ("Cmplt.").

by a seller as a means of competing, and may be ***desired by buyers***." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 n. 6 (3d Cir. 1998). Because a buyer is always free to negotiate on a bundled basis if it so chooses, a purchaser's claim necessarily "***falls apart***" in the absence of alleged coercion. *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486 (3d Cir. 1992).

*Second*, Plaintiffs lack standing to challenge the discounts their physician buying groups (PBGs) negotiated. The plaintiffs are not actually involved in the negotiations for the discounts they now challenge. Rather, they challenge the contracts negotiated by their duly-authorized physician buying groups and vaccine suppliers. Because the individual members have chosen to outsource the negotiation function to PBGs, it is the PBGs who would have standing if, in fact, the agreements they negotiated were the result of economic coercion.

In that regard, the Third Circuit's decision in *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004), controls. There, a hotel owner entered into an *agency* agreement requiring it to purchase supplies from approved vendors at prices set forth in *vendor* agreements negotiated by Sheraton, the national franchiser. Rejecting plaintiff's argument – that a direct purchaser necessarily has standing to challenge the "artificially inflated prices" it was forced to pay – the court held that the plaintiff's harm actually flowed through the *agency* agreement; and therefore, it did not constitute antitrust injury. The court also noted that the plaintiff – whose economic freedom was restrained not by the challenged *vendor* agreements but by the *agency* agreement it had voluntarily entered – was not a proper plaintiff to challenge the defendant's *vendor* agreements. As the court explained, the plaintiff's injury, at best, stemmed from a "***corruption of the principal-agent relationship***." *Id.* at 739. Here, too, the

plaintiffs seek an end-run around their own PBG membership agreements.   The antitrust laws do not countenance such a claim.

This is not a technical pleading failure; rather, it goes to the "heart" of what the antitrust laws seek to protect – "the economic freedom of [the] participants" who are actually engaged in the competitive negotiations between buyers and sellers.  *Acme Mkts., Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230, 1236 (D.N.J. 1995).   Here, granting plaintiffs standing would frustrate the purposes of the antitrust laws.

As the Third Circuit has explained, bundled discounts and exclusivity "may constitute 'a ***vital form of rivalry***, and often the most ***powerful*** one, which the antitrust laws encourage rather than suppress.'"  *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010).   Thus, membership organizations – such as PBGs – are entitled to "a degree of deference" when deciding whether to negotiate with suppliers on a bundled or exclusive basis.  *Id*. at 81. This Third-Circuit-mandated deference would be destroyed if a single physician could veto the PBGs' decision to include multiple vaccines within a single master agreement.   Thus, individual members must seek their remedies through their PBG's corporate governance structure, not through the antitrust laws.

*Third*, Plaintiffs have not alleged that PBGs were coerced into entering into multi-vaccine contracts, or that there are no competitive alternatives for Sanofi's vaccines.  *LePage's*, 324 F.3d at 156 (explaining importance of the "indispensability" standard established by *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978)).   The complaint clearly acknowledges that Sanofi's competitors – including Novartis, GlaxoSmithKline, and Merck – sell an overlapping array of bundled and unbundled vaccines.  Cmplt. ¶ 101.  Plaintiffs do not allege that physicians must buy Sanofi vaccines or that it would be economically impractical for PBGs

3

to create an equally-acceptable Sanofi-free offering for their members.  This renders plaintiffs' bundling claims defective as a matter of law.  *Masimo Corp. v. Tyco Healthcare Group*, 2006 WL 1236666, at*12 (C.D. Cal. 2006), *aff'd*, 2009 WL 3451725 (9th Cir. 2009) ("According to *LePage's* and *SmithKline*, it is ***only*** when products that ***do not face competition*** are included in a bundle that the bundle can conceivably be anticompetitive."); P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 749d4, p. 332 n.94 (rev.ed. 1995) (plaintiff bears burden of showing that compiling a competing bundle from other suppliers' offerings is "impractical.").

*Fourth*, Plaintiffs' claims are defective because they failed to allege that Sanofi's conduct forestalled entry into the relevant market, drove rivals from the market, or raised competitors' marginal or variable costs.  To the contrary, plaintiffs expressly acknowledge that Novartis entered the market immediately upon obtaining FDA approval, and promptly increased its market share from zero percent to almost 20% ***in just two years***.  This is far from the type of competitive foreclosure necessary to support an antitrust claim.  *LePage's*, 324 F.3d at 159 ("the foreclosure of 'one significant competitor' from the market may lead to higher prices and reduced output."); *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (unless exclusionary conduct "reduces rivals' elasticity of ***supply*** … there is not even the beginning of an antitrust case.") (Easterbrook, J.); *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (Easterbrook, J) (the antitrust laws only condemn "reductions in output that drive up prices as consumers bid for the remaining supply.").

As such, plaintiffs' claims must be dismissed.

## II.   RELEVANT FACTS

At the outset, it is important to clarify exactly what Sanofi's PBG agreements do and do not require.  They do ***not*** require that any individual PBG member purchase any specified percentage of their vaccine requirements from Sanofi.  And they do ***not*** impose higher prices on

4

members that purchase vaccines from Sanofi's competitors.  Put simply, there is no bundling that occurs at the individual physician or member level.[2]

So what do the Sanofi PBG agreements do?  They allow members of a PBG to purchase Sanofi vaccines at prices the PBG has negotiated.  The right to purchase under the Sanofi PBG agreement, however, is contingent on the PBG's permission.  If permission is granted, then those participating members can purchase whatever vaccines they want from whichever supplier they choose, and the prices they pay to Sanofi will **not change** regardless of whether they purchase all or none of their vaccine requirements from Sanofi.

So if this is a bundling case, where is the bundling?  To the extent there is any "bundling," it allegedly occurs at the PBG level.  PBGs negotiate with Sanofi on the basis of their members' "aggregate" purchases.  Cmplt. ¶ 104.  Although PBGs are not contractually obligated to limit members' purchases of competitive vaccines (*i.e.*, there is no "breach" if they do), PBGs earn an administrative fee only if their members' collective purchases from Sanofi meets or exceeds 80% of their purchases of meningitis vaccines and 90% of other vaccines.  *See* Exhibit A ¶¶ 4.1, 4.1.1.[3]  Because these administrative fees are "based on PBG members' *aggregate* expenditures," a single physician who purchases competitive products does not necessarily put the PBG's administrative fees at risk.  Cmplt. ¶ 104.[4]

---

[2] Attached as Exhibit A to the Certification of John P. Barry is a copy of Sanofi's agreement with Physician's Alliance of America, which is a PBG referenced in paragraphs 110 and 114 of the complaint.  Such agreements may be considered on a motion to dismiss because they are "integral" to and "explicitly relied" upon in the complaint.  *W. Penn Allegheny Health Sys. Inc. v. UPMC*, 627 F.3d 85, 97 n.6, 102 n.11 (3d Cir. 2010) (considering GPO contracts on a motion to dismiss).

