COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West One
250 Pehle Avenue – Suite 401
Saddle Brook, NJ  07663
Tel:  (201) 845-9600
Fax:  (201) 845-9423

*Liaison Counsel for Plaintiffs and the Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADRIANA M. CASTRO, M.D., P.A. and SUGARTOWN PEDIATRICS, LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SANOFI PASTEUR INC.,<br><br>Defendant. | Civil Action No. 11-cv-07178-JLL<br><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT SANOFI PASTEUR INC.'S MOTION TO DISMISS**<br><br>**MOTION DATE:  May 21, 2012**<br><br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY ............................................................................1

II.  FACTUAL BACKGROUND ...................................................................................5

    A.  The Relevant Pediatric Vaccine Markets ...................................................5

    B.  Sanofi Uses Anticompetitive Bundling Contracts With PBGs
        To Monopolize Pediatric Vaccine Markets ................................................6

III.  ARGUMENT ..........................................................................................................9

    A.  Sanofi Fails to Satisfy the Applicable Standards on a Motion to Dismiss .............9

    B.  Plaintiffs Sufficiently Allege a Violation of Section 2
        of the Sherman Act .......................................................................................9

        1.  Sanofi Engaged in Unlawful Exclusionary Bundling ...................................9

            a.  Coercion Is Not an Element of a Bundling Claim ........................11

            b.  Plaintiffs Need Not Be Coerced—or Even Have their
               Selection of Purchases Altered—by Sanofi's Bundling ...............16

    C.  Plaintiffs Sufficiently Allege a Section 1 Violation .................................18

    D.  Plaintiffs Suffered Cognizable Antitrust Injury in the Form of Overcharges........19

    E.  Plaintiffs Have Antitrust Standing as Direct Purchasers ......................................21

    F.  Plaintiffs Properly Allege That Sanofi Foreclosed a Substantial
        Portion of the Market ..............................................................................26

        1.  Sanofi Foreclosed All Rivals from a Substantial Part of the Markets .......26

        2.  The Movements of Sanofi's Market Share Do Not Preclude Liability .....29

IV.  CONCLUSION…………………………………………………………………..………30

**TABLE OF AUTHORITIES**

CASES                                                                                          PAGES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
    369 F.3d 732 (3d Cir. 2004)..................................................................................12, 20

*Abraham v. Intermountain Health Care Inc.*,
    461 F.3d 1249 (10th Cir. 2006) ..........................................................................12, 20

*Acme Mkts. v. Wharton Hardware & Supply Corp.*,
    890 F. Supp. 1230 (D.N.J. 1995) .......................................................................23, 24

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
    521 F.2d 1230 (3d Cir. 1975)....................................................................................29

*American Tobacco Co. v. U.S.*,
    328 U.S. 781 (1946).................................................................................................30

*Associated Gen. Contractors of California, Inc. v. California State Council of
    Carpenters*, 459 U.S. 519 (1983)............................................................................12

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990).............................................................................................12, 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................9

*Bradburn Parent/Teacher Store, Inc. v. 3M*,
    No. 02-CV-7676, 2003 U.S. Dist. LEXIS 13273 (E.D. Pa. July 25, 2003).................... *passim*

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007).......................................................................................9

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998)...............................................................................12, 25

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).................................................................................................30

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)......................................................................................12

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)...........................................................................................12, 20

**(cont.)**

*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ......................................................................... *passim*

*Chattanooga Foundry & Pipe Works v. City of Atlanta*,
  203 U.S. 390 (1906) ................................................................................................19

*Davies v. Genesis Med. Ctr.*,
  994 F. Supp. 1078 (S.D. Iowa 1998) ....................................................................12

*Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp.*,
  905 F.2d 769 (4th Cir. 1990) ...........................................................................12, 20

*Goldwasser v. Ameritech Corp.*,
  222 F.3d 390 (7th Cir. 2000) ................................................................................19

*Hanover Shoe v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968) ...............................................................................................19

*Henke Enters., Inc. v. Hy-Vee Food Stores, Inc.*,
  749 F.2d 488 (8th Cir. 1984) ...........................................................................23, 24

*Houser v. Fox Theatres Mgmt. Corp.*,
  845 F.2d 1225 (3d Cir. 1988) ...............................................................................30

*Howard Hess Dental Labs. v. Dentsply Int'l.*,
  424 F.3d 363 (3d Cir. 2005) .............................................................................. *passim*

*In re Hypodermic Prods. Antitrust Litig.*,
  No. 05-CV-1602, 2006 U.S. Dist. LEXIS 89353 (D.N.J. Sept. 7, 2006).........................21

*In re Hypodermic Prods. Antitrust Litig.*,
  No. 05-CV-5891, 2007 U.S. Dist. LEXIS 47437 (D.N.J. June 29, 2007) ...................... *passim*

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ..........................................................................................19, 21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)............................................................................................12, 20

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) (*en banc*) ........................................................... passim

*Luria Bros. & Co. v. F.T.C.*,
  389 F.2d 847 (3d Cir. 1968)...................................................................................29

*Marchese v. Cablevision Sys.*,
  No. 10-CV-2190, 2012 U.S. Dist. LEXIS 2799 (D.N.J. Jan. 9 2012) ...............................12, 20

**(cont.)**

*Masimo Corp. v. Tyco Health Care Group*,
  No. 02-CV-4770, 2006 U.S. Dist. LEXIS 29977 (C.D. Cal. Mar. 22, 2006).........................15

*McCarthy v. Recordex Serv., Inc.*,
  80 F.3d 842 (3d Cir. 1996)....................................................................................23

*Meijer, Inc. v. Abbott Labs.*,
  544 F. Supp. 2d 995 (N.D. Cal. 2008) .......................................................................2

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
  247 F.R.D. 253 (D. Mass. 2008)........................................................................18, 21

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
  262 F.R.D. 58 (D. Mass. 2008)....................................................................2, 17, 30

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
  No. 05-CV-12024, 2009 U.S. Dist. LEXIS 108858 (D. Mass. Nov. 20, 2009) ...............19, 28

*In re Neurontin Antitrust Litig.*,
  No. 02-CV-1390, 2009 U.S. Dist. LEXIS 77475 (D.N.J Aug. 27, 2009) ..............4, 16, 17, 20

*Ortho Diagnostic Sys., Inc. v. Abbott Laboratories, Inc.*,
  920 F. Supp. 455 (S.D.N.Y. 1996) ......................................................................28, 30

*Perma Life Mufflers v. International Parts Corp.*,
  392 U.S. 134 (1968)..........................................................................................23

*Race Tires Am, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010)................................................................................12, 24

*Roland Machinery Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ...........................................................................28, 29

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978)......................................................................... passim

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
  959 F.2d 468 (3d Cir. 1992)...............................................................................12, 25

*In re Tricor Direct Purchaser Antitrust Litig.*,
  432 F. Supp. 2d 408 (D. Del. 2006).........................................................16, 17, 26, 28

*U.S. v. Grinnell Corp.*,
  384 U.S. 563 (1966)...........................................................................................9

**(cont.)**

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)……………………………………………...............29

*Wallach v. Eaton Corp.*,
   2011 814 F. Supp. 2d 428 (D. Del. 2011) ......................................................20, 21

*Xerox Corp. v. Media Sciences Int'l, Inc.*,
   511 F. Supp. 2d 372 (S.D.N.Y. 2007) .......................................................28

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*,
   953 F. Supp. 617 (E.D. Pa. 1997) ...........................................................29

STATUTES & RULES

15 U.S.C. § 1……………………………………………………...........*passim*

15 U.S.C. § 2……………………………………………………..*passim*

Fed. R. Civ. P. 12(b)(6)……………………………………………………9

OTHER AUTHORITIES

Einer Elhauge, *The Exclusion of Competition for Hospital Sales Through Group
   Purchasing Organizations* (Report to U.S. Senate) (July 25, 2002) ...................................7, 25

Einer Elhauge*, Tying, Bundled Discounts, and the Death of the Single
   Monopoly Theory*, 123 HARV. L. REV. 397 (2009)......................................................5, 22, 29

Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW.............................................3, 10, 11, 29

Thomas A. Lambert, *Evaluating Bundled Discounts*, 89 MINN. L. REV. 1688 (2005)..................15

## I.      INTRODUCTION AND SUMMARY

This action challenges Sanofi Pasteur Inc.'s ("Sanofi" or "Defendant") anticompetitive bundling practices in five pediatric vaccine markets.  It has monopoly power in each.  Plaintiffs allege that Sanofi used a series of exclusionary bundling agreements to leverage Sanofi's monopoly power in all of these markets, and foreclose competition from rival vaccine producers. Under these bundling contracts, purchasers who want to buy any Sanofi vaccine must buy all or nearly all of their vaccines from Sanofi or face substantial price penalties on *all* of Sanofi's pediatric vaccines.  Plaintiffs allege that these bundling contracts had the collective effect of enabling Sanofi to handicap rival vaccine suppliers, enhance its monopoly power in each of its five vaccine markets, and artificially inflate prices for all of its pediatric vaccines.

