**Proskauer›**

June 25, 2013

**_Via ECF_**

Hon. Magistrate Judge Michael A. Hammer
Martin Luther King, Jr. Federal Building & U.S. Courthouse
U.S. District Court of New Jersey
50 Walnut Street, Courtroom 3C
Newark, New Jersey 07101

       Re:  *Castro v. Sanofi Pasteur Inc.*, 2:11-cv-07178 (JLL) (MAH)

Dear Magistrate Judge Hammer:

   Sanofi, the plaintiffs, and non-party Novartis Vaccines & Diagnostics, Inc. jointly request this Court's assistance concerning two issues that will govern the taking of testimony from Novartis witnesses in this action.  *First*, in order to "fairly examine" Novartis witnesses, Sanofi for itself, and for the benefit of the plaintiffs, seeks leave under Rule 30(d)(1) to extend a handful of critical depositions beyond a single day of seven hours.  Plaintiffs join in Sanofi's request as to certain witnesses, but believe depositions of other witnesses might be excessive or not ripe for decision by the Court.  *Second*, and relatedly, because it is a non-party who has already provided extensive discovery, Novartis objects to Sanofi's further request for at least *nine* depositions of current and former Novartis employees, most for two days each, including an unspecified number of 30(b)(6) depositions.

   Sanofi contends that the parties have telephonically met and conferred and have exchanged numerous letters on these issues, but have been unable to resolve them.  The parties have thus reached impasse regarding two immediate issues:  the length of Mr. Sanyour's deposition and whether Novartis can unilaterally limit the number of depositions to just two witnesses, despite the fact that it would not even come close to covering the issues for which Novartis is the ***critical*** witness in the case.  Novartis, however, claims that Sanofi raises many of the issues addressed below for the first time, including the request for multiple depositions of high-ranking Novartis employees.  While Sanofi disagrees with this, Sanofi does agree with Novartis' suggestion (below) that the issues are ripe for "addressing now all of the deposition subpoenas Sanofi proposes to serve."[1]

---

[1] The documents attached as exhibits are:  Ex. 1 (Christian Lease Deposition); Ex. 2 (March 25, 2013 Ltr. from NVD); Ex. 3 (March 26, 2013 Ltr. from Sanofi); Ex. 4 (April 30, 2013 Ltr. from Sanofi); Ex. 5 (May 2, 2013 Ltr. from NVD); Ex. 6 (May 22, 2013 Ltr. from Sanofi); Ex. 7 (August 28, 2013 Ltr. From NVD).  Unless otherwise noted, all emphasis added and internal citations and quotation marks omitted.

Proskauer»

## I.      Sanofi's Position[2]

Sanofi's position is straightforward.  Given the complexity of the case and Novartis' central role in it, Sanofi should in fairness be permitted to examine *seven* additional Novartis witnesses for up to seven hours each, as well as certain additional witnesses to cover information that these seven may not possess.  Fairness also dictates that plaintiffs be afforded a similar opportunity, if necessary.  By necessity, therefore, the parties will require more than a single day of deposition testimony from certain witnesses.[3]  This Court should also deny Novartis' request to shield Mr. Rzewnicki from testifying, as he is currently in charge of Novartis' vaccines strategy and of Menveo's adolescent business, and has himself produced over *300,000* pages of documents, comprising almost one-third of Novartis' document production.

In contrast, Novartis believes that Sanofi should be limited to *one more deposition of no more than three-and-a-half hours*.  That position is untenable in a case of this complexity and importance, especially in light of Novartis' role in it.  Novartis is the case's *central* player. And its argument – that it is unduly burdensome to make a handful of witnesses available for a full day of questioning by Sanofi – cannot be squared with Novartis' role in *instigating* the case itself. If Novartis does not believe it is unduly burdensome for its employees and paid consultants to spend literally *thousands* of working hours laying the groundwork for this case

---

[2] Sanofi would be pleased for this matter to be resolved by either the Court or the Special Master, to whom this matter may be referred in accordance with the Court's June 6, 2013 Order.  *See* Dkt. 191 (appointing the Special Master for "such other matters as the Court may refer."); *see also* Dkt. 181 , at 31:21-24 (plaintiffs' reaffirmation of their off-the-record consent to the appointment of the Special Master); *id.* (plaintiffs' acknowledgement that the Court may refer "future discovery disputes" to the Special Master); June 6, 2013 Letter from Sanofi re Appoint of Special Master (noting that "many of the discovery disputes will relate to Novartis"). Novartis initially agreed that this matter may be heard by the Special Master, but upon being notified by plaintiffs of their opposition to the Special Master's  involvement, also stated that they "prefer[ed] to have the matter resolved by the Court rather than the Special Master."

[3] Sanofi currently believes it will need all or most of a full day of deposition testimony from the following witnesses:  Mark Sanyour, Peter Rzewnicki, Martin Peters, Vas Narasimhan, Brent McGregor, and Bryan Baxter, and former Novartis employee Chris Fikry.  Sanofi also expects it will need less than a day with certain other current or former Novartis employees, and approximately 7 to 10 hours of 30(b)(6) deposition time to cover topics (*e.g.*, relating to costs or profitability) that cannot be adequately covered by other fact witnesses.

**Proskauer** »

over the course of **two years**, then surely it is not too burdensome to require a few of its key decision makers and employees to sit for a two-day deposition.[4]

More importantly, this case fundamentally threatens to undermine how vaccines are sold and distributed in the United States for the foreseeable future.  Thus, this case has tremendous public importance, and Novartis has a civic duty to make its witnesses available so that this Court may reach the right decision.  If it fails to fulfill that duty, the Court may wrongly deprive healthcare providers of the price-lowering competition they now enjoy.

### A.  The Parties Have Fully Met and Conferred.

Antitrust cases are inherently complex and the inquiry usually "involve[s] voluminous documentary and *testimonial* evidence, extensive discovery, complicated legal, factual, and technical (particularly economic) questions, [and] *numerous parties*."  *See* Manual for Complex Litigation, 4th § 30 (noting that "[m]any of the principles and practices of judicial management and of the procedures discussed in this manual were initially developed in antitrust litigation.").

Not surprisingly, therefore, from the start of the case, the parties, recognizing the importance of deposition testimony, sought to address this issue.  The Court ultimately agreed to extend the presumptive deposition limit of ten per side under Rule 31(a)(2) to **thirty** per side.  *See* July 18, 2012 Hrg. Tr. 75:22-76:10.  In doing so, the court rejected any "arbitrary" limit on the number of depositions that could be directed to any party.  *Id*.

While Novartis may not technically be a party, the need for deposition testimony from Novartis is no less compelling than the need for such testimony from Sanofi.  Accordingly, long before document discovery from Novartis was complete (in fact, it still is not), Sanofi raised the issue of depositions with Novartis.  One of the first witnesses Sanofi sought to depose was Christian Lease, the leader of Novartis' "Bundle Buster" strategy.[5]  This deposition was designed to, and did, focus largely on Novartis' multi-year campaign to instigate third-parties to publicly disparage, investigate, or challenge Sanofi's contracting practices, while Novartis played a

---

[4] Novartis devotes much of its argument to disputing its role in instigating this suit. The record, however, shows otherwise.  Mr. Lease testified that he had discussions with plaintiffs' counsel in advance of filing this lawsuit, and the documents show that Mr. Lease had proposed that Novartis do all that it could to assist plaintiffs' counsel.  After Mr. Lease was told by his superiors that it would be "inappropriate" for Novartis to be seen as having coordinated with plaintiffs' counsel, Mr. Lease requested that further assistance be filtered through its paid consultant, Navigant. Notably, while plaintiffs have tried to shield these communications between Novartis' paid consultants and plaintiffs' counsel by moving to quash a subpoena to Navigant in the Northern District of Illinois, that Court, following *in camera* review of a set of Navigant documents hand-picked by plaintiffs, found that "the documents … reflect, **as Sanofi maintains**, the nature of the **relationship and endeavor** that B&M, Navigant, and **Novartis** were undertaking."  The Court also rejected plaintiffs' protestations that the documents were irrelevant.  *Id*. *See* Case No. 1:13-cv-02086, Dkt. 33, at 5 ("given Sanofi's arguments about a conspiracy between Novartis, Navigant, and B&M, communications between B&M and Navigant prior to Castro's retention of B&M may well be relevant to both the substance and credibility of Castro's claims of foreclosure").

[5] Sanofi actually sought to depose Mark Meltz, a former Novartis counsel and core member of the Bundle Busters team.  At Novartis' request, Sanofi agreed to hold that deposition in abeyance based on Novartis' representation that Mr. Lease was a better deponent on the topic.  At this time, Sanofi does not currently intend to depose Mr. Meltz.

**Proskauer**>>

behind-the-scenes role.[6]  As Sanofi sought this deposition, however, it also explained that it would need to depose other Novartis witnesses.

In response, Novartis staked out the position that "Novartis will not voluntarily make numerous deponents available;" and thus, if Sanofi wanted to explore Novartis' bundling campaign, it would be limited to *one* deposition to cover all of Novartis' sales, marketing, distribution, contracting, pricing, and production practices. Ex. 2.  Novartis took this position even though (i) different people are responsible for each of these areas, and (ii) there has been substantial employee turnover at every level of the company, limiting the knowledge that any one employee has.  Nonetheless, relying on its status as a non-party, Novartis refused to make even its even a third material witness available, even though it concedes that such witnesses have "relevant and material information."[7]

Faced with this position, and seeking a way to limit the number of depositions to the bare minimum, Sanofi tried to focus its requests for depositions, a task made difficult because Novartis has not completed its production.  Sanofi, therefore, began identifying witnesses one by one as it became clear that the record could not be developed without their testimony.  Sanofi first identified Mark Sanyour, head of pricing, and Peter Rzewnicki, who was in charge of Novartis' Menveo business and had himself produced over 300,000 pages of documents, almost a third of Novartis' production.  *See* Ex. 3, 4.

The parties then focused discussions on these two witnesses.  Novartis, consistent with their position that they would only make two witnesses available in this case, insisted that Sanofi pick between Mr. Sanyour and Mr. Rzewnicki.  Sanofi explained that both were critical and non-duplicative, as Novartis claimed.  The parties agreed they had reached impasse, as confirmed by the position Novartis takes below, with Novartis stating its willingness to make Mr. Sanyour and Mr. Rzewicki available for a ***half day*** each so long as there are ***no*** further depositions of Novartis employees.

Though at impasse, Sanofi requested dates for both Mr. Sanyour and Mr. Rzewnicki.  Novartis offered June 6th, and told Sanofi to pick one witness to the exclusion of the other.  Ex. 5.  Reserving its rights, but wishing to get depositions under way, Sanofi agreed to proceed with Mr. Sanyour's deposition on June 6th.  Plaintiffs then expressed concern both about the timing of

---

[6] Novartis denies this, but Mr. Lease confirms it.  *See* Lease Tr. at 64:19-65:3 ("Q. And that was your goal, right, you wanted other people to speak for Novartis, you didn't want Novartis to speak for itself? A. It's an interesting way to say it. We felt that the approach of getting information into the -- into the public and allowing if this was a valid viable thing for it to organically evolve, was a reasonable approach, yes.").

