# COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP

COUNSELLORS AT LAW

PARK 80 WEST · PLAZA ONE · 250 PEHLE AVENUE, SUITE 401 · SADDLE BROOK, N.J. 07663
201-845-9600 · FAX 201-845-9423

Peter S. Pearlman, Esq.
psp@njlawfirm.com
Direct Dial: 551-497-7131
Cell: 201-709-0597

General E-mail: clphk@njlawfirm.com
Internet Address: www.njlawfirm.com

October 23, 2013

*VIA ECF*

The Honorable Michael A. Hammer
United States Magistrate Judge
United States District Court for the District of New Jersey
M.L. King, Jr. Federal Building & Courthouse
50 Walnut Street
Newark, NJ 07102

Re:  *Castro v. Sanofi Pasteur Inc.*, No. 2:11-cv-07178 (D.N.J.) (JLL) (MAH)

Dear Judge Hammer:

Sanofi and the plaintiffs request the Court's assistance to resolve a number of disputes concerning discovery from named-plaintiff Marquez & Bengochea, M.D., P.A. ("M&B").  The parties have met and conferred but were not able to resolve these issues, necessitating this joint letter.[1]

## I.   SANOFI'S POSITION

Sanofi seeks an order compelling Dr. Bengochea to appear for deposition (and sanctions for plaintiffs' disregard of Sanofi's valid notice of deposition, and failure to timely move for a protective order, as required by Rule 37(d)).  Sanofi also seeks a limited reopening of Dr. Marquez's deposition for the narrow purpose of correcting her testimony on a critical issue. Finally, Sanofi seeks an order compelling certain documents relating to M&B's practice.

---

[1] The Exhibits attached are: Ex. 1 (deposition of Dr. Marquez); Ex. 2 (Dr. Bengochea Deposition Notice); Ex. 3 (Sanofi's September 3, 2013 portion of a prior iteration of this joint letter); Ex. 4 (Plaintiffs' Supplemental Interrogatory Responses); Ex. 5 (DX 298, November 10, 2011 email blast from Physicians' Alliance); Ex. 6 (September 13, 2011 close-out of Menveo on Demand account); Ex. 7 (Sanofi's proposed Second Set of Requests for Production); Ex. 8 (July 15, 2013 S. Abeles Letter); Ex. 9 (July 31, 2013 D. Walker letter); Ex. 10 (Sept. 18, 2013 email string among counsel); Ex. 11 (Feb. 22, 2013 S. Abeles letter); Ex. 12 (Sanofi's First Requests for Production); Ex. 13 (Aug. 20, 2013 S. Abeles email).  Documents cited, but not attached, are available on request. Unless otherwise noted, all emphasis added and internal citations and quotation marks omitted.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

### A.    *Sanofi is Entitled to Take the Deposition of Dr. Bengochea*

Dr. Bengochea is one of two principals who own and operate M&B. Dr. Marquez, at her deposition, described her husband, Dr. Bengochea, as a "true partner[]" in the practice. Ex. 1, at 16:5. He was also the primary physician responsible for operating the business at a critical time during the relevant period, and – it appears – was responsible for signing up with Physicians' Alliance, a Novartis and GSK PBG. He, therefore, has important information relating to M&B's vaccine purchases in this case. Equally important, as discussed below, Dr. Marquez exhibited, if not outright evasion, a surprising lack of recall.

Because Dr. Bengochea clearly possesses relevant information, Sanofi sought Dr. Bengochea's deposition by serving, on August 23rd, a formal notice of deposition, scheduled for October 3, 2013. Ex. 2. (Despite plaintiffs' suggestion to the contrary, no Rule 45 subpoena is necessary because Dr. Bengochea is a principal of a party). Plaintiffs did not respond for over three weeks. On September 13, 2013, in connection with the preparation of a joint letter on other issues (the remaining issues below), plaintiffs included a footnote that, for the first time, suggested that they would not make Dr. Bengochea available, objecting to the deposition as "cumulative."

In follow-up emails and discussions, Sanofi noted that, under Rule 37(d)(1)(A)(i), a party's "[f]ailure to appear for that person's deposition," "after being served with proper notice," is sanctionable, and that such a "failure … is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a ***pending*** motion for a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2); *see also* Ex. 10, at 1-2. Plaintiffs did not seek a protective order prior to the October 3rd date noticed for the deposition. (In fact, plaintiffs did not serve their portion of this joint letter until October 4th, more than a month after the notice issued). Accordingly, plaintiffs are subject to sanctions under Rule 37(d), and have waived any objections to the deposition.

Aside from plaintiffs' procedural violations, plaintiffs have no basis for denying Sanofi the right to depose Dr. Bengochea. The deposition of a named plaintiff is a critical event in the life of a class action. It is an integral opportunity to discover the grounds for the plaintiffs' case, to test whether the named plaintiff is typical and adequate, and to explore whether there are individual issues the preclude class certification. This deposition is also critical because – as the

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

face for a nationwide class of all pediatricians, all hospitals, all vaccine retailers, all vaccine wholesalers, and all vaccine distributors – the strengths and weaknesses of the named plaintiffs' case are magnified a thousand-fold.

Deposition testimony from M&B is particularly important.  First, M&B is the ***only*** named plaintiff that claims it was threatened with termination by its PBG (as noted below, plaintiffs disclaimed this testimony *after Dr. Marquez's deposition*, since the documentary evidence undermines it).  Second, M&B is the only named plaintiff that claims it was not solicited by plaintiffs' counsel after Novartis and plaintiffs' counsel conspired to engineer this suit.  (The documentary record also does not support this claim).  And third, M&B is the only named plaintiff that claims, because of its unique (and therefore atypical) practice, that GSK vaccines are unsuitable (despite its past use of GSK vaccines).  Accordingly, plaintiffs are relying on M&B to fill critical gaps in their case.

There are also serious questions going to the adequacy of M&B to serve as a class representative and its counsels' ability to carry out their responsibilities.  For example, Dr. Marquez did not see the Complaint before it was filed.  She was also not informed – by her counsel or anyone else – of the Counterclaim that was filed against her.  Ex. 1 at 152:15-153:6.  In fact, she told her Sanofi sales representative that she wasn't even aware of the case, and wanted to withdraw, which she, in fact, tried to do.  (Ex. 3 goes into these issues in greater detail).

In any event, at the deposition, Dr. Marquez – with a disturbing degree of on-the-record coaching that far surpasses any acceptable limits – testified in support of plaintiffs' themes.[2]  But

---

[2] Plaintiffs' counsel repeatedly encouraged Dr. Marquez to be forgetful and otherwise improperly sought to shape her testimony.  *See, e.g.*, Ex. 1 at 19 (Mr. Cramer:  If you don't know, you don't know); 29 ("He asked if you remembered why.  And you said you didn't remember."); 33 ("You can answer if you understand the question"); 37 ("it's probably that [a Sanofi employee] worked with counsel in drafting this declaration.  It's also probable that there was a lot of pressure upon her … to draft and write this."); 61 ("If you know the answer to that, you can answer."); 67 ("You can answer if you know."); 68 ("You can answer if you understand the question."); 69 ("But if you can read Ms. Garcia's mind, which is what he's asking you to do, go ahead."); 72 ("You can answer if you understand the question."); 74 ("Asked and answered … Do you want her to restate the answer."); 75 ("You can answer if you understand the question."); 84 ("This lawsuit … that didn't exist."); 104 ("He didn't ask you – he just asked you one of the reasons."); 107 ("Answer if you know."); 117 ("Those are not the only two options.  But go ahead and answer if you can."); 133 ("if you remember."); 136 ("She said she didn't remember, that counsel brought a lot of documents to her and she couldn't tell which ones she read and which she didn't."); 137 ("She said she didn't remember."); 138 ("she said she didn't remember."); 139 ("you can answer if you remember."); 148 ("you can answer if you understand the question."); 158 ("Answer if you understand."); 164 ("But she may have used the

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

her testimony was fraught with inconsistencies and convenient denials of knowledge. For example, she claimed to have thought up this lawsuit on her own in 2009, before Novartis even entered the market. Ex. 1, at 84:21-85:14. Her testimony is contradictory concerning a critical issue, discussed in more detail below: she claimed to have switched from Menveo back to Menactra® both *before* and *after* she received a threat letter in the mail from her PBG, which her counsel later admitted did not exist. *Id*. at 21:15-17, 119:7-16.

Likewise, instead of exhibiting the "most knowledge" about M&B's vaccine purchasing and PBG contracts as plaintiffs claim, Dr. Marquez found them to be "so confusing." *Id.* at 191:19-25. Indeed, Dr. Marquez has never read M&B's PBG agreements in detail. *Id.* at 180:8-12. M&B is a member of two distinct PBGs, but Dr. Marquez only knew about one of them. *Id.* at 190:8-24. When shown a document confirming "Dr. Jose Bengochea's" eligibility to participate in Physicians' Alliance, Dr. Marquez testified she was out of the office for medical reasons at that time and that "I don't remember anything about this." *Id.* at 188:23-190:24.

Neither was Dr. Marquez able to testify about administering Menveo, another crucial issue in this case. Unlike Menactra, Menveo is shipped to physicians in two parts, and before administering the vaccine, physicians must reconstitute the two parts into one. This is major drawback which has limited Novartis' market share even in segments where plaintiffs and

---

word bankruptcy … and been confused."); 173 ("answer if you understand the question."); 185 ("I think she's explained. And it's also explained in the complaint. And you clearly understand what is going on here."); 192 ("If you know"); 193 ("If you know"); 199 ("If you don't know the answer, just say you don't know."); 200 ("Only testify if you know the answer."); 201 ("If you don't know, you don't know."); 204 ("If you don't know, the answer is 'I don't know.'"); 205 ("Dr. Marquez is not being put forward as an expert witness."); 207 ("If you don't know, you don't know."); 209 ("She said she didn't have an understanding."); 212 ("If you don't remember or don't know, you're not required to memorize all of this."); 223 ("If you know."); 233 ("She already answered that and said she doesn't know."); 234 ("If you know."); 237 ("If you know."); 241 ("If you know."); 242 ("If you know."); 252 ("If you know."); 253 ("If you know."); 257 ("If you know."); 273 ("This witness is not an expert on credit card companies and how they work. And you very well know the answer to your own question."); 276 ("You imagine or do you know?"); 283 ("Her testimony was that she didn't know."); 288 ("The second sentence refers to what the contract says."); 293 ("It's just a yes or no."); 294 ("It's just a yes or no.").

As reflected in a case in which plaintiffs' counsel represented the moving party, this conduct is sanctionable. *See In re Neurontin Antitrust Litig.*, 2011 WL 253434, *12 (D.N.J. 2011) ("counsel should not (1) make speaking, coaching or suggestive objections; (2) coach or change the witness's own words to form a legally convenient record; (3) frustrate or impede the fair examination of a deponent during the deposition by, for example, making constant objections and unnecessary remarks; (4) make speaking objections such as "if you remember," "if you know," "don't guess," "you've answered the question," and "do you understand the question"; or (5) state that counsel does not understand the question.")

