COHN LIFLAND PEARLMAN
     HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: (201) 845-9600
Facsimile:  (201) 845-9423

CARELLA, BYRNE, CECCHI, OLSTEIN,
     BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700
Facsimile:  (973) 994-1744

*Liaison Counsel for Plaintiffs and Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADRIANA M. CASTRO, M.D., P.A.; SUGARTOWN PEDIATRICS, LLC; and MARQUEZ and BENGOCHEA, M.D., P.A., on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>SANOFI PASTEUR INC.,<br><br>     Defendant. | Civil Action No. 2:11-cv-07178-MCA-MAH |

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

**Dated: March 30, 2015**

<u>**TABLE OF CONTENTS**</u>

<u>**PAGE**</u>

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................1

II.    ARGUMENT ...............................................................................................................4

    A.    Classwide Evidence Is Capable of Proving Plaintiffs' Claims...............................4

        1.    Plaintiffs Have Classwide Proof of the Antitrust Violation........................4

        2.    Plaintiffs Have Classwide Proof of Common Impact...................................7

            a.    Prong 1: The MBLC Caused Price Inflation Generally..................8

                i.    The market division artificially inflated prices...................8

                ii.    The differentiated Bertrand model is appropriate.............12

                iii.    Standard economic theory is sufficient by itself...............17

            b.    Prong 2: Classwide Evidence Is Capable of Showing All Class Members Paid the Artificially Inflated MCV4 Prices..........18

                i.    Sanofi has a rigid pricing structure ....................................18

                ii.    There is no evidence that Sanofi would have departed from its rigid price structure in the but-for world .............19

                iii.    List prices would be lower in the but-for world ................21

            c.    Prof. Elhauge's Analysis Does Not "Mask" Individualized Issues........................................................................23

                i.    Novartis did not target Sanofi loyals. The data are clear .............................................................24

                ii.    Novartis did not compete aggressively for Sanofi loyals because it would have been futile..........................26

                iii.    Sanofi never departed from its rigid price structure, confirming common impact.............................28

    B.    There Are No Fundamental Class Conflicts and Thus Rule 23(a) Is Satisfied..............................................................................29

C.      Sanofi's Request That the Court Vacate Law of the Case is Without Merit .........31

         1.      This Court Ruled that Paying Inflated MCV4 Prices Is Injury.................31

         2.      This Court Ruled that "Coercion" Is Not Required ...................................33

D.      A Class Action Is Superior to Alternative Methods of Adjudication ...................34

III.    CONCLUSION.................................................................................................................35

## TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(S)**

*Allen v. Holiday Universal*,
  249 F.R.D. 166 (E.D. Pa. 2008) ..................................................................30

*Allied Ortho. Appl., Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ............................................................10, 21

*Amchem Prods., Inc. v. Windsor*
  521 U.S. 591 (1997) ..............................................................................34, 35

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) .......................................................................1, 5, 8

*Bradburn Parent/Teacher Store, Inc. v. 3M*,
  CIV. A. 02-7676, 2000 WL 34003597 (E.D. Pa. Jul. 25, 2003)...........................32

*Bradburn Parent/Teacher Stores, Inc. v. 3M*,
  CIV. A. 02-7676, 2004 WL 414047 (E.D. Pa. Mar. 1, 2004)..............................30

*Bradburn Parent/Teacher Stores, Inc. v. 3M*,
  CIV. A. 02-7676, 2004 WL 1842987 (E.D. Pa. Aug. 18, 2004) ..........................30

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ...............................................................34, 35

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) .....................................................................34

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
  C.A. No. 08-4168 (MLC), 2014 WL 1343254 (D.N.J. Mar. 28, 2014)..................34

*FTC v. CCC Holdings Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ................................................................8

*Freeland v. AT&T Corp.*,
  238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................32

*Grand River Enters. Six Nations v. King*,
  783 F. Supp. 2d 516 (S.D.N.Y. 2011).........................................................13

*In re Blood Reagents Antitrust Litig.*,
  283 F.R.D. 222 (E.D. Pa. 2012)...........................................................13, 35

*In re Chocolate Confectionary Antitrust Litig*,
  289 F.R.D. 200 (M.D. Pa. 2012)................................................................19

*In re Flat Glass Antitrust Litig.,*
  191 F.R.D. 472 (W.D. Pa. 1999) ...................................................30

*In re Flonase Antitrust Litig.,*
  284 F.R.D. 207 (E.D. Pa. 2012) ...................................................30

*In re High-Tech Employee Antitrust Litig.,*
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..............................7, 18, 35

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) ...........................................................7

*In re Ins. Brokerage Antitrust Litig.,*
  297 F.R.D. 136 (D.N.J. 2013) .....................................................30

*In re Intel Corp. Microprocessor Antitrust Litig.,*
  No. MDL 05-1717JJF, 2010 WL 8591815 (D. Del. Jul. 28, 2010) ....................13

*In re K-Dur Antitrust Litig.,*
  No. MDL 1419, 2008 WL 2699390 (D.N.J. Apr. 14, 2008) ...................30

*In re K-Dur Antitrust Litig.,*
  686 F.3d 197 (3d Cir. 2012) .................................................8, 19, 30

*In re Nexium Antitrust Litig.,*
  777 F.3d 9 (1st Cir. 2015) ...........................................................19

*In re Pharmacy Benefit Managers Antitrust Litig.,*
  582 F.3d 432 (3d Cir. 2009) .......................................................34

*In re Plastic Additives Antitrust Litig.,*
  2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ................................10

*In re Visa Check/Mastermoney Antitrust Litig.,*
  192 F.R.D. 68 (E.D.N.Y. 2000) ...................................................32

*JBDL Corp. v. Wyeth-Ayerst Labs., Inc.,*
  No. 1:01-CV-704, 2005 WL 1396940 (S.D. Ohio Jun. 13, 2005)....................17, 18

*JBDL Corp. v. Wyeth-Ayerst Labs., Inc.,*
  225 F.R.D. 208 (S.D. Ohio 2003) ............................................... 18

*Kohen v. Pac. Inv. Mgmt. Co.,*
  571 F.3d 672 (7th Cir. 2009) .......................................................30

*Lesende v. Borrero,*
  752 F.3d 324 (3d Cir. 2014)........................................................34

*In re Rhone-Poulenc Rorer Inc.*,
  51 F.3d 1293 (7th Cir. 1995) ...........................................................................35