[3] The Complaint alternatively alleges that the administrative fee thresholds for the meningitis vaccines are set at 90%.  Cmplt. ¶ 115.  The contracts, of course, speak for themselves.  And they make clear that the meningitis vaccine threshold is set at 80%.

[4] Plaintiffs allege that "[i]f any member of a physician practice fails to comply with the exclusivity requirements, then the entire practice pays penalty prices on all Sanofi vaccines in the

Nevertheless, in order to earn this administrative fee, PBGs carefully manage the roster of physicians they permit to participate in each of their supplier agreements.  Obviously, once a physician becomes a participating member, it is entitled to purchase vaccines at the prices the PBG negotiated.  If the PBG chooses not to add a physician to this roster, the physician must negotiate independently with Sanofi, seek the PBG's permission to join a different supplier agreement, or join another PBG.

In this case, the plaintiffs do not allege that they were denied permission to participate in a Sanofi PBG contract.  Nor do they allege that they purchased a competing product, and were subjected to higher prices.  Instead, the plaintiffs allege that Sanofi's PBG agreements may have theoretically "impeded" some (unidentified) members from purchasing competitive vaccines because of the potential fear that a PBG *might* delist them as a participating member if they did so, and that "[o]nce removed from the PBG contract," they would no longer be able to access the PBG's negotiated prices.  *Id.* ¶¶ 109, 133.

Thus, this case does not turn on Sanofi's alleged dealings with physicians.  Rather, the case turns on PBGs' dealings with their own members, the PBGs' decision to list or delist a member as a participant in Sanofi's PBG contracts, and Sanofi's role in the process.  As an initial matter, this requires an understanding of the relationship between PBGs and their members.

---

bundle."  *See* Cmplt. ¶ 106.  But this allegation is belied by the express terms of the Sanofi PBG Agreement, which speaks for itself.  That agreement does not impose any requirements on individual members.  And members suffer no adverse consequences – regardless of how many competitive vaccines they purchase – unless the PBG terminates them as a participating member. PBGs, however, have no incentive to terminate a member unless that member drove the PBG's *collective* volume below the 80% threshold.  Thus, the supposition that the "entire practice pays a penalty" if a single physician buys a competitive vaccine is mere speculation or hyperbole. And even if the practice is terminated, any adverse effect stems not from Sanofi's imposition of "penalty prices," but the practice's inability to participate in the PBG.

PBGs are sophisticated "for-profit" entities.  *Id*. ¶ 104.  But they "do not actually buy anything."  *Id*.  Rather, their primary purpose is to devise means for driving down prices.  They do this by "coordinating and aggregating [their] member purchases," which allows them to negotiate with vaccine suppliers on the basis of their members' collective purchasing power.  *Id*.

To maximize their negotiating power, therefore, PBGs must obtain assurances or commitments from their members that they will purchase predominately through approved suppliers.  These assurances allow the PBGs to negotiate by diverting (or threatening to divert) sales to suppliers that give the biggest discounts.  Accordingly, the PBGs require that members execute Membership Agreements that "typically require that participating [members] agree to contractual terms" consistent with the supplier agreements the PBG has negotiated.  *Id.*

By executing a Membership Agreement, the member expressly appoints the PBG as its agent and – from that point on – the member effectively becomes a passive participant in the price negotiation process.  Individual members are not involved in the negotiations between PBGs and suppliers; they do not have a seat at the table; and they do not dictate the terms of the agreements executed by the PBG.  Nor do the PBGs negotiate individual contracts for each member.  Rather, acting as independent contractors, each PBG takes a holistic view of the market, using its power to negotiate supplier agreements that it then offers to its members on a "take-it-or-leave it" basis.

While members are mere passive participants in the negotiating process, they do have many choices.  A physician, for example, must first decide which vaccines it needs and which suppliers it prefers.  As the complaint alleges, for each vaccine on the U.S. Centers for Disease Control's pediatric vaccine schedule that Sanofi sells, there is at least one alternative supplier, and sometimes two.  *Id.* ¶ 101.  As such, while many physicians prefer Sanofi's products –

giving it a slight majority share in a number of vaccine categories – there is no allegation that Sanofi's vaccines are "indispensable" to physicians or their PBGs.[5]

After deciding which vaccines to purchase, the physician then decides whether to negotiate independently with vaccine suppliers or join a PBG.   If the physician decides effectively to outsource the negotiation function to a PBG, it must then decide which PBG to join, a decision which is based on many factors, including the requirements each PBG imposes on its members and types of discounts the PBG offers.   Notably, there is no alleged dearth of PBG alternatives, including PBGs that offer contracts with Sanofi's competitors.

Having chosen a PBG, the member then asks the PBG for permission to participate in one or more PBG supplier agreements.   If the PBG grants this permission, the member is added to the roster of members participating in the supplier agreement, and may then place orders with the vaccine supplier at the prices specified under that agreement.

Individual members, however, remain free to purchase competing products.   As noted, participating members do not make any commitments to Sanofi, and PBGs' administrative fees are not necessarily put at risk just because a handful of physicians have a preference for a competing suppliers' products.   Thus, if there are physicians with a preference for a competitor's product, Sanofi's PBG Agreements will not stand in the way.   In that regard, there is no

---

[5] The complaint conclusorily alleges that there "are no reasonably adequate medical substitutes" for Sanofi's Hib vaccines.  *Id*. ¶ 109.  But the complaint specifically alleges that Merck and GSK sell competing Hib vaccines.  *Id*. ¶ 101.  While plaintiffs assert that Merck had a recall of Hib vaccines in 2007, the relevant period for the case is February 2010, when Novartis' meningitis vaccine entered the market.   *Id*. ¶ 141.   There is no allegation Merck's Hib vaccine was unavailable during this period.   Nor is there any allegation that physicians purchased Sanofi's meningitis vaccines because they feared the loss of discounts on Sanofi's Hib vaccine.

allegation that any specific PBG member – let alone all PBG members – have been prevented from purchasing vaccines from their preferred supplier.[6]

Most importantly, for purposes of this motion, there is no allegation that the **_named plaintiffs_** in this case – Sugartown or Castro – were forced to purchase unwanted doses of Sanofi's meningitis vaccine, Menactra, or were prevented from purchasing desired doses of Novartis' vaccine, Menveo. The absence of any such allegation is particularly telling because this is information that is clearly within their individual possession, custody, and control, and – if true – could have been easily alleged.