Plaintiffs Adriana M. Castro, M.D., P.A. and Sugartown Pediatrics, LLC ("Plaintiffs") are physician practices that purchased pediatric vaccines directly from Sanofi.  Pediatric physician practices and other healthcare providers must buy a wide range of vaccines to serve their patients' needs, and Sanofi is by far the dominant seller of pediatric vaccines in the U.S. Indeed, for several years, Sanofi had a complete monopoly in two pediatric vaccine markets, and at all times had dominant shares of multiple pediatric vaccine markets.  Plaintiffs bring claims on behalf of themselves and a proposed class of direct purchasers alleging that Sanofi's bundling scheme violates Sections 1 and 2 of the Sherman Act, causing Plaintiffs and the proposed class to incur substantial overcharges on their pediatric vaccine purchases.

It is well-settled in this Circuit that a plaintiff states a bundling claim if it alleges that an entity: (a) has monopoly power in one or more markets, (b) includes goods in a bundle that a rival does not sell, and (c) imposes price penalties on all products in the bundle if a buyer purchases even small amounts of one product from a rival.  In essence, a bundle is exclusionary

1

where the bundler leverages monopoly power from its "leading sellers" in one or more markets to foreclose competition in another market. *See LePage's Inc. v. 3M*, 324 F.3d 141, 155-56 (3d Cir. 2003) (*en banc*); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1061-62 (3d Cir. 1978).

It is also well-established that *direct* purchasers (such as Plaintiffs and proposed class members) may seek recovery of overcharges paid as a result of the cumulative effects of exclusionary bundling on competition in the relevant markets. *See In re Hypodermic Prods. Antitrust Litig.*, No. 05-CV-5891, 2007 U.S. Dist. LEXIS 47437 (D.N.J. June 29, 2007) (Linares, J.) ("*Hypo.*") (upholding direct purchasers' overcharge claims flowing from exclusionary bundling); *Bradburn Parent/Teacher Store, Inc. v. 3M*, No. 02-CV-7676, 2003 U.S. Dist. LEXIS 13273 (E.D. Pa. July 25, 2003) (same); *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995 (N.D. Cal. 2008) ("*Norvir*") (same); *see also Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) ("*Natchitoches I*") (certifying class where direct purchasers' theory of injury was based on overcharges stemming from foreclosure due to illegal bundling).

This action involves paradigmatic anticompetitive bundling claims brought by the most directly affected parties:  the direct purchasers who paid overcharges stemming from Sanofi's abuse of monopoly power.  Nevertheless, Sanofi has moved to dismiss ("Mot.") Plaintiffs' First Consolidated Amended Class Action Complaint ("Compl.").  Yet, with the exception of one passing reference to *Hypo.*, Sanofi does not cite, much less distinguish, any direct purchaser bundling cases.  In refusing to follow precedent, Sanofi makes four fundamental errors.

*First*, Sanofi errs in asserting that Plaintiffs must allege a particularized form of "coercion" to state a claim based on exclusionary bundling.  Sanofi is vague about what it means by "coercion," but Sanofi appears to argue that Plaintiffs must either allege that Sanofi has

explicitly conditioned the purchase of one of its vaccines on the purchase of another (such as in a tying case) or, alternatively, that Plaintiffs must allege that the bundle contains at least one product for which there are no substitutes. *See* Mot. at 12, 25-26. But the law requires neither. The Third Circuit has held that while coercion—as Sanofi defines it—is necessary for some tying claims, it is *not* required for a bundling claim. *See, e.g.*, *SmithKline*, 575 F.2d at 1061-62 & n.3 (upholding bundling claim even where buyers "were free to purchase" rival's products and where bundler's scheme "lack[ed] the element of coercion"); *LePage's*, 324 F.3d at 146, 155 (bundling illegal even where defendant controls 90%—not 100%—of one market and low shares of others, and buyers are free to purchase from rival); *see also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 900 (9th Cir. 2008), quoting 3 Areeda & Hovenkamp, ANTITRUST LAW P 749b2 at 332 (Supp. 2006) (unlike tying, bundling "'gives the buyer the choice'" to decline the bundle and pay the penalty). This legal error pervades Sanofi's entire brief, undermining its arguments as to violation, injury, and standing.

Plaintiffs need not allege that the bundler conditioned the sale of one or more products in a bundle on the purchase of another (as in a tying case) or that a bundler had a 100% monopoly on at least one of the products in a bundle. Yet, even if having a complete monopoly were the standard, Plaintiffs' allegations would satisfy it. Plaintiffs allege Sanofi had 100% of the market for meningitis vaccine for five years and the market for complete-regimen doses of Hib vaccine for nearly three years. This meant that to buy meningococcal and Hib vaccines during these periods—as any health care provider would need to do—Sanofi was the only option.

*Second*, Sanofi erroneously asserts that direct purchasers must allege that they themselves were coerced. But direct purchasers need not be offered the bundle at all, let alone be coerced by it. Bundling is like other monopolization claims: Plaintiffs must show foreclosed competition

3

and enhanced monopoly power, leading to artificially inflated prices. Bundling is simply the means by which Sanofi has exploited its monopoly power and harmed competition. Plaintiffs allege they were overcharged—*i.e.*, paid more due to anticompetitive conduct—on purchases of Sanofi vaccines because Sanofi's conduct impaired competition. That has long been recognized as quintessential antitrust injury, including in bundling cases. *See, e.g.*, *Hypo.*, 2007 U.S. Dist. LEXIS 47437, at *25-29 (overcharges due to exclusionary bundling deemed cognizable antitrust injury where plaintiff wholesalers were not offered the bundle or "coerced" by it).[1] Sanofi neither distinguishes any of these direct purchaser bundling cases, nor cites a case that required a direct purchaser seeking overcharges due to exclusionary bundling to show that it was "coerced."

Sanofi makes the same mistake when it asserts that Plaintiffs lack antitrust standing. Sanofi argues that Plaintiffs—physicians who happen to have been offered Sanofi's bundle— have no standing if they "chose" to accept the bundle or if they would have purchased Sanofi's vaccines in any event. Mot. at 15. But regardless of whether the bundle "forced" Plaintiffs to buy vaccines from Sanofi, Sanofi's monopolization scheme caused them to pay artificially inflated prices. That is enough. Moreover, to the extent that Sanofi is arguing that a direct purchaser's standing to recover overcharges is extinguished merely because it accepted the terms of an exclusionary contract, that is incorrect as a matter of settled law.

*Third*, much of Sanofi's argument—as to violation, antitrust injury, and antitrust standing—is premised on the false notion that Sanofi's bundle offered pro-competitive discounts. That contradicts the Complaint, which makes clear that Sanofi's offer of "discounts" is really a

---

[1] *Bradburn*, 2003 U.S. Dist. LEXIS 13273, at *8-13 (overcharges due to exclusionary bundling that impaired competition deemed cognizable antitrust injury); *see also In re Neurontin Antitrust Litig.*, No. 02-CV-1390, 2009 U.S. Dist. LEXIS 77475, *55-59 (D.N.J Aug. 27, 2009) (overcharges paid by direct purchasers of a prescription drug resulting from a scheme to monopolize deemed cognizable antitrust injury).

way to impose *penalty* prices on buyers who fail to comply with its bundle.  (Compl. ¶¶ 4, 105-07, 116, 123, 128-129.)   In fact, Sanofi charged supracompetitive prices—through monopoly power maintained by its bundling scheme—to buyers who bought subject to the terms of the bundle and *even higher penalty prices* to those who did not.  (*Id.* at ¶¶ 7, 138, 157, 163.)  Thus, *all* purchasers paid higher prices to Sanofi than they would have in the absence of the illegal bundling.  As Prof. Einer Elhauge explains:

> The most important thing to get straight about bundled discounts is that they need not reflect true discounts at all. . . .  [A]ll a bundled "discount" means is that the defendant charges higher prices to buyers who won't comply with a bundling condition. . . .  If the unbundled price charged to noncompliant buyers exceeds the but-for level, then the program in fact imposes a price *penalty* on buyers who refuse the bundle.[2]

*Fourth*, Sanofi incorrectly claims that foreclosure requires elimination of a rival from the market.  It does not.  Under controlling Third Circuit law, if bundling impairs a rival and greatly reduces its market share—and thereby increases the market share and monopoly power of the bundler (as Plaintiffs allege)—that suffices for foreclosure and anticompetitive harm.

## II.   FACTUAL BACKGROUND

Plaintiffs purchased pediatric vaccines directly from Sanofi, the largest seller of pediatric vaccines in the U.S.  Sanofi sells pediatric vaccines to wholesalers for resale and (through its own wholly-owned wholesaler subsidiary) to healthcare providers.  (Compl. ¶¶ 8-9, 28, 141-42.)