[7] Novartis claims that the issue concerning the depositions of specific witnesses, other than Mr. Rzewnicki and Mr. Sanyour, is not ripe because Sanofi has not yet issued subpoenas.  But when Sanofi served the Lease deposition subpoena before finalizing the meet and confer process, Novartis and plaintiffs criticized Sanofi for doing so.  In part, both plaintiffs and Novartis wanted *this* Court to resolve the issue, even though once the subpoena issued, the Court did not technically have jurisdiction because the witness was located, and the subpoena issued out of, the District of Massachusetts.  To address both of these issues, Sanofi felt the better approach going forward would be to confer first, and serve the subpoena second.  Having requested that Sanofi follow this path, Novartis should not be now heard to complain.  Regardless, the issues before the Court have less to do with the specific witnesses than with the presumptive numerical limits of Rule 30(d)(1) and 31(a)(2).

**Proskauer》》**

the deposition and the length of it.  The parties held a telephonic meet and confer on May 24th to try to resolve the issues.  Over the next month, plaintiffs, Novartis, and/or Sanofi conferred and exchanged drafts of this joint letter.[8]

### B.  The Parties Have a Critical Need for Novartis Deposition Testimony.

The central issue in this case is whether Sanofi's decision in 2009 to offer discounts on Menactra to PBG members has foreclosed Novartis from the alleged meningococcal vaccine market.  On this issue, Novartis is in a unique position to provide relevant testimony.

It is the competitor who:

- is allegedly foreclosed;

- has a market share that sky-rocketed to 25% within three years of launch;

- itself bundled its products in competition with Sanofi, offered rebates and administrative fees to PBGs just like Sanofi, and offered market share and loyalty discounts;

- joined forces with GSK by entering into a joint marketing arrangement to sell Menveo with a broader portfolio of vaccines than Sanofi's;

- earned over a hundred million dollars on its U.S. Menveo business, and touted Menveo as the shining star in an otherwise money-losing vaccine business;

- adopted a price parity strategy, even though healthcare providers typically viewed Novartis' product as having no additional clinical benefits and significant drawbacks;

- in order to increase market share without lowering prices, adopted a strategy of paying third-party lobbyists and others over one million dollars to challenge Sanofi's contracting practices; and

- as part of its "behind-the-scenes" lobbying activities, made material misrepresentations of fact concerning Sanofi's pricing practices and their impact on Novartis.[9]

---

[8] The parties have not meet and conferred specifically about the depositions of witnesses beyond Messrs. Lease, Sanyour, and Rzewnicki.  Specifically, the parties have not discussed whether the *regional* Presidents of NVD (itself a relatively small subsidiary of Novartis), each of whom was actively involved in the events at issue, should be deposed.  Sanofi is perfectly willing to explain why it chose the witnesses it did.  For now, the Court need only address Novartis' position that it will allow two, and only two, depositions to proceed, or whether some other limit or standard should apply. *See* Fed. R. Civ. P. 30(d)(1) and 31(a)(2) (noting the court's authority to address deposition time and number limits).  This guidance will allow the parties to efficiently meet and confer, and develop a mutually agreeable deposition plan.  It appears that Novartis agrees by "suggest[ing] that the Court consider… addressing now all of the deposition subpoenas Sanofi proposes to serve."

**Proskauer》**

  These facts are just the tip of the iceberg.  The jury will need these kinds of details if it is to ever reach a reasoned decision concerning whether Novartis has truly been foreclosed, or whether Novartis – working with plaintiffs' counsel and their jointly retained consultants – is using the antitrust laws as a means to insulate itself from competition from Sanofi.  Such details will need to take the form of *admissible evidence* based on *personal knowledge* of the relevant facts.  That evidence needs to be developed through deposition testimony, with each side given proper time to extract it.  This cannot be done in a few hours with one or two *hostile* witnesses.

  Novartis is the quintessential hostile witness.  Examining such witnesses requires extra time and effort.  The lawsuit Sanofi is defending is the product of Novartis's **corporate policy** of lobbying and paying others to advocate for, and ultimately to bring, this suit.  Lease Tr. at 8:19 – 18:21; 35:12-18.  That effort required the enlistment of no fewer than **ten** senior Novartis executives and employees, multiple consultants, two law firms, a "crisis management" firm, and five outside lobbying groups.  *Id.* at 29:5 – 35:18; 48:1-19.  For strategic reasons, Novartis affirmatively decided to play a "*behind the scenes*" role, which included (a) having its paid consultants work with plaintiffs' counsel; (b) making false statements to the FTC and the public; and (c) apparently destroying documents that demonstrate the connections between Novartis' and plaintiffs' counsel.  *Id.* at 137:10 – 140:22; 165:1-179:9; 287:16 – 289:13.[10]  Novartis' witnesses cannot be expected to serve up, on a silver platter, information that will undo all of the hard work they devoted to developing their story.[11]

---

[9] Plaintiffs devote the majority of their section to highlighting snippets of their favorite Sanofi documents, hoping that the opportunity to showcase these documents without rebuttal will give their allegations the illusion of merit.  Because snippets of *Sanofi's* documents do not bear on the present dispute – namely the need for *Novartis* depositions – and this letter is long enough as it is, Sanofi will not take the bait.

[10] Mr. Lease admitted that he "may have" destroyed numerous documents reflecting pre-complaint communications between Novartis and plaintiffs' counsel after he was told by his superior that coordination would be "inappropriate."  Lease Tr. at 131:19 – 132:16; 165:1-179:9.  In response to Mr. Lease's supposition that any destruction was routine, and not intentional, Sanofi introduced an exhibit consisting of hundreds of routine emails on other subjects that somehow avoided any "routine" cleaning.  Rather than answer questions concerning this discrepancy, Novartis' counsel instructed the witnesses not to answer questions and terminated the deposition.  *Id.* at 495:7 – 499:12.  In its section below, Novartis seeks to diminish this point by contending that Mr. Lease was "not under a preservation obligation prior to the service of the subpoena," and that Sanofi "cannot claim any prejudice, having received the same emails from Navigant."  These legal arguments are neither ripe nor relevant.  Sanofi is not presently seeking spoliation sanctions; rather Novartis' document destruction demonstrates that Novartis was seeking to cover-up its involvement with plaintiffs' counsel.  The document destruction not only undermines Novartis' credibility, but undermines their argument that plaintiffs' counsel and Novartis acted independently.  In any event, no rule of evidence precludes Sanofi from introducing evidence of such destruction.

[11] The need for adequate examination time is demonstrated by the Lease deposition.  The majority of plaintiffs' examination of Mr. Lease consisted of plaintiffs pointing to statements in lobbying documents Novartis or their consultants made and asking Mr. Lease whether he agreed with those litigation-driven statements.  Sanofi had to devote virtually all of its re-cross examination time to showing that Mr. Lease not only lacked personal knowledge on these substantive issues (which he ultimately admitted), but that his opinions were inconsistent with the record and often his prior factual testimony.  In that regard, Novartis does not claim that extensive cross-examination is unnecessary to uncover the truth.  Instead, Novartis criticizes the "emphatic" nature of *one* question posed by Sanofi's counsel.  While we disagree with Novartis' characterization, and believe that the entire deposition was conducted cordially by all parties, Sanofi's counsel immediately apologized to the witness once Novartis' counsel raised the issue.  *See* Lease Tr. at 276:10.

**Proskauer»**

The wealth and importance of information Novartis possesses on the core issue of foreclosure also cannot be disputed. Plaintiffs bear the burden of proving foreclosure. Plaintiffs, however, have conceded in their responses to Sanofi's written discovery that they lack **any** information to support this allegation. Plaintiffs will likely seek to cure this evidentiary gap by asking Novartis to provide a witness who can testify *at trial*. Sanofi needs the opportunity to demonstrate that, in fact, Novartis has not been foreclosed, and any trial testimony to the contrary is not credible.[12]

Deposition testimony is therefore required to show: (i) Novartis is *not* being driven from the alleged relevant market, but instead has made over a hundred million dollars on its U.S. Menveo franchise; (ii) Novartis' market share has *not* been stunted as a result of any unlawful conduct, but has instead rapidly grown; (iii) Novartis has *succeeded* in competing for business in every segment of the alleged relevant market; and (iv) there is no merit to the unsubstantiated allegation that Sanofi's conduct has increased Novartis' variable costs.[13]

By focusing on how Novartis' sales and marketing strategies have evolved since Menveo's launch, Sanofi will be able to show the jury that – far from causing prices to rise – Sanofi's discounts did what they were designed to do: lower prices and increase competition. In fact, deposition testimony will show that Sanofi's conduct actually forced **Novartis** to lower prices, thereby *benefiting* members of the proposed class. Depositions of Novartis' sales, marketing, and pricing personnel will also force plaintiffs' counsel to admit that many healthcare providers chose Menactra over Menveo because of Menveo's restricted age indication, its need to be reconstituted at the physicians' office, its lack of any medical superiority, the inexperience of Novartis' sales force, its own mismanagement, its high employee turnover, and its high prices, and *not* because of any "bundling." Testimony regarding specific instances of head-to-head competition between Sanofi and Novartis will also show that, instead of being coerced into purchasing a product they did not want, purchasers used their purchasing power over a broad array of vaccines to **lower** the prices that they paid for Menactra, directly contradicting the allegations in the complaint.

Document discovery is insufficient to cover these issues; they each require **deposition** testimony of individuals *with personal knowledge*. *See* Fed. R. Evid. 602. Plaintiffs' responses to written discovery prove this point. Despite their access to over one million pages of Novartis documents, plaintiffs still claim a **lack of information** to answer even the most basic Novartis-related RFAs, including the way Novartis cooperates with GSK to sell a broader portfolio of vaccines than Sanofi (*see* RFA Nos. 28, 29, 34); the inherent limitations of Novartis' vaccine (*see* RFA Nos. 48, 53, 91); the significant profits Novartis earns on its Menveo franchise (*see* RFA Nos. 120-122, 254); the growth in Novartis' Menveo business (*see* RFA Nos. 256-257);

---

[12] At a minimum, this Court should preclude plaintiffs from calling any current or former Novartis employee who, because of a ruling limiting the number of depositions, could not be deposed by Sanofi.

[13] Mr. Lease testified that Novartis has lost $250 million on its U.S. Menveo business. Lease Tr. at 210:24 – 211:7. The allegation is belied by Novartis' own SEC disclosures, which show that Novartis' U.S. Menveo business is the shining star in Novartis' overall vaccines and diagnostics business. And while Novartis' vaccine and diagnostic business did apparently lose $250 million globally in 2012, that was due to mismanagement and other changes unrelated to Novartis' U.S. Menveo business.

**Proskauer»**

Novartis' pricing strategies and their effect on Novartis' sales (*see* RFA No. 261, 263); the effect of Sanofi's contracts on Novartis' business overall and in specific customer segments (*see* RFA Nos. 288, 315); or the effect of Sanofi's contracts on Novartis' costs (*see* RFA Nos. 330-334).[14]

### C.  Sanofi and the Plaintiffs Will Likely Each Need a Full Day For Each of the Critical Novartis Witnesses, Including Mr. Sanyour.

The issues described above are not simple ones that can be addressed with a handful of questions in a couple of hours from one or two witnesses.  They are complex, and made doubly so because the critical information must be extracted from interested, hostile, and otherwise "unavailable" witnesses. Thus, Sanofi must use its depositions to not only discover the truth, but also to reduce the truth to admissible *trial* testimony.[15]   One or two witnesses will not cover the waterfront.   The Federal Rules of Evidence require testimony to be based on personal knowledge, not hearsay.  Sanofi must therefore depose the individuals responsible for Novartis' businesses during the relevant period.   Just as plaintiffs' counsel needs to depose **ten to fifteen** Sanofi witnesses for seven hours each to prepare *its* offensive case, Sanofi needs to depose some (lesser) number of Novartis witnesses to defend itself.