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Novartis concede there is no bundling.  Even though M&B used Menveo in its practice *for a year*, Dr. Marquez did not know Menveo had to be reconstituted.  Ex. 1, at 234:10-235:20.
After being informed of this fact, she then said that she has never reconstituted it herself and that Dr. Bengochea and the nurses do it.  *Id.* at 236:22-237:2.  Accordingly, Dr. Marquez could not testify to the impact of Menveo's clinical and operational drawbacks.

Dr. Marquez exhibited an amazing lack of recall as to information central to this suit. She did not know whether M&B was using Menactra or Menveo at the time she decided to file suit against Sanofi.  Ex. 1, at 118:9-20.  Indeed, she could not remember when M&B started and stopped purchasing Menveo.  *Id.* at 242:20-24.  She did not remember any of the details of the PBG letter that she supposedly "received in the mail" and that caused her to switch back to Menactra.  *Id.* at 23:2-24:5, 119:7-16.  (As noted below, her counsel claimed after the deposition that this letter did not exist, and that she was referring to a different document, Ex. 5, that played no role in her vaccine selection decision but was, nonetheless, a reason she wanted to sue Sanofi).  She did not remember whether her prices for other vaccines went up after she started purchasing Menveo.  *Id.* at 122:21-123:20.

Dr. Bengochea can fill these gaps.  As Dr. Marquez testified, she and Dr. Bengochea are "true partners" in every sense of the word.  Ex. 1, at 16:5.  Thus, if Dr. Marquez had some lapse of memory, Dr. Bengochea is the best candidate to fill the void.  Notably, while plaintiffs assert that Dr. Marquez has more knowledge than Dr. Bengochea, they do not deny that Dr. Bengochea is a decision-maker in all relevant facets of M&B's business, including its selection of vaccines and its decisions to join PBGs.  Indeed, Dr. Marquez refused to directly answer the question about who oversees the business side of the practice, claiming that she just wants to treat children and doesn't "want to do business."  Ex. 1, at 14:18-15:14.

Plaintiffs' argument for avoiding a deposition is meritless.  Their argument – that this deposition would be unreasonably cumulative of Dr. Marquez's  – is not only an unsupported assertion, it also does not account for Dr. Marquez's loss of memory, her extended absence from the practice, and her non-involvement in the critical decision to join a Novartis/GSK PBG.

5

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

As such, plaintiffs have not, and cannot, satisfy their burden of demonstrating that this would be unreasonably cumulative. *Campbell v. Detert*, 2013 WL 1314429, at *8 (D.N.J. 2013); *Johnson v. Jung*, 242 F.R.D. 481, 483 (N.D. Ill. 2007). When a party is an entity, it is common course to depose all the relevant decision-makers. *See, e.g.*, *Capitol Pants Co. v. United States Fid. & Guar. Co.*, 1996 WL 50642, at *2-3 (E.D. Pa. 1996) (dismissing complaint and ordering plaintiffs to pay defense costs where plaintiffs, among other things, prevented defendant from deposing the two principals of plaintiffs' corporation); *Shopping Mall Investors, N.V. v. E.G. Frances & Co.*, 1987 WL 12082, at *1 (S.D.N.Y. 1987) (compelling the deposition of the two principals of the plaintiff corporation at plaintiff's expense, noting "the plaintiff has instituted the lawsuit and must comply with discovery obligations; if the plaintiff refuses to produce the witnesses, a motion to dismiss will be entertained").

Notably, plaintiffs point to no authority for their position that the deposition of one principal of a named plaintiff precludes deposition of the other, particularly where the record demonstrates the other principal is likely to have a bank of unique and personal knowledge and can fill the gaps left by a prior deponent's lack of recall. Each of the cases plaintiffs cite is inapposite. *Ford Motor Co. v. Edgewood Properties, Inc.*, 2011 WL 2517133, at *1 (D.N.J. 2011) involved the deposition of a high-level executive of a gigantic global corporation who lacked ***any*** personal knowledge. Plaintiffs do not seek to satisfy this standard. The other cases plaintiffs cite are even further removed, as they involved reopening a deposition of the ***same*** witness, not depositions of ***other*** witnesses. *See State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 235 (E.D. Pa. 2008) (discussing standard for re-opening deposition of "already-deposed" witness).

Nor can plaintiffs credibly claim the deposition of a named plaintiff imposes an undue burden and expense. M&B instituted this suit and should have no problem adhering to its discovery obligations. Dr. Marquez sat for a full day of deposition without any material detriment to their practice. Dr. Bengochea can do the same. (Indeed, if he prefers, we can conduct the deposition on a Saturday or Sunday, when – according to its website – M&B is closed).

6

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

In that regard, although Sanofi recognizes that the "goose/gander" principle has limited applicability in the context of a discovery challenge, it should be noted that plaintiffs' position is inconsistent with their own when it comes to deposing Sanofi witnesses. They have already taken, noticed, or requested over 11 depositions of Sanofi's field sales employees, despite the similarity in their roles, positions, and knowledge. If plaintiffs were subject to the "unique personal knowledge test" they advocate, then plaintiffs would not have been able to take most, if any, of these depositions, and further depositions by plaintiffs would be wholly out of reach.

Plaintiffs' other grounds for disregarding the validly-served deposition notice are specious. Plaintiffs argue that it should be excused from complying with its obligation because Sanofi didn't provided the topics and documents on which it wished to question Dr. Bengochea. Nowhere, in any of the rules of procedure, is such a requirement imposed. Indeed, to do so would be unfair and prejudicial. *See, e.g.*, *National Life Ins. Co. v. Hartford Acc. and Indem. Co.*, 615 F.2d 595, 600 (E.D. Pa. 1980) ("We see no policy justification for allowing the witness the option of reviewing written questions prior to the deposition"). Likewise, the bald assertion that "Dr. Bengochea's knowledge … [is] primarily derived from privileged conversation he had with his wife" neither reflects reality nor constitutes an excuse for failing to appear for his deposition. Dr. Bengochea is a principal in the practice and has independent knowledge relating to it. Moreover, any relevant communications between Dr. Bengochea and Dr. Marquez relating to M&B's practice were conducted in their capacity as business partners, and cannot be shielded from discovery.

For these reasons, the Court should order the deposition of Dr. Bengochea. Additionally, given their failure to appear, plaintiffs should bear the costs of the deposition and all motion practice related to it, as required by Rule 37(d).[3]

---

[3] Plaintiffs seek to avoid sanctions by drawing analogies to Sanofi's conduct. Sanofi welcomes the comparison.. Sanofi has offered alternative dates (and in most cases, multiple dates) for its witnesses, and not refused to make any of its witnesses available. Here, plaintiffs are not raising "scheduling issues" as an excuse, they are refusing to make him available at all absent court order. Because plaintiffs were required to move for a protective order – and failed to do so – they have violated the Federal Rules of Civil Procedure, and sanctions are appropriate.

COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
COUNSELLORS AT LAW

**B.     Dr. Marquez's Deposition Should Be Re-Opened For the Limited Purpose of Correcting False or Mistaken Testimony.**

Sanofi also requests an order reopening Dr. Marquez's deposition for the limited purpose of correcting the testimony on a *critical* issue.  Dr. Marquez testified that her Sanofi PBG sent her a letter threatening to terminate her contract if she continued to buy Menveo.  She also testified that she **relied** on this letter as a reason for switching from Menveo back to Menactra. As she testified,

> "[W]hen I realized that all my other vaccines were getting to be more expensive and *I received the letter in the mail* that I mentioned earlier during this deposition, I said to the girls in the office, like, I guess we're going to stick with the whole battery of vaccines from [Sanofi]…"

Ex. 1, at 119:9-15.

It is now undisputed that there is no such letter.  In subsequent communications with plaintiffs' counsel, it now appears that Dr. Marquez's story has changed so that – according to her counsel – the letter had *no role* in her vaccine selection decision.  But counsel's vague assertions are not sworn testimony, and in any event, Sanofi was denied the opportunity to explore the real reasons for the switch because of her prior incorrect answer. As such, we need to re-open the deposition to correct the record in order to determine her actual reason for switching back to Menactra vaccine.

Dr. Marquez plays an essential role for the plaintiffs in this case.  M&B was the last of the three named plaintiffs to join the suit and was necessary to fill a major gap.  The first named plaintiff, Dr. Castro, did not order Menactra vaccine during the relevant class period.  Thus, while she served her purpose of providing plaintiffs' counsel with a name to put on the caption to quickly get a complaint on file, her lack of injury and standing will preclude her from going the distance.  A different defect infects the second named plaintiff, Sugartown Pediatrics. Sugartown never sought to buy Menveo, nor does it claim to have been threatened by Sanofi, so its ability to claim to have been "forced" to accept Sanofi's discounts is tenuous, at best.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

M&B entered the case in order to ameliorate these defects.  M&B is the only named plaintiff to purchase both Menactra and Menveo during the relevant period.  It purchased Menactra until mid-2011, when it switched to Menveo, and then switched back to Menactra in mid-2012, after the suit was filed.

In fact, M&B is a member of two distinct PBGs, and like many physician practices, it uses one to buy discounted Sanofi vaccines, and the other to buy Novartis vaccines.  Its *Sanofi* PBG is Integrated Physicians Solutions ("IPS"); its *Novartis* PBG is Physicians' Alliance. (As we shall see, this distinction becomes crucial.)

The reason for M&B's switch back to Menactra in 2012 was the subject of much of Dr. Marquez's deposition.  She testified at length that the reason she switched back to Menactra was because her Sanofi PBG threatened, in a letter she received in the mail, to terminate her from her contract if she continued purchasing Menveo.  Throughout the day, Dr. Marquez repeatedly referred to this "letter" as at least one of the triggering incidents for her switch back to Menactra and decision to sue Sanofi.  Ex. 1, at 21:15-17, 23:2-24:8, 79:20-80:5, 119:7-16, 122:23-123:16.

This testimony was so critical that plaintiffs' counsel immediately incorporated it into their (court-ordered) supplemental interrogatory responses.  Specifically, with citation to the testimony concerning this letter, plaintiffs claim that M&B was "forced" to purchase Menactra, and that she was told that her "practice would ***risk losing all discounts*** by purchasing Menveo." Ex. 4, at 13 (citing Marquez deposition).[4]

But there is no such letter.  This is ***not*** disputed.  Skeptical that Dr. Marquez had received such a letter – given its absence from M&B's document production – Sanofi asked Dr. Marquez if she still had it. She said, "[w]e have the letter, yes."  Ex. 1, at 23:24-24:2.  Following the deposition, Sanofi requested a copy.  Ex. 8.  Plaintiffs responded by acknowledging that there is no such letter.  Instead, they pointed to an email blast sent by Physicians' Alliance – M&B's *Novartis* PBG – to its membership.  Ex. 5, 9.

Obviously, Physicians' Alliance cannot – and did not – threaten to remove M&B from its IPS Sanofi contract.  This means that one of two things is true.