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
  745 F.2d 248 (3d Cir. 1984)...............................................................................31

*Pa. v. Milk Indus. Mgmt. Corp.*,
  812 F. Supp. 500 (E.D. Pa. 1992) ......................................................................32

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990)................................................................................................6

*Schwartz v. Avis Rent a Car Sys., LLC*,
  No. CIV.A. 11-4052 JLL, 2014 WL 4272018 (D.N.J. Aug. 28, 2014) ..................35

*Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*,
  No. CIV.A. 07-5295 SRC, 2008 WL 3833577 (D.N.J. Aug. 13, 2008) ................32

*Siegel v. Chicken Delight, Inc.*,
  448 F.2d 43 (9th Cir. 1971) ...............................................................................32

*U.S. v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..............................................................14

*United Farmers Agents Ass'n v. Farmers Ins. Exch.*,
  89 F.3d 233 (5th Cir. 1996) ...............................................................................32

*Will v. Comprehensive Accounting Corp.*,
  776 F.2d 665 (7th Cir. 1985) .............................................................................32

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)...........................................................................33, 34

**RULES**

Fed. R. Civ. P. 11 .......................................................................................................1

Fed. R. Civ. P. 23 ............................................................................................. *passim*

**OTHER AUTHORITIES**

10 AREEDA & HOVENKAMP, ANITRUST LAW, 3D ED. 2011.......................................33

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Sanofi's class opposition brief ("OB") is unusual in several respects.  *First*, in antitrust cases, class certification often turns on a battle of the experts.  But Sanofi has largely abandoned its own expert, never once mentioning his name and citing him only a handful of times.  This is for good reason. Plaintiffs' experts, Prof. Elhauge and Dr. Leitzinger, demonstrate that the arguments of Sanofi's expert, Mr. Kaplan, are wrong about economic theory and mistaken about the evidence. *Second*, it is rare that a defendant's internal documents ████████████████ ████████████████████████████████  do.  So Sanofi deploys two desperate strategies: ███████████████████████████████████████████████████████,[1] OB at, *e.g.*, 39-40, in favor of recently contrived, self-serving testimony, and ███████████████████ ████████.[2] *Third*, at class certification, most defendants avoid arguing that members of a proposed class should all lose *for a common reason*, particularly since the Supreme Court recently confirmed that such common issues *support* class certification.  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 1196 (2013).  Yet Sanofi spends much of its brief providing reasons that *all* class members should lose. OB 1-2, 7-13, 20-22.  Sanofi is wrong, and Plaintiffs explain why below.  But what matters now is that these issues are common.

*Fourth*, Sanofi does not distinguish any of Plaintiffs' key cases. Here are two prime examples.  Plaintiffs cite four analogous bundling cases in which courts certified classes.  *See, e.g.*, Plaintiffs' Opening Class Brief at 7 ("CB").  Sanofi ignores them.  Plaintiffs also cite

---

[1] Plaintiffs' opposition to Sanofi's motion to exclude Plaintiffs' experts is referred to herein as "DO." Throughout the brief emphasis is added and internal marks are omitted unless noted otherwise.

[2] In making these and other arguments, Sanofi often crosses the line from aggressive argument to distortions and even untruths, conduct this Court has previously criticized. *E.g.*, ECF 169 at 9 ("Sanofi's arguments . . . are largely based on inaccurate interpretations and mischaracterizations of what this Court actually held").  Plaintiffs do not have room to correct each of these points, particularly since many pertain to classwide issues on the merits.  And Plaintiffs do not want to burden this Court with a Rule 11 motion.  So Plaintiffs refute some but not all of Sanofi's many inaccuracies.

1

numerous cases holding that common issues predominate in antitrust cases if plaintiffs offer common evidence that (1) the conduct at issue generally inflated prices (**prong 1**), and (2) a ███████████████████████████ means that the vast majority of class members paid those inflated prices (**prong 2**).  *See, e.g.*, *id.* at 4-5 (citing cases).  Sanofi fails to challenge them.

Nor does Sanofi offer any sound evidentiary basis for questioning that Plaintiffs meet both of these prongs.  Sanofi is unable to rebut any of the three, complementary classwide methodologies Prof. Elhauge uses to show general price inflation.  And, in any case, whether Sanofi's conduct generally inflated prices is an issue common the class.  So what proves pivotal for class certification is that Sanofi fails to meaningfully contest ████████████████ ██████████████████.  Nor could it.  ██████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  That makes this case extraordinarily appropriate for class treatment because ████████████████████████ ██████████████████████████████████████████.

Sanofi is thus left with a main strategy of trying to confuse matters.  But the basic economic logic of this case is straightforward. As Prof. Elhauge explains, Sanofi had a dominant market position in regard to numerous pediatric vaccines, including Menactra (for meningitis (MCV4)).  ██████████████████████████████████████████████  ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████.  Until mid-2009, Sanofi treated Menactra specially, because it had no MCV4 competition.  To be sure, ████████████████████████████████████████ Sanofi's ████████████████████.  Customers who bought pediatric vaccines (such as for

measles) from Sanofi's rival, GSK, faced a ███████████ for ████████████████████. But Sanofi did not ██████████████ if customers bought an MCV4 other than Menactra—because there was none. Matters changed in mid-2009.

That was when Sanofi learned that Novartis planned to enter the market with its own MCV4, Menveo. Not wanting to engage in honest competition on price, Sanofi extended its existing bundling practices to the MCV4 market. It imposed the Menactra Bundled Loyalty Condition (MBLC) in its contracts. The MBLC requires ██████████████████████ ████████████████████████████████████. For a typical buyer purchasing according to the governmental vaccine schedule, this would amount to ████████████████████████████████████ ██████████████ made it impossible for Novartis to compete ██████████████ ██████████████████████. This foreclosed Novartis from a substantial portion of the market, as ██████████████████.

This strategy insulated Menactra from price competition, and led to artificially inflated Menactra prices to all class members. Without the MBLC, Novartis would have vigorously competed for ████████████████. With the MBLC, Sanofi could maintain ██████ ██████████████ without fear of losing substantial market share. The MBLC also inflated the Menactra prices that Sanofi ████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████ ████████████████████ ████████████████████████████

█████. The result is what Prof. Elhauge calls a "market division" and ████████

███████████████████████████████████████████████████████████

█████████████████████████████. Prof. Elhauge uses a standard economic model—routinely deployed by the DOJ and FTC—to calculate that this "bifurcation" artificially inflated Menactra prices ███████████████████████

███████████████████████████████████████████████████

███████████████████ price inflation affected all or nearly all of its customers.