In fact, far from alleging coercion, the complaint highlights numerous reasons why physicians may prefer purchasing their meningitis vaccines from Sanofi rather than Novartis. Menactra has proven itself to be a tried and true, safe and effective vaccine over the course of many years. As the complaint alleged, it entered the market a full **_five years_** before Novartis' Menveo. *Id.* ¶¶ 126-127. After many years of positive experience, it is not surprising that physicians would not have any desire to *switch* suppliers, incurring the burden of switching and retraining medical personnel. This is especially true since Menveo provides **_no_** additional *FDA-approved* benefits and **_no_** alleged economic benefits. Novartis also does not sell multiple pediatric vaccines. Thus, it is hardly surprising that physicians would prefer to order multiple complementary vaccines from a single supplier than to add a new supplier for just one product.

---

[6] At best, the complaint alleges that "physician practice and hospital purchasers were impeded from purchasing Novartis' Menveo vaccine" as a result of Sanofi's PBG Agreements. Cmplt. ¶ 133. But this allegation is a mere conclusion or inference based on hypothetical consequences that *might* flow *if* a PBG terminates a member for purchasing Menveo. There is no non-conclusory allegation that any physician who wanted to buy Menveo was actually prevented from doing so. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (in deciding a motion to dismiss, the court should "identify" and exclude from consideration "allegations that, because they are no more than conclusions, are not entitled to the assumption of truth.").

While there, thus, may be reasons for a physician to choose Sanofi over Novartis (or vice versa), the relevant issue here is whether there has been market foreclosure.   This, plaintiffs have not alleged.   The complaint only alleges that Novartis has lost sales, and that Sanofi has gained sales because of Sanofi's discounting practices.   *Id.* ¶ 134.   But the complaint also alleges that Novartis is a viable, thriving, and growing competitor.   As the complaint alleges, Novartis has substantially ***grown*** its market share since it entered the market in February 2010, increasing share from zero to almost 20% in as little as two years.  *Id.* ¶ 52.[7]   The complaint also alleges that GlaxoSmithKline is currently seeking FDA licensing approval; and therefore, it too is in the process of entering the market.   Thus, there is no allegation that Sanofi's alleged "web of [PBG] contracts" has delayed or deterred entry.  *See id.* ¶ 3.

## III.   THE NAMED PLAINTIFFS LACK ANTITRUST INJURY BECAUSE THEY FAILED TO ALLEGE COERCION.

Sugartown and Castro allege that they purchased meningitis vaccines from Sanofi.   But they do not allege that they were "force[d] into the purchase of a … product that [they] either did not want at all, or might have preferred to purchase elsewhere on different terms."   *Jefferson Parish,* 466 U.S. at 12.   The absence of such an allegation fatally undermines their ability to demonstrate antitrust injury.  *Marchese v. Cablevision Systems Corp.*, 2011 WL 149917 (D.N.J. 2011) (Linares, J.) (granting motion to dismiss because plaintiffs failed to allege coercion).[8]

---

[7] The Complaint's allegations are internally inconsistent with respect to Sanofi's market share. In paragraph 52, the Amended Complaint alleges that Sanofi's share remains "above 80% today," which was a change from the original *Castro* complaint, which alleged that Sanofi's market share was "above 93% … today."   *See* Castro Cmplt. ¶ 51.   While the Amended Complaint corrected this flaw in paragraph 52, plaintiffs failed to make the corresponding corrections to paragraph 2.  This was apparently an oversight, and does not change the fact that the 93% figure was stated without any substantiation (and indeed significantly overstates Sanofi's share and understates Novartis' success).

[8] Bundling claims are a complex hybrid of both predatory pricing claims and tying claims.  P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 749d2, p. 325 (rev.ed. 1995) ("Package

A defendant in a bundling case stands accused of '"cutting prices in order to increase business'" because a "bundled discount, however else it might be viewed, is a price discount on a collection of goods." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 n. 17 (1986); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008) (en banc). In such cases, courts recognize that '"mistaken inferences ... are especially costly'" and risk '"chill[ing] the very conduct the antitrust laws are designed to protect.'" *Cargill*, 479 U.S. at 122 n. 17.

To guard against the chilling of competition, courts require each plaintiff to allege an injury that qualifies as '"antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" A*tlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010); *Marchese*, 2011 WL 149917, at *2.

In the context of bundling, the coercion element is essential to "ensur[e] that a plaintiff can recover only if [its] loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield*, 495 U.S. at 344 (1990). Coercion is fundamental because it distinguishes between competition-enhancing and competition-diminishing conduct.

Put simply, if a customer wants its suppliers to compete on a bundled basis, the Sherman Act will not stand in its way. As the Third Circuit explained, "[t]he Sherman Act is not designed to preclude" "package sales" that "may be used by a seller as a means of competing, and may be ***desired by buyers***." *Brokerage Concepts,* 140 F.3d at 511 n.6. Thus, a plaintiff's claim "***falls apart***" where the "purchaser buying the second product from the defendant does so *voluntarily*,

---

discounts bear some characteristics of both predatory pricing and tying. Indeed, they are best analyzed by a model that draws a little from each area."); *LePage's Inc.*, 324 F.3d at 155 (bundling cases are "best compared with tying, whose foreclosure effects are similar"). In this brief, we draw from both lines of authority, noting where applicable any distinguishing features between those types of claims and the bundling claim at issue here.

or at least for reasons other than an ***unrequited desire***" for the other products in the package. *Town Sound & Custom Tops,*, 959 F.2d at 486; P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 749d3, p. 326 (rev.ed. 1995) ("an essential element of unlawful package discounting is that the purchaser be 'forced' to take the bundle.").

This is not just an issue of liability; it goes directly to plaintiffs' standing.  This is because the antitrust laws are ***not*** vindicated by allowing a purchaser who ***benefits*** from a discount to later challenge the contract it *voluntarily* negotiated free of any economic coercion.  Thus, it is well-settled that the ***only*** buyer who can adequately plead antitrust injury are "'purchasers who are ***forced to buy*** the tied product to obtain the tying product.'"  *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1266 n.10 (10th Cir. 2006); *see also Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp.*, 905 F.2d 769, 772 n.5 (4th Cir. 1990) (only "***coerced buyers*** and [competitors] have standing.").[9]

Because physicians choose suppliers for a multitude of reasons, plaintiffs cannot gloss over this critical element by pointing to generalized public (or private) statements by PBGs concerning the mechanics of their Membership Agreements or vendor agreements.  *Cf.* Cmplt. ¶¶ 110-113.  Nor can the named plaintiffs rely on the vague allegations that some *unnamed* physicians were – theoretically – "impeded from purchasing Novartis's Menveo vaccine" due to

---

[9] Plaintiffs' allegation that they paid inflated prices does not cure their failure to allege coercion. *First*, "paying inflated purchasing prices to vendors, without more" is not "antitrust injury." *Sheraton*, 369 F.3d at 738-39.  *Second*, such pricing allegations are conclusory and are not entitled to the presumption of truthfulness.  *See Milberg Factors*, 662 F.3d at 212.  *Third*, any impact on prices flowing from a *voluntary* purchase is too remote and too conjectural.  A plaintiff that *voluntary* buys a bundled product receives an immediate *benefit* from doing so.  Even if that purchase eventually contributes to a rival's decline, and a later price increase, such ripple effects do not confer standing.  *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy," but the "general tendency of the law … is not to go beyond the first step.").