### A.     The Relevant Pediatric Vaccine Markets

Since 1995, the U.S. Centers for Disease Control and Prevention ("CDC") has maintained a recommended vaccination schedule.  (*Id.* ¶¶ 25, 26.)  Pediatric healthcare service

---

[2] Einer Elhauge*, Tying, Bundled Discounts, and the Death of the Single Monopoly Theory*, 123 HARV. L. REV. 397, 450 (2009) (emphasis in original)*.  See also, e.g., Bradburn*, 2003 U.S. Dist. LEXIS 13273, at *12-13 (upholding injury claim where direct purchasers established that in the absence of the bundling "the prices that plaintiff paid . . . would have decreased to the point where they were less than the price Plaintiff actually paid . . . *even after any rebates or discounts*") (emphasis added).

providers must purchase the types of vaccines included on CDC's schedule.  (*Id.* ¶ 102.)
Vaccines for one disease cannot substitute for vaccines for another disease, and booster vaccines
cannot substitute for initial inoculations.  (*Id.* ¶¶ 51, 61, 71, 81, 91.)  Five pediatric vaccine
product markets are relevant to this lawsuit: vaccines for (1) meningococcal bacteria, (2)
diphtheria, tetanus, and pertussis ("DTaP"), (3) a booster dose for boosting immunity to
diphtheria, tetanus, and pertussis ("Tdap"), (4) poliovirus ("IPV"), and (5) haemophilus
influenzae type b ("Hib").  Sanofi has monopoly power in each of these markets, with shares of
80-100%, 66%, 71%, 59%, and 68%-100%, respectively.  (*Id.* ¶¶ 45-95.)  As a result of Sanofi's
bundling, it has maintained more than 90% of the meningococcal vaccine market, despite having
had a competitor for more than two years.  (*Id.* ¶¶ 2, 52, 130.)

> **B.**     **Sanofi Uses Anticompetitive Bundling Contracts With PBGs To Monopolize Pediatric Vaccine Markets.**

Beginning in 2005, Sanofi began to use bundling agreements with physician buying
groups ("PBGs") to foreclose competition from rival vaccine suppliers and to maintain and
enhance its monopoly power in multiple pediatric vaccine markets.  (*Id.* ¶¶ 3, 103-06.)  PBGs
coordinate and aggregate vaccine purchases on behalf of their health care provider members.  (*Id.*
¶ 104.)  The vast majority of pediatricians and other independent medical practices in the U.S.
are members of PBGs, and the majority of PBGs are exclusively aligned with Sanofi (and its
cooperative partner, Merck) for the purchase of pediatric vaccines.  (*Id.* ¶¶ 104, 115.)

PBGs typically derive their income from "administrative fees" paid by the supplier,
calculated as a percentage of the total dollar value of members' purchases of a supplier's
products.  (*Id.* ¶ 104.)  The more money members spend on Sanofi vaccines, the higher the
PBGs' fees.  Thus, PBGs benefit from helping Sanofi maintain and enhance its monopoly power
because PBGs share in those profits.  PBGs are like group purchasing organizations ("GPOs")

and "thus have ample incentive to collude with sellers to create seller market power in exchange for a share of seller's supracompetitive profits."[3]  Sanofi offered purported "discounts" on the entire line of Sanofi products through individual PBGs to PBG members.  However, these discounts were only "discounts" in relation to the penalty prices Sanofi charged to purchasers who failed to comply with its bundling requirements.  (*Id.* ¶¶ 4-5, 105-07, 109.)  Thus, the bigger the bundled "discount," the higher the penalty for refusing the bundle, and the more exclusionary the bundling scheme was.  Even after the supposed "discounts" the PBG members paid supracompetitive prices, just not as high as the supracompetitive prices paid by nonmembers. (*Id.* ¶¶ 135, 138, 140, 155, 163.)

Sanofi's discounts were essentially "all or nothing"—meaning that it would take away a physician's discounts on all products in its bundle if the physicians purchased from a rival. Sanofi and the PBGs threatened physicians with regular audits of vaccine purchasing records to ensure compliance.[4]  (*Id.* ¶¶ 109-12.)  As a result, rivals with fewer products lost purchases they otherwise would have had because they could not make up for the penalties customers would be forced to pay on all of Sanofi's vaccines merely for buying one from a rival.  (*Id.* ¶¶ 128-29, 134.)  This had the effect of greatly reducing the ability of rival producers to compete for market share.  (*Id.* ¶¶ 7, 128-135.)

An example of the resulting harm involves Novartis.  Before Novartis began selling Menveo in 2010, Sanofi had 100% of the market for meningococcal vaccines.  (*Id.* ¶ 130.)

---

[3] Einer Elhauge, *The Exclusion of Competition for Hospital Sales Through Group Purchasing Organizations*, 31 (July 25, 2002) (Report to U.S. Senate) (Pearlman Declaration Ex. 1).

[4] Sanofi asserts that some of the PBG contracts put the onus on the PBG to ensure its members, collectively, comply with Sanofi's bundle requirements.  Mot. at 6-7, 12, 17.  But it makes no practical difference whether Sanofi requires the PBGs to punish members for buying from Sanofi's rivals or whether the punishment comes directly from Sanofi.  Either way, the Sanofi-PBG scheme ensures strict enforcement of the terms of the contracts. (Compl. ¶¶ 108-116.)

Additionally, Sanofi had 100% of the market for the initial doses of the Hib vaccine because Merck (Sanofi's only competitor) was subject to a recall that lasted from December 2007 through August 2010.[5]  (*Id.* ¶ 92.)  When Novartis entered the meningococcal vaccine market in February 2010, Sanofi responded by further leveraging its dominant market position in multiple markets, including its complete monopoly for the required initial doses of Hib, by increasing the market share requirements in its PBG contracts.  (*Id.* ¶¶ 107, 130.)  The new PBG contracts mandated that PBG members purchase as much as 100% of their vaccines from Sanofi.  (*Id.*)

Novartis sold only a meningococcal vaccine, and no other vaccines in Sanofi's bundle. (*Id.* ¶ 128.)  Thus, even if Novartis sold Menveo below cost—or offered to give it away for free—it would have been uneconomical for physicians to take that deal because of price penalties on Sanofi's entire vaccine line, including the Hib vaccine.  (*Id.* ¶ 134.)  As a result, although Menveo is medically superior to Sanofi's Menactra (*id.* ¶ 42), it gained market share only slowly until it reached 20% of the market, and then after Sanofi ratcheted up its bundle requirements, Menveo's share fell back to less than 10%, after nearly two years on the market. (*Id.* ¶ 130.)  Remarkably, Sanofi both increased its market share and raised its prices in the face of new competition from a superior product.  (*Id.* ¶¶ 132, 135.)  Sanofi also used its monopoly power in the meningococcal vaccine market to enhance its monopoly power in the other vaccine markets and thereby charge supracompetitive prices to all direct purchasers.  (*Id.* ¶ 136.)

---

[5] Sanofi asserts that both GSK and Merck had competing Hib vaccines, Mot. at 8 n.5, but "Hib is administered as a three or four dose series" and GSK's Hib vaccine "is only licensed for the final dose of the three or four dose Hib series."  (Compl. ¶ 101.)  Thus, GSK is not a competitor for the initial doses of the Hib vaccine.  Additionally, Sanofi asserts that "[t]here is no allegation Merck's Hib vaccine was unavailable" at the time that Menveo was introduced into the market, Mot. at 8 n.5.  However, Menveo was introduced in February 2010 and Merck's Hib vaccine was off the market until August 2010 (Compl. ¶¶ 42, 92).

## III.  ARGUMENT

### A.    Sanofi Fails to Satisfy the Applicable Standards on a Motion to Dismiss.

To defeat Sanofi's Rule 12(b)(6) Motion, Plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  At this stage, the Court need not resolve factual disputes because "the question is not whether plaintiffs will prevail at trial, but whether they should be given an opportunity to offer evidence in support of their claims."  *Hypo.*, 2007 U.S. Dist. LEXIS 47437, at *17.

### B.    Plaintiffs Sufficiently Allege a Violation of Section 2 of the Sherman Act.

To satisfy Section 2, a plaintiff must allege willful maintenance of monopoly power. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  Under Third Circuit law, anticompetitive bundling is sufficiently pled where the plaintiff alleges (in addition to causation and injury) that the defendant:  (1) has monopoly power; (2) engaged in exclusionary bundling; and (3) foreclosed rivals.  *LePage's*, 324 F.3d at 155-56; *SmithKline*, 575 F.2d at 1061-62, 1065. Plaintiffs more than satisfy these elements.[6]

#### 1.    Sanofi Engaged in Unlawful Exclusionary Bundling.

One recognized form of willful misconduct under Section 2 is exclusionary bundling. This practice involves a seller with monopoly power in one or more markets, packaging products together by threatening to impose penalty prices on all of the products unless a buyer meets most

---

[6] Sanofi does not challenge Plaintiffs' allegations, and thus concedes monopoly power for purposes of its Motion.  Monopoly power may be proven through "direct" evidence of supracompetitive prices, which does not require proof definition of a relevant market, or through "indirect" evidence, by defining relevant markets and determining whether the defendant has sufficient market share.  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007).  Plaintiffs adequately allege monopoly power through both direct and indirect proof. (Compl. ¶¶ 45-97).

or all of its needs for these products from the bundler.  *See LePage's*, 324 F.3d at 154-55; *SmithKline*, 575 F.2d at 1061-62; *Hypo.*, 2007 WL 1959224 at *9-10.[7]  Because bundling can allow a seller to leverage its monopoly power in one market to foreclose competition from rivals in another, bundling can have deleterious economic effects.  The Third Circuit sitting *en banc* has held it unlawful for a seller with monopoly power to offer a bundle that forecloses competition by including products that a rival does not sell.  *LePage's*, 324 F.3d at 155 (unlawful to use bundling contracts to leverage monopoly power and to "foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer"); *SmithKline*, 575 F.2d at 1061-62 (bundle exclusionary where rival had to compete "three-on-one" with a bundler with monopoly power).[8]

Sanofi has engaged in just the sort of bundling the Third Circuit found to be anticompetitive.  Sanofi used bundling contracts to leverage its monopoly in multiple vaccine markets, including its 5-year complete monopoly in the meningococcal vaccine market and its nearly 3-year 100% monopoly regarding a complete Hib regimen, to cause vaccine purchasers to buy the vast majority (typically 90% or more) of their pediatric vaccines from Sanofi. The bundling agreements threatened stiff price penalties on the full line of Sanofi vaccines on

---

[7]  Contrary to Sanofi's claim, Mot. at 1, exclusionary bundling is distinct from volume discounting.  In bundling, a buyer avoids penalties by refraining from purchasing from the bundler's rivals, not by buying high volumes.  Under the bundle, a small volume buyer gets the same bundled prices as a large volume buyer so long as it exclusively buys from Sanofi. *See LePage's*, 324 F.3d at 154 ("Rather than competing by offering volume discounts which are concededly legal and often reflect cost savings, 3M's rebate programs offered discounts to certain customers conditioned on purchases spanning six of 3M's diverse product lines.").