Regarding deposition length, Sanofi needs a full day to "fairly examine" each key Novartis witness responsible for sales, marketing, pricing, and overall business.  The issue currently before the court, however, focuses most immediately on the deposition of Mark Sanyour.[16]

Mr. Sanyour was head of Novartis pricing, and was a key player both in Menveo's launch and in Novartis' efforts to instigate third parties to challenge Sanofi's contracting practices.  He

---

[14] Sanofi appreciates Novartis' offer to "stipulate" to the fact that it "opposes Sanofi's bundling."  But as a non-party, it cannot engage in stipulations.  Setting that aside, this offer misses the point. Sanofi seeks discovery from Novartis to demonstrate that Novartis "opposes Sanofi's bundling" because it wanted to use the antitrust laws as a weapon to reduce price competition from Sanofi, not because Novartis is foreclosed.  Sanofi also seeks evidence that Novartis' foreclosure claims, if made, cannot be believed in light of the analysis Novartis conducted and sponsored. More importantly, Sanofi needs deposition discovery to make a record that Novartis has not, in fact, been foreclosed, and that customers have benefited from the intense head-to-head competition between the companies.

[15] Novartis suggests below that Sanofi does not need to take *trial* testimony because Novartis' home office is in New Jersey.  They ignore that many of Novartis' witnesses are located in Boston (outside of the 100 mile rule), so Sanofi cannot be assured that these witnesses can be compelled to testify.  Moreover, Novartis takes a curious position: Sanofi can compel witnesses to testify at trial, but cannot depose them.  Novartis cites no authority for this position.

[16] Novartis states below that "**Sanofi's position** is that the parties should be allowed to depose Mr. Sanyour and Mr. Rzewnicki for a total of **fourteen hours each**, and then be allowed to depose additional witnesses who also have responsibility for marketing and sales at Novartis." This is not quite accurate.  Sanofi's position is that **Sanofi** requires up to **seven** hours with the critical Novartis witnesses.  Plaintiffs' position is that it wants whatever time Sanofi receives.  It is unclear, however, whether plaintiffs seek equal time because they need it, or as a matter of "principle."  If the latter, the justification is insufficient to overcome Novartis' burden objection. More importantly, from plaintiffs' perspective, Novartis is not an adverse witness.  Thus, it should be relatively easy to quickly extract information plaintiffs' counsel seeks from Novartis.

**Proskauer»**

has served as the Chairman of Novartis' Pricing Committee.[17] The Pricing Committee holds formal meetings several times a month to discuss pricing proposals, price terms, offers, and the business rationale for specific customers and specific products. Mr. Sanyour and the Pricing Committee make recommendations, decisions and follow-up action items related to pricing. The Pricing Committee frequently has side discussions or "ex-committee" meetings. Mr. Sanyour has responsibility for developing Novartis' pricing strategy. Additionally, he can testify to Novartis' initiatives and pricing strategy before, and in anticipation of, the Menveo launch. Mr. Sanyour also has knowledge of Novartis' pricing strategy after the Menveo launch. It appears from Novartis' documents that Mr. Sanyour retains significant responsibility for Novartis' pricing. Moreover, he is also the head of contracting for both public and private contracts.[18]

The notion that Sanofi can fairly cover all of Mr. Sanyour's relevant knowledge in three and a half hours of questioning is untenable. Mr. Sanyour has spent virtually every working hour over the last three years on these issues. He has developed, or implemented, an exceedingly complex pricing strategy designed to maximize Novartis' profits by looking for ways to *raise* prices. Under this strategy, he established complex pricing models, invoking different approaches for different customers, including public customers, distributors, wholesalers, large GSK-loyal health systems, small GSK-loyal health systems, large "Sanofi-loyal" health systems, small "Sanofi-loyal" health system customers, PBG owners, large PBG members, small PBG members, and others. Not only did Mr. Sanyour deploy different strategies for each of these customers, these strategies evolved over time, and have been subject to numerous exceptions. These facts critically undermine liability *and* plaintiffs' ability to show injury or damages on a class-wide basis.

Accordingly, Sanofi should be permitted to examine Mr. Sanyour for a full day. Notably, neither Novartis nor Mr. Sanyour has provided any reason why he cannot participate in a two day deposition, either over two consecutive days or over non-consecutive days (whichever is more convenient for him). Nor does Novartis claim Mr. Sanyour lacks relevant information,

---

[17] Novartis below seeks to play down Mr. Sanyour's role by arguing that while he "does have responsibility for **government** pricing and contracting, he does not have general pricing responsibility for Menveo." This is a misleading statement that borders on falsity. Through at least August 2012 (Novartis collected documents through August 2012), Novartis' documents – and Mr. Sanyour's own signature block – identify him as "Head of Pricing," which included both public and private Menveo pricing. It may be that Mr. Sanyour's *current* position is limited to government pricing. (It appears he was demoted in late July or August 2012). But other documents suggest that Mr. Sanyour continues to play a critical role with respect to both public and private pricing. For example, it appears that Mr. Sanyour continues to chair Novartis' Pricing Committee, a committee on which Mr. Rzewnicki does not even serve. Notably, Novartis does not identify anyone else whose *primary* responsibility concerns pricing.

[18] Mr. Sanyour also played a central role in Novartis's "Bundle Busters" campaign (the campaign to attack Sanofi's practices through sponsored academic papers, captured (i.e., *paid*) public interest groups, and false and misleading statements made to the Federal Trade Commission). Notably, Mr. Sanyour was the source of much of the misinformation that Novartis and its paid consultants relied upon.

**Proskauer >>**

such that the parties would quickly exhaust his store of relevant knowledge.   *All* parties – Novartis included – recognize that Mr. Sanyour has played a central role in this case.[19]

### D.  Sanofi Should Be Permitted to Depose Mr. Peter Rzewnicki.

This Court should also deny Novartis' request for a protective order shielding Peter Rzewnicki from deposition.  Mr. Rzewnicki is the Director of Marketing for Novartis' US Vaccines.  He also has responsibilities as the Menveo Brand Director and Adolescent Lead for Menveo.  Almost **one-third** of Novartis' production of documents – ***well in excess of 300,000 pages (76,000 documents)*** – came from Mr. Rzewnicki's files.

Mr. Rzewnicki generates and receives a significant amount of information concerning issues relevant to this lawsuit, including competition for pediatric vaccines, pricing and promotions.  Based on Sanofi's review of Novartis' production, Mr. Rzewnicki's responsibilities and knowledge concerning Novartis' vaccine business is vast and goes far beyond pricing.  He has significant responsibilities concerning Novartis' overall marketing and promotional strategies for Novartis Vaccines in general, and specifically for Menveo.  Unlike Mr. Sanyour, Mr. Rzewnicki can testify regarding the marketing and promotional strategies for Menveo.  He can also testify regarding Novartis' public relations activities related to Menveo.

Specifically, based on Sanofi's review of his voluminous files, Mr. Rzewnicki played a significant role in the launch of Menveo.  He was involved in analyzing and implementing marketing and promotional strategies concerning specific customer targets, segments, and solicitations.  He has significant knowledge of Novartis' success with Menveo, including wins and losses, sales, and market share.  He has knowledge of Novartis' plans and strategies concerning Menveo, as well as forecasts, budgets, and financials.  He is also knowledgeable concerning customer complaints regarding Menveo.  He is well-aware of Menveo's product

---

[19] Novartis relies on *In re Centrix Financial, LLC*, 2012 WL 6625920, at *6 (D.N.J. 2012).  But *Centrix* involved a non-party that appeared to have no relevant information, and if it did, the information was otherwise available.  *Id.* ("the Court is not persuaded that [the information sought] is relevant," and "any discoverable information … [is] already available.").  Here, Novartis concedes "it has evidence relevant to the action."

Novartis' citations to other cases are off point.  *See Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009) (relating to the discovery of marginally relevant documents, not the taking of depositions); *Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41-42 (1st Cir. 2003) (same); *State Farm Mut. Auto Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 233 n.3 (E.D. Pa. 2008) (quashing a third, and potentially forth, deposition of the *same* witness testifying in his individual and representative capacities); *In re Lazaridis*, 865 F. Supp. 2d 521, 524 (D.N.J. 2011) (document discovery in a foreign country relating to irrelevant information); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (quashing subpoena issued to journalists in light of journalists' privilege under the First Amendment).

Indeed, two cases Novartis cites actually ***uphold*** the deposition subpoena.  Specifically, Novartis appears to rely on the Westlaw ***headnote*** in *Emerson Elec. Co. v. Le Carbone Lorraine*, 2009 WL 435191, at *1 (D.N.J. 2009), which misstates the Court's holding (by omitting the word "not").  *Emerson* **permitted** foreign depositions concerning foreign activity because – though only indirectly related to the issues – "the Court … [did] **not** find the burden of answering those questions … outweigh their relevance."  *Id.*  Novartis also cites *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004), which *reversed* a motion to quash a subpoena for deposition testimony and documents, merely modifying the documentary portion of it to exclude clearly irrelevant information.

**Proskauer** »

attributes and can testify to many of the documents, produced from his files, that compare Menveo and Menactra. Mr. Rzewnicki can also testify regarding Novartis' unsuccessful efforts to seek an infant indication for Menveo, which may have resulted in significant losses for Novartis unrelated to Sanofi's alleged bundling. He can also testify regarding Novartis' creation of high level plans, analyses, and reports concerning Novartis' Menveo business.

Nonetheless, Novartis seeks to shield Mr. Rzewnicki from a deposition, offering Sanofi and the plaintiffs a Hobson's choice. According to Novartis, Sanofi can either take the deposition of Mr. Sanyour, Head of Pricing and Contracting and Chairman of Novartis' Pricing Committee, *or* Mr. Rzewnicki, the Director of Marketing, who now has some undefined responsibility for pricing.

But the two senior executives have unambiguously had unique responsibilities relevant to this case. Mr. Sanyour is responsible for pricing – a critical position in an industry in which physicians have choices for every vaccine at issue in this case, and for which pricing can be a key determinant for purchasers. One of Sanofi's key defenses in this case is that Novartis elected to price Menveo *at parity* with Menactra, notwithstanding Menactra's status as the incumbent, safe, effective choice for prevention of meningitis during the five years preceding Menveo's entry, and Menveo's status as a "me-too-at-best" entrant. Mr. Sanyour will be the key witness on this topic. Mr. Sanyour will also be able to testify regarding many significant issues regarding the conduct of the Bundle Busting team and campaign.

In contrast, Mr. Rzewnicki can testify regarding Novartis' marketing and sales of Menveo. These are areas in which Mr. Sanyour was *not involved*. Novartis' marketing and sales techniques before, during, and following the launch of Menveo were controversial, to say the least. For example, Novartis elected to discontinue its initial – and successful – discounting practices shortly after launch, causing Menveo to lose market share (Novartis apparently substituted its lobbying strategy for price-cutting). Reputedly, Novartis made false representations to physicians regarding the relative efficacy of Menveo versus Menactra. Novartis made critical elections regarding the customers it would, and would not, target for sales. Novartis also informally, and later formally, jointly "bundled" Menveo with GSK's portfolio. These are critical issues that can neither be covered in less than a full day, nor covered authoritatively by Mr. Sanyour.