---

[4] Dr. Marquez also referred to alleged statements by a Sanofi sales representative that M&B could get greater discounts by ordering multiple products.  Dr. Marquez, however, admitted that no Sanofi employee ever told her that she would be terminated from her PBG if she ordered Menveo.  Ex. 1, at 260:8-264:7.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

One alternative is that Dr. Marquez knew that she did not receive a threat letter from her PBG and testified falsely. There is some support for this. The email blast from Physicians' Alliance is dated two months *after* Dr. Marquez closed out her Menveo-On-Demand Account (the program she used to buy Menveo). *Compare* Ex. 6 *with* Ex. 5. Thus, it appears that Dr. Marquez returned to Menactra before she received the Physicians' Alliance email. As plaintiffs point out, at one point in the deposition, Dr. Marquez made a passing reference to having received the letter "after" she made the decision. Ex. 1, at 21:16-17. But when we followed up, she changed her story, claiming that the letter was a basis for her decision. *Id.*, at 119:10-16. Moreover, despite repeatedly referring to the supposed "threat" letter she "received in the mail," when Sanofi introduced the Physicians' Alliance email blast as an exhibit, Dr. Marquez did not say that this was the letter she had been referring to all day. *Id.*, at 191:12-196:3. These facts suggest that Dr. Marquez may have fabricated the story about the letter and its role in her decision, or at least embellished the story by stretching the truth beyond what the facts would truly support.

Alternatively, Dr. Marquez might have been mistaken or confused, either during her deposition, or *at the time* she received the Physicians' Alliance email. Physicians' Alliance is one of a few national PBGs that offers both a Sanofi contract and a Novartis contract and provides *preferred* pricing for both. Even though M&B only belongs to the *Novartis* contract, and not the *Sanofi* contract, the email blast she received discusses both Physicians' Alliance offerings. As to the Menveo offering, Physicians' Alliance touts the fact that it was "one of the first groups in the country to have an agreement with Novartis for preferred pricing on Menveo." But the blast also talks about the benefits and obligations of the Physicians' Alliance Sanofi offering.

Perhaps Dr. Marquez was confused and thought the portion of the letter relating to the Physicians' Alliance *Sanofi* contract applied to her. Perhaps she did not know that the email blast was a result of her participation in the *Novartis* contract. Perhaps she did not know that Integrated Physicians Alliance was her *Sanofi* PBG. (It should be noted that, despite multiple opportunities to correct the record, plaintiffs never sought to explain why Dr. Marquez's testimony was inconsistent with the documents or tried to clarify any confusion. It would not have been difficult for plaintiffs to simply explain that Dr. Marquez was confused.) As

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

discussed above, Dr. Bengochea, who joined Physicians' Alliance during Dr. Marquez's absence, likely has a better understanding of M&B's PBG memberships.

Whatever the source of discrepancy between Dr. Marquez's testimony and the documents was, however, it was not Sanofi's fault. While examining Dr. Marquez, Sanofi could not have anticipated that in response to its later request for the alleged letter from Dr. Marquez's *Sanofi* PBG that Dr. Marquez claimed she had "at her office," that Dr. Marquez's attorneys would claim she meant to refer to an email from her *Novartis* PBG that Sanofi had introduced as an exhibit. That clarification, or rehabilitation, came too late.

Normally, Sanofi would live with a witness's mistaken testimony, if the mistake was unremarkable (*e.g.*, the witness misstates the year she graduated from medical school) or if her counsel provided adequate assurances that they would not rely on an inaccurate record. But neither of those scenarios applies here.

The existence, or lack thereof, of a "threat" letter is critical in a case that plaintiffs have described as one that centers on so-called "threats." If Dr. Marquez switched back to Menactra as a result of *her own mistake* – not realizing that the communication she received from Physicians' Alliance had nothing to do with her contract with IPS – that is clearly a relevant fact. Indeed, it may preclude her from testifying about any alleged letter, or perhaps her decision to switch back to Menveo, since her own mistakes are not relevant to the question of whether Sanofi foreclosed Novartis from competing. At this point, plaintiffs have no evidence Sanofi directly or indirectly forced a significant number of healthcare providers to purchase Menactra, such that Novartis was effectively driven from the market or forced to raise prices due to the inability to achieve economies of scale, save for Dr. Marquez's incorrect, false, or misleading testimony. Likewise, plaintiffs have not certified that they will not rely on what they know is flawed testimony.

Accordingly, Sanofi is entitled to get the true facts on the record. Under Rule 30(d)(1), the "court must allow additional time [beyond one day of seven hours] if needed to fairly examine the deponent." Fed. R. Civ. P. 30(d)(1). As this Court noted in *Hibbert*, courts typically order such depositions where "the importance of the information to be addressed at [the] second deposition outweighs [any] minimal inconvenience of having to be deposed twice." *Hibbert v. Bellmawr Park Mut. Housing Corp.*, 2013 WL 3949024, at *3 (D.N.J. 2013); *Keck v.*

11

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

*Union Bank of Switzerland*, 1997 WL 411931, at *2 (S.D.N.Y. 1997) (allowing second deposition where a disputed factual issue came to light for the first time in deposition); *Hayden v. Acadian Gas Pipeline Sys.*, 1997 WL 180380, at *6 (E.D. La. 1997) (allowing a second deposition where plaintiff sought to change date of alleged accident); *Dixon v. Certainteed Corp.*, 164 F.R.D. 685, 692 (D. Kan. 1996) (allowing second deposition where a statement by the witness was produced after the first deposition); *V. Mane Fils, S.A. v. International Flavors and Fragrances Inc.*, 2010 WL 1855873, *8 (D.N.J. 2010) (same).

Plaintiffs' only argument for resisting the need to correct the record is their position that Dr. Marquez's own confusion about the timeline of events renders it unnecessary. Specifically, her testimony that the letter was the trigger for her going back "to the girls in the office" and telling them that M&B was going to stay with Menactra, is inconsistent with her earlier testimony (contained in a fragment of a sentence that appeared as a passing reference in an answer non-responsive to the question posed) that she stopped buying Menveo and received the letter "after that." *Compare* Ex. 1, 21:16-17, with *id*. at 119:10-16. Her inconsistency – coupled with her mistaken testimony about a letter that does not exist – is a reason for a second deposition, not an excuse to avoid it.

Ultimately, Sanofi should be able to get record testimony on the true story. If, in fact, the earlier testimony is correct, and the latter testimony false, then Sanofi will need to explore exactly what Dr. Marquez knew – and what she was told – at the time she made her decision. If, on the other hand, her decision was based on communications with a PBG, we need to understand that as well, because the communication about which she testified does not exist and never occurred.

The re-opening of the deposition should also be at plaintiffs' expense. It was Dr. Marquez's incorrect testimony that sparked the need to correct the record. It was Dr. Marquez who failed to correct her error when Sanofi introduced DX 298 at the deposition. It was Dr. Marquez who chose not to speak up and inform Sanofi that DX 298 was in fact the document she had been referring to all day and continued to refer to even after Sanofi introduced DX 298. As between Sanofi and plaintiffs, therefore, the cost of correcting the record should fall on plaintiffs. *EBC, Inc. v. Clark Bldg. Sys., Inc*., 618 F.3d 253, 267 (3d Cir. 2010) (noting that, where a plaintiff changes her testimony "[s]ome courts also permit the deposing party to reopen the

12

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

deposition (with costs to be borne by the amending party) to question the deponent on the alteration.").

C.    *Sanofi's Request for Vaccine Reimbursement Data*

Sanofi also seeks information showing the levels of reimbursement and administration fees that M&B receives for relevant vaccines, including the differences between "single-entity" or "stand-alone" vaccines and "combination" vaccines.  Ex. 7.

This evidence is important.  Plaintiffs have already acknowledged that combination vaccines "are typically preferred to stand-alone vaccines" because, among other reasons, they reduce "the number of injections" and, therefore, "the amount of pain that children experience." Cmplt. ¶ 29.  Accordingly, combination vaccines have experienced substantial growth in the last few years, since their introduction into the market.

But while combination vaccines are good for patients, they are not good for plaintiffs' antitrust claims.  Both Sanofi and GSK produce combination vaccines, and a substantial percentage of physicians choose to use GSK's combination or single-entity vaccines over Sanofi's.  *See*, *e.g.*, Cmplt. ¶ 102.  This fact will undermine any attempt by plaintiffs to show that Sanofi has monopoly power or that its vaccines are indispensable.  *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1059 (3d Cir. 1978) (defendant "enjoyed a ***complete and legal monopoly*** by virtue of its patents" over two products); *LePage's, Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003) (noting that *SmithKline* rested on the fact that the products were "indispensable to hospital pharmacies.").

In an effort to overcome this, plaintiffs turned once again to anecdotal evidence provided by Dr. Marquez.  Dr. Marquez testified that her patients are "scared" of combination vaccines, and thus demand single-entity vaccines.  Ex. 1, at 220:18-222:9.  Because Sanofi is the only producer of a stand-alone polio vaccine (GSK's polio vaccine is part of its combination products, Pediarix and Kinrix), she claims she must purchase at least one vaccine from Sanofi.  *Id.* at 217:24-218:2.

To the extent it could without the relevant documents, Sanofi cross-examined Dr. Marquez on this point at deposition.  Dr. Marquez denied that her decision was based on reimbursement but acknowledged that that she heard that other practices found it is "more cost

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

effective" to use single-entity vaccines, but that "[r]eimbursement is [not] a factor in [her] choice for a single entity vaccine." *Id.* at 222:10-223:8.

Sanofi believes the truth is that Dr. Marquez's vaccines selections are driven by profit motive, though it cannot fully explore that contention without the relevant documents from M&B. Typically, insurance companies reimburse healthcare providers by providing a reimbursement for the vaccine itself and a separate administration fee for administering it. So the more shots a physician administers, the more administration fees she collects, and the more money she earns. Of course, many physicians have not allowed this to factor into their decision, while others have. Either way, the decision to use single-entity vaccines instead of combination vaccines for reimbursement issues is not sufficient to render Sanofi's vaccines indispensable.

Sanofi believes that plaintiffs should be required to produce reimbursement information so that Sanofi can properly and fully cross-examine Dr. Marquez on this issue, and present the jury with an alternative explanation for Dr. Marquez's vaccine selection decisions.

This does not constitute impermissible "downstream" discovery. It is true, as plaintiffs argue, that federal antitrust laws do not recognize a "pass-on" defense, *i.e.*, a defense premised on showing that the direct purchaser was not injured in fact because it was able to pass on any overcharges to others further down in the distribution chain. But Sanofi is not seeking "downstream" reimbursement data in order to mount a "pass-on" defense.