Sanofi's only response is to ███████████████████████████

█████████. OB 2-3, 26-30. But, as Prof. Elhauge explains, there is no economic reason why that would be true. ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████ Sanofi has no answer to this, and thus has no credible refutation of common impact. Sanofi does not contest many of the requirements of class certification—numerosity, commonality, or typicality. It makes weak arguments about adequacy and superiority, which Plaintiffs refute below. Given the overwhelming evidence in support of common impact—and therefore predominance—this Court should certify the class.

## II.   ARGUMENT

### A.   Classwide Evidence Is Capable of Proving Plaintiffs' Claims.

#### 1.   Plaintiffs Have Classwide Proof of the Antitrust Violation.

Plaintiffs predicted in their opening brief that Sanofi's challenge to predominance would "almost certainly be narrow because Sanofi cannot credibly dispute that Plaintiffs' proof that Sanofi violated federal antitrust law will be common to the class." CB 2. Plaintiffs were right.

While Sanofi challenges Plaintiffs' proof that Sanofi willfully maintained monopoly power in violation of the antitrust laws *on the merits*, OB 1-2, 7-13, 20-22, it nowhere refutes the crucial point: all of the evidence—for and against—is common to the class.  When class members win or lose on an issue collectively, class certification is appropriate and a court cannot resolve it on the merits.  *Amgen*, 133 S. Ct. at 1191, 1196; *see also* CB nn.4, 5 & 6 (citing cases).[3]  Sanofi makes the following assertions, each an issue common to the class:

None of the challenged contracts purportedly imposes any penalties. OB 7-13.  First, this is irrelevant because it is the *threat* of penalties and customer commitment to loyalty that matter to the exclusionary effect. *See, e.g.*, Elh. Rpt. ¶¶191-210; P. Ex. 37 (Elh. Dep. at 36-37 (customers deterred by *threat* of penalties)). Second, the ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████.[4]

Certain of the challenged contracts purportedly do not provide for bundled commitments. OB 11-13.  Plaintiffs' evidence shows Sanofi is wrong. *E.g.*, Elh. Rpt. ¶¶122-126, 134; Elh. Reb. ¶¶ 97-101.  The relevance of this issue is confined to determining whether a sufficient share of Sanofi's customers were subjected to bundled contracts "to effectively divide the market in a way that altered the incentives of Novartis and Sanofi to compete aggressively on price with each other."  Elh. Reb. ¶95.  Either Sanofi imposed enough bundled contracts to alter Sanofi's

---

[3] Sanofi has, in fact, conceded that "[i]t is true that plaintiffs do not need to prove the elements of their claims at class certification."  ECF 101 at 17 n.14.

[4] ███████████████████████████████████████████████████

███████████████████████████████████████████████████

and Novartis's pricing incentives and divided the market— ████████████████████

████ —or it did not. *Id.* Either way, it is a classwide issue.[5]

     <u>Novartis purportedly was not foreclosed</u>. OB 13-14. This, too, is a common question with a common answer. CB 30-31. Either the challenged conduct foreclosed Novartis sufficiently to impair competition in the MCV4 market or it did not. Plaintiffs' proof is based on several classwide sources, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ contracts. CB 30-32 (citing Elh. Rpt. ¶224; Reb. ¶95; Supp. ¶224).[7] Sanofi disagrees,[8] but nowhere refutes Plaintiffs' point that foreclosure is a common question.[9]

---

[5] Sanofi also absurdly claims that the challenged conduct is not "bundling." OB 7-9. But this Court has already deemed the conduct "bundling." ECF 106, at 16-20 (Aug. 6, 2012) ("MTD Op."). ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

[9] Sanofi argues that the challenged conduct did not restrict Novartis's ability to compete, and thus that this case is somehow unprecedented. OB 14. ***False***. While the theory does not depend on showing a diminishment in Novartis's *general* ability to compete, the challenged conduct did restrain Novartis's ability to gain sales ████████████████████. Elhauge Reb. ¶¶28-37; Elhauge Dep. at 32-38; DO 9. Further, conduct that modifies incentives (even without diminishing the ability to compete) has a storied history as a source of anticompetitive harm. *See* DO 2, 7-10 & n.18 (citing cases), 13. Finally, the market division created by Sanofi's bundle is akin to a *per se* illegal market allocation agreement, *e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990), in which by allocating markets, each firm benefits by the diminishing competition in its allocated region. P. Ex. 37 (Elh. Dep. at 168, 276). There is nothing unprecedented about any of this.

## 2.      Plaintiffs Have Classwide Proof of Common Impact.

Sanofi argues that Plaintiffs cannot establish predominance under Rule 23(b)(3) because they do not have evidence "capable of proving' classwide impact." OB at 24.  Sanofi is wrong. A standard way to establish common impact is with classwide evidence capable of showing that (1) an antitrust violation *generally inflated prices* (**prong 1**), and (2) ██████████████████ ████████████ price inflation to injure the vast majority of the class members (**prong 2**).[10] Sanofi fails to address this case law.[11]   Plaintiffs have classwide evidence establishing both common impact prongs.

**Prong 1: General Price Inflation.**   Plaintiffs have three independent sources of classwide evidence capable of showing that the challenged conduct generally inflated prices: (i) Prof. Elhauge's market division analysis, confirmed by the data and Sanofi's and Novartis's internal documents; (ii) a standard economic model (called "differentiated Bertrand"); and (iii) standard economic theory, providing ████████████████████ combined with an end to the MCV4 monopoly should have driven prices down, not up.

Two key points apply to all of Sanofi's challenges.  First, Sanofi relies largely on naked attorney assertions.   While some courts have been willing to delve into the testimony of competing experts for limited purposes, they have not countenanced the unsupported speculation

---

[10]  *See, e.g., In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013) (plaintiffs' "approach followed a roadmap widely accepted in antitrust class actions that use evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class") (citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d Cir. 2002)).  *See also* CB 35 & n.39, 51 & 58.