Sanofi's discounts.  *Cf. id.* ¶133; *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 504 (S.D.N.Y. 1996) ("a plaintiff may not use the procedural device of a class action to bootstrap himself into standing he lacks under the express terms of the substantive law.").

        In order for the ***named plaintiffs*** to state a claim, they must allege that they – not others – were prevented from purchasing Menveo because of Sanofi's PBG discounts. Thus, no matter what the consequences might be if *other* physicians would have preferred to purchase Menveo, if Sugartown and Castro purchased Menactra because they wanted to purchase Menactra, and *not* because of a demonstrable fear of being terminated by their PBGs, no amount of hypothetical coercion can overcome the lack of actual "injury in fact." *See, e.g., Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1093 (S.D. Iowa 1998) (antitrust "injury alleged must be palpable and distinct, rather than abstract, conjectural, or hypothetical.").

        Here, neither Sugartown nor Castro allege that they were coerced into purchasing unwanted doses of Menactra.  They do not allege that they were members of a PBG or were participants in any Sanofi PBG Agreement.  They do not allege that they requested, but were denied, permission from their PBGs to purchase Menveo.  They do not allege that Sanofi or any PBG threatened them with penalties if they purchased Menveo.   Finally, they do not allege that they would have purchased Novartis' Menveo (rather than Sanofi's Menactra) in the absence of any alleged "penalties" that either Sanofi or their PBGs threatened to impose upon them.

        The absence of such allegations compels dismissal.  *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959224, at *6 (D.N.J. 2007) (Linares, J.) ("Though a court must take as true all the facts alleged, it may not 'assume that the [plaintiff] can prove [any] ***facts that it has not alleged***.'").

13

## IV.    PBG MEMBERS LACK ANTITRUST STANDING TO CHALLENGE THE DISCOUNT STRUCTURE THAT THEIR PBGS NEGOTIATED.

PBG members vest their PBGs with authority to negotiate prices with vaccine suppliers. If some members are unhappy with the resulting contracts, that may raise a corporate governance issue.  But it does not give rise to an antitrust claim.  Put simply, PBG members lack antitrust standing to challenge the supplier agreements their duly-authorized PBGs negotiated.

"Antitrust standing to sue is at the center of all antitrust law and policy.  It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).  "At the heart of the antitrust standing inquiry is whether the party bringing the claim is the proper party" to "enforce the antitrust laws".  *Acme Mkts.,* 890 F. Supp. at 1236; *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991).  Accordingly, "'only those parties who can most efficiently vindicate the *purposes* of the antitrust laws'" have the right to demand relief.  *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006).

There is no "talismanic test capable of" determining whether a plaintiff is a proper party. For example, a plaintiff's "status as a consumer" is not "dispositive."  *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998).   Rather, it is a "balancing test comprised of many constant and variable factors," chiefly including the following five *Associated General Contractors* factors:

> (1) The "causal connection between the antitrust violation and the harm to the plaintiff," (2) the nature of the injury, and whether it is "of the type for which the antitrust laws were intended to provide redress;" (3) the "directness of the injury," (4) the "existence of more direct victims of the alleged antitrust violations;" and (5) the "potential for duplicative recovery."

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993) (distilling *Associated Gen. Contractors*, 459 U.S. 519).

Thus, even where the plaintiff is a direct purchaser, courts "intensify [their] focus" to determine whether the "alleged injury is *really* of the type that the antitrust laws were intended to prevent." *City of Pittsburgh*, 147 F.3d at 266 (denying standing where purchaser's freedom to choose among competing suppliers was restrained by factors other than defendants' conduct).

Here, to the extent PBG members are injured, the injury flows from their voluntary decision to enter into Membership Agreements with their respective PBGs. This basic fact drives a wedge between defendant's alleged unlawful conduct and plaintiffs' alleged injury, which "cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise." *City of Pittsburgh*, 147 F.3d at 268. This is not a technical failing; it goes to the "heart" of whether a PBG member is a "proper party to bring a private antitrust action." *Acme Mkts.*, 890 F. Supp. at 1236.

That point was made clear in *Sheraton*. There, the plaintiff – a hotel owner – entered into a management agreement with Sheraton, the national franchisor, that required the plaintiff to purchase supplies from approved vendors. The plaintiff alleged that Sheraton's vendor agreements forced the plaintiff to pay "artificially inflated purchasing prices to vendors." The Third Circuit held that plaintiff lacked antitrust standing – and failed ***all*** five of the *Associated General Contractors* factors – because plaintiff's injury was caused not by the anticompetitive effects of the alleged antitrust violation, but rather by the alleged "***corruption of the principal-agent relationship***" between Sheraton and the hotel owner. *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 739 (3d Cir. 2004).

Here, the plaintiffs stand in the same shoes as the hotel owner in *Sheraton*.  Here, as there, a central organization is contractually vested with the authority to negotiate with suppliers, and consequently, entered into agreements with suppliers that set the prices at which the plaintiff buys supplies.  And here, as there, the requirement to purchase from approved suppliers (if any) emanates from the *agency* agreement.  Thus, here, as there, any injury flowing from the *vendor agreements* is derivative.  Accordingly, the *Sheraton* court's conclusion – that plaintiffs lack standing to challenge the *vendor agreements* – applies here.

More doctrinally, there are at least four reasons why PBG members should be denied standing to challenge the discounts their duly-authorized PBGs negotiated:  (i) PBG members' injuries flow from intervening contractual commitments contained in their Membership Agreements, and only derivatively (if at all) from the challenged supplier agreements' alleged anticompetitive effects; (ii) the challenged supplier agreements do not actually restrain members' "economic freedom;" (iii) permitting suit would frustrate, rather than promote, the goals of the antitrust laws; and (iv) there are other plaintiffs better suited to enforce the antitrust laws.