[8]  *See also Cascade*, 515 F.3d at 899 (recognizing in the Third Circuit "all bundled discounts offered by a monopolist are anticompetitive with respect to its competitors who do not manufacture an equally diverse product line"); P. Areeda & H. Hovenkamp, ANTITRUST LAW, Vol. IIIA, p. 334 (rev. ed. 2006) (noting that under *LePage's* a defendant has engaged in "an exclusionary practice if it simply offered a bundled discount that its competitor could not match").

purchasers who bought even small amounts of vaccines from Sanofi's competitors.  None of Sanofi's competitors offers the full line of vaccines in Sanofi's bundle, and thus Sanofi's bundling enabled it to foreclose competition and raise prices to supracompetitive levels. This is quintessential illegal bundling.[9]

### a.  Coercion Is Not an Element of a Bundling Claim.

Sanofi argues that Plaintiffs fail to state a claim because they do not allege "coercion." Sanofi appears to define "coercion" in two different ways: (1) a bundler conditioning its sale of one product on the purchase of another (as in a tying case), Mot. at 12, and (2) a bundle including at least one product that has no substitutes, *id.* at 26-28.  Under clear Third Circuit law, "coercion" is *not* an element of a bundling claim.  *SmithKline*, 575 F.2d at 1061-62 & n.3; *LePage's*, 324 F.3d at 146, 155.  Moreover, even if coercion (as Sanofi defines it) were an element of a bundling claim, Plaintiffs have sufficiently pled it.

*First*, Sanofi is wrong that Plaintiffs must allege Sanofi coerced them into purchasing one vaccine to have the opportunity to obtain another.  That is an element of a "tying" claim,  not a bundling claim.  *SmithKline*, 575 F.2d at 1061-62 & n.3 (bundling unlawful even where buyers "were free to purchase" rival's products and where bundler's scheme "lack[ed] the element of coercion"); *see also Cascade*, 515 F.3d at 900, quoting 3 Areeda & Hovenkamp, ANTITRUST LAW P 749b2 at 332 (Supp. 2006) (bundling "'gives the buyer the choice'" to decline the bundle

---

[9]  Sanofi's suggestion Plaintiffs must allege that Sanofi was able to "recoup" the bundled "discounts" after the foreclosure of competition (Mot. at 1) evinces a fundamental misunderstanding of the claim.  *See Cascade*, 515 F.3d at 910 n.21 ("recoupment requirement from single product cases [does not] translate[] to multi-product discounting cases").  Plaintiffs do not allege below-cost pricing, *Bradburn*, 2003 U.S. Dist. LEXIS 13273, *10-11 (bundling in *LePage's* not below cost), or even true discounting.  Rather, Plaintiffs allege that Sanofi sets its bundled price and then imposes a penalty on those who are not compliant members of a PBG exclusive to Sanofi. (Compl. ¶¶ 106, 109, 116 ).  Thus, because Sanofi is overcharging, not undercharging, there is nothing to "recoup."

and pay the penalty).[10]   Whereas in a tying claim the plaintiff must show that the seller effectively conditioned the sale of one product on the purchase of another—*e.g., Marchese v. Cablevision Sys.*, No. 10-CV-2190, 2012 U.S. Dist. LEXIS 2799, at *15-16 (D.N.J. Jan. 9 2012) (coercion required for tying claim)—the plaintiff in a bundling case must simply establish that the bundle made it uneconomical for some purchasers to buy goods that they otherwise would have bought from the monopolist's rival.  *LePage's*, 324 F.3d at 155-57; *SmithKline*, 575 F.2d at 1061-62.   Indeed, in *SmithKline* the Third Circuit recognized that buyers could purchase cephalosporins (the bundled products) both from Lilly and its rivals if those buyers were willing to pay the resulting penalties, *SmithKline*, 575 F.2d at 1061, 1065, and the same was true in *LePage's*, 324 F.3d at 157.  *See also Cascade*, 515 F.3d at 900.

   *Second*, Sanofi is wrong that a bundle is sufficiently exclusionary only where at least one product in the bundle is "indispensable," by which Sanofi means that the bundler must be the

---

[10] In arguing that coercion is an element of bundling, Sanofi relies heavily on the following tying cases even though under Third Circuit law, tying requires coercion and bundling does not: *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *Abraham v. Intermountain Health Care Inc*., 461 F.3d 1249 (10th Cir. 2006); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc*., 140 F.3d 494 (3d Cir. 1998); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp*., 959 F.2d 468 (3d Cir. 1992); *Faulkner Advertising Assocs., Inc. v. Nissan Motor Corp*., 905 F.2d 769 (4th Cir. 1990); *Marchese*, 2012 U.S. Dist. LEXIS 2799.

   Sanofi also relies on other inapposite cases involving claims other than bundling.  *See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990)* (vertical, non-predatory maximum price-fixing); *Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104 (1986)* (predatory pricing); *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) (group boycott); *Burtch v. Milberg Factors, Inc., 662 F.3d 212 (3d Cir. 2011)* (price-fixing and group boycott); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp*., 369 F.3d 732 (3d Cir. 2004) (Robinson-Patman Act); *see also Davies v. Genesis Med. Ctr*., 994 F. Supp. 1078 (S.D. Iowa 1998) (no bundling claim).

   Sanofi's discussion of *Race Tires Am, Inc. v. Hoosier Racing Tire Corp*., 614 F.3d 57 (3d Cir. 2010), is no more persuasive.  *Race Tires* involved a sports sanctioning body that *freely* entered into an exclusive contract with a tire manufacturer.  *Id*. at 78-84.  It involved an exclusive dealing arrangement, not bundling.  Indeed, in *Race Tires* the Third Circuit explicitly noted that coercion is *not* generally an essential element of an antitrust claim but rather is one only in that distinctive—and distinguishable—setting.  *Id*. at 78 ("In the end, . . .we do **not** hold that coercion is an essential element of every successful antitrust claim[.]") (emphasis added).

only one who sells it.  Mot. at 26-27.  This is not the law.  Sanofi goes astray, in part, by misinterpreting the use of the word "indispensable" in *LePage's* to mean that (at least) one of the products in the bundle had no substitutes.  Mot. at 27.  The Third Circuit has made clear that the critical factor is not whether the seller's products have no substitutes, but whether "the bundled rebates reflected an exploitation of the seller's *monopoly power*."  *LePage's*, 324 F.3d at 156 (emphasis added).  Similarly, Sanofi takes out of context the Third Circuit's statement in *SmithKline* that some of the drugs in Lilly's bundle did "not face competition."  Mot. at 27.  The court was explaining that SmithKline, the foreclosed rival, could not offer drugs that matched all of the products in Lilly's bundle.  *See LePage's*, 324 F.3d at 155-56.  Exploitation of monopoly power is what is necessary for a bundling claim, not market exclusivity.[11]

Indeed, in both *LePage's* and *SmithKline* the "indispensable" products had competitors. In *LePage's*, 3M controlled 90%—not 100%—of the market for transparent tape, and alternatives existed to 3M's Scotch-brand tape.  *Id.* at 146.  In fact, part of the reason 3M engaged in its anticompetitive bundling was that LePage's tape sales were eroding 3M's market share.  *Id.* at 144, 156.  What made 3M's conduct illegal was not that Scotch tape had no competitors, but that 3M had monopoly power in the transparent tape market and bundled its Scotch tape with other products to exploit its market dominance and foreclose competition. Similarly, in *SmithKline*, it was enough that the bundle contained products that "dominated the cephalosporin market," 575 F.2d at 1061, where domination for most of the relevant period meant that Lilly's two bundled products never accounted for more than 65% and 22% of the

---

[11] Further, the Third Circuit in *SmithKline* highlighted "the importance of *cephalosporins*" and held that the drug class constituted its own relevant market.  *SmithKline*, 575 F.2d at 1062-65. The court did not single out the "indispensability" of the brands sold by Lilly in the bundle. Similarly, here, each kind of pediatric vaccine in this action forms a distinct, and indispensable, market.

relevant market, respectively.  *Id.* at 1060.  *See also Hypo.,* 2007 U.S. Dist. LEXIS 47437, at *9-10, *27 (bundler used monopoly power—not 100% market share—in the market for non-safety needles to maintain its share of the market in safety needles).