That pricing, marketing, sales, and strategy are unique areas requiring different witnesses is confirmed by plaintiffs' insistence to depose ***Sanofi's*** pricing lead, co-heads of marketing, chief operating officer, and head of sales, among many others. Plaintiffs have had, or will have, a full day with each such witness. Sanofi requires the same type of access to mount its defense.[20]

---

[20] Each witness played different roles in Novartis' "Bundle Busting" campaign as well. Christian Lease, who was deposed by Sanofi and plaintiffs on May 16-17, 2013, explained that Mr. Sanyour was initially the primary information source for Novartis' efforts (Lease Tr. at 25:10-14) and Mr. Sanyour communicated with Novartis and Plaintiffs' economists Hal Singer and Kevin Caves "relatively early" in their analysis of Sanofi's alleged anti-competitive bundling scheme. (See Lease Tr. at 254:9 – 255:20) Mr. Rzewnicki did not become the primary contact for Novartis' "Bundle Busting" team until later. (*See* Lease Tr. at 26:3-26:10)

11

**Proskauer》**

Accordingly, this Court should deny Novartis' request for a protective order shielding Mr. Rzewnicki from deposition.

### E. The Court Should Not Anticipatorily Quash the Depositions of Messrs. Narasimhan and McGregor.

Novartis devotes a significant portion of its response seeking an advance ruling prohibiting Sanofi from taking the depositions of its current and former *regional* presidents, Vas Narasimhan and Brent McGregor.  *See* Lease Tr. at 20:9.   As an initial matter, the case law Novartis cites applies on its own terms to "official(s) at the highest level" of a corporation, *e.g.,* a Board Chairman or CEO. Without intending to diminish either executive, Sanofi notes that NVD is a division of Novartis, and Mr. McGregor, and Mr. Narasimhan before him, is a regional head. More importantly, both of these individuals were intimately involved in setting Novartis' U.S. Menveo strategy.  And neither was, or is, the top executive at Novartis Vaccines, itself a relatively small division of Novartis.[21]

Perhaps most tellingly, when Novartis wanted to present to the FTC the most *knowledgeable* witness about the business and the impact of Sanofi's conduct on it, it was Mr. Narasimhan – and no one else – that it chose.  Indeed, Mr. Lease testified that Mr. Narasimhan was "*primarily responsible*" for drafting the presentation made to the FTC, a presentation that contains numerous false, misleading, or at a minimum unsupported, statements.  Lease Tr. at 366:17-20. Mr. Lease also testified that "Vas [Narasimhan] was responsible for the [pricing] strategy, while Mark [Sanyour] was responsible for coming up with the actual price."  *Id.* at 390:7-12.   Mr. Narasimhan also presumably approved the statements to the investment community touting Menveo's success, while simultaneously telling the FTC that it was foreclosed from the market.

Similarly, Mr. McGregor, who succeeded Narasimhan, also has critical information relevant to this suit.  As an initial matter, Mr. McGregor – before he started at Novartis but after he left Sanofi – signed a declaration stating that Sanofi's conduct did not foreclose any competitor, including Novartis.  Yet shortly after he joined Novartis, he met with Mr. Lease and its crisis management firm, and then directed Mr. Lease to proceed with his plan to provide material assistance to those who may wish to disparage Sanofi or challenge its practices.  *See* Lease Tr. 21:1-23:1.  More importantly, Mr. McGregor was the leading force behind Novartis' agreement with GSK to jointly market their portfolio of vaccines, enhancing "bundle-to-bundle" competition, which economists universally recognize leads to lower pricing than line-item

---

[21] Novartis contradictorily asserts that Mr. McGregor and his predecessor, Mr. Narasimhan, are Novartis' "top executives," but then claims that Mr. Narishiman "now holds an even higher position in the global Novartis organization."  The fact is both individuals are mid-level executives within the Novartis corporate hierarchy.  Even as to Novartis Vaccines and Diagnostics, the top executive is CEO "Andrin Oswald."  *See* Lease Tr. 65:12-17.

**Proskauer»**

competition.  More generally, the impact of Sanofi's conduct on Novartis' current business requires testimony from the person currently responsible for that business, *i.e.*, Mr. McGregor.[22]

Novartis seeks to shield these individuals from deposition by analogizing them to instances where parties seek to take the depositions of CEOs who had no involvement in the relevant issues.  This is not that situation.  Neither Mr. McGregor nor Mr. Narasimhan are the type of executives to which the "Apex deposition" standard applies; they are *mid-level* executives within Novartis.  But even if they were, they possess highly relevant information, a fact Novartis does not contest.  This distinguishes this case from the few cases that Novartis cites, where the deposition of the CEO with no knowledge of the relevant facts was designed primarily to obtain settlement leverage.[23]

Just as the CEO in Microsoft cratered its arguments – on the merits – depositions of the two mid-level executives, Mr. Narasimhan and Mr. McGregor, are likely to show that Novartis' efforts to, in its own words, "develop evidence against Sanofi" have been a sham from the start. *Cf. Grateful Dead Prods. v. Sagan*, 2007 WL 2155693, at *1 (N.D.Cal. 2007) ("Because of the potential for abuse, courts do sometimes protect high-level corporate officers from depositions when the officer has no first-hand knowledge of relevant facts or where the testimony would be repetitive. … However, where a corporate officer may have *any* first hand knowledge of relevant facts, the deposition should be allowed."); *see also* Kevin F. Ryan, *Lex Et Ratio*, 27 Jun Vt. B.J. 5, 7 n.13 (June 2001) (citing the deposition of Bill Gates as "one of the reasons Microsoft lost the antitrust suit filed against it").[24]

---

[22] Notably, Novartis excluded both Mr. Narasimhan and Mr. McGregor from the organization charts they provided, and from their proposed list of document custodians.  Relying on the org charts and Novartis' representations about how it ran its business, Sanofi initially agreed to a custodian list that did not include either witness.  It has become apparent that both have been intimately involved in setting Novartis strategy and in the events at issue.  Thus, Sanofi has begun conferring with Novartis, and will soon serve a document subpoena, for these individuals, which will likely be the subject of a separate joint letter.

[23] Novartis' cases are inapposite.  *See Reif v. CNA*, 248 F.R.D. 448, 451-55 (E.D. Pa. 2008) (denying deposition of CEO in a "lower level" employment matter, since CEO had no knowledge or involvement); *Roman v. Cumberland Ins. Group*, 2007 WL 4893479 (executives had "no direct knowledge" of denial of an insurance claim); *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. 2007) (postponing deposition because executives had no personal knowledge, except on one limited issue that could be covered by another employee); *Affinty Labs of Texas v. Apple, Inc.*, 2011 WL 1753982 (N.D. Cal. 2011) (denying deposition of Steve Jobs, who did not have "any knowledge of Affinity, its patents, the inventors of those patents, or infringement by Apple products."); *Chick-Fil-A, Inc. v. CFT Dev., LLC*, 2009 WL 928226, at *3 (M.D. Fla. 2009) (denying deposition where plaintiff "fails to identify any matter about which [the COO] has any knowledge, let alone unique or superior knowledge."); *Burns v. Bank of Am.*, 2007 WL 1589437, at *4 (S.D.N.Y. 2007) (denying deposition of Bank of America's General Counsel, who had "no personal knowledge" and was not even working at the company when the "events at issue" occurred).

[24] *Johnson v. Jung*, 242 F.R.D. 481, 485 (N.D.Ill. 2007) (denying protective order; evidence suggested "knowledge of the incidents forming the basis of plaintiff's claim," as well as "personal involvement in the decision-making process"); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535, 536 (S.D.Ind. 2002) (pointing to evidence of "personal knowledge of and involvement in certain relevant matters" in denying protective order); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y.2001) (protective order denied where court found executive had "some unique knowledge" that was relevant).

**Proskauer»**

## II.    Plaintiffs' Position[25]

Sanofi asserts that its position with regard to Novartis depositions is "straightforward," yet it spends twelve pages of single-spaced type espousing that position.  Indeed, rather than concisely addressing the discovery dispute at issue, Sanofi's counsel, consistent with its *modus operandi* in this case, launches into a rambling and inaccurate diatribe about how Plaintiffs' claims—upheld on the pleadings by Judge Linares[26] and confirmed by the evidence adduced to date—are the product of some kind of conspiracy between Plaintiffs' counsel and Novartis.  The fact that its conspiracy allegations have no support in the documents and were then debunked by the first Novartis deponent, Christian Lease, did not deter Sanofi's counsel from reiterating them here.  Thus, in response to Sanofi's arguments, Plaintiffs' portion of this letter is in two sections.

*First*, Section A sets forth Plaintiffs' views with respect to depositions of Novartis employees.  Plaintiffs agree that Novartis is an important third-party witness on the merits as it constitutes a substantial part of the competition impaired by Sanofi's monopoly bundling at issue, but disagree with Sanofi's attempt to focus these third party depositions on Sanofi's irrelevant and baseless claim that Novartis "instigat[ed] this lawsuit" and is "working with plaintiffs' counsel."

*Second*, because Sanofi injects multiple mischaracterizations and misrepresentations into this (and seemingly every other) letter to the Court, Plaintiffs briefly respond on the merits, lest our silence be construed either as acquiescence with Sanofi's mischaracterization of the record or as tacit acknowledgment that Sanofi's single-minded focus on its baseless theory that Novartis instigated this lawsuit.  That theory should be seen for what it is: a desperate attempt to distract from the merits of a case in which the evidence adduced to date clearly and increasingly supports Plaintiffs' allegations.  Thus, in Section B, Plaintiffs briefly review some of the evidence showing that, as Plaintiffs alleged, Sanofi has, for years, operated an illegal and anticompetitive bundling scheme with the purpose of handicapping competition from Novartis and other potential competitors and maintaining supracompetitive prices for its meningococcal vaccines.

### A.  *Plaintiffs' Positions Regarding Sanofi's Request For Novartis Depositions*

Plaintiffs request that, for any Novartis deposition *that is noticed by both parties*, there be a presumptive equal split of time for Plaintiffs and Sanofi to question the witness.  The parties

---

[25] Plaintiffs do not consent to referring this dispute to the Special Master, and Plaintiffs do not wish to bear the expense of such a referral because, as discussed herein, the parties and Novartis have not met and conferred on a number of issues related to Sanofi's proposed deposition discovery of Novartis, and Plaintiffs believe that Sanofi's requests for discovery from Novartis are excessive in the first instance.  Plaintiffs request that Sanofi's entitlement (or lack thereof) to wide-ranging discovery from Novartis, which threatens to go well beyond any possibly relevant issue in this case, should be decided in the first instance by the Court, and *after* an appropriate meet and confer on these issues.  Moreover, Sanofi's footnote 4 misrepresents the record.  Plaintiffs have *not* consented to referring any and all future discovery disputes to the Special Master, and indeed, the Court made clear that such decisions would be made on an "as-needed basis."  Dkt. 181, at 35:1-2.  Plaintiffs believe that this dispute is not an instance where referral to the Special Master would be appropriate.

[26] In addition to rejecting Sanofi's motion to dismiss Plaintiffs' First Amended Complaint in all respects, Judge Linares dismissed, as a matter of law, Sanofi's Counterclaim.  *See generally* Doc. No. 135.

**Proskauer》**

agreed to a presumptive 50/50 time split for all non-Novartis third-party deponents that are noticed by both parties, and believe that the same arrangement should be applied here as well given that, on the merits, information about the impaired competitor (Novartis) in a case about abuse of monopoly power, is clearly important both to the Plaintiffs and Sanofi.