Rather, Sanofi seeks this evidence to undermine plaintiffs' new theory that Sanofi's IPOL® vaccine is *clinically* indispensable – a theory that relates to Sanofi's alleged monopoly power, the alleged anticompetitive effects of Sanofi's pricing practices, and plaintiffs' credibility. The only thing the rule against offering "downstream" discovery to mount a "pass-on" defense precludes is the introduction of such evidence to disprove the plaintiffs' ***injury.*** *In re Urethane Antitrust Litig.*, 2011 WL 1327988, at *5-6 (D. Kan. 2011) (downstream discovery is permissible if relevant to an issue in the case other than the non-existent pass-on defense under federal law); *Air Tech Equip., Ltd.*, 2006 WL 3193720, at *2-3 (E.D.N.Y. 2006); *In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D. 539, 543 (E.D. Pa. 2010) (noting prior order where court ordered discovery because it was "relevant regardless of whether it was 'downstream' discovery."). Plaintiffs' reliance on pass-on defense cases is misplaced.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Finally, Sanofi has not waived its right to seek this information.  Nothing in the Court's scheduling orders, or otherwise, prevents a party from seeking leave to obtain supplemental information, the import of which only became clear as discovery proceeded.  When Sanofi issued its first, and only, document requests in March 2012 (over a year-and-a-half ago), Sanofi did not know that Dr. Marquez would contradict her own Complaint's allegation that "combination vaccines are typically preferred to stand-alone vaccines."  Cmplt. ¶ 29.  (Of course, if plaintiffs had complied with their obligation to show Dr. Marquez a copy of the Complaint before they filed it, Ex. 1, at 135:15-17, 151:13-153:6, perhaps she would have disclosed her "single-entity" theory and Sanofi would have requested reimbursement information at the time or insisted upon its production).  Now that she has contradicted the Complaint, however, Sanofi should be entitled to obtain information concerning the veracity and basis of that position.  Nor have plaintiffs identified any burden associated with producing this basic information.  This information should be readily available, and Sanofi should be allowed to obtain it.

> **D.      *Sanofi's Request for M&B's Patient Volume Data***

Sanofi also requests documents sufficient to show the number of patients seen by M&B each month between January 2008 to the present, and the number of such patients vaccinated. Ex. 7.  This is basic information relevant to a host of issues in this case, including pricing options available to M&B; types of competitive offers it may qualify for; the alternative offers it may have obtained in the absence of its PBG agreement; the amount of vaccines it must purchase and have on-hand; and alleged damages.  Sanofi notes this request does not require production of any identifying information of patients, just the number of patients seen and vaccinated.

Although Dr. Marquez testified that M&B sees approximately 20-30 patients per day, Ex. 1, at 13:12-16, suggesting annual patient volume of 4,000 to 9,000 patients, M&B only buys about 35 doses of meningococcal vaccines a year.  Thus, M&B only vaccinates about *one percent* of its patients against meningitis.  This suggests that M&B has a unique practice, and further undermines the notion that her alleged injuries prompted her to bring suit.  More importantly, information concerning the volume of patients, especially those requiring vaccination with relevant vaccines, is important because it goes directly to the alternative purchasing options available to M&B apart from her IPS and Physicians' Alliance contracts.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Sanofi is not looking for the purchasing *power* of M&B but rather into the purchasing *options* available to M&B.

At her deposition, Dr. Marquez was not able to provide any specific information regarding M&B's patient volume.  Sanofi inquired to the extent Dr. Marquez's knowledge allowed, but a true picture of this important issue can only come from documentary evidence.

Because Sanofi is seeking basic records that any physicians' practice would normally maintain, plaintiffs cannot refuse to produce this information on burden grounds.  Nor can plaintiffs refuse to produce this information on the ground that it was not specifically requested by Sanofi's original document requests.  Sanofi's original document requests may not have *specifically* asked for this information.  But at the time, Sanofi was not aware of the disconnect between M&B's claimed patient volume and the minimal doses of meningococcal vaccines ordered.  Sanofi cannot cobble this information together from its own records – it has no way to independently determine the number of patients seen by any particular practice.

### E.    *Sanofi's Request for M&B Profits and Disbursement Data*

Sanofi also requests documents sufficient to show the amount of money Dr. Marquez and Dr. Bengochea received from their practice on a monthly basis from January 2008 to the present, including any amounts withdrawn, received, or paid by the practice, either in their capacity as employees, partners, or owners of the practice.  Ex. 7.  This information is important because it goes directly to a number of core themes in the case, and a specific allegation that plaintiffs had previously abandoned, but which was resurrected by Dr. Marquez at deposition.

In their Complaint, plaintiffs allege that "[p]aying Sanofi's penalty prices would put physician and hospital purchasers at a severe disadvantage because they, in turn, could not offer pediatric vaccines at commercially viable prices."  Cmplt. ¶ 123.  Sanofi responded by noting that Sanofi's discounts "significantly benefit physicians and healthcare providers, substantially increasing their profit margins," making it "surprising that physicians and healthcare providers – acting on their own volition and not at the behest of plaintiffs' attorneys – would choose to participate in this lawsuit."  Answer at 41.

This is where the parties stood as the case proceeded into discovery.  Sanofi requested information concerning plaintiffs' vaccine-related profits and cash flows, noting that plaintiffs' allegations addressed the profits that some (or all) class members earn from Sanofi's vaccines.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

In response, plaintiffs claimed that this was a stray allegation, and that this "lone allegation" was not relevant to their claims since "proving or disproving that single allegation will have no bearing on the ultimate issue of whether Sanofi violated the antitrust laws." *See* November 2, 2012 Joint Letter, Dkt. 124 at 44.

After the court ordered the parties to further meet and confer, Sanofi accepted plaintiffs' representation that this issue was not relevant to their claims. Sanofi thought that this would be the end of it. But it was not.

At her deposition, Dr. Marquez repeatedly claimed that she does not make money from administering Sanofi vaccines, that vaccines do not yield profit but barely keep the lights on, and that Sanofi's conduct precluded her from making a decent living. For example, she testified:

> Sanofi is "making it financially very difficult because their prices" are "expensive prices. So it makes it ... such a fine margin of profit that ***it's not profit for me***, it's profit to pay our overhead, our nurses, etc. Like I said before it makes it very difficult."

Ex. 1, at 225:14-20; *see also id*. 294:18-24.

Dr. Marquez has, thus, re-opened the door her counsel closed to the profits she makes administering vaccines. As such, this information is clearly relevant. *See Air Tech Equip., Ltd. v. Humidity Ventilation Sys., Inc.*, 2006 WL 3193720, at *2 (E.D.N.Y. 2006) (ordering discovery where plaintiff alleged that defendant "hampered [plaintiffs] from growing and profiting from their business in the relevant market of alternative dehumidifiers."). The downstream discovery rule is not a sword and shield; Dr. Marquez cannot claim that Sanofi has prevented her from making a decent living, while precluding Sanofi from obtaining access to information on that point.

## II.     PLAINTIFFS' POSITION (re Dr. Marquez & Document Discovery)

Sanofi's demand for supplemental discovery and to reopen the deposition of Dr. Eysa Marquez-Brito, a principal of Plaintiff M&B, is just the latest step in Sanofi's campaign to harass a pediatrician who has stepped forward to represent a proposed class challenging Sanofi's anticompetitive practices. Apparently unable to accept that such a plaintiff is willing to take the risks inherent in challenging a market dominant vaccine manufacturer like Sanofi, Sanofi has gone to great lengths to dispose of this case by any means ***except*** on the merits. Sanofi's

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

campaign started with an extraordinary retaliatory counterclaim against the named plaintiffs – and even those absent class member physicians who might choose not to opt out of this case – that was dismissed by this Court and has since moved onto unfounded personal attacks on a small, family-owned pediatric practice and its counsel.

M&B consists of Dr. Marquez, her husband, Dr. Jose Bengochea, and a small support staff.  M&B has fully complied with its discovery obligations in this case, including producing documents, participating in written discovery, and sitting for a full-day deposition of Dr. Marquez.  Despite all of that, Sanofi seeks retribution for M&B's willingness to speak up on behalf of vaccine purchasers against Sanofi's illegal conduct. The facts of this case, the applicable law, and Dr. Marquez's testimony all show that Sanofi's discovery requests are nothing but an attempt to enlist the Court in an improper offensive on a class representative.  The Court should deny Sanofi's demands.

### A.    Sanofi's Request to Re-Open the Deposition of Dr. Marquez

Sanofi contends that it has the right to depose Dr. Marquez a second time because Dr. Marquez's testimony conflicts with a document that Dr. Marquez produced eight months prior to the deposition, that was introduced during the deposition, and about which Dr. Marquez was questioned. Sanofi's argument that it purportedly needs a second deposition of Dr. Marquez to "correct" certain testimony suffers from at least two fatal flaws.  First, Dr. Marquez's testimony is accurate and needs no "correction" via further deposition (or otherwise).  Second, even if Dr. Marquez's testimony conflicted with a document, as Sanofi now contends, Sanofi is not entitled to a second deposition since it had ample opportunity to ask her whatever it wanted to when it deposed her.

The crux of the matter revolves around Dr. Marquez's testimony regarding her decision to quit purchasing Menveo and return to purchasing Sanofi's Menactra vaccine.  Dr. Marquez testified multiple times that the primary reason she stopped buying Menveo was the threat, made by Sanofi's sales representative, that Dr. Marquez would lose her discounts on multiple Sanofi vaccines if she merely continued buying Novartis's meningococcal vaccine.  Dr. Marquez also testified that she received a communication discussing the consequences of purchasing Menveo while on a Sanofi PBG contract, but that she was unclear as to who sent the communication and whether the communication was a letter, email, or memorandum.  Thus, contrary to Sanofi's

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

representations, Dr. Marquez's testimony makes clear that the PBG communication did ***not*** "trigger" her decision to stop purchasing Menveo, but rather, that the trigger was the threat delivered by Sanofi's own employee.

Ignoring the testimony already on the record, Sanofi argues that it must be allowed to re-depose Dr. Marquez because, according to Sanofi, she incorrectly testified that the communication came from her Sanofi PBG and that it was a letter.   But that is not what Dr. Marquez said.  Dr. Marquez clearly testified, the first time the communication came up at her deposition, that she did not have a full recollection of it. Ex. 1, at 21:16-17 ("And I even got a letter in the mail after that, which I don't remember").  Sanofi returned to the topic a few minutes later:

> Q:    Do you recall who the letter is from?
> A:    Maybe from a purchasing group.
>
> Q:    In referring to your purchasing group –
> A:    But I don't know.
>
> Q:    – Is that Integrated Physicians Services?
> A:    I don't know exactly. I think that is our group.
>
> Q:    IPS, do you know that acronym?
> A:    Honestly, I don't know.
>
> Q:    Okay, we'll look at some documents. Did you keep
>        that letter that you received after your purchase of
>        Menveo?
> A:    A copy or an e-mail, or a copy somewhere, yes.

*Id.* at 23:2-23.  Sanofi's claim that it was surprised by Plaintiffs' disclosure, after Dr. Marquez's deposition, that the communication was from Physician's Alliance, not IPS, is baseless as it was ***Sanofi's counsel*** who suggested it came from IPS, and Dr. Marquez repeatedly said she did not recall the source.  Likewise, Sanofi cannot claim surprise that the communication was an email because Dr. Marquez was also clear that she did not recall what form it took.

Dr. Marquez repeated these points later in the day:

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

> A:    So what I recall is that I said to the girls and I think
>       that's when [Sanofi sales representative] Lourdes
>       was always there and she said, yeah, if you buy
>       [Sanofi] vaccines, you'll get a better price. And I
>       think the letter also addresses that, that memo, that
>       e-mail.
>
> Q:    And having thought about it a little bit more you
>       had told me you weren't sure who the letter came
>       from earlier in the day. Is that still the case?
> A:    I don't remember who the letter came from.