[11]  Sanofi erroneously says that this formulation is akin to the "*Bogosian* shortcut," OB 26, n.18, which involves *presuming* common impact from a general inflation of prices.  *See, e.g., In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 325-27 (3d Cir. 2008).  But Plaintiffs rely on no presumption. Instead, they present substantial evidence and economic theory demonstrating that the MBLC artificially inflated prices and that those higher prices were paid by all or virtually all Class members.  Sanofi notes that *Hydrogen Peroxide* rejected the *Bogosian* presumption, OB 26, n.18, but *Hydrogen Peroxide* recognized that *evidence* of the kind Plaintiffs provide here (*e.g.*, of a price structure) *can* establish common impact.  *Hydrogen Peroxide*, 552 F.3d at 325-27.

of counsel over documentary evidence, data, and expert testimony. *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 73 (D.D.C. 2009) (rejecting "speculative" economic arguments "supported by little more than lawyer argument").  Second, whether the challenged conduct increased prices generally is a classwide issue.  If Plaintiffs lose on it, as Sanofi claims they should, OB 18-19, it is fatal to every member's claims.  When class members will win or lose on an issue collectively, class certification is appropriate and a court cannot resolve it on the merits. *Amgen*, 133 S. Ct. at 1191, 1196.  Thus, the Court cannot decide the general price inflation (prong 1) issue now. *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 222 (3d Cir. 2012) ("for certification plaintiff need not prove antitrust injury actually occurred").

**Prong 2:** . Plaintiffs offer classwide evidence that the artificially inflated prices harmed all class members, █████████████████████████████

█████████████████████████████████████████████

██████████████████ absent the MBLC, *id*. at 29, it fails to refute that ████████████

████████████████████████████████████

### a.   <u>Prong 1</u>: The MBLC Caused Price Inflation Generally.

Plaintiffs provide three forms of classwide evidence showing that the MBLC had the effect of artificially inflating MCV4 prices classwide. Sanofi responds with lawyerly speculation about economic theory and distortions of the evidence.  Its arguments are not persuasive and, even if they were, they raise classwide issues *supporting* certification.

### i.   *The market division artificially inflated prices.*

Classwide evidence demonstrates Sanofi used the MBLC to divide the MCV4 market. █

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████. *See, e.g.*, Elh. Rpt. ¶¶16, 174-190.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████. *Id.* ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████. These penalties diminished Novartis's incentives and ability to compete ██████████

████████████████████████████████████████[12] Consequently,

Novartis effectively ceded the vast majority ███████████████. Elh. Rpt. ¶¶175-76.[13]  This

strategy worked.  After several years, Menveo could garner only ████████████████████

███████████████████████████████████████████████. *See* Elh.

Reb. ¶129. Indeed, ██████████████████████████████████████

███████████████████████████████

What Sanofi misses, OB 37-38, is that this market division also artificially inflated

Menactra prices ████████████████████████████████████████

████████████████████████████████. Otherwise, ████████████████

───────────────────

[12] 



██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ .[14]

Without the MBLC, Sanofi could no longer rely upon its bundled penalties to insulate ████

from competition, ████████████████████████████ .   That, in turn, would allow

Sanofi ████████████████████████████ .   In other words, ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

    This economic logic is confirmed ████████████████ .[15] ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[14] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[15] Sanofi's reliance on *In re Plastic Additives Antitrust Litig.*, No. 03-CV-2038, 2010 WL 3431837, *12 (E.D. Pa. Aug. 31, 2010), and *Allied Ortho. Appl., Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 172-73 (C.D. Cal. 2007), to claim that contemporaneous internal documents are not relevant, OB at 39-40, is misplaced. *Plastic Additives*, unlike here, found that the expert's "opinion is nothing more than a repetition of unexplained conclusions" in documents so it could not be afforded "much weight." In *Allied*, unlike here, the expert improperly relied on certain predictions in documents that were undermined by other evidence.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████ Sanofi contends that this

document is only ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

Sanofi at times concedes the market division, but then argues that "the *same* divided market would exist 'in the but-for world.'"  OB 25 (emphasis in original); *see also id*. at 34. This assertion conflates two issues. ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████. The MBLC would *not* exist in the but-for world and thus ████████████████

███████████████████████

████████████████████████████████████████████████

█████████████████████████████████     ████████████████████████████

████████████████████████████ case do *not* challenge Sanofi's bundling *other than*

*the MBLC*.  So, in the but-for world, Sanofi would persist in bundling pediatric vaccines to

protect other vaccine markets, and █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ the

MCV4 market absent the MBLC, █████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████. *See* Elh. Rpt. ¶¶187-189.   Indeed,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████.

ii.    ***The differentiated Bertrand model is appropriate.***

Prof. Elhauge uses the differentiated Bertrand model—a well-accepted economic model

the DOJ and the FTC call their "workhorse"—to show that Sanofi's prices ████████████████

█████ but for Sanofi's anticompetitive conduct. Elh. Rpt. ¶¶262-63.[16]   This model relies on

---

[16] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

actual data from the portion of the MCV4 market unaffected by the challenged conduct (Federal Supply Schedule prices) and Novartis's costs.  *See* Elh. Rpt. ¶¶239-66; Elh. Supp. ¶¶188-89.[17]

Sanofi's principal claim is that Bertrand is inapplicable to the MCV4 market because Sanofi and Novartis would not have competed aggressively on price, ███████████████████

████████████████████████████████████████████████████████████████

███████████████████████████.[18]  OB 30-34.  Sanofi is wrong.  ████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████.  *See* Elh. Rpt. ¶229; Elh. Reb. ¶¶143-224, 243-50.[19]   Sanofi argues—without citation to any data or expert analysis—that Prof. Elhauge wrongly assumes that Sanofi and Novartis ███████████████████████████████

████████████████████████████████.  But Prof. Elhauge does not *assume* a lack of coordination; he *proves* it.  *See* Elh. Rpt. ¶229; Elh. Reb. ¶¶143-224, 243-50.

---

[17] Bertrand is a well-accepted model often used by government agencies.  *See* CB 37 & n.56.  It relies on a standard form of economic analysis based on strategic decision-making.  *See Grand River Enters. Six Nations v. King*, 783 F. Supp. 2d 516, 527 (S.D.N.Y. 2011) ("There is no dispute that [simulated models like Bertrand] . . . are textbook economic methodologies which are generally accepted and widely used by economists to predict prices in various contexts.").  Because Bertrand does not require a control group, it is particularly well-suited for use in situations, like here, where there is no suitable benchmark period.  *See* DO 21-23 Elh. Rpt. ¶232 & n.334.