### A. *Plaintiffs' Injuries Are Derivative Contractual Injuries, Not Direct Antitrust Injuries.*

Plaintiffs do not complain about either their own agreements with Sanofi or their Membership Agreements.  Rather, they complain about the "antecedent transaction" between Sanofi and the PBG, a transaction to which they are not a party.  This renders plaintiffs' claims derivative.  *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (denying standing where plaintiffs' injury arises "only by virtue of an antecedent transaction between the [alleged] monopolist and another, independent purchaser.").

But it is not just that plaintiffs' injuries are derivative.  The problem is that their alleged injuries flow – not from the elimination of competition – but from their PBG membership

16

obligations.  Injury due to such contractual commitments are not "antitrust injuries," even if some physicians prefer being able to access PBG pricing without committing their volume.  *See* P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 381 (rev.ed. 1995) ("The essential point ... is that protecting firms from provident or improvident deals is not the concern of the antitrust laws."); *Orion Pictures Distrib. Corp. v. Syufy Enters.*, 829 F.2d 946, 949 (9th Cir. 1987) (no antitrust injury where plaintiff's "duties … were fixed by its contractual commitment[s].").

Here, the plaintiffs' alleged harm flows from the members' commitments to purchase from approved suppliers, not from the alleged anticompetitive effects of any supplier agreement. This is not antitrust injury.  *Sheraton*, 369 F.3d at 740-41 (being contractually required to purchase supplies at "inflated prices" from approved vendors flows from antecedent agency agreement, and is not "antitrust injury").

Indeed, the plaintiffs here do not even complain about any restrictions *Sanofi* imposes on PBG members.  As noted above, the supplier agreements do not require that any individual physician purchase vaccines from Sanofi.  In fact, regardless of whether members buy zero percent, one percent, or a hundred percent of their meningitis vaccines from Sanofi, they still pay ***exactly the same price*** for all their other vaccines.  Thus, to the extent "PBGs typically require that participating practices agree to" purchase from approved vaccine suppliers, *see* Cmplt. ¶ 104, such requirements are ones that PBGs impose and enforce.

But the harm a member suffers from being delisted from a PBG supplier agreement is not antitrust injury.  In order to qualify as "antitrust injury," the injury must flow from and be closely correlated with the anticompetitive effects of the defendants' conduct. *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1376 (8th Cir. 1983) (plaintiffs lack standing where "[a]ny resultant effect on competition by reason of [defendant's conduct] would have occurred whether or not

17

plaintiffs were harmed."); *see also* ABA Section of Antitrust Law, *Antitrust Law Developments*, p. 848 (5th ed. 2002) ("Courts have rejected claim were the plaintiff's injury is deemed unrelated to the alleged antitrust violation," such as where the plaintiff would suffer injury even without there being "an adverse effect on competition in general.") (collecting cases).

Here, plaintiffs' harm from alternatively being compelled to purchase from approved suppliers or being delisted does not *depend* on the procompetitive or anticompetitive nature of the PBG's supplier agreements. Specifically, a member that is delisted allegedly suffers injury because it is unable to purchase at the PBG negotiated price; a member that remains listed allegedly suffers injury because it cannot purchase from non-approved suppliers. As the following chart illustrates, in both cases, the members' alleged injury does not depend on a finding that the supplier agreement is itself anticompetitive:

|  | Member Listed | Member Delisted |
|---|---|---|
| **Supplier Agreement Pro-competitive** | Member allegedly harmed to the extent it is unable to purchase from non-approved suppliers. | Member allegedly harmed because it is unable to purchase at PBG-negotiated prices. |
| **Supplier Agreement Anticompetitive** | Member allegedly harmed to the extent it is unable to purchase from non-approved suppliers. | Member allegedly harmed because it is unable to purchase at PBG-negotiated prices. |

As this chart demonstrates, "[p]laintiffs would have been injured despite any damage to the market, and, thus, [are] not injured by any resultant lack of competition." *R.W. Int'l. Inc. v. Borden InterAmerica, Inc.*, 673 F. Supp. 654, 657 (D.P R. 1987).

This stands in sharp contrast to where there is no agency agreement severing the connection between buyer and seller. In such cases, the buyer makes the relevant competitive decision of whether to negotiate on a bundled basis. Thus, the element of "coercion" creates a close correspondence between the alleged anticompetitive effect of the defendant's conduct and the plaintiffs' injury. If the plaintiff is coerced *by the seller* (assuming all other elements are

18

satisfied), there is both liability and injury.  But if the plaintiff desires to negotiate on a bundled

basis, there is neither.  *Brokerage Concepts*, 140 F.3d at 511 n.64.

Accordingly, where an agency agreement requires a member to purchase supplies from

an approved supplier pursuant to a suppler agreement negotiated by a duly-authorized agent, the

principal's injury is not "antitrust injury."

### B.     Plaintiffs' "Economic Freedom" Has Not Been Restrained.

The agency agreement also negates plaintiffs' ability to show that their "economic

freedom" has been restrained.  Because the "Sherman Act was enacted in order to protect 'the

economic freedom of participants in the relevant market,'" it is axiomatic that "antitrust injuries

include **only** those injuries that result from interference with [that] freedom." *Henke Enters., Inc.*

*v. Hy-Vee Food Stores, Inc.*, 749 F.2d 488, 489 (8th Cir. 1984); *Johnson v. Univ. Health Servs.,*

*Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998); *Acme Mkts.,* 890 F. Supp. at 1236 ("For purposes of

antitrust standing," courts focus on whether the defendants' conduct restrained "the economic

freedom of participants in the relevant market.").

The inquiry into whether a PBG member's economic freedom has been restrained *by*

*defendant's conduct* is fundamentally different depending on whether there is an agency

agreement wedged between that conduct and the plaintiff's alleged injury.  Absent an agency

agreement, unlawful conduct directly impairs the purchasers' economic freedom.  For example,

price-fixing deprives customers of the freedom to obtain competitive quotes.  Tying deprives

some customers of the freedom to buy the tied product from an alternative source.  And

predatory pricing deprives customers of the ability to purchase products from rivals that have

been driven from the market.

But where there is an agency agreement, everything is different.  The principal's

economic freedom is restrained – not by the vendor agreements negotiated by the agent – but by

19

the agency agreement the plaintiff voluntarily executed.  In such cases, the principal may not use the antitrust laws to get back what it had voluntarily given up.  *Johnson & Johnson*, 722 F.2d at 1374 (collecting cases) ("[c]ases are legion that preclude plaintiffs' standing to bring suit for antitrust violations when they have voluntarily withdrawn from the market.").

This is especially true where, as here, the PBGs' members have relegated themselves into a passive position with respect to the pricing negotiations that are subject to challenge.  In that regard, in determining whether an agency agreement deprives a principal of antitrust standing, the key question is whether the agent acts as "independent contractor" (as the PBGs do here) or a mere "servant" with respect to the area of the market restrained by defendant's conduct. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853-54 (3d Cir. 1996).