*Third*, even if Plaintiffs were required to allege a lack of available alternatives, they have done so.  As discussed above, Sanofi had 100% of the meningococcal vaccine market from 2005 to 2010, and 100% of market for the initial essential doses of the Hib vaccine from 2007 to 2010.  Sanofi says that "Sanofi faces two Hib competitors:  GSK and Merck," Mot. at 26, n. 15, but that is incorrect because (a) GSK's Hib product cannot be used in the first doses of the Hib vaccination process and thus does not compete with Sanofi's Hib vaccines (Compl. ¶ 90), and (b) while Merck now sells a rival Hib vaccine, it did not sell it from 2007 to 2010 (*id.* ¶ 92).  Thus, from the time Novartis initiated sales of Menveo in February 2010 until the end of August 2010, purchasers had to buy Hib from Sanofi.

In short, each of the vaccines in Sanofi's bundle competes in a separate product market, and Sanofi has monopoly power in each one.  (Compl. ¶¶ 45-95.)  That there have been alternatives at times to those products does not matter for a bundling claim, just as it did not matter in *LePage's* that LePage's offered a competing transparent tape or in *SmithKline* that SmithKline (and others) offered competing cephalosporins.[12]

---

[12] Sanofi attempts to distinguish *SmithKline* by arguing that Lilly had a complete and legal monopoly over two of the products in the bundle, Keflin and Keflex, by virtue of its patents. Mot. at 27.  But that did not mean that there were no alternatives.  These were merely two high-selling cephalosporins, of which there were several others competing in the same market. *SmithKline*, 575 F.2d at 1065.  Indeed, in both *LePage's* and *SmithKline* the availability of alternatives to a monopolist's product created an *incentive* for the illegal bundling:

> LePage's private-label and second-tier tapes are, as Kefzol and Ancef were in relation to Keflin, less expensive but otherwise of similar quality to Scoth-brand tape.  Indeed, before 3M instituted its rebate program, LePage's had begun to enjoy a small but rapidly expanding toehold in the transparent tape market.  3M's incentive was thus the same as Lilly's in *SmithKline*:  to preserve the market

Sanofi next argues the purported ability of PBGs "to design" competitive bundles that "do not include Sanofi's vaccines" negates Plaintiffs' claims. Mot. at 25-26. This contention has no merit. *First*, Sanofi is wrong as a factual matter because: (a) at relevant times, Sanofi was the exclusive seller of two critical vaccines, and thus a complete competitive bundle would have been impossible, and (b) it incorrectly assumes that the PBGs—who profit from Sanofi's monopoly power (Compl. ¶ 104; *supra* at 6-7)—have an interest in countering Sanofi and would have done so. *Second*, Sanofi is wrong as matter of law: the Third Circuit law does not place the burden on the plaintiffs to show (or plead) that it would be "impractical" for a competitor (like Novartis) to coordinate with other vaccine suppliers to create a "rival bundle" to Sanofi's. *LePage's*, 324 F.3d at 155. Indeed, Sanofi's principal authority for this proposition is a law review article—by Thomas A. Lambert, *Evaluating Bundled Discounts*, 89 MINN. L. REV. 1688 (2005)—whose primary focus is criticizing binding law from this Circuit and presenting an alternate—admittedly contra-legal—alternative. *Id.* at 1742-56 (offering an "Alternative Approach" to *LePage's*); *see also* 1721-22 (criticizing Third Circuit law for providing that "any plaintiff could successfully challenge a bundled discount simply by showing that its product line does not include products within the discounter's bundle").

---

position of Scotch-brand tape by discouraging widespread acceptance of the cheaper, but substantially similar, tape produced by LePage's.

*LePage's*, 324 F.3d at 156.

Sanofi similarly confuses this point in relying on *Masimo Corp. v. Tyco Health Care Group*, No. 02-CV-4770, 2006 U.S. Dist. LEXIS 29977, *aff'd*, 2009 U.S. App. LEXIS 23765 (9th Cir. 2009). Sanofi quotes the trial court opinion for the proposition that *LePage's* and *SmithKline* required that "it is only when products that do not face competition are included in a bundle that the bundle can conceivably be anticompetitive." Mot. at 27-28 (citing *Masimo*, 2006 U.S. Dist. LEXIS 29977 at *35). However, the next page of the opinion clarifies that when the trial court said products "do not face competition" it meant only that at least one product in the bundle had "monopoly or near monopoly power." *Id.* at *36. Moreover, the trial court refused to follow *LePage's* and *SmithKline*, *id.*, and therefore has no precedential weight here.

15

Finally, Sanofi's reliance on Ninth Circuit cases to support its "coercion" argument also fails. *See* Mot. at 11, 28. First, *Cascade* recognized that bundling claims, unlike tying claims, do *not* require coercion. *Cascade*, 515 F.3d at 900. Second, the Ninth Circuit expressly refused to follow Third Circuit law, noting that in the Third Circuit "all bundled discounts offered by a monopolist are anticompetitive with respect to its competitors who do not manufacture an equally diverse product line." *Cascade*, 515 F.3d at 899. Third, Plaintiffs here succeed even under the Ninth Circuit test. Under *Cascade*, a bundle is anticompetitive if a hypothetical competitor that has the same cost structure as the monopoly bundler could not sell its product at a price that both (a) allows that hypothetical competitor to make a profit and (b) compensates the buyer for all of the penalties that buyer would incur for breaking the monopolist's bundle. *Id*. at 906-07. Plaintiffs specifically allege that a hypothetical competitor with the same cost structure as Sanofi would have to sell its vaccines *below its own costs* to make up for the penalties a typical buyer would incur for breaking Sanofi's bundle and buying the rival's product. (Compl. ¶¶ 129, 134.) Thus, Plaintiffs' allegations establish that Sanofi's bundle is unlawful even under *Cascade*.

### b. Plaintiffs Need Not Be Coerced—or Even Have their Selection of Purchases Altered—by Sanofi's Bundling.

Sanofi errs by arguing that Plaintiffs must allege that Plaintiffs themselves were coerced into buying Sanofi's vaccines. Mot. at 10-16; 25-28. Sanofi's position misconstrues the nature of claims for monopolization and conspiracy to monopolize, which require only that a defendant engages in conduct to willfully maintain monopoly power, not that the defendant does so by imposing constraints on direct purchasers. So, for example, a defendant may acquire or maintain monopoly power by fraudulently obtaining patents used to block rivals from coming to market, *Neurontin,* 2009 U.S. Dist. LEXIS 77475, or by using sham product innovations to block

efficient means of rival entry, *In re Tricor Direct Purchaser Antitrust Litig.*, 432 F. Supp. 2d 408 (D. Del. 2006). It is irrelevant that the exclusionary behavior itself does not involve the direct purchasers. What matters is that the behavior stifles competition, enhances the defendant's monopoly power, and allows it to impose *artificially inflated prices on the direct purchasers*. *E.g., Neurontin*, 2009 U.S. Dist. LEXIS 77475, at *55-59. That suffices for each direct purchaser to state a claim.

The same is true in bundling cases. It is mere happenstance if in some bundling cases the defendant's method of willfully maintaining monopoly—the bundle—happens to constrain the choices of *some* direct purchasers. Just as in other cases of monopolization and conspiracy to monopolize, the direct purchasers here pled the relevant form of harm if they allege that they paid supracompetitive prices as a result of bundling, regardless of whether they entered into bundling agreements with Sanofi that constrained their choices. What matters is the cumulative effect of the bundling on the defendant's monopoly power in the market as a whole, just as in cases involving other forms of exclusionary conduct.[13]

This Court's decision in *Hypo.* confirms that Plaintiffs themselves need not be coerced by a bundle or even offered it. In that case, Becton Dickinson ("BD") bundled various hypodermic and other healthcare products, in particular using its monopoly power (*not* 100% market share) in the market for non-safety needles to maintain its share of the market in safety needles. *Hypo.*, 2007 U.S. Dist. LEXIS 47437, at *9-10, *27. BD implemented its bundles through agreements with group purchasing organizations ("GPOs"), which, like the PBGs here, aggregated and

---

[13] This is precisely what the court in *Natchitoches* found in holding that plaintiffs had set forth a viable theory for proving antitrust injury to a class of direct purchasers in a bundling case. It was sufficient to be able to show "that the substantial foreclosure caused by [the defendant's] conduct, combined with the diminished rival competitiveness and the lack of redeeming efficiencies, resulted in overcharges suffered by each direct purchaser." *Natchitoches I*, 262 F.R.D. at 69. The direct purchasers need only pay overcharges, not be subject to the bundle.

coordinated buyers' purchases of BD's products. *Id.* at \*6; (Compl. ¶¶ 3, 104.)  The GPOs, again like PBGs, were paid by manufacturers a share of the total dollar volume of the purchases by GPO members and were thus incentivized to serve the dominant manufacturer's interests and promote its sales. *Id.* at \*10-12; Compl. ¶ 104.  As here, the plaintiffs in *Hypo* asserted that the bundling agreements "had the cumulative effect" of foreclosing competition from a substantial portion of the relevant markets. *Id.* at \*39-40; Compl. at ¶¶ 3, 5-7, 123, 140.