Regarding the deposition of Mark Sanyour, a Novartis employee with pricing responsibility, Plaintiffs have well more than 3.5 hours of material about which to question Mark Sanyour.  It is hard to say with specificity how many hours Plaintiffs will have with Mr. Sanyour without knowing what background information Sanofi may cover in the opening portion of the deposition, but Plaintiffs estimate they have at least 5 hours (and potentially more than 7 hours) of material to cover with Mr. Sanyour.  If the Court limits the parties to fewer than two full 7-hour days with Mr. Sanyour, Plaintiffs ask that the Court split the time evenly between Plaintiffs and Sanofi.  Naturally, if the Court limits the parties to one 7-hour deposition of Mr. Sanyour, Plaintiffs ask the Court to allow Plaintiffs half of that time.

Regarding the proposed deposition of Mr. Rzewnicki, Plaintiffs believe that it is premature to determine whether a full two days is necessary for Mr. Rzewnicki's deposition.  It will likely be more efficient to defer that determination until after Mr. Sanyour's deposition, at which point the parties can more accurately gauge whether a deposition of Mr. Rzewnicki is necessary, and if so, how many hours on the record would be appropriate for that deposition.

Finally, in footnote 3, Sanofi requests (a) a full day (for Sanofi alone) for each of seven additional Novartis witnesses that Sanofi has identified, and (b) additional depositions for unspecified amounts of time with an unspecified group of Novartis witnesses.  Plaintiffs do agree that a limited number of the individuals named by Sanofi are relevant to the claims and defenses in this case, but the sheer number of depositions proposed by Sanofi is excessive, particularly given the relatively limited range of topics about which Novartis testimony will be necessary above and beyond the documents it has already provided in discovery.  More importantly, however, the parties have not met and conferred regarding these additional witnesses, including as to whether there is some less burdensome way to conduct this discovery.  Thus, Plaintiffs believe it is premature to bring this dispute before the Court.

### B.  Plaintiffs' Response To Sanofi's Mischaracterizations Of The Evidentiary Record

As noted above, Sanofi's description of the evidentiary record in general, and Novartis's role in this case in particular, is inaccurate, misleading, and requires correction. Plaintiffs briefly take the opportunity to do so here.

### 1.  The Record Strongly Supports Plaintiffs' Claims Regarding Sanofi's Anticompetitive Bundling.

For years, Sanofi has implemented an anticompetitive and continuing bundling scheme through a web of contracts with, *inter alia*, physician buying groups ("PBGs"), group purchasing organizations ("GPOs"), integrated health networks ("IHNs"), and health systems ("HSs").  As set forth in far more detail in the Complaint and in Judge Linares's decision denying Sanofi's motion to dismiss, Sanofi's bundling contracts—often given the Orwellian label of "loyalty"

**Proskauer**≫

contracts—foreclose competition by threatening to impose steep penalty prices on *all* Sanofi vaccines for purchasers who do not agree to forego purchasing even a small amount of vaccines from Sanofi's rivals.  Because Novartis competes against Sanofi in only the meningococcal vaccine market, any customer who wishes to buy from Novartis would be subject to penalty prices on all other Sanofi vaccines.  This means that, in order to compete on price, Novartis must offer discounts steep enough to compensate purchasers for all of the penalty prices the purchasers would incur on other Sanofi products.[27]  *See* Op. Denying Mot. Dismiss (Doc. No. 106), at 4-6.

Indeed, while Sanofi kicks up a lot of dust about how Novartis could still fairly compete notwithstanding these contracts, and that Novartis is somehow using this lawsuit to gain an unfair competitive advantage, Sanofi's own internal documents contradict these arguments and show that Sanofi knew that its bundling contracts would help it stifle competition .  For example, Sanofi's own internal assessments admit that its bundling scheme was devised with the intent to "*insulat[e] . . . Menactra from competition*," SP 00391938, to "*ensure[] that [Sanofi] will lock in business*" for Menactra, SP 00116653.  Sanofi further recognized that its bundling contracts "*provide[d] a significant barrier for Novartis to overcome*" in trying to gain market share, SP 00378755, just as Plaintiffs have alleged.  Indeed, Sanofi recognized that head-to-head competition with Menveo would result in lower prices or erosion of market share—two conditions that would threaten Sanofi's monopoly profits.  *See e.g.*, SP 00501061 ("Sanofi Pasteur vs. Novartis is better than Menactra vs. Menveo"); SP 00042810 (noting "line item comparison" puts Sanofi "at a significant disadvantage" and that Sanofi "needs to analyze Menactra vs. Menveo in the context of the overall portfolio" instead of head-to-head price comparison).  Thus, by using its bundling contracts to "avoid[] a head to head price comparison with Novartis" for meningococcal vaccines, SP 00684858, Sanofi could maintain its monopoly power and continue to charge supracompetitive prices to Plaintiffs and the proposed Class of vaccine purchasers.

Likewise, Sanofi's own internal documents also show that Sanofi is and has long been aware of the powerful exclusionary incentives embedded in its bundling contracts, which are designed to disrupt competition on the merits between vaccines, and leverage Sanofi's monopoly power and broad product line to defeat less powerful rivals, including those like Novartis that do not have a broad vaccine product line.  *See, e.g.*, SP 00010812 (Menactra "selling strategy" involves "[u]tiliz[ing] the full portfolio to sell against Menveo," touting "[t]otal value discounts of SP portfolio," with "[c]onsultative message that clearly links 4 product loyalty to pricing and admin fee benefits"); SP 00501064 ("***Moving to Menveo would save almost $3 per dose, but will force the contract owner to remove them***" **and thereby incur price penalties on the full**

---

[27] For instance, as a result of the bundling requirements in Sanofi's scheme, purchasers are incentivized to refrain from buying Novartis's Menveo vaccine (which inoculates against meningitis in competition with Sanofi's Menactra vaccine) due to the threat of paying price penalties on *the full-line of Sanofi vaccines* as a punishment for disloyalty to Sanofi with respect to only one vaccine.  *See, e.g.*, Kevin Caves & Hal Singer, *Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, J. Comp. Law & Econ. (2012), at 20-23; Susan H. Manning & Jonathan S. Bowater, White Paper: *The Effects of Bundled Discounts on Entry in the Market for Pediatric Vaccines* (2012), at 8-12; Kevin W. Caves & Hal J. Singer, White Paper:  *Bundles in the Pharmaceutical Industry: A Case Study of Pediatric Vaccines* (2012), at 35-43.

**Proskauer»**

**line of Sanofi vaccines, costing the healthcare provider far more than the savings gained by switching to Menveo**) (emphasis added); *id.* (due to bundling penalties, any savings that would accrue to a purchaser switching to the less expensive Menveo, would be offset by Sanofi's penalties on its other vaccines: "Savings on Menveo not worth increased costs for [Sanofi's combination vaccine, Pentacel]").[28]

Additionally, Sanofi is (and has been) aware that by using "market share measurements" to award administrative fee and rebate payments to PBGs (and other purchasing groups), it strongly incentivizes these groups to drive strict compliance to Sanofi's exclusivity requirements. Indeed, not only do Sanofi's sales personnel threaten the imposition of penalty prices (through the loss of contract pricing) for purchasing competing products, Sanofi's sales personnel act, in as stated in one confidential internal Sanofi document, as the "'eyes and ears' of each [PBG] member's performance" because they are "in these members' offices doing inventory checks," and are expected to report purchases of competing vaccines to higher-level account managers. *See, e.g.*, SP 00945389-90.

In addition to providing incentives to enforce compliance with Sanofi's bundling requirements, Sanofi's administrative fee structure strongly incentivizes physician buying groups and group purchasing organizations to support Sanofi's efforts to maintain monopoly power, and thereby artificially inflate vaccine prices above competitive levels. As Sanofi's Deputy Direct of Contracts Administration and Finance, Laurie McDonald, explained in an email to another Sanofi executive regarding a potential price increase, ***buying groups that receive administrative fees "aren't going to complain [about prices increases]" given that Sanofi "just increased their fee basis."*** SP 00088811; *see also* McDonald Dep. Tr., at 230 ("Q. So the PBG agents get more money when the prices go up? A. That would be correct.").

In short, it has become increasingly clear that Sanofi intended to maintain its monopoly power through its bundling contracts and to charge supracompetitive prices for vaccines that are critical to the public health. Facing the potential loss of a business plan that allows it to avoid competition on the merits and reap huge profits in doing so, Sanofi is now fighting the only way it can—by attempting to bog this case down and focus on the sideshow conspiracy theory that in impaired competitor is really the one behind this lawsuit. But as discussed below, this conspiracy theory is a baseless side-show.

2.   Sanofi's Conspiracy Theory Has Been Debunked.

---

[28] *See also* SP 00945389 (when Menactra loyalty tied to prices of other Sanofi vaccines, "PBG members are motivated to maintain and increase full-line product compliance "); SP 00945377 (noting new contracting scheme "ensures that [Sanofi] will retain business"); SP 00388874 ("Retain Menactra market share by leveraging our contract strategy . . . to drive conversions and stronger commitment to the sp portfolio"); SP 00391938 (***"Implementing new contract strategy to protect business" by "[i]nsulat[ing] . . . Menactra from competition"***); SP 00116653 (***loyalty requirement "ensures that [Sanofi] will lock-in business and insulates [Sanofi] from competition"***); SP 00378755 (***penalty on entire bundle for switching to Menveo "provides a significant barrier for Novartis to overcome"***); SP 00706342 ("although the Menveo savings was about $8K a year, their total contract savings by remaining compliant is $105k- easily offsetting the competition").

**Proskauer»**

Novartis did not "instigat[e]" this lawsuit, as Sanofi's counsel continues to claim. *Supra* at 2. Nor is Novartis is "working with plaintiffs' counsel" on this lawsuit. *Supra* at 3.[29] Moreover, if Novartis did in fact "spend literally thousands of working hours laying the groundwork for this case" as Sanofi states, *supra* at 2, that would not only be irrelevant to any claim or defense, but it would be news to Plaintiffs' counsel, who have brought this case without assistance from Novartis.

Sanofi's conspiracy theory has not improved with time. Whereas Sanofi previously described Plaintiffs as Novartis's "stalking horse" and argued that Novartis brought Dr. Castro into this lawsuit as a named Plaintiff, discovery has shown that these arguments are simply not true. Novartis's interests are aligned with Plaintiffs *only* in so far as purchasers of Sanofi vaccines and Novartis have been harmed by the same anticompetitive bundling scheme perpetrated by Sanofi. It is simply not the case that Novartis is anything other than an interested non-party.

Indeed, it is clear that Sanofi believed the deposition of Mr. Lease would yield the evidence it needed to prove that Novartis is behind the lawsuit, but that deposition showed just the opposite. The only contact between Mr. Lease and Plaintiffs' counsel was one brief phone call prior to the filing of the lawsuit, *see* Lease Depo. 133:12-22, which is exactly the kind of third-party witness interviews one would expect diligent Plaintiffs' counsel to conduct with an impaired competitor in preparing to file a monopolization case. Sanofi is literally accusing Plaintiffs' counsel of doing their jobs responsibly. Moreover, Mr. Lease even testified that Novartis's official position was that it would not help Plaintiffs' counsel with this lawsuit.[30] Lease Depo. At 129-131.

In short, Sanofi's conspiracy theory is running out of gas, and instead of abandoning it and focusing on the merits of the case (which is the last thing Sanofi wants to do here), Sanofi is increasingly focused on creating a sideshow out of discovery with Novartis. This effort should be rejected.