*Id.* at 123:7-16.

Sanofi even used the Physician's Alliance email as an exhibit at Dr. Marquez's deposition and its

questioning of Dr. Marquez about it spans more than ten pages of the transcript. *Id.* at 191:12-

201:18. Sanofi's argument that it needs another opportunity to examine Dr. Marquez to

"correct" her testimony fails in the face of both Dr. Marquez's testimony that she was unclear

about the source and form of the communication and the fact that Sanofi had ample opportunity

to explore the issue at her deposition.[5]

Just as the transcript fails to support Sanofi's argument that Dr. Marquez's testimony is

"incorrect" it also refutes Sanofi's argument that Dr. Marquez repeatedly stated that the

communication was "one of the triggering incidents for her switch back to Menactra and

decision to sue Sanofi." In fact, the responses cited by Sanofi in support of that argument show

that the first time the communication from Physician's Alliance was mentioned by Dr. Marquez

she made clear, in an unsolicited statement, that it was received ***after*** she stopped buying

Menveo because of a warning from her sales representative:

> A:    [. . .] What happened was that then the rep comes –
>       our rep comes in, who I like very much, and said,
>       you know, Doctor, you have to realize that when
>       you buy vaccines, if you don't buy other vaccines,
>       the prices are going to change.

---

[5] Sanofi argues that Plaintiffs are to blame for the fact that Dr. Marquez did not recognize that the communication at issue and the exhibit introduced at her deposition were one and the same, but Sanofi's claim of surprise is unwarranted given Dr. Marquez's clear and repeated testimony that she did not recall anything about the communication except that it was from a PBG and that it warned of penalties as a result of purchasing Menveo. In other words, it was clear that she lacked sufficient recall of the communication to recognize it was the exhibit and, even if she had, she was under no obligation to answer questions Sanofi elected not to ask.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

> And the percent, there's bundling that if you buy –
> you know, its sort of like the more you buy, the
> better price you will get. And not the more, but I
> mean the more types of different vaccines. We're
> calling it's [*sic*] a bundle and if you buy different
> products, DPT and whatever, the polio and also buy
> our meningitis vaccine, you're going to get a better
> price. So I stopped buying – I really stopped buying
> the other vaccine. And I even got a letter in the mail
> ***after*** that, which I don't remember[.]

*Id.* at 21:3-17 (emphasis added).

Remarkably, Sanofi includes part of this passage to support its argument that Dr. Marquez's testimony needs to be corrected. Sanofi's other citations are similarly disingenuous and can be disposed of *seratim*. Dr. Marquez made clear that she did not recall the specifics of the communication's form or content and did not tie it to her decision to stop purchasing Menveo. *Id.* at 23:2-24:8. She testified that she decided to file suit in part because of her concerns about bundling practices generally and mentioned the communication as just one example of Sanofi's overt anticompetitive acts that she was aware of ***at the time of her decision to file suit***, not as an example of why she switched back to Menactra. *Id.* at 79:20-80:25 and 118:9-119:16. And she testified that the communication prompted her to confirm with her Sanofi sales representative that her Sanofi prices would increase if she purchased Menveo just as the communication stated. *Id.* at 122:16-123:11.

Sanofi even goes so far as to compare an answer under one line of questioning with a response to a separate and distinct area of inquiry in an attempt to fabricate inconsistencies, but when apples are compared to apples it is clear that her testimony is wholly consistent. Sanofi argues Dr. Marquez's testimony that she received the communication after her decision to switch is inconsistent with her supposed testimony that the communication was one of the reasons she went back "to the girls in the office" and told them that the practice was staying with Menactra. A review of the transcript, however, shows that the latter is a creative misrepresentation of Dr. Marquez's testimony. Dr. Marquez was actually asked whether she was using Menveo or Menactra at the time of her decision to file suit against Sanofi and she replied that her previous decision to purchase Menveo had been "based on finances" and provided a number of reasons

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

why she was financially foreclosed from purchasing Menveo *at the time of her decision to file suit*. *Id.* at 118:9-119:16.  The communication was one of those reasons because, after receiving the communication, Dr. Marquez asked her Sanofi sales representative about it and the Sanofi representative confirmed that it applied to Dr. Marquez: the practice could not buy Menveo without risking higher prices on its other Sanofi products. *Id.* at 122:23-123:11.  That Dr Marquez received the communication after she switched back to Menactra is in no way inconsistent with the fact that its receipt – along with the subsequent confirmation from her Sanofi sales representative that it applied to her  – was one of the reasons she was using Menactra at the time of her decision to file suit against Sanofi.

Besides disavowing that the letter communication "triggered" her decision to stop purchasing Menveo, Dr. Marquez repeatedly testified about what did actually prompt that decision – threats from Sanofi's sales representatives.  *Id.* at 123:19-124:4, 131:9-23, 186:13-187:22, 197:12-198:4.  Dr. Marquez even corrected Sanofi's attempt to tie the communication to her decision to stop purchasing Menveo:

> Q:    And that commentary that you were just relaying is reflected in a letter that you think you have back at your office?
> A:    No, that was a verbal statement more than once, like twice by my rep.
>
> Q:    Ms. Garcia?
> A:    By my Sanofi rep.

*Id*. at 247:25-248:7.

Sanofi is unhappy about this testimony.  It supports Plaintiffs' claims, and critically, undermines Sanofi's false assertions that it never threatened its customers with price penalties for buying competing vaccines.[6]  But the mere fact that Sanofi elicited testimony harmful to its defense provides no justification to harass Dr. Marquez by re-deposing her on these issues.  Her prior testimony is clear: she received a communication, possibly a letter or email, from a PBG that she cannot recall *after* she switched back to Menactra, and her decision to switch was based

---

[6] This is not the only evidence, of course, undermining Sanofi's frivolous defense, but it is compelling given that it comes in live testimony from a named Plaintiff who spoke with conviction about the fact that she chose to stand up to Sanofi – despite the threats and fears of retaliation – because Sanofi's monopolistic practices recalled the very conduct her parents fled communist Cuba to escape.  Ex.1, at 172:10-21.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

primarily on threats from Sanofi relating to the anticompetitive bundling scheme at issue in this case.

Moreover, even if there were a conflict between Dr. Marquez's testimony and the documentary evidence, the law does not support reopening her deposition. *See Melhorn v. N.J. Transit Rail Operations, Inc.*, 203 F.R.D. 176, 180 (E.D. Pa. 2001) (preserving impeachment value of evidence obtained after a deposition does not warrant reopening the deposition); *see also Krueger v. Wyeth, Inc.*, No. 03-CV-2496, 2012 WL 1976070, at *2 (S.D. Cal. Jun. 1, 2012) ("The Court is left with the firm impression that Defendants seek to re-depose [the plaintiff] primarily to attempt to impeach her earlier testimony. If that is their desire, they may have the opportunity to do so at trial.").

"A party seeking a court order to extend the examination must show 'good cause' to justify such an order." *Boston Scientific Corp. v. Cordis Corp.*, No. 03–CV–5669, 2004 WL 1945643, at *2 (N.D. Cal. Sept. 1, 2004) (citing *Cardenas v. The Prudential Ins. Co. of America*, No. Civ. 99-1421,); *see also Melhorn*, 203 F.R.D. at 180 ("Absent a showing of need or good reason for doing so, a deponent should not be required to appear for a second deposition") (citing Fed. R. Civ. Pro. 26(b)(2) and 30(a)(2)).   A court may only grant leave to conduct multiple depositions of an individual to the extent consistent with Rule 26(b)(2).  Fed. R. Civ. Pro. 30(a)(2).   Rule 26(b)(2) provides that the court "**must** limit the frequency and extent of discovery" if it determines that: (i) the discovery is unreasonably cumulative or duplicative; (ii) the party seeking discovery has had ample opportunity to obtain the information; or (iii) the burden or expense of the proposed discovery outweighs the likely benefits. Fed. R. Civ. Pro. 26(b)(2)(C) (emphasis added).  All three of these factors weigh strongly in favor of denying Sanofi's motion and none of Sanofi's cases are to the contrary.

First, Sanofi relies on *Hibbert v. Bellmawr Park Mut. Housing Corp.*, No. 10-5386, 2013 WL 3949024 (D.N.J. Aug. 1, 2013), for the proposition that depositions can be re-opened where the importance of the information outweighs the burden of being re-deposed. Sanofi's reliance on *Hibbert* is misplaced.  In *Hibbert*, this Court reopened a deposition after the defendant obtained new documents that plaintiff knew about and should have produced from the onset of the case, and the court limited the inquiry to just the newly-produced documents. *Hibbert*, 2013 WL 3949024, at *8.  In this case, by contrast, Sanofi admits it is seeking to re-depose Dr.

23

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Marquez to re-question her about a document that it has already had ample opportunity to explore, and indeed, ***was introduced as an exhibit at Dr. Marquez's deposition***.

Sanofi's other citations also do not help its arguments.  In *Keck v. Union Bank of Switzerland*, No. 94-CIV-4912, 1997 WL 411931 (S.D.N.Y. Jul. 22, 1997), the court reopened a deposition to explore issues related to a cross-complaint filed after the deposition occurred and expressly foreclosed any inquiry into areas covered by the prior deposition.  *Keck*, 1997 WL 411931, at *3.  Similarly, *Hayden v. Acadian Gas Pipeline System*, No. Civ. A. 96-3612, 1997 WL 180380 (E.D. La. Apr. 10, 1997), allowed additional questioning "to the extent necessary" to explore an allegation injected into the case after the deposition. *Id.* at *6.  Here, the issues at stake have been in the case from the first-filed complaint and have been hotly contested. There is nothing new for Sanofi to explore.

*V. Mane Fils, S.A. v. International Flavors and Fragrances Inc.*, No. 06-CIV-2304, 2010 WL 1855873 (D.N.J. May 6, 2010) and *Dixon v. Certainteed Corp.*, 164 F.R.D. 685 (D. Kan. 1996), are similarly inapposite.  In those cases, the courts granted leave to reopen depositions to allow inquiry into critical issues not known at the time of the initial examination.  In the case of *V. Mane*, the plaintiff produced information about multiple companies it had dealings with one year after its deposition in a case seeking $250 million in damages for tortuous interference with customer relationships.  2010 WL 1855873, at *4.  In *Dixon*, the plaintiff was permitted to re-depose two employees of a defendant about documents concerning the conditions of the premises on which plaintiff was injured because the documents were not produced to the plaintiff until after the depositions and plaintiff could not have known about them.  164 F.R.D., at 692. Here, the document in question was produced in October 2012, eight months before Dr. Marquez's deposition.  Sanofi questioned Dr. Marquez about the document and about all of the other issues raised by Sanofi in this letter.  Thus, Sanofi is not seeking to investigate information produced for the first time after a deposition, but is instead demanding to re-question Dr. Marquez about topics she has already testified about at length and about a document that Sanofi introduced during the deposition.  Simply put, the law does not allow for that.