[18] Contrary to Sanofi's argument, OB at 30, 34, *In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 241 (E.D. Pa. 2012), does not require that a damages model correct for duopolistic competition in every case.  In *Blood Reagents*, unlike here, the plaintiffs' economist opined that there would have been some coordination in the but-for world, and thus his model corrected for it.  *Id.* at 241-42.  Sanofi's reliance on *In re Intel Corp. Microprocessor Antitrust Litig.*, No. MDL 05-1717 JJF, 2010 WL 8591815 (D. Del. July 28, 2010), OB at 34, is equally misplaced.  In that case, unlike here, plaintiffs' expert relied solely on economic theory while ignoring the actual evidence and data.  Here it is Sanofi that avoids the data.

[19] ██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Sanofi points to ███████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████.  Yet, as Prof. Elhauge observes, "every firm

*prefers* to avoid price competition.  But that does not mean that the firms will be able to avoid

price competition in a market not distorted by anticompetitive conduct." Elh. Reb. ¶172.[20]██

██████████████████████████████████████████████████.  ████████

██████████████████████████████████████████████.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ *See* Elh. Reb. ¶¶175-180.[22]

       ██████████████████████████████████████████████████

██████████████████████████████████████████ by the competitors (*i.e.*,

██████████).  *See* Elh. Reb. ¶¶163, 169-70 (citing literature), 243-50; *id.* at 143-224; Elh. Rpt.

¶229; *U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1166 (N.D. Cal. 2004) ("[w]ithout

homogeneity [of products] or transparency [in pricing], the market conditions are not conducive

to  coordinated  effects").  ██████████████████████████  ████████

████████████████████████████████████████████████████████████

---

[20] "In a competitive market, if one firm chooses not to compete on price, then the profit-maximizing strategy for its rival will be to undercut its price and gain market share. If each firm could unilaterally decide to avoid price competition, then *every single market* would be characterized by perfect oligopolistic coordination and monopoly prices." Elh. Reb. ¶169; *see also* Elh. Supp. ¶195.

[21] *See* Elh. Reb. ¶¶37, 175-80, Fig. 6, 191, n.39, 358; Elh. Supp. ¶¶192, 194, 213, 218, 220, 223; P. Ex. 37 (Elh. Dep. at 654-59); DO 25-26.

[22] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███ Elh. Rpt. ¶¶42-49, 237-48; Elh. Reb. ¶202, n.381, and ██████████

█████████████████████████████████████. *See* Elh.

Supp. ¶222 & n.47; Elh. Rpt. ¶229; Elh. Reb. ¶¶15, 163, 170, 202, 245-50. ██████

██████████████████, Elh. Reb. ¶202, █████████████████████████

████████████ Elh. Reb. ¶163; *id.* ¶170.[23]

█████████████████████████████████████████. Both Sanofi
and Novartis have repeatedly certified to this Court that pricing and contractual information is so
top secret that it must be filed under seal. *E.g.*, ECF 333-2 (Sanofi's "contract terms, . . .
discount structures . . . [and] pricing programs . . . are confidential and competitively sensitive";
"*it has not shared [this] information . . . with its competitors*;" and "*it will be placed at a
competitive disadvantage should [this] information . . . become publicly available to
others*[.]"); *see also* ECF 122. Novartis has argued similarly. *E.g.*, ECF 196-1 at 2. ██████

█████████████████████████████████████████████

█████████████████████████████████████████.[24]



23 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

24 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Sanofi responds by mischaracterizing anecdotes that it claims show coordination.  OB 15-18, 32.  But they show the opposite.  

Sanofi's other examples fare no better.

*See* Elh. Rpt. ¶¶19, 25, 174-79.  Finally, Sanofi invokes the possibility                    , OB 33,                    .  *See* Elh. Reb. ¶¶151-54, 176; Elh. Supp. ¶¶205, 213-14.                    .  *Id*.  To coordinate successfully, the firms would need to know the prices actually paid by customers in real time.  *Id*.                    .  This is not the kind of conduct expected                    .  Thus, Sanofi's                    suggestion is wrong, and its challenge to Bertrand fails.

16

### iii.    *Standard economic theory is sufficient by itself.*

A third independent form of classwide evidence that MCV4 prices were artificially inflated due to the MBLC is "the standard insight of economics . . . that competition will lower prices." Elh. Supp. ¶201, n.288 (quoting relevant literature).   As Prof. Elhauge made clear, "Menveo entry,

██████████████████████████████████████████████████

█████████" Elh. Rpt. ¶17; *see also id*. ¶¶167-68, 226; Elh. Reb. ¶¶1, 202, 227-28; Elh. Supp. ¶¶1, 201-02, 227. ████████████████████████████████████████████

████████████████████████████████████████████████.

Sanofi responds in three unpersuasive ways. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ *See* Elh. Rpt. ¶¶18-20, 226, 267, 285; Elh. Reb. ¶¶271, 314; Elh. Supp. ¶¶1, 227, 230.

Second, █████████████████████████████████████████████████████

██████████████████████████. *See* OB 15-18. ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████  █  ██████

██████████████████████████████████

Third, relying on *JBDL v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-CV-704, 2005 WL 1396940 (S.D. Ohio June 13, 2005), Sanofi contends that "the *mere assertion* that entry should

---

[25] Elh. Reb. ¶¶12, 17, 145, 148, 149, 168-70; Elh. Supp. ¶¶2, 3, 14, 59, 87, 108, 191, 192, 202-08, 217-20.

have lowered prices is neither reliable nor sufficient to establish impact."  OB 4, 38.  Sanofi is refuting a straw man.  Prof. Elhauge does not claim that entry *alone* establishes anything. Rather, he finds that a previously monopolized market facing competition for the first time ███████████████████████████████ should have lowered prices.[26]

> **b.**     **Prong 2**: Classwide Evidence Is Capable of Showing All Class Members Paid the Artificially Inflated MCV4 Prices.

Plaintiffs have thus shown that evidence common to the class is capable of proving that the MBLC artificially inflated prices generally (prong 1).  Plaintiffs next present classwide proof that all or nearly all of class members paid these artificially inflated prices (prong 2).  That

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

> **i.**     ███████████████████████████.