In *McCarthy*, the Third Circuit expressly drew this distinction.  After noting that "[a]n agent may be either an independent contractor or a servant (or employee in modern day parlance)," the court concluded that, for antitrust purposes, "the relevant inquiry here is not whether a principal-agent relationship exists between clients and their [agents], but whether [the agents] are independent contractors or mere employees." *Id.*[10]

The independent contactor/servant distinction goes to the heart of who is a proper plaintiff to enforce the antitrust laws.   This is because the antitrust laws protect the competitive process.  If the principal makes the relevant economic decisions, as occurs where the agent is a mere servant, the principal's economic freedom may be restrained, and allowing suit would protect the competitive process.  If the agent makes those decisions, as occurs where it is an

---

[10] *McCarthy* addressed whether the agent was a "direct purchaser" for purposes of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  But the independent contractor/servant distinction applies with equal or greater force under *Associated General Contractors*, since the latter "echo[s]," "incorporates," and expounds upon the *Illinois Brick* factors.  *McCarthy*, 80 F.3d at 850-51.

independent contractor, the principal's freedom has not been restrained and permitting suit would only interfere with the competitive process.

Here, as in *Sheraton*, PBGs are independent contractors.  They do not carry out the instructions of any individual member.  Rather each "has exclusive control of the manner of performing" the negotiations and is, therefore, "responsible only for the result."  *See* Restatement (2d) of Agency § 220 (1958); *McCarthy*, 80 F.3d at 853; *see also Race Tires*, 614 F.3d at 78 (courts should not "overlook the crucial and undisputed fact that" in a membership organization the "organization … ultimately decides whether or not to enter into [the challenged] contract."). Conversely, because members do not negotiate with vaccine suppliers – having conferred the authority to do so on the PBG – they are not meaningful "participants" in the relevant market for "purposes of antitrust standing." *Acme Mkts.*, 890 F. Supp. at 1236.[11]

### C.   Allowing Suit Would Frustrate Goals of the Antitrust Laws.

In any membership organization, the organization must be able to make decisions that impact their members, including whether to negotiate with suppliers on an exclusive or bundled basis.  Because such arrangements are presumptively procompetitive, the organization's decision to enter into these arrangements are entitled to deference.  *Race Tires*, 614 F.3d at 80-81 (denying standing to third party because membership organizations deserve a "degree of

---

[11] Of course, members do make choices, just none that are relevant to this suit.   Physicians, for example, decide whether to negotiate prices with vaccine suppliers or whether to cede that authority to the PBG.  Physicians taking the latter approach have "voluntarily withdrawn" from the pricing negotiations between competing buyers and sellers, rendering their injuries – if any – derivative. *Johnson & Johnson*, 722 F.2d at 1374.  In any event, nothing in the Sanofi PBG Agreements restrains plaintiffs' economic freedom to make such choices.

deference," and therefore may "freely" impose exclusive [supply] requirements on their members, so long as they do so "in good faith.").[12]

In *Race Tires*, the Third Circuit held that membership organizations "should be given leeway with respect to their adoption of [members' purchasing] requirements, as well as their related decision to enter [into] exclusive contracts with the respective suppliers." *Id.* at 80. "[E]xclusive dealing contracts are not disfavored by [the] antitrust laws," the court held, because competition "to be an exclusive supplier may constitute a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Id.* at 76.

Antitrust standing rules must, therefore, be tailored to the unique commercial realities by which membership organizations select suppliers. And, as the court noted, allowing third-parties to challenge the exclusive contracts a membership organization negotiates is not "very deferential." *Id.*

Here, allowing members to challenge PBG supplier agreements would interfere with the competitive process in two distinct ways. *First*, allowing members to challenge PBG supplier agreements would deter vaccine suppliers from entering into exclusive or bundled contracts, even where such agreements are procompetitive. As the Third Circuit has observed, allowing third parties to challenge an organization's awards would, in practical effect, impermissibly "preclude [organizations] from entering into an exclusive … contract with a supplier that already has a high share of the relevant geographic or product markets." *Id.* Here, granting standing to

---

[12] This "deference" is due even where the organization's members are direct purchasers. "We do not overlook the fact that it is the [members] that ultimately purchase" the equipment," the court explained; but nevertheless a "deferential approach" is "appropriate" because members are "more than able to ... vote with their trailers." *Race Tires*, 614 F.3d at 79 n.2, 80-81 (noting that competition among organizations ensures that they "do not have unfettered discretion in adopting rules, entering [into] exclusive arrangements, or imposing higher [supply] costs on" members). Here, members have the freedom to join, or refrain from joining, any PBG of their choice.

any member who claims to be unhappy with the resulting PBG supplier agreement would allow that member to threaten vaccine suppliers with immeasurable treble damages.   Even the most procompetitive bundled or exclusive supplier contract could not survive such an onslaught.

*Second*, preventing PBGs from negotiating on the basis of their members' committed volume would fundamentally undermine the economic model on which PBGs are based.   As plaintiffs acknowledge, PBGs obtain discounts by "coordinating and aggregating" their members' purchases.  Cmplt. ¶ 104.   In so doing, PBGs must overcome a classic prisoners' dilemma:  each member has an incentive to opportunistically reap the benefits of the prices the PBG negotiates without committing their volumes even though, collectively, they may all do better by "sticking together" and negotiating as a group.  If the antitrust laws could be used by a single member to demand access to the pricing PBGs negotiate, without having to commit its volume, then PBGs would be unable to negotiate "exclusive" contracts.  The most "powerful" tool the PBGs posses would, thus, be rendered impotent.[13]

Consequently, allowing members to sue would frustrate, rather than further, the purposes of the antitrust laws.

### D.   There Are More Direct Plaintiffs Who Are Better Parties to Enforce the Antitrust Laws.

Plaintiffs lack standing because there are other potential plaintiffs better suited to enforcing the antitrust laws.  As the Supreme Court has noted, "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public

---

[13] Indeed, the impact of plaintiffs' suit is to – effectively – obtain a contractual veto right over the types of supplier agreements a PBG can negotiate.   But the antitrust laws do not grant standing to parties who are "simply seeking to substitute [their] proposed method [of selecting suppliers] for that selected by" the entity charged with responsibility for making that decision "without demonstrating that the substitution would advance the competitive process."  *See Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995).

interest in antitrust enforcement diminishes the justification for allowing a more remote party …
[to serve as] private attorney general." *Associated General Contractors*, 459 U.S. at 542.  Here,
there are two such groups:  supposedly foreclosed competitors and supposedly coerced PBGs.