This Court held, *inter alia*, that bundling by a company can constitute the unlawful maintenance of monopoly power. *Id.* at \*34-35 & n. 21 (citing *SmithKline*, 575 F.2d at 1065); \*39-40.  It did not matter if the GPOs in *Hypo.* may have been willing accomplices in the unlawful conduct, just as the PBGs may well be willing accomplices here. *Id.*  Nor did it matter that the bundling agreements were with the GPOs, not the direct purchasers, or that some plaintiffs were wholesalers who were never even offered the bundle. *Id.* at \*5-6.  In sum, direct purchasers need only show bundling caused them to pay artificially inflated prices to state a claim. *See also Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* 247 F.R.D. 253, 272-73 (D. Mass. 2008) ("*Natchitoches II*") (accepting that direct purchasers in bundling case were injured by overcharges; irrelevant whether they voluntarily purchased); *Bradburn*, 2003 U.S. Dist. LEXIS 13273, at \*12-14 (direct purchasers have cognizable overcharge claim flowing from the same anticompetitive bundling that had foreclosed competition in *LePage's*; court did not require a showing of coercion).

## C.    Plaintiffs Sufficiently Allege a Section 1 Violation.

Sanofi's motion does not address Plaintiffs' Section 1 claims.  The Complaint states a claim under Section 1 for the same basic reasons that the challenged conduct violates Section 2.  Bundling agreement violates Section 1 where they satisfy the following elements: "(1) concerted

action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *Hypo.*, 2007 U.S. Dist. LEXIS 47437, at *36-37 (internal citation omitted). Just as in *Hypo.*, for essentially the same reasons Plaintiffs sufficiently plead their case under Section 2, Plaintiffs satisfy the elements of Section 1. Bundling involves agreements between Sanofi and multiple PBGs that impair competition, enhance market power, and artificially inflate prices. This conduct is illegal under Section 1. *See generally id.*; *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* No. 05-CV-12024, 2009 U.S. Dist. LEXIS 108858 (D. Mass. Nov. 20, 2009) ("*Natchitoches III*").

### D.   Plaintiffs Suffered Cognizable Antitrust Injury in the Form of Overcharges.

"Antirust injury" is injury of the sort that the antitrust laws are designed to prevent. *Atlantic Richfield Co., v. USA Petroleum Co*., 495 U.S. 328, 343 (1990). Plaintiffs allege that Sanofi used exclusionary bundling to enhance its monopoly power and charge artificially-inflated prices for pediatric vaccines and that Plaintiffs were injured when they paid overcharges directly to Sanofi. Direct purchasers' paying overcharges to an entity that maintained monopoly power through exclusionary conduct has long been considered quintessential antitrust injury. *See Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 489 (1968) ("when a buyer shows that the price paid by him . . . is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of [Clayton Act] § 4").[14]

---

[14] *See also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724-25 (1977) (holding that direct purchasers are injured to full amount of overcharge); *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398 (7th Cir. 2000).

Sanofi nevertheless argues that Plaintiffs must allege not only that they were overcharged but *also* that they were coerced into buying Sanofi's vaccines.  This argument rests on the faulty premise that the harm to direct purchasers in a bundling case is coercion.  It is not.  The harm is payment of inflated prices.  Indeed, Sanofi does not cite a single bundling case to support its assertion that coercion is required to show antitrust injury.  Instead, Sanofi relies on inapposite cases,[15] none of which involves bundling claims and none of which stands for the proposition that only plaintiffs who were themselves coerced have suffered antitrust injury in a bundling case.  There is no such case for Sanofi to cite because it is not the law.

 Sanofi also fails to address the many cases holding that overcharges suffice as antitrust injury for direct purchasers.  The vast majority of antitrust cases brought by direct purchasers, whether under Sections 1 or 2, proceed in the same way.  Plaintiffs claim that some challenged conduct—*e.g.*, price fixing, exclusive dealing, *Walker Process* fraud, or bundling—reduced competition.  Plaintiffs then claim that (a) the reduced competition enhanced the defendant's market power, enabling it to raise prices above levels it otherwise could have sustained and (b) the direct purchasers bought products at the artificially inflated prices.  *E.g.*, *Neurontin*, 2009

---

[15] Sanofi relies primarily on *Sheraton*, 369 F.3d at 738-39, which was a commercial bribery action under the Robinson-Patman Act, and had nothing to do monopolization.  Mot. at 12, n.9.  The "inflated prices" in *Sheraton* stemmed not from anticompetitive behavior, or from the collective effect of multiple exclusionary contracts, but rather from breaches of a single contract.  Thus, that case does not stand for the proposition that a direct purchaser must allege more than overcharges to allege antitrust injury.  Sanofi also relies on several tying cases, including *Marchese*, *Jefferson Parish*, *Abraham*, and *Faulkner Advertising*, Mot. at 10, 12, which are inapposite because, as discussed above, the Third Circuit has held that unlike with tying, bundling claims do not require coercion.

Additionally, Sanofi quotes extensively from *Cargill*. (The "bundled discount" quotation (Mot. at 11) is not from *Cargill*, as Sanofi indicates, but is instead from *Cascade*.)  *Cargill* was not a bundling case.  The quotation about the potential "chilling effects" of "mistaken inferences" refers to the fact that predatory pricing cases "must be evaluated with care" because they involve single product *below cost* price cutting.  479 U.S. at 122 n.17.  Plaintiffs don't allege predatory pricing here.  Indeed, Sanofi's prices, even with the bundled "discounts," are supracompetitive. (Compl. ¶ 138).

U.S. Dist. LEXIS at *57-59 (direct purchasers suffered antitrust injury where prices inflated due to defendants' scheme to exclude rivals); *Wallach v. Eaton Corp.*, 2011 814 F. Supp. 2d 428, 439 (D. Del. 2011) (direct purchasers suffered cognizable antitrust injury where defendants used exclusionary contracts to foreclose competition and artificially inflate prices).

Moreover, Sanofi does not address, much less distinguish, the numerous direct purchaser bundling cases in which courts, including this Court, have found plaintiffs suffered antitrust injury without having to show they were coerced.  *E.g.*, *Hypo.*, 2007 U.S. Dist. LEXIS 47437, at *27-29, 35-36 (overcharges deemed cognizable antitrust injury in bundling case where plaintiffs include wholesalers who were not even offered the bundle);[16] *Bradburn*, 2003 U.S. Dist. LEXIS 13273, at *8-13 (overcharges deemed cognizable antitrust injury where some claimants were offered the bundle and did not claim they were injured by coercion); *Natchitoches II,* 247 F.R.D. at 272-73 (direct purchasers injured by overcharges; coercion not relevant).  Simply put, a plaintiff suffers antitrust injury if it paid overcharges directly to a defendant as a result of an illegal bundling scheme.  No more is required.

### E.    Plaintiffs Have Antitrust Standing as Direct Purchasers.

Courts have long recognized that direct purchasers, like Plaintiffs here, are the quintessential antitrust plaintiffs because they are best situated to act as "private attorneys general" to enforce the antitrust laws.  *See, e.g.*, *Illinois Brick*, 431 U.S. at 745-46; *Howard Hess Dental Labs. v. Dentsply Int'l*, 424 F.3d 363, 375 (3d Cir. 2005) (noting that direct purchasers suing to recover overcharges caused by exclusionary conduct will serve the purposes of the antitrust laws because they tend "to make arguments that will protect rather than injure

---

[16] *See also In re Hypodermic Prods. Antitrust Litig.*, No. 05-CV-1602, 2006 U.S. Dist. LEXIS 89353, *18-19, *30-33 (D.N.J. Sept. 7, 2006) (direct purchaser wholesalers' "downstream purchasers" entered the bundling agreements).

consumers"). Moreover, this Court has recognized that direct purchasers have standing to sue an entity with monopoly power that uses bundling through intermediaries akin to PBGs—just like Plaintiffs here—to leverage that power into different markets and charge supracompetitive prices. *See Hypo.*, 2007 U.S. Dist. LEXIS 47437, at \*28-29.