---

[29] Additionally, Sanofi misstates the record by referring to Navigant as being "jointly retained" by Novartis and Plaintiffs' counsel. *See supra* at 3. Each separately retained and used Navigant as an economic consultant in conjunction with investigating Sanofi's illegal conduct. Navigant is a well-respected economic consulting firm involved in many of the most important antitrust cases. Novartis hired Navigant to investigate Sanofi's bundling practices, and this investigation resulted in a white paper spelling out the anticompetitive effects of Sanofi's bundling practices. Plaintiffs' counsel read that white paper, had discussions with Navigant's economists about its findings, and decided to retain Navigant as a non-testimonial consultant, independently of Novartis, because Navigant economists were far up the learning curve on certain relevant issues. Moreover, Plaintiffs' counsel has long worked with the Navigant economists at issue as both a consulting and testifying expert in multiple other antitrust cases. But Navigant is not a "jointly retained consultant."

[30] Now that Sanofi has come up empty-handed in its efforts to substantiate its conspiracy theory, Sanofi has resorted to the well-worn refrain from a party lacking evidence, namely, that Novartis must have somehow spoliated all of the evidence showing its direct involvement in this lawsuit. But Sanofi misrepresents the supposed record on this issue, as Sanofi's only "evidence" of spoliation is literally a lack of evidence: that Mr. Lease's production did not have certain documents that were in Navigant's production. *See, e.g.*, Lease Depo. at 163-64.

**Proskauer»**

More importantly, even putting aside the baselessness of Sanofi's conspiracy theory, it is ultimately irrelevant to any claim or *legitimate* defense in this case.

Reading past the bluster in Sanofi's position Sanofi can only come up with a narrow set of issues to which Novartis discovery is relevant.  In particular, Sanofi asserts that the requested deposition discovery is:

> [R]equired to show: (i) Novartis is not being driven from the alleged relevant market, but instead has made over a hundred million dollars on its U.S. Menveo franchise; (ii) Novartis' market share has not been stunted as a result of any unlawful conduct, but has instead rapidly grown; (iii) Novartis has succeeded in competing for business in every segment of the alleged relevant market; and (iv) there is no merit to the unsubstantiated allegation that Sanofi's conduct has increased Novartis' variable costs.

*Supra* at 3-4.  But if that is the purported focus of all this requested deposition discovery, how is Sanofi's theory that Novartis is behind this lawsuit possibly relevant to *any* of those points?[31]  In short, it is not relevant, and Sanofi's effort to burden and harass Plaintiffs (and potentially Novartis, too) by diverting resources to this sideshow should be halted.

To be sure, Plaintiffs do agree with Sanofi that Novartis is an important third-party witness on a handful of topics, including on topics such as Sanofi's impairment of Novartis in competing in the meningococcal vaccine market, the effect of Sanofi's monopoly bundling on Novartis's ability to compete within the meningococcal vaccine market, and Novartis's pricing and market decisions with respect to Menveo.[32]  These are legitimate issues that are relevant to the case, important to both Plaintiffs and Sanofi.  This is why Plaintiffs request an equal split of deposition time with Mr. Sanyour, a Novartis employee directly involved in pricing decisions.

---

[31] Likewise, Sanofi also asserts that its discovery is focused on the fact that Novartis lobbied government agencies to stop Sanofi from what Novartis apparently (and correctly) believes are anticompetitive bundling practices; that Novartis hired a public relations firm to help it break Sanofi's stranglehold on pediatric vaccine markets; and that Novartis had a corporate policy dedicated to breaking the anticompetitive effect of Sanofi's bundling.  But even if true, none of this is remotely surprising or improper.  Moreover, and more importantly, how are any of those points relevant to the issues Sanofi lists as the focus of its discovery?

[32] Contrary to Sanofi's assertion, Plaintiffs have not "conceded in their responses to Sanofi's written discovery that they lack **any** information to support this allegation," *supra* at 3, and indeed, Sanofi cites no support for that untrue statement because it is simply untrue.  As the Complaint alleges, Novartis's share of the  meningococcal vaccine market is substantially smaller than it otherwise would have been as a result of Sanofi's anticompetitive contracting scheme.

**Proskauer** ≫

### III.    Novartis' Position[33]

Although not a party to this litigation, Novartis recognizes that it has evidence relevant to the action and has gone to great lengths to comply with Sanofi's subpoenas, including producing over 1.1 million pages of documents, producing the entire contents of multiple confidential internal databases, producing a witness (Christian Lease) for a two-day deposition, agreeing to produce an additional witness for a deposition, and agreeing to consider producing additional witnesses for deposition if they have substantial, material, non-duplicative knowledge.[34]

Sanofi and the Plaintiffs, however, now demand even more of Novartis.  Though raised for the first time here, Sanofi's letter makes clear that it expects the parties to take depositions of at least nine additional Novartis employees (including 30(b)(6) depositions), most for two days apiece (one day for Sanofi and one day for Plaintiffs) – including the depositions of both Novartis's current and former President. (This is in addition to the two days of deposition already taken.)  Novartis objects to this request, which should not be allowed.[35]

---

[33] Novartis would prefer for this Court to decide the issues raised in this Joint Letter, rather than a Special Master, for three reasons. First, Novartis believes that directly reviewing these matters will allow the Court to understand the extent to which Sanofi (and, to a lesser extent, Plaintiffs) seeks to impose extraordinary and undue burdens on non-party Novartis. Second, Novartis would prefer not to face the costs associated with briefing an additional level of appeal, as it has already been put to extraordinary costs in this matter. Finally, Novartis understands that the parties cannot agree on how to divide the costs of the Special Master, and that at least Plaintiffs have contemplated non-party ***Novartis*** shouldering some of that expense.  Sanofi nonetheless claims above that Novartis initially was willing to consent to referring the matter to the Special Master, and then changed its mind – as has been pointed out to Sanofi, this is false.  As Novartis is a non-party and not privy to the discussions between the parties and this Court regarding the role of the Special Master in this case, Novartis initially declined to take ***any position*** on whether this matter was appropriate to refer to the Special Master, and was instead prepared to abide by whatever the parties' agreed upon.  (Frankly, we did not think this would be such a contentious issue.)  However, since it is now clear that the parties cannot see eye-to-eye, Novartis believes that these issues are better suited for this Court rather than the Special Master.

[34] Sanofi makes a number of accusations against Novartis, including that Novartis lied to the Federal Trade Commission, "reputedly" lied to physicians regarding the efficacy of Novartis's products, and destroyed documents prior to receiving a subpoena.  Novartis refuses to be drawn into a mud-flinging contest with a competitor, but will correct Sanofi's claims where necessary to this motion.

[35] The only matter technically ripe for consideration is Sanofi's request for a second day to depose Mark Sanyour. (Novartis does not object to producing Mr. Sanyour for one day, if that is who the parties believe should testify to issues related to pricing and contracting, but does object to a second day.)  Although Sanofi speaks in terms of a protective order with respect to Peter Rzewnicki, neither Sanofi nor Plaintiffs have yet served a subpoena on him. However, Novartis's objection to a second day of deposition for Mr. Sanyour is based on Sanofi's representation that this deposition is merely the tip of the iceberg, to be followed shortly by a subpoena to Mr. Rzewnicki and then similar subpoenas to a string of other Novartis employees.  Accordingly, both Sanofi and Novartis here discuss not just the deposition of Mr. Sanyour, but also all the issues related to Sanofi's further planned subpoenas to Novartis. Novartis suggests that the Court consider exercising its inherent power to manage discovery in its matters by addressing now all of the deposition subpoenas Sanofi proposes to serve.  Sanofi includes a footnote seeking to rebut Novartis's raising of this issue, even going so far as to say that Novartis should not be "heard to complain…" about it.  But Novartis is not complaining; it is merely alerting the Court to the issue and explaining that Novartis has no objection to reaching questions that may not technically be ripe.  It is unfortunate that something so simple has to be so contentious.

**Proskauer》》**

### A. Novartis Has Never Taken the Position that Sanofi Can Take Only One Further Deposition, But Also Refuses to Consent to Nearly Unlimited Discovery

As an initial matter, Sanofi misrepresents Novartis's position. As it has made clear to Sanofi, Novartis *is* willing to consider more than one additional deposition in this matter, but it is not willing to consent to duplicative depositions of multiple employees.[36]

On March 20, 2013 Sanofi stated that it planned to subpoena Mark Sanyour, explaining that it believed him to have responsibility for Novartis's pricing and contracting practices with respect to Novartis's Menveo product, the key Novartis product relevant to this case. Although Mr. Sanyour does have responsibility for ***government*** pricing and contracting, he does not have general pricing responsibility for Menveo.[37] Novartis advised Sanofi that another employee, Peter Rzewnicki, had direct responsibility for Menveo pricing and suggested that Sanofi may want to depose him instead of Mr. Sanyour. *See* March 25, 2013 Letter from Bryan Gant to Colin Kass, Exh. 2. Novartis further made clear that it would not allow unlimited, duplicative depositions:

> We wanted to make sure you were aware of that fact [i.e., that Mr. Rzewnicki rather than Mr. Sanyour was the person with principal responsibility for Menveo pricing] given your observation that you plan to subpoena additional Novartis witnesses. As I said on our call, Novartis will not voluntarily make numerous deponents available. Under the applicable rules, a third-party such as Novartis is entitled to protection from undue burden. Whether burden is undue depends, among other things, on (1) the relevance and materiality of the information sought, (2) the extent to which the discovery sought is duplicative, and (3) the cumulative burden of all discovery imposed on the third-party (which in this case includes one million pages of documents). While Novartis will not oppose Sanofi's taking the [Lease and Sanyour] depositions referenced above, it believes that those two depositions already approach or exceed the burden to which it should be subjected.

---

[36] In response to Novartis's pointing out that Sanofi had misrepresented Novartis's position, Sanofi simply misrepresents Novartis's position in a different way: Sanofi now claims that Novartis has drawn a hard-and-fast "two depositions" limit. To the contrary, Novartis would be willing to consider a further truly necessary deposition (in addition to Mr. Sanyour, Mr. Rzewnicki, and the already-taken two days of Mr. Lease) if Sanofi were able to provide ***any basis for needing one***. But when asked in a recent meet-and-confer to explain ***why*** it needed so much additional, burdensome discovery on top of the 1.1 million pages and the depositions to which Novartis already has agreed, Sanofi could only argue that it needed yet more evidence for "impeachment" of Novartis witnesses. As explained below, this is simply not a sufficient argument for further expanding the burden on a third party.

[37] Sanofi suggests it was misleading of Novartis to point out that Mr. Sanyour is responsible only for pricing of Menveo to the government, whereas Mr. Rzewnicki is responsible for all Menveo pricing, given that Mr. Sanyour previously was responsible for all pricing. Novartis's statement was not misleading, especially given that it knew that Sanofi had thousands of documents indicating the roles of these two individuals. Novartis believed and believes that Mr. Rzewnicki has the greater relevant experience, and it wanted to avoid a situation in which Sanofi first deposed Mr. Sanyour and then concluded that it was really Mr. Rzewnicki that it needed.

**Proskauer»**

Accordingly, we urge Sanofi to prioritize its discovery. If either [Mr. Rzewnicki or Mr. Sanyour] is not one of your top two proposed Novartis deponents, we suggest that you instead depose someone at Novartis with more relevant and material information.  I make this point now, despite the lack of a current controversy, so that you understand that subsequent efforts to depose Novartis employees may face an objection based on undue burden, even if those deponents have relevant and material information and Novartis would not have objected to those depositions if they had been the only ones noticed. For example, Novartis would object to a deposition of Mr. Rzewnicki if Mr. Sanyour has already been deposed.