Sanofi had ample opportunity to investigate this topic, and the law is clear that Sanofi is not entitled to multiple bites at the apple.  *State Farm Mutual Automobile Ins. Co. v. New Horizon, Inc.*, 254 F.R.D. 227, 235 (E.D. Pa. 2008) (insufficient justification to reopen

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

deposition where defendant could have made inquiry at the prior deposition); *EEOC v. Product Fabricators Inc.*, 285 F.R.D. 418, 422-23 (D. Minn. 2012) (same); *Arugu v. City of Plantation*, No. 09-61618-CIV, 2010 WL 2609394, at *4 (S.D. Fla. Jun. 27, 2010) (no good cause to reopen deposition based upon a party's choice or neglect to ask questions that could have been asked).

In sum, the "true facts" are on the record: Dr. Marquez clearly testified that she did not recall, at the time, who the communication was from and what form it took. She did not testify that the communication was the "triggering event," and indeed, testified clearly that it was threats from Sanofi that caused her to stop purchasing Menveo. Sanofi has already questioned Dr. Marquez for seven hours on the record on this and other topics. The fact that Sanofi may not like the answers it received because they are bad for Sanofi's defense provides no basis for a second deposition of Dr. Marquez and Sanofi's frivolous request to reopen the deposition at Plaintiffs' expense should be denied.

## B.     Sanofi's Request for Vaccine Reimbursement Data

Sanofi seeks to compel Marquez & Bengochea to produce information showing the amount of fees and reimbursements it receives from insurers in connection with administering vaccines simply because it does not believe Dr. Marquez's testimony that her practice uses single-entity vaccines instead of combination vaccines for a number of reasons, including patient concerns, the differing reactions to shots, and difficulties in coordinating patient vaccination schedules with combination vaccines. That Sanofi does not believe Dr. Marquez's reasons for providing single-entity vaccines instead of combination vaccines in her practice is not sufficient to justify this additional discovery.

Dr. Marquez provided multiple reasons why her practice does not use combination vaccines. In addition to certain concerns about combination vaccines expressed by the parents of some of her patients, she testified that she used Sanofi's single-entity polio vaccine (IPOL) because switching to a combination vaccine that contained polio vaccine in addition to other vaccine components would be "very difficult" and "very complex," as the switch would require realigning her patients' shot schedules to ensure proper vaccine coverage. Ex. 1, at 218:4-218:17. Such an endeavor "could lead to a lot of confusion and chaos." *Id.* at 218:18-219:23. Dr. Marquez also testified that the reaction caused by the shots factored in the decision because combination shots could cause more of a reaction in her patients. *Id.* at 221:7-15.

Unable to accept these answers, Sanofi insists – without providing any support – that it believes the "truth" is that Dr. Marquez's practice makes more money administering single entity vaccines and that the reimbursement data is necessary to cross-examine Dr. Marquez on this point. But whether Dr. Marquez's practice receives greater fees from single-entity shots versus combination shots is irrelevant: Dr. Marquez testified that reimbursement is ***not*** a factor in her decision to use single-entity vaccines. *Id.* at 222:25-223:3. Showing that her practice receives greater fees from single-entity shots, if in fact it does, in no way contradicts that testimony or the many other reasons Dr. Marquez gave as to why her practice depends on Sanofi's single-entity polio vaccine.[7]

Sanofi also misconstrues the law on downstream discovery. While originally intended by the Supreme Court in *Hanover Shoe* and *Illinois Brick* to prevent fishing expeditions in connection with a pass-on defense, the prohibition on downstream discovery has since been extended to instances where no pass-on defense is being asserted. *See In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *7-8 (E.D. Pa. May 26, 2006) (declining to depart "from the long-held practice of proscribing discovery of downstream data").[8]

Sanofi's cases do not help it overcome this bar. *Urethane* allowed downstream discovery in order to explore whether the plaintiffs themselves had created the market conditions they alleged were anticompetitive because such evidence would obviously disprove the culpability of the defendants. *In re Urethane Antitrust Litig.*, No. 04-1616, 2011 WL 1327988, at *5-6 (D.

---

[7] Animating Sanofi's concern is the fact that Sanofi had hoped to argue, in defense, that purchasers can obtain any vaccine that Sanofi sells from other sources. This is not true, however, for polio vaccines because while GlaxoSmithKline sells combination vaccines that include a polio component, Sanofi is the only producer that sells a single-entity polio vaccine. But this fact was known to Sanofi before the deposition, and Sanofi had ample opportunity to cross-examine Dr. Marquez on her reasons for providing single-entity vaccines to her patients. Moreover, as discussed above, even if Sanofi could show that she received greater reimbursements for providing single-entity vaccines, that does not rebut the basic fact that Sanofi is the only manufacturer that sells a single-entity polio vaccine in the United States. Thus, even if Dr. Marquez purchased the single-entity vaccines to make more money on insurance reimbursements – which is not the case – that would do nothing for Sanofi's ill-fated defense that equivalent vaccines are available from other sources.

[8] *See also, e.g., In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, No. 05-CV-1602, 2006 WL 6907107, at *6 (D.N.J. Sept. 7, 2006) (Linares, J.) (denying discovery into economic interests of class representatives); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 06-MD-1775, 2010 WL 496723, at *2 (E.D.N.Y. Nov. 24, 2010) (noting "the tide of cases precluding discovery of 'downstream' information"); *In re K-Dur Antitrust Litig.*, No. 01-CV-1652, 2007 WL 5302308, at *10-15 (D.N.J. Jan. 2, 2007), *aff'd in part on appeal* at 686 F.3d 197 (3d Cir. 2012); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 498 (M.D. Pa. 2005).

Kan. Apr. 5, 2011). *Wellbutrin* allowed discovery into the product's market size where the defendant sought to prove the scope of the market was broader than alleged and expressly avoided the question of whether that information was downstream. *In re Wellbutrin XL Antitrust Litig.,* No. 08-cv-02431 (E.D. Pa. Mar. 12, 2010 Order). The information sought here, however, is clearly downstream discovery as it relates solely to reimbursements received by a single named plaintiff and has no bearing on the claims, allegations, or defenses in the case as a whole and will not vindicate Sanofi.[9]

Whether M&B receives greater reimbursements by administering single-entity vaccines plays no role in Dr. Marquez's inability to substitute a combination vaccine for Sanofi's IPOL. Such information would not disprove Plaintiffs' allegations that Sanofi enjoys artificially high prices by virtue of its bundling practices. As Sanofi admits, the intent of this request is to "cross-examine" Dr. Marquez "and present the jury with an alternative explanation" for her vaccine selections.[10] Sanofi's disagreement with Dr. Marquez's reasons for relying on IPOL does not make the reimbursement data relevant to the case as a whole. Where, as here, the information sought is, at best, only marginally relevant to the issues in the case, downstream discovery should be denied. *See In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000) (denying downstream discovery where record establishes only marginally, if at all, the relevance of the information).

In addition to being irrelevant to the actual issues in this case, it is highly likely that Sanofi already has this information given the nature of its business. Sanofi had ample opportunity to explore this issue at Dr. Marquez's deposition given its industry knowledge, and its misplaced insistence that it knows the "true" reason for Dr. Marquez's vaccines selections belies any claim to the contrary. The benefits to Sanofi of producing this information is outweighed by the burden to M&B, particularly given Sanofi's stated goal to depose

---

[9] The other case cited by Sanofi in support of its bid to obtain downstream discovery, *Air Tech*, expressly distinguished its facts, where the damages sought included lost profits, from antitrust cases such as this one that seek only overcharge damages. *Air Tech Equip., Ltd.,* No. 05-CV-77, 2006 WL 3193720, at *3 n.9 (E.D.N.Y. Nov. 2, 2006). As discussed *infra*, that distinction is critical as downstream information is not necessary to prove damages in overcharge cases.

[10] Even were the Court to grant this request, Sanofi would not be entitled to re-depose Dr. Marquez on this issue. *Melhorn*, 203 F.R.D. at 180 (preserving impeachment value of evidence obtained after a deposition does not warrant reopening the deposition); *see also Krueger*, 2012 WL at *2 (proper method to attempt to impeach earlier testimony is at trial, not by reopening a deposition).

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Dr. Marquez – and now her husband – about every piece of supplemental discovery it can get its hands on.  The Court should not allow Sanofi to use the discovery process to intimidate and burden M&B in this way and should deny this request.

> **C.      Sanofi's Request for M&B's Patient Volume Data**

Sanofi demands information showing the number of patients seen by M&B for the admitted purpose of analyzing the practice's pricing options, ability to obtain alternative offers, and damages. Sanofi's need for this data, it claims, arises out of its sudden belief that M&B "has a unique practice" because of the small number of meningococcal vaccines it purchases compared to its estimated patient volume.

Discovery into the ability of a plaintiff to leverage its purchasing power to obtain greater purchasing options is the exact type of downstream discovery to which defendants in antitrust cases are not entitled.  For example, the defendants in *In re Pressure Sensitive Labelstock Antitrust Litig.* argued that they needed discovery into the relative size of the plaintiffs in order to distinguish ordinary buyers from "power buyers," as the latter would have greater leverage in negotiating prices, differentiating them from other class members. *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 496 (M.D. Pa. 2005).  The court rejected this argument, holding that the leverage of a class member does not affect questions common to the class. *Id.* (citing *Vitamins*, 198 F.R.D. at 301).  While Sanofi attempts to distinguish those cases from our circumstances by characterizing its inquiry as being into the "purchasing options" available to M&B rather than its "purchasing power", that is a distinction without a difference and Sanofi's argument should also be rejected.

Further, as the court in *Labelstock* found, the more direct means of determining the pricing power of a particular class representative is through its purchase records. *Labelstock,* 226 F.R.D. at 496. P laintiffs have already produced their purchase records to Sanofi, and of course, Sanofi has its own records of Plaintiffs' purchases of Sanofi products.  This information is more than sufficient to show the relative size of the Plaintiffs as well as their damages.  Indeed, despite its claims to the contrary Sanofi routinely uses the quantity of vaccines purchased by its customers to estimate their size as part of its normal business practices.

Sanofi had ample opportunity to explore whether M&B had a "unique practice" at Dr. Marquez's deposition and it knew the number of meningococcal vaccinations purchased by

COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
COUNSELLORS AT LAW

her practice well in advance of that day. Sanofi's failure to make any inquiry into what it perceives to be a discrepancy between patient volume and the number of administered vaccines does not justify subjecting M&B to supplemental discovery, let alone subjecting Dr. Marquez to further questioning.  *See Arugu*, 2010 WL 2609394, at *4 (finding no good cause to reopen a deposition based upon neglect or choice not to ask questions that could have been asked at the initial deposition).  Given its prior opportunity to explore this issue, the likelihood that it already has this data, the bar on downstream discovery, and Sanofi's failure to offer any authority in support of its position, Sanofi's request for patient volume data should be denied.

### D.   *Sanofi's Request for M&B Profits and Disbursement Data*

Sanofi finally argues, in the face of overwhelming case law to the contrary, that it is entitled to M&B's profits and disbursement data because that information "goes directly to a number of core themes in the case."  In support of this request it points to just a single sentence from the complaint and to Dr. Marquez's testimony that the profit margin on vaccines is exceedingly small.[11]  Sanofi claims that this testimony "re-opened a door" closed previously in the case and makes the information "clearly relevant."