Strikingly, Sanofi's brief fails to refute a crucial issue:  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.  *See High-Tech*, 985 F. Supp. 2d at 1206, 1221-22 (citing,

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

---

[26] The *JBDL* opinion Sanofi cites was decided on summary judgment.  Sanofi omits that the same court in the same case—which was about the exclusionary effect of loyalty discounts— had certified an analogous class.  *See JBDL*, 225 F.R.D. 208 (S.D. Ohio 2003).  This tale of two opinions highlights Plaintiffs' point: proof that the challenged conduct caused higher prices generally (prong 1) is a common question with a common answer.  This bolsters the case for class certification.



But the above numbers *underestimate* the proportion of the class that was harmed.  For impact, a purchaser needs to pay an overcharge on *only one of its purchases*.[27]  Each overcharge is actionable and thus one overcharge suffices.  *Id*. ████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████.  Common impact does not require evidence of harm to *every* class member.  Courts certify classes even if they have some uninjured members.  *Nexium*, 777 F.3d at 25, 31-32.  It is enough that "the vast majority of class members were probably injured."  *Id*. at 31; *see also* CB 33-34.  Common evidence that the MBLC harmed ██████████████████████████████████.

        **ii.**     ***There is no evidence that Sanofi*** ████████████████████
                                        ***in the but-for world.***

The above analysis shows that *all* class members suffered injury.  Elh. Rpt. ¶267.  As ████████████████████████████████████████████████████████████████████
██████████████████████████████████████████.  at ¶¶268-71.  Sanofi submits an

---

[27] *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27-28 (1st Cir. 2015); *K-Dur*, 686 F.3d at 220-21; *In re Chocolate Confectionary Antitrust Litig*, 289 F.R.D. 200, 221 (M.D. Pa. 2012) ("an impacted customer" is "one who tak[es] at least one transaction at a supracompetitive price").

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████ OB 28. ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ P. Ex.

40 (Grau Dep. at 303). ████████████████████████

██████████████████████████. P. Ex. 37 (Elh. Dep. at 290).

Sanofi would have had the same reasons to ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████.[29] Elh. Rpt. ¶269; Elh. Reb. ¶¶206-16.

██████████████████████████████████████████████

███████████████████████. *Id*. As discussed above, *see supra* at 12, in the

but-for world, while Sanofi would eliminate the MBLC, it would still bundle its pediatric

vaccines with Menactra ███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[28] The Grau Declaration, S. Ex. 70—as made clear in the accompanying motion to strike—is improper whether it is considered as an untimely offer of evidence, the submission of an unqualified expert report, or both. It also is unpersuasive. ████████████████

████████████████████████████████████████████

[29] ████████████████████████████████████████████

███████ Leitz. Rpt. ¶36.



iii. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

conduct.  OB 2-3, 26-30.  ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

This argument is unpersuasive for two reasons.  First, common impact does not require

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Prof. Elhauge's common

impact conclusion holds whether or not ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[30] Sanofi cites *Allied*, 247 F.R.D. at 169, for the proposition that the absent MBLC, the distribution of discounts might change between the actual and but-for worlds.  OB at 3, 29. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮  247 F.R.D. at 168-169. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮



Second, and in any case, Sanofi is wrong about ███████████   ████████

in the MCV4 market beginning in 2010.



### c.   Prof. Elhauge's Analysis Does Not "Mask" Individualized Issues.

Sanofi theorizes that it would *be impossible* for it to use the MBLC to divide the MCV4

market. OB 35-36.  In Sanofi's view, Novartis could have undermined the market division by



**(i)**



**(ii)** 

Third, ███████████████████████████████████ because of the pricing floor created by the government's Vaccines for Children ("VFC") program, which accounts for 41% of all MCV4 vaccines sold in the U.S. *See* Elh. Rpt. ¶177. By law, Sanofi must sell to the VFC at the lowest price it sells to any customer. *Id.*

Fourth, ████████████████████████████████



██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████

     **(iii)** ██████████████████████████████████, **confirming common**

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████. The impact analysis is based on overcharges on Menactra, █

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████ ████████

███████████████████████████████████████ ██████████████

████████████████████████████████

---

45 ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█ ████████████████████████████████████████████████████████

█ ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ ''



**B.     There Are No Fundamental Class Conflicts and Thus Rule 23(a) Is Satisfied.**

Correctly observing that Prof. Elhauge's impact analysis shows that ████████████████

████████████████████████████████, Sanofi speculates—without

evidence—that some hypothetical class members "may want" a different approach. OB at 46-

48. Sanofi is just wrong that this presents a cognizable conflict under Rule 23(a). *Id.* First, its

facts are wrong. Sanofi speculates that Prof. Elhauge *could have concluded* that the challenged

conduct inflated prices only to a certain segment of the Class, and thus in the but-for world

*See* P. Ex. 37 (Elh. Dep. at 347) ("Well, I think given the economics, [the discounts in the but-for

█████████████████████████████████████████████████████████

█████████████████████████████████. *Id.*[49]

Second, mere speculation concerning potential conflicts cannot defeat class certification. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 680 (7th Cir. 2009) (rejecting hypothetical conflicts); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 218 (E.D. Pa. 2012) (class certification will not be denied "because of a potential conflict [] that may not become actual"); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 482 (W.D. Pa. 1999) (courts have "rejected efforts . . . to defeat certification by raising the possibility of hypothetical conflicts"). Conflicts must be fundamental and imminent to be cognizable.[50] Third, that some hypothetical class member *might prefer* a different approach cannot create a conflict. *See In re K-Dur Antitrust Litig.*, No. MDL 1419, 2008 WL 2699390, at *10 (D.N.J. Apr. 14, 2008) (that class members "*may prefer*" alternative damages theories is not a conflict); *Allen v. Holiday Universal*, 249 F.R.D. 166, 181 (E.D. Pa. 2008) ("[P]otential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy.").[51] Given that Sanofi presents no other challenges to adequacy or any other prong of Rule 23(a), the Court should find that Rule 23(a) has been satisfied. *See* CB 18-21.

---

[49] █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[50] *See K-Dur*, 686 F.3d at 223 (defendants did not point to any "plausible scenario" in which class members might seek conflicting forms of relief); *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 149 (D.N.J. 2013) ("a conflict will not be sufficient to defeat a class action unless that conflict is apparent, imminent, and on an issue at the very heart of the suit").