Foreclosed competitors are more appropriate plaintiffs because they suffer the more
immediate effects of unlawful bundling.   Indeed, as the Third Circuit explained, "[t]he principal
anticompetitive effect of bundled rebates … is that … they may foreclose … a potential
competitor." *LePage's*, 324 F.3d at 155.  Thus, if the plaintiffs' claim has any merit, there would
be a foreclosed competitor with the self-interest and motivation to sue.  As in *Sheraton*, this
alone is enough to deny PBG members standing to challenge the terms of their PBG supplier
agreements.  *Sheraton*, 369 F.3d at 741-42 (even if plaintiff satisfies all the other *Associated
General Contractors* factors, it surely lacks standing "because there are clearly 'more direct
victims'," namely "[v]endors who may have been prevented from selling goods" to the plaintiff
because they were foreclosed by defendants' conduct).

PBGs would also have standing to challenge the conduct here, if in fact they truly are
being economically coerced.  Even if, unlike foreclosed competitors, the PBG could not bring a
treble damages claim under *Illinois Brick*, the PBG certainly could sue for injunctive relief.  A
PBG, of course, is in a much better position than an individual member to enforce the antitrust
laws, since only it knows when it was forced to accept a bundle it did not want and when it used
a bundle as a negotiation tactic to best exploit the purchasing power of its members.

Accordingly, PBG members lack antitrust standing to challenge the discounts that their
duly-authorized PBGs negotiated.

24

## V.    PLAINTIFFS FAILED TO ALLEGE THAT PBGS WERE COERCED OR THAT SANOFI'S VACCINES ARE "INDISPENSABLE."

Even if plaintiffs had standing, their substantive claims fail because they have not, and cannot, allege that PBGs (or their members) were coerced into entering multi-vaccine agreements with Sanofi.   As we noted above, coercion is a fundamental element of a bundling claim.   The purpose of this section, however, is not to repeat what we said above.   Earlier, we focused on the **named plaintiffs**' failure to allege that they were actually prevented from purchasing Novartis' Menveo vaccine.

In this section, we focus on plaintiffs' failure to allege plausibly that PBGs have been coerced into entering multi-vaccine supplier agreements.   As the Third Circuit explained, "coercion is a fundamental consideration" even where an organization "adopt[s] … rules" that require their members to purchase from approved suppliers, and then "enter[s] into exclusive contracts with … suppliers." *Race Tires*, 614 F.3d at 78.[14]

Here, the plaintiffs allege that PBGs entered into multi-vaccine supplier agreements in which the administrative fees they received were contingent on participating members purchasing their vaccines primarily from Sanofi.   There is no allegation, however, that the PBGs were coerced into entering into these agreements.   For example, there is not even an allegation that the PBGs sought to negotiate a multitude of separate single-vaccine contracts with Sanofi,

---

[14] It matters not that PBGs are compensated for their services by suppliers in the form of administrative fees, rather than by PBG's members in the form of membership fees.   It is "no more an act of coercion," the Third Circuit explained, "for [suppliers] or any one else to offer more money to [an organization] than it is for such suppliers to offer the lowest … prices" directly to the members who purchase the supplies. *Race Tires*, 614 F.3d at 79.   Notably, in *Race Tires*, even though more than a *thousand members* objected to both the organization's decision to award an exclusive contract to a supplier and the associated payments the organization received from that supplier, the court nevertheless held that there was no basis for inferring that the supplier "coerced or otherwise unduly interfered with the [organization's] decision-making process." *Id*. at 78, 79 n.2.

but were denied the opportunity to do so.  Nor is there any allegation that PBGs lack the power to insist on a non-bundled contract if they so desire.

Moreover, any such allegation would be inherently implausible.  *See Milberg Factors*, 662 F.3d at 221 (dismissing claims where factual allegations do not "'plausibly give rise to an entitlement for relief.'").  As the complaint alleges, there is at least one other vaccine supplier for each and every vaccine listed on the CDC's pediatric vaccine schedule that Sanofi produces. Cmplt. ¶ 101.  Thus, PBGs can certainly design offerings for their members that do not include Sanofi's vaccines.  *See* Thomas A. Lambert, *Evaluating Bundled Discounts*, 89 Minn. L. Rev. 1688 (2005) (burden of proof is on plaintiff to show that it is "impractical" to purchase the individual components of the package from one or more other suppliers); P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. II, ¶ 749d4, p. 332 n.94 (rev.ed. 1995) (placing the burden of alleging impracticality on the plaintiffs is "sensible").

Of course, designing a Sanofi-free PBG offering might be impractical *if* Sanofi's vaccines were indispensable to the PBGs members.  But there is no allegation that Sanofi possesses such an exalted position in the market.  To the contrary, the complaint affirmatively alleges that many – even if not a majority – of "physician practice and hospital purchasers use GlaxoSmithKline as their *primary* vaccine supplier."  Cmplt. ¶ 102.  Indeed, far from alleging that Sanofi's vaccines are essential, the complaint admits that, in each of the relevant vaccine categories (other than Menactra), Sanofi only has between 59-71% market share.  *See id.* ¶¶ 62, 72, 82, 92.  This means that, in each category, approximately *thirty* to *forty* percent of physicians chose *not* to purchase from Sanofi, but rather from its competitors.[15]

---

[15] Plaintiffs allege that "there are no reasonably adequate medical substitutes" for Sanofi's Hib vaccines.  Cmplt. ¶ 109.  As noted above, this conclusory allegation is belied by the complaint's other allegations showing that Sanofi faces two Hib competitors:  GSK and Merck.  Thus, the

The failure to allege that Sanofi's vaccines are indispensable to either the PBG or their members negates plaintiff's ability to satisfy the critical element of coercion. This is because it is the "indispensable" nature of a product – not the defendants' market share – that determines the defendant's power to force customers to purchase products "[they] either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12. Where there are competitive alternatives for a product, customers cannot be coerced. *Town Sound*, 959 F.2d at 487 ("[b]y definition, in no free market can buyers be forced to pay more for a package than they think that the package is worth at the time of purchase.").

The importance of alleging the absence of competitive alternatives is aptly demonstrated in both *LePage's* and its predecessor, *SmithKline*, the two cases on which plaintiffs seek to model their claims. Both cases are factually and legally inapposite to this case precisely because the defendants' products in those cases were indispensable. In *SmithKline*, the defendant "enjoyed a ***complete and legal monopoly*** by virtue of its patents" over two products, which it bundled with a third product on which it faced generic competition. *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1059, 1065 (3d Cir. 1978); *LePages*, 324 F.3d at 156 (noting that *SmithKline* rested on the fact that the products were "indispensable to hospitals.").