Sanofi's challenge to Plaintiffs' antitrust standing takes many erroneous forms. Sanofi's principal argument is that Plaintiffs voluntarily entered into contracts to buy Sanofi's bundle of vaccines and thus have no "standing to challenge the discounts their duly-authorized PBGs negotiated." Mot. at 16. This argument has two fatal flaws. First, Sanofi's "discounts" were only "discounts" compared to the penalties Sanofi imposed on non-bundled purchases. Had any healthcare provider turned down the bundle, it would have been subject to Sanofi's *penalty* prices, and paid *even higher* supracompetitive prices. (Compl. at ¶¶ 105-107, 116.) It is well recognized that buyers will accept bundles "willingly" so as to avoid penalties even though the collective effect of multiple buyers doing so harms competition and causes higher prices.[17]

Second, Sanofi's argument fundamentally misunderstands Plaintiffs' claims. Those direct purchasers that happen to be members of PBGs are not challenging the terms of the bundled contract Sanofi had with their respective PBGs, standing alone. Rather, Plaintiffs' case is about the overall adverse effect of Sanofi's multiple bundling contracts on the ability of Sanofi's rivals to compete on the merits. Sanofi incorrectly wants to analyze each contract in isolation. But "courts must look to the monopolist's conduct taken as a whole." *LePage's*, 324 F.3d at 162. And Plaintiffs allege that it is the *cumulative effect* of thousands of individual decisions to accept Sanofi's bundle (to avoid Sanofi's penalties) that handicapped rivals' ability

---

[17] *See, e.g.*, Elhauge, 123 HARV. L. REV. at 457 (bundling anticompetitive even though "buyers agreed to the bundled discounts voluntarily . . . because agreeing to anticompetitive bundled discounts is individually profit maximizing for buyers even though it collectively harms all buyers in the market").

to compete for market share, maintained Sanofi's monopoly power, and caused all direct purchasers of Sanofi's vaccines to pay artificially inflated prices.  Thus, whether any direct purchaser "voluntarily" accepted Sanofi's bundle—or indeed, whether or not it was a member of a PBG in the first place—is wholly irrelevant to that purchaser's standing.  Moreover, to the extent that Sanofi is asserting that class members who accepted the bundle (standing alone or through PBGs) have no standing because they participated in the illegal conduct, the argument is barred by Supreme Court precedent.[18]

Sanofi next contends that Plaintiffs' claims are derivative contractual injuries, not direct antitrust injuries.  The nub of Sanofi's position is that Plaintiffs' "alleged injuries flow—not from the elimination of competition—but from their PBG membership obligations."  Mot. at 16-17.  Sanofi has this point backwards:  Plaintiffs' claimed injures do indeed flow directly from the elimination of competition, not from their PBG membership obligations.  For this reason, class members who were not members of PBGs suffered the same relevant injury as those who were.

Sanofi further argues that Plaintiffs lack antitrust standing because their "economic freedom" has not been restrained.  Mot. at 19-21.  This is just a variation on the same failed argument that direct purchasers who incur overcharges need to show coercion to have standing.  But the law is clear that paying overcharges is sufficient.  Indeed, the very cases that Sanofi cites for this point demonstrate that direct purchasers *have* antitrust standing to recover overcharges regardless of whether the exclusionary conduct at issue happened to involve agreements with some direct purchasers.[19]  And, indeed, Sanofi fails to cite a single case where a court has held

---

[18] *See Perma Life Mufflers, Inc. v. Int'l Parts Corp*., 392 U.S. 134, 138-39 (1968) (rejecting *in pari delicto* ("unclean hands") defense to antitrust actions where defendant is culpable actor).

[19] *See, e.g., McCarthy v. Recordex Serv., Inc*., 80 F.3d 842, 844-45 (3d Cir. 1996) (attorneys who directly paid for hospital records, and not their clients, had standing to bring overcharge claims because they were the direct purchasers).  The other "economic freedom" cases in Section IV.B

that a plaintiff who paid artificially inflated prices directly to a seller that maintained monopoly power through exclusionary conduct lacks antitrust standing.

Sanofi also asserts that Plaintiffs lack standing because allowing this lawsuit would frustrate the goals of the antitrust laws.  Mot. at 21-23.  The opposite is true:  as noted above, courts have recognized direct purchasers as the ideal plaintiffs to serve the goals of the antitrust laws.  Indeed, the only case that Sanofi cites for this argument—*Race Tires*—did not involve a direct purchaser at all, but rather a disgruntled competitor that had bid on an exclusive supply deal and lost.  *Id*. at 84.  It provides no support for Sanofi's claim, Mot. at 21, that courts should generally defer to decisions made by membership organizations (especially where those membership organizations are compensated not by their members, but by the defendant supplier).  Sanofi does not cite to any case in this Circuit—or any other—that has carved out a special exception to the ban on exclusionary bundling when it occurs through membership organizations.  This Court in *Hypo.*—which Sanofi fails to address, much less distinguish—is at odds with Sanofi's argument.  2007 U.S. Dist. LEXIS 47437, *6 (upholding standing to bring bundling claim where "GPOs essentially act[ed] as negotiating agents for hospitals and other healthcare providers").

Additionally, Sanofi argues that Plaintiffs lack antitrust standing because other parties were purportedly more directly affected by its anticompetitive conduct.  Mot. at 23.  Yet Sanofi does not cite to any case that has ever held that "there are more direct plaintiffs" than direct

---

of Sanofi's brief are also inapposite.  In both *Henke Enters., Inc. v. Hy-Vee Food Stores, Inc.*, 749 F.2d 488 (8th Cir. 1984) and *Acme Mkts. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230 (D.N.J. 1995), the courts required the plaintiffs to show their economic freedom was restrained because the plaintiffs were not otherwise participants in the relevant market and could claim no other harm.  They were neither competitors nor consumers.  Indeed, both decisions specifically noted that purchasers are typically the most direct parties to bring antitrust claims.  *See Henke*, 749 F.2d at 490; *Acme Mkts.* 890 F. Supp. at 1236.

purchasers.  Direct purchasers *are* direct plaintiffs, and indeed are the only claimants allowed to recover Sanofi's illegal overcharges.  Sanofi proposes instead that foreclosed competitors or PBGs could bring antitrust claims here.  But the very cases that Sanofi cites recognize that direct purchasers—like the Plaintiffs—are **better** plaintiffs than competitors.  *See, e.g., Brokerage Concepts*, 140 F.3d at 518-519 (noting that antitrust laws are designed to protect competition and consumers, not competitors) (citing *Town Sound*, 959 F.2d at 494) (same)); *see also Dentsply*, 424 F.3d at 375 (direct purchasers suing to recover overcharges will best serve the purposes of the antitrust laws because they tend "to make arguments that will protect rather than injure consumers").  Sanofi cites no case holding that direct purchasers lack standing because competitors may also sue to recover their lost profits.

Finally, Sanofi argues that the PBGs might be better plaintiffs than the direct purchasers. But Plaintiffs have alleged that the PBGs benefit from and are potential co-conspirators in Sanofi's illegal practices.[20] (Compl. ¶ 104).  Moreover, the PBGs do not buy or sell drugs (*id*.), and thus could not recover any overcharges. Whereas Plaintiffs as direct purchasers can seek overcharge damages, it is unclear how PBGs could bring damages claims at all.  Finally, Sanofi's argument regarding the PBGs is premised on the same mistake that lies at the core of the rest of its motion.  Sanofi claims that the PBGs are the right plaintiffs because they are the ones "supposedly coerced."  Mot. at 18-19, 24.[21]  But Plaintiffs' injuries derive from the overcharges they paid, not from coercion.  Plaintiffs thus have antitrust standing.

---

[20] "GPOs . . . have ample incentive to collude with sellers to create seller market power in exchange for a share of seller's supracompetitive profits."  Pearlman Decl. Ex. 1 (Elhauge, *The Exclusion of Competition for Hospital Sales Through Group Purchasing Organizations*), at 31.

[21] Sanofi relies on *Brokerage Concepts* to claim that Plaintiffs lack antitrust standing because the PBGs suffered the alleged "coercion," not Plaintiffs (citing 140 F.3d at 511 n.64 [sic]).  But that case involved a Section 1 tying claim—not a bundling claim—where plaintiffs had not demonstrated defendant had market power.  *Id*. at 511, 516-19.

**F.      Plaintiffs Properly Allege That Sanofi Foreclosed a Substantial Portion of the Market.**

Sanofi next urges the Court to dismiss the complaint for failure to allege that the bundle penalties "foreclosed any rival from the market," *i.e.*, drove at least one rival entirely out of the market.  Mot. at 28, 29.  The Third Circuit has held, however, that total foreclosure of a competitor is not required; plaintiffs need show only that the challenged conduct deprived rivals of access to "a substantial percentage of the available opportunities for… distribution." *LePage's*, 324 F.3d at 159; *see also Dentsply*, 399 F.3d at 191 ("[t]he test is not total foreclosure, but whether the challenged practices … severely restrict the market's ambit"); *Tricor*, 432 F. Supp. 2d at 423 (complete foreclosure "is not the correct legal standard").  A monopolist unlawfully forecloses a "substantial percentage of the available opportunities" when it blocks rivals from 40% or more of the market.  *LePage's*, 324 F.3d at 159.  Plaintiffs here meet that standard:  Sanofi foreclosed all rivals from far more than 45% of the relevant markets.[22] (Compl. ¶¶ 103–107; 115; 124-135.)

**1.      Sanofi Foreclosed All Rivals from a Substantial Part of the Markets.**

Plaintiffs allege that Sanofi's contracts cover "the vast majority" of purchasers and impose the bundle penalties unless purchasers buy 90%-100% of their supplies from Sanofi. (Compl. ¶¶ 103-04; 106; 115; 136.)  Thus, the bundle penalties deprive rivals of far more than 45% of the sales opportunities in the relevant markets.  These allegations regarding foreclosure are easily sufficient.  The Court in *LePage's* held that bundle penalties imposed by a monopolist "may foreclose portions of the market to a potential competitor who does not manufacture an

---

[22] This foreclosure figure is computed by simply multiplying the market share requirements in most of the bundling agreements, 90% (Compl. ¶ 106), by the amount of the market subject to these bundling agreements, at least 51% (Compl. ¶ 103), though in reality it was likely well more than 51% of the markets subject to these agreements given that they applied to the "vast majority" of physicians (*id.*).

equally diverse group of products and who therefore cannot make a comparable offer."  324 F.3d at 155.  The test is "substantial foreclosure," and it is satisfied by alleging that rivals are foreclosed from something less than 40%-50% of the market.  *See LePage's*, 324 F.3d at 158-59.  Sanofi's foreclosure of rivals here from far more than 45% clearly meets that standard.  Moreover, *LePage's* specifically rejects Sanofi's proposed requirement that at least one rival be driven entirely from the market, 324 F.3d at 161-62, upholding a verdict for plaintiff even though the rival there had a 9% market share at the time of trial (*id*.)—a share greater than the 7% of Sanofi's meningococcal vaccine rival, Novartis.  (Compl. ¶¶ 2, 130.)