*Id*.  Sanofi's response, however, was to demand the right to depose *both* Mr. Sanyour and Mr. Rzewnicki on this topic.  *See* March 26, 2013 Letter from Colin Kass to Bryan Gant, Exh. 3. Sanofi reiterated this demand for duplicative depositions on the same topic in a further letter on April 30, 2013.  *See* April 30, 2013 Letter from Ryan Blaney to Bryan Gant, Exh. 4.  Novartis again responded that it was willing to produce one witness to testify on the topic, but not two:

With respect to the requested deposition of an employee with responsibility for pricing and contracting, either Mark Sanyour or Peter Rzewnicki would be available on June 6.  However, please be aware that if Sanofi seeks to depose more than one Novartis employee with responsibility in this area, Novartis will move to quash.  To be clear, if Sanofi identifies a particular need for testimony regarding a truly relevant and important topic *not* covered by Christian Lease or Mr. Sanyour ∕ Mr. Rzewnicki, we are not at this point stating that we would oppose a subpoena to a witness to address that topic.  However, as a non-party Novartis will not voluntarily produce duplicative witnesses on any topic.  We therefore encourage you to choose which employee you would prefer to depose on the issue of pricing and contracting, rather than burdening the Court with a motion to quash.

May 2, 2013 Letter from Bryan Gant to Ryan Blaney, Exh. 5.  Sanofi nonetheless continued to demand that the two witnesses be presented on the same topic.  *See* May 22, 2013 Letter from Ryan Blaney to Bryan Gant, Exh. 6.

Sanofi, apparently aware that its demand for two witnesses on the same topic is untenable, now claims that it seeks to depose only *Mr. Sanyour* on the topic of pricing and contracting, and that the never-before-disclosed purpose of the Rzewnicki deposition would instead be to cover topics such as marketing and sales.   Novartis frankly would not oppose such an approach – *if* the parties agreed not to then seek further duplicative depositions on the issues covered by Mr. Rzewnicki and *if* the depositions were limited to the seven hours provided by Federal Rule of Civil Procedure 30(d)(1).  Unfortunately, Sanofi's position is that the parties should be allowed to depose Mr. Sanyour and Mr. Rzewnicki for a total of ***fourteen*** hours each, and ***then*** be allowed to depose additional witnesses who ***also*** have responsibility for marketing and sales at Novartis.  It is these demands to which Novartis objects.

Proskauer»

### B.  Novartis Is Entitled to Protection Against Undue Burden

Under Federal Rule of Civil Procedure 45(c)(3), a court "must quash or modify a subpoena that . . . subjects a person to undue burden."  Federal Rule of Civil Procedure 26(b)(2)(C) requires that a court "limit the frequency or extent of discovery . . . if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  *See also In re Centrix Financial, LLC*, 2012 WL 6625920, at *6 (D.N.J. Dec. 18, 2012).[38]  This rule imposes a proportionality standard, under which the probative value of the information requested should be balanced against the costs and burdens imposed upon the producing party.  *Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, Civ. A. No. 05-6042, 2009 WL 435191, *1 (D.N.J. Feb. 18, 2009).[39]

The factors that a court may consider in determining whether requested discovery presents an undue burden include: (1) the party's need for the production; (2) the nature and importance of the litigation; (3) the relevance of the material; (4) the breadth of the request for production; (5) the time period covered by the request; (6) the particularity with which the documents are described; and (7) the burden imposed on the subpoenaed party.  In re Lazaridis, 865 F. Supp. 2d 521, 524 (D.N.J. 2011).  The burden thrust on nonparties is a factor entitled to special weight in evaluating balance of competing needs.  *See Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004); *Heidelberg Ams, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41-42 (1st Cir. 2003); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998); *Centrix*, 2012 WL 6625920, at *6.  This is true, moreover, even when the subpoenaing party seeks to argue that the non-party subpoena target has an interest in the litigation.  *See Centrix*, 2012 WL 6625920, at *6.

Sanofi's and Plaintiffs' request to depose at least nine further Novartis witnesses, including most for multiple days,  is unduly burdensome and duplicative, and it should not be permitted.

1.    Non-Party Novartis Should Be Protected Against the Undue Burden of Presenting Multiple Deponents on the Same Issue

Initially, to the extent that Sanofi still seeks to depose two witnesses with responsibility for Novartis's pricing and contracting practices, such duplication is inappropriate.  *See, e.g.*,

---

[38] The court in *Centrix* quashed the subpoena first and foremost because it burdened a non-party.  Sanofi claims that this case is distinguishable because the subpoenaed party lacked relevant information, but in fact the court did so largely because the burden on the third party was too high.  *See Centrix*, 2012 WL 6625920, at *6.

[39] *See also Inventio AG v. Thyssenkrupp Elevator Am. Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009); *State Farm Mutual Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 233 n.3 (E.D. Pa. 2008).  Sanofi claims that Novartis misstates *Emerson* by citing the "headnote" rather than the case.  Novartis does no such thing.  The court clearly explained that "Rule 26(b)(2)(C) incorporates the rule of proportionality. Thus, Rule 26(b)(2)(C) requires the Court to limit the extent of the discovery when, *inter alia*,'the burden or expense of the proposed discovery outweighs its likely benefit' or the information can be obtained from another, less burdensome, source."  *Emerson*, 2009 WL 435191, at *1.  Nor (despite Sanofi's attempt to distinguish the other cases Novartis cites) is this a controversial proposition:  Rule 26(b) imposes a proportionality standard, which Sanofi oversteps by seeking burdensome discovery from a third party on issues of little or no relevance.

**Proskauer》》**

Federal Rule of Civil Procedure 26(b)(2)(C); *Centrix*, 2012 WL 6625920, at *6.   However, Sanofi now claims to seek Mr. Rzewnicki's testimony with respect to a number of topics other than pricing and contracting, principally Novartis's sales and marketing practices.   Novartis does not object to such a deposition, if Mr. Rzewnicki is the witness that Sanofi would like to depose regarding these issues.   However, in addition to Mr. Rzewnicki, a director of marketing, Sanofi also seeks the deposition of five other Novartis custodians with responsibility for sales and marketing, including two presidents, a vice president of marketing, a senior director of marketing, and a "National Segment Lead."   And Plaintiffs also seek depositions of each of these witnesses – meaning that the parties would end up taking at least twelve depositions from Novartis on the subject of sales and marketing (with the possibility of additional 30(b)(6) or other witnesses as well).   Given the duplicative nature of this request, the Court should limit the parties to truly necessary and non-duplicative depositions.

2.    <u>Non-Party Novartis Should Be Protected Against the Undue Burden of Presenting Its Current and Former Presidents for Multiple Depositions</u>

Sanofi and Plaintiffs should also be precluded from taking ***four days*** of depositions from Novartis's current and former Presidents.[40]   Courts consistently have recognized the need to avoid depositions of senior executives unless the subpoenaing party has demonstrated that such executives would have unique or superior relevant knowledge.   *See, e.g.*, *Reif* v. *CNA*, 248

---

[40] While Novartis is a multi-national corporation, as Sanofi claims, Mr. MacGregor and Mr. Narashiman hold or have held the highest position in the North American entity subpoenaed by Sanofi.  There is no basis to demand that a third party produce such a witness.  The cases Sanofi cites are all inapposite because each deals with a deposition of a *party's* executives, rather than a third party's.  *See Johnson v. Jung*, 242 F.R.D. 481, 485 (N.D. Ill. 2007); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001).

Importantly, moreover, Sanofi indicates in its portion of this letter that it intends not ***just*** to seek depositions of these top executives, but also to serve a subpoena for documents.  Sanofi has separately indicated that this planned subpoena would include at least five new custodians (including these executives), and additional topics.  Although this issue will be raised separately, Novartis notes now that any such subpoena will be improper.

In September 2012 Sanofi had the opportunity to identify the topics and witnesses for which Novartis should produce documents, and identified ***seventeen*** such custodians and numerous topics.   Novartis has spent the last eight months producing responsive documents, at great expense.  Sanofi did not, however, seek documents from Novartis's top executives, nor would Novartis have voluntarily agreed to produce them.  That Sanofi even proposes to reopen document discovery in this way – to demand that Novartis, after having produced over 1.1 million pages of documents, now start over with additional custodians and additional topics – reveals just how utterly uninterested Sanofi is in respecting Rule 45(c)(1)'s demand to limit undue burden on a third party.  Rule 45(c)(1) ***requires*** sanctions against a party that fails to take reasonable steps to avoid undue burden ("the issuing court ***must enforce this duty and impose an appropriate sanction*** . . ."), and Novartis reserves the right to seek them here.

Sanofi seeks to justify its extraordinarily burdensome demand to re-open production by claiming that Novartis somehow improperly failed to list its President on its organization charts back in August 2012.  But as Novartis told Sanofi on August 28, 2012, Novartis "does not regularly maintain organization charts within the United States," but "in the spirit of cooperation" was producing "the possibly-relevant organization charts we have located thus far." *See* August 28, 2012 Letter from Bryan Gant, Exh. 7.  Sanofi was therefore fully on notice that it would need to conduct its own investigation into the identity of Novartis's top executives if it wanted to include them on its list of custodians – a simple Google search would have sufficed – and cannot now attempt to blame Novartis for its decision to instead choose ***seventeen other*** custodians.

**Proskauer** »

F.R.D. 448, 451-55 (E.D. Pa. 2008); *Roman* v. *Cumberland Ins. Grp.*, No. 07-cv-1201, 2007 WL 4893479 (E.D. Pa. Oct. 26, 2007); *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374 MMC (JL), 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) ("Virtually every court that has addressed deposition notices directed at an official at the highest level . . . has observed that such discovery creates a tremendous potential for abuse or harassment.").[41]   Before a party is permitted to depose the high ranking officers of its corporate opponent, it must show that (1) the executive actually possesses unique or superior knowledge regarding issues germane to the litigation, and (2) the information is not otherwise available from another witness or through less intrusive discovery.  *See Reif*, 248 F.R.D. at 451-55.  Sanofi offers no justification for its request to depose **not just** the individual with the highest level of authority at Novartis, but also his predecessor – who now holds an even higher position in the global Novartis organization.   The request for four deposition days from Novartis's top executives therefore should be denied.

3.    <u>Non-Party Novartis Should Be Protected Against the Undue Burden of Presenting Witnesses for Multiple Day Depositions</u>

Sanofi and Plaintiffs offer three justifications for the demand that they *each* have seven hours to depose **virtually every** Novartis witness: (a) the Lease deposition required seven hours (for Sanofi), and therefore all other depositions will as well,[42] (b) Novartis's witnesses are "hostile" to Sanofi, and (c) Sanofi would like to use the depositions to make a record for use at trial.  None of these arguments justifies the substantial burden Sanofi seeks to impose on non-party Novartis.

Sanofi first complains that Plaintiffs asked Mr. Lease if he agreed with statements in documents, which Sanofi claims required extensive re-cross.  But Sanofi not only fails to explain why this would be any different than any other deposition, it fails to inform the Court that the documents and statements covered by the Plaintiffs were the **same** documents and statements addressed by Sanofi in its prior examination – and yet Plaintiffs completed their examination in a fraction of the time.  Sanofi then complains that Novartis is a "hostile" witness.  Even if true, virtually all deponents are "hostile" to the party taking the deposition, and the Federal Rules nonetheless recognize that depositions should be completed in seven hours.