As an initial matter, Sanofi previously agreed not to pursue this information.  As part of an agreement between the parties that resolved a number of discovery disputes that were submitted to the Court on November 2, 2012, Sanofi agreed to withdraw its Request For Production No. 29.  *See* Ex. 11.  Request No. 29 sought "all documents concerning the costs of purchasing Relevant Vaccines, including all documents relating to the effect of such costs on Your cash flows, revenues, or profits."  *See* Ex. 12.  During the parties' efforts to resolve this issue without court intervention Sanofi argued that an allegation in the complaint opened the door to profits discovery and demanded that Plaintiffs consent to that discovery or withdraw the allegation.  Plaintiffs refused on both fronts and Sanofi ultimately agreed to abandon its efforts as part of the settlement of the numerous discovery disputes. Sanofi cannot now claim that Plaintiffs have resurrected this allegation as it was specifically on notice that Plaintiffs were not abandoning it.  That Dr. Marquez independently echoed that allegation during her testimony

---

[11] Of course this is entirely consistent with Dr. Marquez's testimony in Section C, *supra*, that reimbursement does not factor into her decision to purchase single-entity vaccines instead of combination vaccines.  The mere fact that Sanofi is not happy with Dr. Marquez's testimony on this issue does not warrant supplemental discovery, let alone re-opening her deposition.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

does not change the fact that Sanofi agreed not to pursue this discovery in order to gain concessions from Plaintiffs on numerous other discovery disputes. Sanofi cannot claim surprise about the existence of an issue which it knew existed and which had been the subject of its own prior discovery demand – a demand which it withdrew as part of a compromise with Plaintiffs. The information Sanofi seeks was reasonably contemplated by the terms of the agreement and Sanofi is bound by it.

Even absent that agreement, the case law is clear: in overcharge cases such as this, information regarding plaintiffs' profits is not relevant. Judge Linares, for example, rejected downstream discovery in *Hypodermic Products* because plaintiffs' profits are irrelevant in an overcharge case. *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, No. 05-CV-1602, 2006 WL 6907107, at *6 (D.N.J. Sept. 7, 2006) (citing, *inter alia*, *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968)); *see also Vitamins*, 198 F.R.D. at 300; *In re Carbon Dioxide Antitrust Litig.*, MDL 940, slip op. at 4 (M.D. Fla. Nov. 19, 1993) (denying discovery into plaintiffs' profits in overcharge case); *In re Wirebound Boxes Antitrust Litig.*, 131 F.R.D. 578 (D. Minn. 1990) (where damages will be determined by the extent of unlawful overcharges, not lost profits, plaintiff's financial information is not relevant).

Sanofi's citation to *Air Tech* does not help it avoid this bar. *Air Tech* allowed limited downstream discovery because there the alleged damages included lost profits and expressly distinguished its facts from *Vitamins* and other overcharge cases. *Air Tech*, 2006 WL 3193720, at *3 n.9. Dr. Marquez's testimony and a lone reference in the complaint do not change the fact that Plaintiffs are not seeking lost profit damages.

Given its prior agreement not to seek this information and the bar on such irrelevant discovery even if it had not, Sanofi's request for M&B's profit and disbursement data should be denied.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

### III.   PLAINTIFFS' POSITION (re Dr. Bengochea)[12]

In this application, Plaintiffs seek a protective order preventing Sanofi from deposing Dr. Bengochea.  Sanofi has already deposed M&B's only other principal, Dr. Eysa Marquez, for seven hours on the record.  In addition to being Dr. Bengochea's wife, Dr. Marquez is the M&B principal responsible for and most knowledgeable about vaccine products, pricing, and interactions with vaccines sales representatives, as well as M&B's involvement in this case.  At Dr. Marquez's deposition, Sanofi had every opportunity to question (and, in fact, did extensively question) Dr. Marquez about M&B and the various vaccine product, pricing, and contracting issues that are implicated in this case.  In seeking to depose Dr. Bengochea, Sanofi refused to identify – despite Plaintiffs repeated requests – a single topic it wished to discuss with Dr. Bengochea that it could not have explored with Dr. Marquez during her deposition.[13] Sanofi's demand for a deposition of Dr. Bengochea presents an undue burden, expense, and annoyance, and is otherwise unreasonably cumulative and/or duplicative of the deposition already taken of Dr. Marquez.  Good cause therefore exists under Fed. R. Civ. P. 26(c) for this Court to issue a protective order preventing Sanofi from deposing Dr. Bengochea.

####   A.   Background

On May 13, 2013, Sanofi simultaneously served both a notice of deposition and a deposition subpoena for Dr. Marquez.  On June 27, 2013, Sanofi deposed Dr. Marquez, for a full day – using the maximum time permitted under the Federal Rules.  Dr. Marquez testified that, among other things, she is the M&B principal having responsibility for, and the most knowledge about, vaccine products, pricing, and interactions with vaccines sales representatives.  *See* Ex. 1, at 16:9-14.  She also responded to Sanofi's exhaustive and repetitive questioning on just about every issue one could imagine a defendant would ask of a named plaintiff in a class action suit (as well as a number of lines of questioning clearly beyond what is relevant and ordinarily asked about in a deposition of a class representative).  *See generally* Ex. 1.  Sanofi was not prevented

---

[12] The structure of this joint letter misrepresents the presentation and procedural posture of the issues.  Plaintiffs led the briefing on the issues relating to Dr. Bengochea's deposition and therefore are entitled to lead on those issues in this joint letter.  Sanofi insisted, however, that its briefing be presented first and as "as an integrated whole"—seemingly in an attempt to bolster its (meritless) argument that Plaintiffs should be sanctioned.

[13] It was not until Plaintiffs' service of their portion of the joint letter regarding Dr. Bengochea that Sanofi articulated any grounds for the deposition.  Notwithstanding this sandbagging tactic, Sanofi's reasons for seeking Dr. Bengochea's deposition further support Plaintiffs' application for a protective order.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

from exploring any non-privileged area of examination.  Shortly after Dr. Marquez's deposition, Sanofi demanded to re-depose Dr. Marquez about issues it had already explored during her deposition.  Plaintiffs opposed Sanofi's re-deposition request.  Unable to resolve this dispute, on August 20, 2013, the parties agreed to a briefing schedule for a Joint Letter to the Court.  *See* Ex. 13.  The issues presented by that Joint Letter are the subject of Sanofi's application concerning Dr. Marquez and document discovery discussed above.

Just three days later, on August 23, 2013, Sanofi served a notice of deposition for Dr. Bengochea.  *See* Notice of Deposition to Jose Bengochea (attached hereto as Ex. 2).  Sanofi did not, and has not, served a deposition subpoena on Dr. Bengochea.[14]  The August 23 service of the notice of deposition was the first time Sanofi expressed its intent to have Dr. Bengochea sit for deposition.  The cover email to that deposition notice made clear that Sanofi had "***tentatively*** scheduled the deposition for October 3, 2013 in Proskauer's Newark office ***but we will be flexible to find a mutually-agreeable date and location***."[15]

Up until service of its response to Plaintiffs' portion of the joint letter on October 11, 2013 (over a week after the proposed deposition), Sanofi had flatly refused to explain – despite Plaintiffs' repeated requests – how any proposed deposition of Dr. Bengochea would not be unreasonably cumulative or duplicative of the deposition of Dr. Marquez.   Requiring Dr. Bengochea, the only other M&B principal, to also sit for deposition presents an annoyance, undue burden, and expense, not only with respect to the burdens posed by the deposition itself, but also with respect to the disruption and financial impact the deposition will have on M&B's small two-pediatrician practice.  By failing to previously identify any non-duplicative topic for examination Sanofi tacitly admits the proposed deposition of Dr. Bengochea would be entirely duplicative of the deposition of Dr. Marquez.[16]  Plaintiffs respectfully request, pursuant to Rule

---

[14] This distinction is important because in serving both a Notice of Deposition and a Deposition Subpoena on Dr. Marquez, Sanofi made clear that it was seeking to depose Dr. Marquez both as a 30(b)(6) representative of M&B (through service of the Notice of Deposition) and in her personal capacity (through the deposition subpoena).  Here, Sanofi served only a Notice of Deposition for Dr. Bengochea, and candidly declares in this joint letter that it is seeking further "[d]eposition testimony from M&B" through its proposed deposition of Dr. Bengochea.  As discussed in the text, this is precisely the kind of duplicative deposition that is not permitted.
[15] *See* Ex. 2.
[16] In this respect, Sanofi's citation to *National Life Ins. Co. v. Hartford Acc. and Indem, Co.*, 615 F.2d 595 (3d Cir. 1980) is unavailing.  That case involved a blanket assertion of the Fifth Amendment privilege against self-incrimination by a witness who demanded a list of questions in advance to determine whether any could be

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

26(b)(2)(c), that the Court grant a protective order preventing Sanofi from deposing Dr. Bengochea.

**B.      Argument**

For "good cause" Fed. R. Civ. P. 26(c) provides the Court with the authority to prevent or otherwise restrict discovery to protect a party or person from "annoyance . . . undue burden or expense."   Pursuant to Fed. R. Civ. P. 26(b)(2)(C) the Court is also required to prevent or otherwise restrict discovery where:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive.
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

While a showing on any one of the above factors would suffice to establish good cause, each factor supports the Court's entry of the requested protective order in this case.

1.      <u>Sanofi Seeks an Unreasonably Cumulative and Duplicative Deposition.</u>

The deposition of Dr. Bengochea would be unreasonably cumulative and duplicative. Sanofi's repeated refusal during the meet and confer process to identify even a single question it would pose to Dr. Bengochea that it could not have posed to (or did not already pose to) Dr. Marquez constitutes an admission that this deposition is unreasonably cumulative or duplicative of the deposition already taken of Dr. Marquez.  Sanofi knows that Dr. Marquez is the M&B principal responsible for, and having the most knowledge about, vaccine products, pricing, and interactions with vaccines sales representatives, as well as M&B's involvement in

---

answered without invoking the privilege.  Here, Plaintiffs did not ask for specific questions or documents, but instead sought a description of the topics Sanofi sought to explore with Dr. Bengochea that it could not have explored with Dr. Marquez, in an effort to identify whether a reasonable accommodation could be made – *i.e.*, by provision of the requested information through a less burdensome discovery vehicle or through a more limited deposition.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

this case.  Sanofi also knows that Dr. Bengochea's knowledge, insofar as this case is concerned, is limited, and primarily derived from privileged conversations he had with his wife which are not discoverable.[17]  Where a principal lacks "personal or unique knowledge of the facts at issue in [the] litigation" a protective order preventing that principal's deposition is wholly appropriate.  *See Ford Motor Co. v. Edgewood Properties, Inc.*, No. 06-1278, 2011 WL 2517133, at *2-*3 (D.N.J. Jun. 23, 2011) (granting protective order prohibiting depositions of two higher-level employees lacking personal or unique knowledge).

> 2.    Sanofi Has Had Ample Opportunity to Obtain Information.