[51] *Bradburn Parent/Teacher Stores, Inc. v. 3M*, CIV. A. 02-7676, 2004 WL 414047 (E.D. Pa. Mar. 1, 2004), OB 5-6, 48, is unavailing. Unlike here, the defendant had demonstrated the conflict through expert evidence, not mere speculation, 2014 WL 414047, at *4, and class members affirmatively expressed opposition to class certification. *Id.* at *9, n.10. Further, the court ultimately certified the class. *See Bradburn Parent/Teacher Stores, Inc. v. 3M*, CIV. A. 02-7676, 2004 WL 1842987 (E.D. Pa. Aug. 18, 2004) ("*Bradburn II*"). In fact, in *Bradburn II*, the court rejected defendant's argument that the revised class had a similar conflict explicitly finding it to be speculative. *See id.* at *4-7. *Pa. Dental Ass'n v.*

**C.**      **Sanofi's Request That the Court Vacate Law of the Case is Without Merit.**

**1.**      **This Court Ruled that Paying Inflated MCV4 Prices Is Injury.**

Sanofi argues—as it did in its motion to dismiss briefing[52]—that to demonstrate antitrust injury in a bundling case, Plaintiffs must show the total price that class members paid for Sanofi's pediatric vaccine bundle as a whole was artificially inflated, rather than just showing that the price they paid for Menactra was. OB at 41-42. This argument misunderstands the economic evidence and misconstrues the relevant law.

As to the evidence, Plaintiffs have shown ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████

And, even if there were such evidence, it would not matter because under both the law of the case and the law more generally, showing that a direct purchaser paid overcharges on one product in a bundling case is enough to establish antitrust injury, and any purported offsetting

---

*Med. Serv. Ass'n of Pa.*, 745 F.2d 248 (3d Cir. 1984), OB 48, is also inapposite because there, unlike here, there was evidence that some class members wanted the challenged conduct to continue. *Id.* at 263.

[52] *See* Sanofi's Reply ISO MTD, ECF 88, at 8 & n.6 (May 14, 2012) ("Sanofi MTD Reply").

discounts on other products in the bundle are legally irrelevant.  In Sanofi's unsuccessful motion to dismiss, it made this same argument relying on the same case law.  *Compare* Sanofi MTD Reply at 8 & n. 6, *with* OB 41-42 (same).  This Court rejected Sanofi's argument, holding that paying inflated prices for Menactra, without more, constitutes "quintessential antitrust injuries." MTD Op. at 11.  That holding is law of the case.

Indeed,  None is.  *See, e.g.*, *Bradburn Parent/Teacher Store, Inc. v. 3M*, No. CIV.A. 02-7676, 2000 WL 34003597, *3-*4 (E.D. Pa. July 25, 2003) (plaintiffs established harm from antitrust violation where they paid inflated prices for tape without considering other products in the bundle); *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 83-85 (E.D.N.Y. 2000) (rejecting speculation about offsetting discounts in package as a basis for denying class certification), *aff'd* 280 F.3d 124 (2d Cir. 2001).[53]

---

[53] *See also id*. at 83-84 (citing tying cases holding that increase in price of tied product, and not combination of tying and tied prices, sufficient for injury).  Sanofi implies that *Mastermoney* adopted a "package approach"—requiring an increase in total net price of all products in the bundle to show injury. OB 41, n.34.  In fact, the Second Circuit explicitly declined to resolve that issue.  *See Mastermoney*, 280 F.3d at 143-44. It also affirmed the trial court holding that speculation about offsetting price decreases was not enough to defeat class certification.  *Id*. at 143-45.  Similarly, *Pa. v. Milk Indus. Mgmt. Corp*., 812 F. Supp. 500, 508 (E.D. Pa. 1992), involved bid rigging, not bundling and did not discuss the "package approach" on p. 508, as Sanofi asserts. OB 41, n.34. Further, Sanofi relies on a cases involving tying, not bundling, *see, e.g., Freeland v. AT&T Corp*., 238 F.R.D. 130 (S.D.N.Y. 2006); *United Farmers Agents Ass'n v. Farmers Ins. Exch*., 89 F.3d 233 (5th Cir. 1996); *Will v. Comprehensive Accounting Corp*., 776 F.2d 665, 672-73 (7th Cir. 1985); *Siegel v. Chicken Delight, Inc*., 448 F.2d 43 (9th Cir. 1971), and one opinion that failed to distinguish between the two.  *See* OB 42, n.35 (admitting that the court in *Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc*., No. 07-5295 SRC, 2008 WL 3833577 (D.N.J. Aug. 13, 2008), "used the terms 'bundling' and 'tying' interchangeably").

## 2.    This Court Ruled that "Coercion" Is Not Required.

Sanofi asks this Court to revisit its ruling that each class member need not show it was coerced as part of its bundling claim.  OB 42-44 & n.36.  But Sanofi offers only the same arguments it made on its motion to dismiss, and there is no reason to rehash this argument.  This Court correctly held that coercion is not an element of a bundling claim.  MTD Op. at 10-12.  Plaintiffs' claim is that bundling has enabled Sanofi to impair competition *across the MCV4 market*, raising prices to purchasers whether or not they were coerced by, or even subject to, by the bundle.  *Id.* at 11.  So coercion—incentivizing any particular purchaser to buy a good—is irrelevant.  *Id.*  What matters is the cumulative effect of the bundle on prices.  *Id.*  This Court so ruled, following the holding of the Third Circuit that coercion is not an element of a bundling claim, although it is required for a different type of antitrust claim known as a tying claim.  *Id.* (citing, *inter alia*, *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1061 n.3 (3d Cir. 1978)).[54] Given binding Third Circuit authority on bundling, the Court appropriately found unpersuasive cases Sanofi cited involving tying and inapplicable law from other Circuits.  *Id.* at 10 ("Sanofi's assertion that [the Sherman Act, including in bundling cases] *requires* coercion in every case— supported by inapposite tying cases and/or decisions from other Circuits—is not the law in the Third Circuit.") (emphasis in original).  Sanofi has now cited the exact same "inapposite tying cases and/or decisions from other Circuits" to repeat the same unpersuasive argument.  *Compare* OB 42-44, *with* Mem. re Sanofi's MTD, at 10-13, ECF 50 & Sanofi MTD Reply at 6-7.[55]

---

[54] Even as to tying case, all that the courts require for "coercion" is that a seller in fact conditioned purchase of one good or service on purchase of another, not that any particular buyer was forced to buy a product it did not want. 10 AREEDA & HOVENKAMP, ANTITRUST LAW, ¶1752e, at 289 n.17 (3d Ed. 2011); *id.* ¶1753c, at 302-304; *id.* ¶1754b, at 311 (the tying condition "is all that is meant by 'coercion'").