Indeed, in *LePage's*, the court found that the defendant's products – and in particular its Scotch-Tape brand of transparent tape – was "***indispensable*** to *any* retailer in the … tape market." *LePage's*, 324 F.3d at 156. Thus, "[a]ccording to *LePage's* and *SmithKline*, it is only when products that ***do not face competition*** are included in a bundle that the bundle can

---

suggestion of indispensability is no more than a "legal conclusion [] draped in the guise of factual allegations," and is not entitled to "benefit from the presumption of truthfulness." *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959224, at *5 (D.N.J. 2007) (Linares, J.). And even if the allegation were true, plaintiffs do not allege that any physician purchased Menactra in order to earn discounts on Hib vaccines.

conceivably be anticompetitive." *Masimo Corp. v. Tyco Healthcare Group*, 2006 WL 1236666, at *12, *aff'd*, 2009 WL 3451725 (9th Cir. 2009).

Here, because plaintiffs do not (and cannot) allege that Sanofi's vaccines are indispensable to PBGs (or their members), they cannot satisfy the coercion element of their bundling claims.  Thus, their claims must be dismissed.

## VI.   PLAINTIFFS FAILED TO ALLEGE MARKET FORECLOSURE.

Plaintiffs' claims must be dismissed for the independent reason that they failed to allege harm to competition.  A plaintiff challenging an exclusionary arrangement must allege that the conduct "reduces ***rivals' elasticity of supply*** [or] there is not even the beginning of an antitrust case." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (Easterbrook, J.).

As the Seventh Circuit explained, a plaintiff "must prove that [exclusionary conduct] is likely to keep at least one significant competitor of the defendant from doing business in a relevant market.  If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (Posner, J.); *LePage's*, 324 F.3d at 159 ("the foreclosure of 'one significant competitor' from the market may lead to higher prices and reduced output."); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (conduct "must be capable [of] … driving [rivals] from the market, or  . . . causing them to raise their prices to supracompetitive levels").[16]

---

[16] *See also Jame Fine Chems., Inc. v. Hi-Tech Pharm Co.*, 2007 WL 927976, at *5 (D.N.J. 2007) (no antitrust violation absent exclusion of significant competition from the market); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 2005 WL 1396940, at *10 (S.D. Ohio 2005) (granting summary judgment because plaintiffs failed to establish actual market foreclosure); *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 469 (S.D.N.Y. 1996) (granting summary judgment on all Section 2 claims, including the plaintiffs' exclusive dealing and bundling claims, precisely because there was no evidence that the "defendant's pricing makes it unprofitable for the plaintiff to continue to produce").

In *LePage's*, for example, the defendant's conduct was "***designed to drive*** LePage's and any other viable competitor from the transparent tape market." *LePage's*, 324 F.3d at 154. The facts also bore out this intent. As the court noted, the defendant's rival "barely was surviving," its "earnings [had] plummeted to below zero" for a period of four years, its market share dropped 35%, and it was "forced to close one of its two plants." *Id.* at 161-62, 170. Thus, if the conduct had continued, the defendant would have been able to "*recoup* the profits it has forsaken [once] . . . there would be *no* competition by others." *Id.* at 151 n.7; *see Race Tires*, 614 F.3d at 77 (explaining that *LePage*'s was premised on a finding that the defendant acted with the "intent of ***forcing … competition from the market*** and ***then*** raising prices.").

Here, the plaintiffs do not contend that Sanofi's contracts with PBGs foreclosed any rival from the market. Plaintiffs, for example, do not allege that any competitor has abandoned plans to enter the market, or is making plans to exit the market. To the contrary, the plaintiffs admit that Novartis not only entered the meningitis vaccine market in 2010, well after Sanofi's alleged exclusionary practices began, but that Novartis ***successfully penetrated*** the market by increasing its market share from zero to almost 20% in just two years. Cmplt. ¶¶ 42, 130. The complaint also alleges that GlaxoSmithKline is currently seeking FDA licensing approval, and therefore, it too is in the process of entering the market. Cmplt. ¶ 44.

These allegations negate plaintiffs' ability to plausibly allege foreclosure. *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976-77 (9th Cir. 1999) (no harm to competition where a competitor "experienced significant growth" and a "significant increase in profits"); *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118, 132 (D.P.R. 2005) (rejecting bundling claim where competitor's claim that it would be "eliminated from the ... market" was "inherently implausible").

29

Plaintiffs' attempt to fill the void by alleging that Sanofi's conduct has allowed it "to increase its market share" is unavailing.  Cmplt. ¶ 135.  As the Supreme Court has explained, "competition for increased market share, is not activity forbidden by the antitrust laws." *Cargill, Inc. v. Montfort of Colo., Inc.*, 479 U.S. 104, 116 (1986).  Nor can the plaintiffs play semantics by claiming that Novartis was "foreclosed" from serving customers who contracted with Sanofi. As now-Justice Breyer has noted, "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market," but that is not what is meant by the term foreclosure.  *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983).

Thus, plaintiffs must allege more than that Novartis lost sales; they must allege the conduct reduces rivals' elasticity of supply."  *Sanderson*, 415 F.3d at 623.  This requires either an allegation – as in *LePage's* – that rivals have been driven from the market or that the conduct has raised rivals' *marginal* costs.  The plaintiffs, having alleged neither, have failed to state a claim.  *Viacom Int'l Inc. v. Tele-Communications, Inc.*, 1994 WL 561377, at *5 (S.D.N.Y. 1994) (the "theory of raising rival's costs does not apply to any increase in cost due to competition, but only to increased marginal costs."); *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (Easterbrook, J) (the antitrust laws only condemn "reductions in output that drive up prices as consumers bid for the remaining supply.").

## VII.   CONCLUSION

For the foregoing reasons, plaintiffs' claims should be dismissed.

Dated:  February 27, 2012                    Respectfully submitted,


                                             ____/s/ John P. Barry_____

Bradley I. Ruskin (admitted *pro hac vice*)        John P. Barry
Jennifer R. Scullion (admitted *pro hac vice*)     PROSKAUER ROSE LLP
Jessica L. Sonenshein (admitted *pro hac vice*)    One Newark Center
PROSKAUER ROSE LLP                                 Newark, New Jersey 17102
Eleven Times Square                                T: (973) 274-3200
New York, NY 10036                                 F: (973) 274-3299
T: (212) 969-3000                                  E: jbarry@proskauer.com
F: (212) 969-2900


Colin R. Kass (admitted *pro hac vice*)
Rhett R. Krulla (admitted *pro hac vice*)
John F. Nader (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
T: (202) 416-6800
F: (202) 416-6899


            *Attorneys for Defendant Sanofi Pasteur Inc.*

31