Similarly, in *Dentsply* the Court of Appeals directed entry of judgment in favor of plaintiff in a Section 2 case where the monopolist had used exclusive dealing contracts to deny rivals access to substantial portions of the market.  *Dentsply* confirmed the "substantial foreclosure" standard and again rejected Sanofi's proposed requirement that a competitor be driven altogether from the market.  Citing *LePage's*, the Court held that the standard is whether "a manufacturer foreclosed competitors from a substantial percentage of the available opportunities for product distribution."  399 F.3d at 190.   Rejecting Sanofi's proposed rule, the Court held that "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Id*. at 191; *see also id.* at 193 ("The proper inquiry is not whether direct sales [the distribution channel not affected by defendant's conduct] enable a competitor to 'survive' but rather whether direct selling 'poses a real threat' to defendant's monopoly").  Indeed, *Dentsply* directed entry of judgment in favor of plaintiff even though the rivals garnered at least 20% of the market.  *Id.* at 184.  Novartis, a rival in one of Sanofi's monopolized markets, has less of a share of the market than that.  (Compl. ¶ 130.)  *See also*

*Tricor*, 432 F. Supp. at 423 (foreclosure sufficiently pled even where the competitors "have not been prevented from marketing" their products).

Courts in other Circuits have likewise adopted the "substantial foreclosure" standard and have rejected Sanofi's proposed "totally excluded rival" requirement in bundle penalty cases under Section 2.   *See, e.g., Cascade*, 515 F.3d at 898-99 (jury instructions provided "substantially foreclose *portions of the market* to a competitor"); *Natchitoches III,* 2009 U.S. Dist. LEXIS 108858, at *6 ("substantial foreclosure" standard met where bundle penalties covered 32%-39% of market); *Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 389-90 (S.D.N.Y. 2007) (loyalty rebates "exclud[e] [competitors] from much of the market"). As one leading decision held, "Abbott's package discount has not driven Ortho out of the market. But it would be senseless to hold that a plaintiff victimized by an antitrust violation may not seek judicial relief as long as it remains in business." *Ortho Diagnostic Sys., Inc. v. Abbott Lab.*, 920 F. Supp. 455, 469 (S.D.N.Y. 1996).

There is not a single decision, from any jurisdiction, that rejected a plaintiff's Section 2 bundle penalty claim for failure to satisfy the non-existent requirement that at least one rival was totally driven from the market.  Instead, Sanofi relies on the decision in *Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380 (7th Cir. 1984), which was *not* a Section 2 case involving anticompetitive conduct by a monopolist.  It was a garden-variety Section 1 case in which plaintiff alleged that a *non-monopolist* in a *competitive market* injured competition through alleged exclusive dealing contracts.  Our Court of Appeals has emphasized, however, that a monopolist's ability to harm competition is far greater than that of a non-monopolist in a competitive market.  *See, e.g., LePage's,* 324 F.3d at 159 (endorsing view that "exclusionary conduct by a monopolist [is] more likely to be anticompetitive than ordinary § 1 exclusionary

28

conduct"). Therefore, a different foreclosure analysis applies in Section 2 cases. *Id.* at 158-59 (foreclosure required in a Section 2 case is "'less than the … share usually required in order to establish a § 1 violation.'" (quoting *U.S. v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C. Cir. 2001), 253 F.3d at 70); *see also Dentsply*, 399 F.3d at 194 n.2 (distinguishing and refusing to follow *Roland Machinery*).

Indeed, in this Circuit even in a Section 1 exclusive dealing case, plaintiff need only show foreclosure of about 20%-40% of the market, *not* that any rival was altogether driven from the market. *See, e.g.*, *Am. Motor Inns, Inc. v. Holiday Inns, Inc*., 521 F.2d 1230, 1252 (3d Cir. 1975) (foreclosure of 14% "may well offend limitations which the Clayton Act places on exclusive contracts"); *Luria Bros. & Co. v. F.T.C.*, 389 F.2d 847, 857 (3d Cir. 1968) (40% foreclosure was sufficient); *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 953 F. Supp. 617, 663 (E.D. Pa. 1997) (21% foreclosure would be "substantial," while 5% would not). *See generally* Areeda & Hovenkamp, Antitrust Law, 1807d, at 345 (Supp. 2011) ("Many discussions of exclusive dealing [in Section 1 cases] suggest that minimum market shares in the range of 30 to 40 percent are required for condemnation.").[23]  Plaintiffs sufficiently alleged foreclosure here under Sections 1 and 2.

### 2.    The Movements of Sanofi's Market Share Do Not Preclude Liability.

Sanofi incorrectly asserts that liability is precluded as a matter of law because "Novartis *successfully penetrated* the market by increasing its market share from zero to almost 20% in just two years." Mot. at 29 (emphasis in original). It is clear, however, that a monopolist's loss of

---

[23] Sanofi cryptically suggests that Plaintiffs must allege that the conduct "raised rivals' costs." Mot. at 30.  But no court has ever imposed that requirement.  Even so, Plaintiffs satisfy this test. To make sales, the rivals would have had to incur the costs of compensating buyers for the penalties that they would pay Sanofi on products that the rivals do not offer.  (Compl. ¶ 134). And foreclosing substantial portions of the market deprives rivals of economies of scale, thereby raising their marginal costs.  *E.g.*, Elhauge, 123 Harv. L. Rev. at 413, 458.

some market share to its rivals does not preclude a finding that it unlawfully maintained monopoly power.  *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 234 (1993) (growth in output and rivals' shares is not dispositive because "[o]ne could speculate ... that the rate of growth would have tripled, instead of doubled [absent the] alleged predation"); *American Tobacco Co. v. U.S.,* 328 U.S. 781 (1946) (monopolization found despite decline in share from 90% to 68%); *Ortho Diagnostic*, 920 F. Supp. at 464.

Moreover, Novartis *initially* garnered 20% of sales, *but then* Sanofi tightened and vigorously enforced the bundle penalties.  (Compl. ¶¶ 107, 130.)[24]  This enforcement abruptly reversed Novartis's initial gains, and its share declined to 7% while Sanofi's rebounded to 93%.  (*Id.* at ¶ 130.)  Sanofi used bundle penalties to unlawfully maintain its monopoly and ensure that "there has never been a competitor that has genuinely challenged [its] monopoly." *LePage's*, 324 F.3d at 163 (liability where rival's share climbed to 14% before retreating to 9%); *see also Dentsply*, 399 F.3d at 190 (liability where monopolist lost share but maintained 75%-80% share); *Natchitoches I,* 262 F.R.D. at 64-65 (liability where monopolist lost share to a "viable competitor" but maintained 54%-65% share).[25]  That suffices for foreclosure.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Sanofi's motion to dismiss.

---

[24] Sanofi maintained a monopoly share of the market (80%) even at its lowest point.  *See, e.g., Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230 (3d Cir. 1988) (66% share sufficient).

[25] Sanofi notes that Novartis entered the market, and GSK intends to enter the market.  Mot. at 29.  But Sanofi's bundle restricts rivals' potential sales no matter how many enter.  *See Dentsply*, 399 F.3d at 195 (mandating entry of judgment for plaintiff despite recent entry of two new competitors).

Dated: April 13, 2012

/s Peter S. Pearlman
Peter S. Pearlman
COHN LIFLAND PEARLMAN
HERMANN & KNOPF LLP
Park 80 Plaza West - One
250 Pehle Ave., Suite 401
Saddle Brook, NJ 07663
201/845-9600
psp@njlawfirm.com

Linda P. Nussbaum
John D. Radice
**GRANT & EISENHOFER, P.A.**
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8504
Fax: (646) 722-8501
lnussbaum@gelaw.com
jradice@gelaw.com

Eric L. Cramer
David F. Sorensen
Daniel C. Simons
Zachary D. Caplan
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

Kenneth Zylstra
Stephen Connolly
**FARUQI & FARUQI, LLP**
101 Greenwood Ave., Suite 600
Jenkintown, PA 19046
Telephone: (215) 277-5770
Fax: (267) 670-2419

31

Joshua P. Davis
**LAW OFFICE OF JOSHUA P. DAVIS**
59 Montford Ave.
Mill Valley, CA 94931
Tel: (415) 422-6223
Fax: (415) 422-6433

Barry S. Taus
Brett Cebulash
**TAUS CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
Fax: (212) 931-0704
btaus@tcllaw.com
bcebulash@tcllaw.com

David Balto
**LAW OFFICES OF DAVID BALTO**
1350 I Street
Suite 850
Washington DC, 20005
Tel: (202) 789-5424
Fax: (202) 589-1819

Michael E. Criden
Kevin B. Love
**CRIDEN & LOVE, P.A.**
7301 S.W.57th Court, Suite 515
South Miami, FL 33143
Tel: (305) 357-9010
Fax: (305) 357-9050

*Additional Class Counsel*