---

[41] *See also Affinity Labs of Texas* v. *Apple, Inc.,* No. C 09-4436 CW (JL), 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011); *Chick-Fil-A, Inc.* v. *CFTDev., LLC,* No. 5:07-cv-501-OC-10GRJ, 2009 WL 928226, at *1 n.1 (M.D. Fla. Apr. 3, 2009); *Burns* v. *Bank of Am.,* No. 03-cv-1685 (RMB) (JCF), 2007 WL 1589437, at *3 (S.D.N.Y. June 4, 2007).

[42] In the Lease depositions, Sanofi's counsel exceeded the seven hour limitation contained in Rule 30(d)(1) by half an hour.  When Novartis informed Sanofi's counsel that it was substantially over time, that the questioning had strayed far from the "last topic" that Sanofi had asked forbearance to explore, and that no further questioning would therefore be allowed, Sanofi's counsel nonetheless **refused** to stop asking questions.  *See* Lease Tr. at 496:2 – 499:10.  Remarkably, in its portion of this Letter, Sanofi alleges that "[r]ather than answer questions concerning [the fact some documents were deleted before this case began and others not], Novartis' counsel instructed the witnesses not too [sic] answer questions and terminated the deposition."  What Sanofi **does not** tell the Court is that it had by that point used up all its time, even after Novartis allowed the deposition to continue an extra half hour.  Nor does Sanofi acknowledge that it was merely re-hashing an irrelevant argument it had made to Mr. Lease the day before, and therefore wasting the witness's time – something Novartis was not willing to grant Sanofi further extra time to do.  *See* Lease Tr. at 169:10-25.

**Proskauer »**

Finally, Sanofi cannot justify any such blanket extension by claiming that it must reduce the testimony of Novartis witness to admissible trial testimony.  Initially, this Court is less than 100 miles from Novartis's headquarters, and Sanofi would be able to subpoena Novartis witnesses for trial if required.  Moreover, Sanofi's deposition of Christian Lease belies the claim that it needs to reduce the testimony to admissible trial testimony – as Sanofi spent much of that deposition eliciting testimony that *would not be admissible* at trial.   For example, Sanofi repeatedly asked Mr. Lease detailed questions about documents he had not drafted or seen – at one point even introducing an exhibit that *Sanofi's counsel* had drafted.  Lease Tr. at 298:2-10. Sanofi's counsel then used this document to ask Mr. Lease to comment on calculations by an expert economist, with which Mr. Lease was *also* not familiar.  Lease Tr. at 298:2-305:5.  Such testimony lacks foundation, and is therefore useless at trial.   At other points, Sanofi simply engaged in extended arguments with the witness, eventually leading Novartis's counsel to instruct the witness that he was there to provide testimony, and was under no obligation to debate Sanofi's counsel.[43]  *See* Lease Tr. at 330:10-331:4.  And despite the fact that Novartis produced over *20,000* documents from Mr. Lease's files, Sanofi spent a substantial amount of its time with Mr. Lease exploring why Novartis failed to produce approximately five emails that were produced by Navigant Consulting, that likely were in Novartis's files at one point, and that Novartis was under no obligation to preserve.[44]

Sanofi apparently intends to repeat this pattern with numerous other Novartis witnesses – including both the current and former President of Novartis – and requests additional time in which to do so.  The time limitations in the Federal Rules focus discovery on matters truly relevant and necessary – a result sorely needed here.  The Court should therefore refuse Sanofi's and Plaintiffs' attempt to double the burden on non-party Novartis, and instead limit each witness to seven hours to be divided between the parties however they see fit.

---

[43] Sanofi's arguments became so heated and emphatic that at one point Novartis's counsel had to instruct Sanofi's counsel to physically back up and not shout at the witness.  Lease Tr. at 275:19-276:10.

[44] Mr. Lease was not under a preservation obligation prior to the service of the subpoena, and accordingly deleted emails he no longer needed – as he does routinely.  Lease Tr. at 168:13-169:25.  As Mr. Lease testified, however, he never deleted a document because of any reference to this lawsuit or conversations with Plaintiffs' counsel, but rather merely as part of his normal clean-up.  *See id.*  That a non-party did not preserve *every* email from a time period before it even knew that it would be subpoenaed is neither a basis to argue spoliation or a fact admissible as evidence, as "there is no general duty in the common law to preserve evidence in a third party spoliation situation."  *Mazloum v. Dist. of Columbia Metro. Police Dep't*, 522 F. Supp. 2d 24, 56 (D.D.C. 2007) (quoting *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 849 (D.C. 1998)); *see also Gurvey v. Fixzit Nat'l Install Servs., Inc.*, No. 06-1779 (DRD), 2011 WL 550628, at *5-6 (D.N.J. Feb. 8, 2011).  And in any event, Sanofi cannot claim any prejudice, having received the same emails from Navigant.

**Proskauer>>**

4.     Sanofi Cannot Justify Its Requests for Unduly Burdensome Discovery by
Claiming that Novartis is Somehow Involved in the Lawsuit

Sanofi seeks to justify its requests here by claiming that Novartis is somehow responsible for bringing this case from "behind the scenes."[45]  This claim is false.  *See, e.g.*, Lease Tr. at 111:8-113:24 (Novartis had never even thought about a class action lawsuit until after Plaintiffs began working on one); 126:17-22 (Plaintiffs had already decided to file a lawsuit before approaching Novartis).  Moreover, it is irrelevant – and does not justify imposing further burden on a non-party.  *See Centrix*, 2012 WL 6625920, at *6 (rejecting argument that because subpoena target had financial interest in litigation, it should be treated differently than any other non-party).  Accordingly, applying the balancing test required under Rule 26, Sanofi cannot justify the extensive discovery that it now demands.  *See Emerson*, 2009 WL 435191, *1; *Inventio*, 662 F. Supp. 2d at 381; *State Farm*, 254 F.R.D. at 233 n.3.[46]

First, Sanofi's claim is incorrect.  In an effort to respond to what it saw as anticompetitive conduct in the marketplace, Novartis commissioned two studies to analyze Sanofi's bundling practices, worked with public interest groups that had taken a view on Sanofi's practices, and ultimately approached the FTC to seek its intervention.  Novartis's goal in this was to determine whether others in the market shared their view that the current structure of the vaccines market was not competitive.  *See* Lease Tr. at 62:14-63:6.  While Novartis had no interest in filing a lawsuit (*see* Lease Tr. at 131:19-132:16), its work may have induced doctors and other purchasers to bring their own action.  However, the filing of a class action lawsuit was a surprise to Novartis.  *See* Lease Tr. at 111:8-112:14.  Sanofi's "behind the scenes" theory is therefore incorrect.

Perhaps more importantly, though, Sanofi's "behind the scenes" theory is irrelevant to any fact at issue in this case.  Simply put, either Sanofi's bundling practices foreclose competition or they do not – and whether it was Plaintiffs, Plaintiffs' counsel, Novartis, or someone else who first encouraged investigation into those practices is irrelevant.  Sanofi's sole justification for this discovery therefore is as impeachment evidence: it seeks to prove that

---

[45] Though Sanofi puts the phrase "behind the scenes" in quotes, it is ***Sanofi's*** characterization, not Novartis's, and one that Mr. Lease rejected.  *See* Lease Tr. at 64:9-18; *id* at 112:9-14 ("Q: So you were interested in helping class action lawyers bring a suit as long as Novartis stayed behind the scenes?  A: No, my god, no.  No.  I was interested in learning more about what was happening because I'd never seen anything in this space.").  Sanofi nonetheless claims that Mr. Lease "confirmed" the exact opposite of what he said – but the passage they cite offers no support.  *See* Lease Tr. at 64:19-65:3 (noting that Novartis informed the public about Sanofi's practices in the hopes that it would lead to change in the market).  While Sanofi claims that this "confirms" that Novartis was taking a "behind the scenes" role in this lawsuit, that claim is simply a *non-sequitur* – and Mr. Lease said the exact opposite.

[46] Sanofi seeks to answer this by claiming – without citation – that Novartis decided it "would be 'inappropriate' for Novartis to be seen as having coordinated with plaintiffs' counsel," and that Mr. Lease "requested that further assistance be filtered through its paid consultant, Navigant."  The reason Sanofi avoids citation for these statements is that they are incorrect.  In fact, what Mr. Lease said was that Novartis decided it was inappropriate "to provide any assistance to [Plaintiffs] with respect to this lawsuit" – he did not say, as Plaintiffs mistakenly claim, that Novartis merely did not want to be "seen" to be involved.  Lease Tr. at 132:9-13.  Mr. Lease further did not testify, as Sanofi claims that he did, that he filtered further assistance through Navigant – he said the exact opposite.  Lease Tr. at 137:10-18 (Mr. Lease telling Navigant that whatever they did with Plaintiffs was "your business").

**Proskauer**

Novartis is strongly opposed to Sanofi's bundling, so the jury can consider that in evaluating any testimony from Novartis at trial.  *See* November 2, 2012 Letter from the Parties to the Court, Dkt. No. 124, at 34-35 (arguing that such discovery is necessary for impeachment).  But Sanofi needs no further discovery to prove that Novartis is strongly opposed to Sanofi's bundling. Novartis has already produced thousands of documents and one witness who has made that abundantly clear.  And if there is any lingering doubt, Novartis will stipulate to that fact!  Thus, the need for "impeachment" evidence cannot justify the extraordinary burden Sanofi seeks to impose on a non-party.  *Emerson*, 2009 WL 435191, at *1; *Inventio*, 662 F. Supp. 2d at 381; *State Farm*, 254 F.R.D. at 233 n.3.

Sanofi's motion for additional time to depose Novartis witnesses should be denied.  If the Court is inclined to establish limitations on discovery at this stage (as Novartis believes it should), the Court should limit Sanofi to two further depositions of Novartis employees (not to include either Novartis's current or former President), not to exceed seven hours per witness.[47]

Dated:  June 25, 2013                                     Respectfully submitted,


*/s/ Ryan P. Blaney*                                     */s/ Peter S. Pearlman*
Ryan P. Blaney                                           Peter S. Pearlman
PROSKAUER ROSE LLP                                       COHN LIFLAND PEARLMAN
1001 Pennsylvania Ave., N.W.                             HERRMANN & KNOPF, LLP
Washington, DC 20004                                     Park 80 Plaza West-One
T: (202) 416-5844                                        250 Pehle Ave., Suite 401
F: (202) 416-6900                                        Saddle Brook, NJ 07663
E: rblaneyy@proskauer.com                                T: 201-845-9600
                                                         F: 201-845-9423
*Attorney for Defendant-Counterclaim*                    E: psp@njlawfirm.com
*Plaintiff Sanofi Pasteur Inc.*
                                                         *Attorney for Plaintiffs-Counterclaim*
                                                         *Defendants*

---

[47] Because the parties have not met and conferred on the additional depositions Sanofi requests in this letter, it is possible that Sanofi may have a true need for a third additional deposition from Novartis.  Novartis would be willing to consider producing such a witness voluntarily, if Sanofi can offer a compelling justification for such a request.

Proskauer»

*/s/ Bryan Gant*
Joseph Angland
Bryan Gant
WHITE & CASE, LLP
1155 Avenue of the Americas
New York, New York 10036-2787
T: 212-819-8200
F: 212-354-8113
E: jangland@whitecase.com
E: bgant@whitecase.com
*Attorneys for non-party Novartis Vaccines & Diagnostics, Inc.*