Sanofi has also had ample opportunity elsewhere to obtain any information it now seeks from a deposition of Dr. Bengochea.  As noted above, Dr. Marquez's deposition lasted for seven hours and Sanofi was not foreclosed from exploring any areas of inquiry.  The fact that Sanofi repeatedly refused during the meet and confer process to identify even a single question it wanted to ask Dr. Bengochea that it could not have asked or did not ask of Dr. Marquez, speaks volumes.

> 3.    The Burden-Benefit Balance Does Not Justify The Deposition.

Finally, the burden and expense of Dr. Bengochea's deposition clearly outweighs any benefit to Sanofi.  Dr. Bengochea is one of only two pediatricians that constitute the small M&B practice.  The other M&B pediatrician, Dr. Marquez, already prepared for and sat through an exhaustive full day deposition.  The burden of forcing Dr. Bengochea to also prepare and sit for a deposition at the expense of M&B's patients and practice (thus requiring disruption of 100% of M&B's income-earners), clearly outweighs any benefit to Sanofi's further examination into any area it could have covered with Dr. Marquez.[18]  Dr. Bengochea's knowledge of the case stems largely from his privileged discussions with his wife, who has already been deposed.  Sanofi cannot show good cause to force a principal of M&B to sit for a second deposition, particularly when it had failed to articulate the relevance of the testimony it seeks to the claims of the case.

---

[17] Sanofi is not entitled to question Dr. Bengochea about matters learned from his conversations with his wife, even if relevant to the case, because any such discussions would be protected by the marital communications privilege.  *See Andrews v. Holloway*, 256 F.R.D. 136, 146-48 (D.N.J. 2009) (observing that common law marital communications privilege applies in federal question cases).

[18] In this respect Sanofi's approach to the balance of the equities is comparing apples to elephants.  One can scarcely imagine the fury that would result if Plaintiffs sought depositions of even 50% of Sanofi's revenue-drivers or instead demanded that Sanofi witnesses be deposed only during their off-hours!

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

*See, e.g., State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 235 (E.D. Pa. 2008) (preventing secondary deposition where there was ample opportunity to explore issues at prior deposition); *Krueger v. Wyeth, Inc.,* No. 03-cv-2496, 2012 WL 1976070, at *2 (S.D. Cal. Jun. 1, 2012) (same); *Arugu v. City of Plantation*, No. 09-61618-CIV, 2010 WL 2609394, at *4 (S.D. Fla. Jun. 27, 2010) (same); *EEOC v. Honda of Am. MFG., Inc.*, No. 06-cv-0233, 2008 WL 440437, at *7 (S.D. Ohio Feb. 13, 2008) (same).

4.      Sanofi Is Not Entitled To Sanctions.

In response to Plaintiffs' Joint Letter request for a protective order preventing Sanofi from deposing Dr. Bengochea, Sanofi moves for sanctions under Fed. R. Civ. P. 37(d) on the grounds that Plaintiffs' did not file a motion for a protective order prior to October 3 – notwithstanding that Plaintiffs made clear weeks before the noticed October 3 date that (i) the October 3 date did not work for the parties, and in any event (ii) Plaintiffs opposed Dr. Bengochea's deposition as unreasonably cumulative and/or duplicative and would seek appropriate relief.  Moreover, the parties were actively engaged in the meet and confer process leading up to Plaintiffs' October 4 service of the "opening" portion of this joint letter.

Sanofi's motion for sanctions should be denied.  As in any case, the time and place of a noticed deposition is subject to negotiation and reasonable accommodation by the parties. Indeed, Sanofi's cover email plainly stated that the October 3 date was "tentative" pending confirmation from Plaintiffs as to the time and place of the deposition.  Plaintiffs made clear well in advance that the noticed October 3 date did not work.  (Moreover, Sanofi knew when it served the notice that, consistent with every other deposition taken in this case, that any such deposition would take place in the Southern District of Florida and not in New Jersey.)  Sanofi therefore had no legitimate basis to incur any related expenses in connection with that proposed October 3 New Jersey deposition, and indeed, does not represent that any such expenses were undertaken. Under the circumstances here, Sanofi has no legitimate basis for seeking sanctions.[19]

---

[19] Indeed, if Sanofi's proposed rule were to apply, Sanofi itself would be subject to repeat sanctions because Sanofi itself has failed to produce *all* of its witnesses on any of the deposition dates Plaintiffs' first noticed.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

      5.      <u>Sanofi's Reasons for the Proposed Deposition Consist of Mischaracterizations and/or Immaterial Facts and Otherwise Do Not Justify the Deposition</u>.

Sanofi asserts three reasons why Dr. Bengochea must be deposed, all of which, according to Sanofi, demand further testimony -- not from Dr. Bengochea personally but from M&B.  In Sanofi's very words, "[d]eposition testimony from M&B is particularly important."  First, Sanofi asserts that "M&B is the only named plaintiff that claims it was threatened with termination by its PBG."  Not true.  Each named plaintiff has testified about how Sanofi threatened them either directly, through a PBG, or through its contracting scheme.  Sanofi also asserts that "plaintiffs disclaimed" Dr. Marquez's testimony.  Not true.  As discussed above in Plaintiffs' Position on Sanofi's application regarding Dr. Marquez, Plaintiffs disclaimed only Sanofi's distorted version of her testimony.  Second, Sanofi asserts that "M&B is the only named plaintiff that claims it was not solicited by plaintiffs' counsel after Novartis and plaintiffs' counsel conspired to engineer this suit."  Not true.  Each named plaintiff has denied being "solicited."  Moreover, the "conspiracy" is Sanofi's tiresome refrain, and still not true:  plaintiffs' counsel and Novartis never conspired to sue Sanofi (and even if they did, that would not excuse Sanofi for its unlawful conduct).  Third, Sanofi asserts "M&B is the only named plaintiff that claims . . . that GSK vaccines are unsuitable."  Not clear what Sanofi is getting at here, but Dr. Marquez very candidly testified about why she preferred to use certain vaccines over others, including her preference to not use combination vaccines.

To the extent Sanofi believes that Dr. Marquez's testimony is inaccurate, misremembered, or otherwise contradicted by other evidence, it is, and remains free to, impeach her.  As discussed above in Plaintiffs' Position on Sanofi's application regarding Dr. Marquez, it is not permitted to "re-open" her deposition to "correct" her testimony.  Moreover, what Sanofi cannot get through a re-opened deposition of Dr. Marquez – *i.e.*, a "correction" of her testimony – it should not be permitted to get through a deposition of her husband and partner, which is Sanofi's clearly stated objective here:  "Dr. Bengochea can fill these gaps."

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

      6.     <u>None of the Cases Upon Which Sanofi Relies Justify the Deposition.</u>

     Sanofi cites four cases in support of its position, none of which involve a duplicative deposition request or otherwise demonstrate the "good cause" Sanofi needs to show to justify the deposition.  The first, *Campbell v. Sedgwick Detert, Moran & Arnold*, No. 11-642-ES-SCM, 2013 WL 1314429 (D.N.J. Mar. 28, 2013), involved a number of requests involving different discovery vehicles.  There the court repeatedly affirmed the basic notion that the defendant did not have to re-produce information that had been previously provided, but could instead object on the grounds that the request was duplicative.  *See id.* at *10-*11.[20]  The second case, *Johnson v. Jung*, 242 F.R.D. 481 (N.D. Ill. 2007), involved a proposed deposition of a CEO in an employment discrimination case whose sole burden objection concerned the impact to her travel schedule – not an issue here.  *Id.* at 483-84.  The third case, *Capitol Pants Co. v. United States Fidelity and Guaranty Co.*, No. 95-CV-4415, 1996 WL 50642 (E.D. Pa. Feb. 5, 1996), involved a plaintiff who repeatedly violated Court orders – not an issue here.  The fourth case, *Shopping Mall Investors, N.V. v. E.G. Frances & Co.*, No. 84 Civ. 1569 (JFK), 1987 WL 12082 (S.D.N.Y. 1987), involved a situation where an affidavit previously submitted by plaintiff on another issue made clear that plaintiffs' proposed deponent had no involvement in the at-issue transaction but that its two foreign investor principals "clearly [were both] significant players in the transactions."  *Id.* at *1.  In contrast, the deposition here sought by Sanofi of M&B through Dr. Bengochea is duplicative of the deposition of M&B already taken of M&B through Dr. Marquez.  The proposed deposition of Dr. Bengochea should be rejected as nothing more than a calculated backdoor attempt to get through Dr. Bengochea what Sanofi cannot get through Dr. Marquez – *e.g.*, a re-opening of her deposition to "correct" her testimony.  In sum, Sanofi has failed to demonstrate the good cause necessary to compel the deposition of Dr. Bengochea.

---

[20] The only deposition issue in *Campbell* concerned its location, and there the Court's decision makes clear that Sanofi's notice of deposition for an October 3 deposition in New Jersey was defective, *ab initio*, when Sanofi knew (i) M&B had no business dealings with the District of New Jersey, and (ii) every other deposition taken in this case, including those of the Plaintiffs, occurred in the party's district of preference which, in this case would be the Southern District of Florida (as it was for Dr. Marquez).  Thus, even if Plaintiffs' advance notice to Sanofi that the noticed October 3 date did not work were ineffective, Sanofi also had no reasonable expectation that the deposition would occur as noticed in New Jersey.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

### C.    Conclusion

Given the (i) clearly cumulative and duplicative nature of the testimony sought, (ii) Sanofi's ample opportunity to explore during its full-day deposition of Dr. Marquez any issues it now seeks to explore with Dr. Bengochea, (iii) marginal, if any, benefit of the deposition to Sanofi, and (iv) undue burden, expense, and annoyance the proposed deposition poses both on Dr. Bengochea and the small two-pediatrician M&B practice, this Court should grant a protective order prohibiting Sanofi from deposing Dr. Bengochea.

In the alternative, Plaintiffs request that the Court grant a protective order strictly limiting any deposition of Dr. Bengochea in duration (*i.e.*, two-to-three hours) and to questions that could not have been asked of Dr. Marquez (which, to avoid protracted disputes at the deposition, would need to be agreed-upon by the parties in advance of the deposition).

Respectfully submitted

Dated:  October 23, 2013                                 Respectfully submitted,

/s/ Ryan P. Blaney                                       /s/ Peter S. Pearlman
Ryan P. Blaney                                           Peter S. Pearlman
PROSKAUER ROSE LLP                                       COHN LIFLAND PEARLMAN
1001 Pennsylvania Ave., N.W.                             HERRMANN & KNOPF, LLP
Washington, DC 20004                                     Park 80 Plaza West-One
T: (202) 416-5844                                        250 Pehle Ave., Suite 401
F: (202) 416-6900                                        Saddle Brook, NJ 07663
E: rblaneyy@proskauer.com                                T: 201-845-9600
                                                         F: 201-845-9423
*Attorney for Defendant-Counterclaim*                    E: psp@njlawfirm.com
*Plaintiff Sanofi Pasteur Inc.*
                                                         *Attorney for Plaintiffs-Counterclaim*
                                                         *Defendants*