[55] The only new case that Sanofi cites, OB 5, 44, is *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).  That case, however, did not involve bundling, but rather exclusive dealing.  *Id.* at 263.  Adding an inapposite *exclusive dealing* case to inapposite *tying* cases does not alter the requirements in a *bundling* case.  Further, although *Meritor* noted that an *exclusive dealing* case must involve some "some

All of this would be true even if this Court should address the issue of coercion *de novo*, as Sanofi argues. But this Court's order denying Sanofi's motion to dismiss and ruling on coercion is law of the case. A trial court is generally bound by its earlier rulings. *Lesende v. Borrero*, 752 F.3d 324, 338-39 (3d Cir. 2014); *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009). The doctrine applies to the trial court's own ruling, even if the judge presiding in a case changes. *See Benefit Managers*, 582 F.3d at 438-39. A trial court may revisit an issue it has resolved only under "extraordinary circumstances," *id*. at 439, such as where a ruling is clearly erroneous and would result in a manifest injustice, new evidence is available, a supervening new law has been announced, or a court needs to clarify an earlier, ambiguous ruling. *Id*. None of these exceptions applies.[56]

### D.     A Class Action Is Superior to Alternative Methods of Adjudication.

Sanofi's professed preference for dozens of bellwether trials, *see* OB at 44-46, is contrary to the primary purpose of Rule 23: to vindicate claims that are too small to be brought individually. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Butler v. Sears, Roebuck & Co*., 727 F.3d 796, 801 (7th Cir. 2013) (Posner, J.). Sanofi relies on inapposite law

---

element of coercion," *id*. at 284, it did **not** require coercion as an element of each plaintiff's claim. Instead, *Meritor* held that substantial foreclosure of competition sufficed to establish the relevant form of coercion. *Id*. at 285. In fact, Sanofi itself admits that in *Meritor* it was enough to establish "some element of coercion" that there was "'[s]ubstantial foreclosure.'" OB at 44 (quoting *Meritor*, 696 F.3d at 286-87). Here, Plaintiffs have used common evidence to demonstrate that the MBLC foreclosed Novartis from a substantial portion of the market. *See supra* at 6, 24-26. Sanofi's reliance on *Meritor* is thus mystifying.

[56] Sanofi nevertheless suggests that this Court may revisit its ruling because there was no decision by an appellate court. OB 43, n.36. But the version of the law of the case doctrine discussed above applies to earlier decisions in the same trial court, not to appellate court decisions. Sanofi also argues the earlier ruling was based on the complaint, not the Rule 23 standard. *Id*. But the trial court ruled on an *issue of law*, so the change in procedural posture is irrelevant. Finally, Sanofi implies that a court may revisit a "non-final ruling," which Sanofi suggests a court is always free to do. *Id*. This is a distortion. *Eisai Inc. v. Sanofi-Aventis, U.S. LLC*, C.A. No. 08-4168 (MLC), 2014 WL 1343254 (D.N.J. Mar. 28, 2014), the case that Sanofi cites, did not suggest it was free to revisit its earlier rulings. To the contrary, it recognized the line of authority cited above requiring an "extraordinary circumstance" to take that step. *Eisai*, 2014 WL 1343254 at *29 (citation omitted). It then noted that it had not decided the issue before it and, in any case, there was supervening new law. *Id*. Neither exception applies here.

34

from personal injury cases to assert that "[a] case presenting an 'immature' theory 'cannot be properly certified without a prior track record of trials." OB at 45 (citing, *e.g.*, *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747 (5th Cir. 1996)).  This is unavailing.  There is nothing "novel" about a bundling case in the Third Circuit, *e.g.*, MTD Op. at 17-20, or about a court certifying a group of direct purchasers bringing such a claim.  *E.g.*, CB 7 (citing four bundling cases in which classes were certified).[57] Further, without a class, most class members will not pursue their claims, thus presenting Sanofi with a "victory" regardless of the merits.  It is precisely in circumstances like this that class certification is superior. *Amchem*, 521 U.S. at 617; *Butler*, 727 F.3d at 801.[58]

## III.     CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' class certification motion under Federal Rules of Civil Procedure 23(a) and (b)(3), and appoint proposed Class Counsel under Rule 23(g).

---

[57] Further, *Castano* is a personal injury case in which claims raised predominantly individualized issues.  *See Castano*, 84 F.3d at 738, 741-44; *see also id*. at 746-47 ("historically, certification of mass tort litigation classes has been disfavored").  But a class action is superior to individual actions where, as here, "Plaintiffs' case rises and falls with their common evidence." *High-Tech*, 985 F. Supp. 2d at 1228.  Sanofi's reliance on *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995), is similarly misplaced.  *Rhone-Poulenc* was a mass tort case involving claims under divergent state laws, raising individual issues.  Here, the class certification requirements are met and Sanofi's assertion that class certification would subject it to "constant pressure of ruinous liability," OB 46, is unsupported and almost certainly false in view of Sanofi's vast size and scope.

[58] *Blood Reagents*, 283 F.R.D. at 247; *Schwartz v. Avis Rent a Car Sys., LLC*, No. 11-4052 JLL, 2014 WL 4272018, at *14 (D.N.J. Aug. 28, 2014) ("courts generally hold that if the predominance requirement is met, then the manageability requirement is met as well").

Dated: March 30, 2015

s/ Peter S. Pearlman
Peter S. Pearlman
**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Tel: (201) 845-9600
Fax: (201) 845-9423
psp@njlawfirm.com

s/ James E. Cecchi
James E. Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com

*Interim Liaison Counsel for Plaintiffs and
the Proposed Class*

Eric L. Cramer
Michael J. Kane
Zachary D. Caplan
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
mkane@bm.net
zcaplan@bm.net

Linda P. Nussbaum
Peter A. Barile III
Bradley Demuth
**GRANT & EISENHOFER, P.A.**
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8504
Fax: (646) 722-8501

36

lnussbaum@gelaw.com
pbarile@gelaw.com
bdemuth@gelaw.com

*Interim Co-Lead Counsel for Plaintiffs and
the Proposed Class*