| COHN LIFLAND PEARLMAN | CARELLA, BYRNE, CECCHI, OLSTEIN, |
|---|---|
| HERRMANN & KNOPF LLP | BRODY & AGNELLO, P.C. |
| PETER S. PEARLMAN | JAMES E. CECCHI |
| Park 80 Plaza West-One | 5 Becker Farm Road |
| 250 Pehle Avenue, Suite 401 | Roseland, NJ 07068 |
| Saddle Brook, NJ 07663 | Telephone:  (973) 994-1700 |
| Telephone: (201) 845-9600 | Facsimile:  (973) 994-1744 |
| Facsimile:  (201) 845-9423 | |

*Liaison Counsel for Plaintiffs and Proposed Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADRIANA M. CASTRO, M.D., P.A.; SUGARTOWN PEDIATRICS, LLC; and MARQUEZ and BENGOCHEA, M.D., P.A., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>SANOFI PASTEUR INC.,<br><br>          Defendant. | Civil Action No. 2:11-cv-07178-MCA-MAH |

## PLAINTIFFS' OPPOSITION TO
## SANOFI'S MOTION TO EXCLUDE PLAINTIFFS' CLASS EXPERTS

**Dated: March 30, 2015**

**TABLE OF CONTENTS**

**Page No.**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.     LEGAL STANDARDS ................................................................................... 4

II.    PROF. ELHAUGE'S QUALIFICATIONS ARE UNQUESTIONED .................. 6

III.   PROF. ELHAUGE'S DIVIDED MARKET CONCLUSION COMPORTS WITH
       THE FACTS, ECONOMIC THEORY, AND ANTITRUST JURISPRUDENCE .................. 7

       A.    The MBLC Divided the MCV4 Market By Foreclosing Novartis ............................. 8

       B.    It is Well Accepted that "Incentive Modification" Causes
             Anticompetitive Harm ............................................................................. 10

       C.    Prof. Elhauge Has Proven that Sanofi's Conduct Divided the MCV4 Market .......... 13

       D.    Prof. Elhauge Does Not Rely on "Assumptions" About "Price
             Discrimination" ..................................................................................... 14

       E.    Prof. Elhauge's Menveo Share Regressions Are Reliable ........................................ 15

IV.    DIFFERENTIATED BERTRAND COMPETITION BEST FITS THE MARKET ............. 19

       A.    Sanofi's Proposed Alternatives to Prof. Elhauge's Differentiated
             Bertrand Model Are Poorer Fits for the MCV4 Market ............................................. 21

             1.     "Benchmark" Methods Are a Poorer Fit For This Case ................................. 21

             2.     Sanofi's Alternative Models are Economically Unsound ............................. 22

             3.     Sanofi's Attacks on the Differentiated Bertrand Model Are
                    Unavailing ............................................................................................ 22

       B.    Prof. Elhauge Properly Calibrated His Differentiated Bertrand Model ................... 24

       C.    There Was No "Coordinated Interaction" in the MCV4 Market ............................... 25

       D.    Differentiated Bertrand Competition Is Rational and Reasonable ........................... 26

       E.    Prof. Elhauge's Model Implies a Reasonable Amount of Increased
             Vaccinations ......................................................................................... 27

       F.    Prof. Elhauge's Opinions on Damages Are Reliable ............................................. 28

**TABLE OF CONTENTS (continued)**                                       **Page No.**

V.      PROF ELHAUGE'S "LIST PRICE REDUCTION CONCLUSION" IS RELIABLE...........29

VI.     STANDARD ECONOMIC THEORY RELIABLY PROVES COMMON IMPACT ...........29

VII.    SANOFI'S ATTACK ON DR. LEITZINGER ALSO FAILS.................................................30

CONCLUSION....................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abarca v. Franklin Cnty. Water Dist.*,
    761 F. Supp. 2d 1007 (E.D. Cal. 2011) ...................................................................... 24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds.*,
    133 S. Ct. 1184 (2013) .................................................................................................. 5, 6

*Bazemore v. Friday*,
    478 U.S. 385 (1986) ........................................................................................................ 17

*Bruno v. W.B. Saunders*,
    882 F.2d 760 (3d Cir. 1989) ......................................................................................... 17

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
    286 F.R.D. 266 (W.D. Pa. 2012) ................................................................................. 30

*Citizen Publ'g Co. v. U.S.*,
    394 U.S. 131 (1969) ....................................................................................................... 10

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ..................................................................................... 21

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ....................................................................................... 11

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ............................................................................................. *passim*

*Eldredge v. Carpenters 46*,
    833 F.2d 1334 (9th Cir. 1987) ..................................................................................... 19

*Ellis v. Costco Wholesale Corp.*,
    285 F.R.D. 492 (N.D. Cal. 2012) ................................................................................ 19

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ......................................................................................... 5

*FTC v. CCC Holds. Inc.*,
    605 F. Supp. 2d 26 (D.D.C.2009) ........................................................................ 20, 26

*FTC v. OSF Healthcare Sys.*,
    852 F. Supp. 2d 1069 (N.D. Ill. 2012), argued ......................................................... 20

*Grand River Enters. Six Nations, Ltd. v. King*,
    783 F. Supp. 2d 516 (S.D.N.Y. 2011) ....................................................................... 20

*Green Mtn. Chrysler Plym. Dodge Jeep v. Crombie*,
   508 F. Supp. 2d 295 (D. Vt. 2007) ............................................. 12

*Heary Bros. Lightning Prot. Co., Inc. v. Lightning Prot. Inst.*,
   287 F. Supp. 2d 1038 (D. Ariz. 2003) ...................................... 21

*In re Actiq Sales & Mktg. Practices Litig.*,
   No. 07-4492, 2014 WL 3572932 (E.D. Pa. July 21, 2014) ................................... 4, 5, 28

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-md-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............................... 4, 19

*In re Amaranth Nat. Gas Commodities. Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ............................................... 6

*In re Broadcom Corp. Sec. Litig.*,
   2005 WL 1403756 (C.D. Cal. June 3, 2005) .............................. 24

*In re Cardizem*,
   Case No. 99-73190 (E.D. Mich.) ............................................... 7

*In re Cathode Ray Tube Antitrust Litig.*,
   No. MDL 1917, 2013 WL 5429718 (N.D. Cal. June 20, 2013) ...................................... 20

*In re EPDM Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009) ................................................ 17

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ..................................................... 5

*In re Processed Egg Prods. Antitrust Litig.*,
   No. 08-md-2002, 2015 WL 337224 (E.D. Pa. Jan. 26, 2015) ................................... 4, 22

*In re Se. Milk Antitrust Litig.*,
   No. 07-cv-188, 2012 WL 947106 (E.D. Tenn. Mar. 20, 2012) ...................................... 21

*In re Titanium Dioxide Antitrust Litig.*,
   284 F.R.D. 328 (D. Md. 2012) ................................................. 21

*In re Unisys Savs. Plan Litig.*,
   173 F.3d 145 (3d Cir. 1999) ................................................... 11

*In re Universal Servs. Fund Tel. Billing Prac. Litig.*,
   2008 U.S. Dist. LEXIS 107727 ............................................... 20

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   644 F.3d 604. (8th Cir. 2011) .................................................. 5

*It's My Party, Inc. v. Live Nation, Inc.*,
   No. 09-547, 2015 WL 736544 (D. Md. Feb. 19, 2015) ................................................. 7

iv

*Kaufman v. Motorola, Inc*,
  2000 WL 1506892 (N.D. Ill. Sept. 21, 2000) ..................................................... 24

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
  551 U.S. 877 (2007)......................................................................................... 10

*Meijer, Inc. v. Abbott Labs.*,
  544 F. Supp. 2d 995 (N.D. Cal. 2008).............................................................. 10

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) .............................................................................. 4

*Paige v. Cal.*,
  291 F.3d 1141 (9th Cir. 2002) ......................................................................... 19

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993) ............................................................................ 6

*Pineda v. Ford Motor Co.*,
  520 F.3d 237 (3d Cir. 2008) .......................................................................... 4, 5

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005) ........................................................................... 10

*Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*,
  401 F.3d 123 (3d Cir. 2005) ............................................................................ 10

*Schachar v. Am. Acad. of Opth., Inc.*,
  870 F.2d 397 (7th Cir. 1989) ........................................................................... 10

*Schor v. Abbott Labs.*,
  457 F.3d 608 (7th Cir. 2006) ........................................................................... 12

*Schuylkill Health Sys. v. Cardinal Health 200, LLC*,
  No. 12-7065, 2014 WL 3746817 (E.D. Pa. July 30, 2014) .............................. 11

*Ticketmaster Corp. v. Tickets.com, Inc.*,
  No. 99-7654, 2003 WL 25781900 (C.D. Cal. Jan. 27, 2003)........................... 20

*U.S. v. Dentsply Int'l, Inc.*,
  399 F.3d 181(3d Cir. 2005) ............................................................................. 12

*U.S. v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011).............................................................. 10, 20

*U.S. v. Verizon Commc'ns, Inc.*,
  959 F. Supp. 2d 55 (D.D.C. 2013).................................................................... 11

*Valente v. Textron, Inc.*,
  931 F. Supp. 2d 409 (E.D.N.Y. 2013) .............................................................. 25

v

*ZF Meritor LLC v. Eaton Corp.*,
    Civ. No. 06-623-SLR, 2013 WL 6729509 (D. Del. Dec. 20, 2013) ............................... 28

**RULES AND STATUTES**

Fed. R. Civ. P. 23 ................................................................................................. 5, 17

Fed. R. Evid. 702 ........................................................................................................ 4

**OTHER AUTHORITIES**

ABA SECTION OF ANTITRUST LAW, ECONOMETRICS ............................................. 21

AREEDA & HOVENKAMP, ANTITRUST LAW (3d ed. 2011) .................................... 11

Baker & Reitman, *Research topics in unilateral effects analysis* 25, 51-52, in RESEARCH
    HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (ed. Elhauge 2013) ................... 23

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 J. COMPET. L. &
    ECON. 189, 218 (2009) ............................................................................................. 11

G.J. Werden, *Simulating the Effects of Differentiated Product Mergers*, 5 GEO. MASON L.
    REV. 363, 375 (1997) .............................................................................................. 23

Lande & Langenfeld, *From the Surrogates to Stories: The Evolution of Federal Merger
    Policy,* ANTITRUST (Spring 1997) ............................................................................ 20

Rubinfeld, *Econometric Issues in Antitrust Analysis*, JITE, Volume 166, Number 1 (2010) ............ 23

Werden, *Economic Evidence on the Existence of Collusion*, 71 ANTITRUST L. J. 719 (2004) ............ 23

## INTRODUCTION

Sanofi finds itself in a difficult position. At issue is whether the Court should certify a class challenging Sanofi's Menactra Bundled Loyalty Condition ("MBLC"). The MBLC imposes ████ █████████████████████████████████████████████████████████████████ ████████████████████ called Menactra, to Novartis' vaccine, called Menveo.[1] Plaintiffs' experts, Dr. Leitzinger and Prof. Elhauge, have demonstrated using classwide evidence and analysis that the MBLC harmed all class members.

Sanofi does not challenge either expert's credentials. Prof. Elhauge in particular is one of the world's leading experts—perhaps *the* leading expert—on the economics of bundling.[2] He shows that ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████. His economic analysis is supported by the economic literature, the relevant case law, hard data, and, crucially, ████████████████████████████. So overwhelming is this evidence that Sanofi in opposing class certification has taken three highly irregular tacks: (a) it all but abandons its own expert, Mr. Kaplan, never mentioning his name in its class opposition and citing to his testimony infrequently here, (b) it ignores or attempts to mischaracterize the central admissions in its own internal documents, and (c) it improperly attempts to supplement the record well after the close of fact and expert discovery.[3] These strategies suggest Sanofi realizes it is in a tough spot.

So Sanofi calls Prof. Elhauge's meticulously reasoned and extensively supported work "junk" and argues—often based on nothing more than lawyer assertion—that not a single syllable of

---

[1] Sanofi mischaracterizes the challenged conduct as "price lowering discounts," Sanofi's Mem. ISO Mot. to Exclude ("SD") 1, but it has never refuted Prof. Elhauge's finding that "no medical providers received lower contract prices when Sanofi added the [MBLC]." Elh. Rpt. ¶158. The MBLC involved penalties, not discounts.

[2] Throughout the brief emphasis is added unless noted otherwise.

[3] These submissions are the subject of Plaintiffs' contemporaneously filed motion to strike.

his three hundred pages of analysis is admissible. And Sanofi attempts to defend this position by misstating economic theory, mischaracterizing the record and, at times, asserting simple untruths. Sanofi makes three main points. None is valid.

*First*, Sanofi challenges Prof. Elhauge's divided market analysis—what it calls Prof. Elhauge's "incentive modification theory," SD 2, 4-7, with an array of misguided arguments. ▮▮



a theory backed by a chorus of economists, and formed part of Sanofi's own (dismissed) Counterclaim.  *See* ECF No. 111 ¶97 (alleging that PBG contracts "harmed the competitive process by reducing, eliminating, or restraining *the incentive or ability* . . . to independently compete").[4] Sanofi finally says that Prof. Elhauge simply assumes that ▮▮▮.  ***Wrong again***. ▮▮▮

▮▮▮. Rpt. Parts I-IV, VI.B-C; Elh. Reb. ¶¶2-3, 26, 111-12, 322-27; Ehl. Supp. ¶¶1-2, 7, 15-16, 91, 227-28.▮▮▮

***Second***, Sanofi says that when a competitor enters the market, prices should go up, not down, which is like arguing that Newton's apple should have risen from the tree, not hit him in the head.  It then challenges Prof. Elhauge's use of a standard economic model of differentiated Bertrand

---

[4] Throughout the brief all internal citations and quotation marks omitted unless otherwise noted.

competition, SD 2, 18-27, ██████████████████████████████████████

██████████████████. Elh. Rpt. Part VII; Elh. Reb. Part IX.  But the ABA antitrust section

calls Bertrand the "workhorse" for analyzing differentiated markets, Elh. Reb. ¶¶170, 243, it is well

accepted by antitrust economists, and multiple courts have approved its use.  So what does Sanofi

do?  It quotes Prof. Elhauge and other sources about the limits of a different version of the model

used for *un*differentiated markets, SD 2, where products are perceived as nearly identical.  It ignores

that Prof. Elhauge uses the *differentiated* Bertrand model and shows that the MCV4 market is

differentiated—that is, many purchasers perceive Sanofi's Menactra and Novartis's Menveo as quite

different—and that the model he used here is therefore appropriate.  Elh. Supp. ¶¶1, 5, 10-14, 22-23,

46-48, 59-88, 183-226.  Sanofi also denigrates efficient price competition that occurs in markets

without anticompetitive restraints as a "price war," and ██████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

   ***Third***, Sanofi asserts that Plaintiffs' experts cannot show that Prof. Elhauge's findings of

general price inflation could have harmed class as a whole ("common impact"). SD 2-3.  ***Sanofi is***

***wrong***.  As detailed in the Class Reply ("CR") 18-23, Plaintiffs prove common impact by

████████████████████████████████████████████████████████████████████—

and thus that any general inflation in prices would necessarily be experienced marketwide.  Sanofi

claims that to establish classwide harm Plaintiffs' experts would need to show that the challenged

conduct ███████████████████████████████████████████████████████████████

██████████████████████.  SD at 2-3.  ***Sanofi is doubly wrong***.  ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████. *Id.* at 22-23.

It is understandable that Sanofi wants to walk away from ███████████, its own expert, the overwhelming evidence, and standard economic theory. They are fatal to its position. But its arguments for excluding Plaintiffs' expert opinions are unpersuasive.  They are based largely on naked lawyerly assertion and untimely, unauthorized, unqualified declarations.  That provides no basis for exclusion and consequently Sanofi's motion should be denied.

## ARGUMENT

### I.   LEGAL STANDARDS

To satisfy *Daubert* and Federal Rule of Evidence 702, a court must determine whether: (1) the witness is "qualified," (2) the testimony is "reliable," and (3) "the expert testimony must assist the trier of fact."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). This admissibility standard is a "liberal" one, such that "the rejection of expert testimony is the exception and not the rule." *In re Actiq Sales & Mktg. Practices Litig.*, No. 07-4492, 2014 WL 3572932, at *2 (E.D. Pa. July 21, 2014).[5]  In demonstrating admissibility, "[p]roponents of expert testimony do not have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2015 WL 337224, at *2 (E.D. Pa. Jan. 26, 2015) (emphasis in original). Analysis of an expert's conclusions is "for the trier of fact when the expert is subjected to cross-

---

[5] *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1175, 2014 WL 7882100, at *17-18 (E.D.N.Y. Oct. 15, 2014) (referring to the exclusion of expert testimony as "draconian").

examination." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000); *Pineda*, 520 F.3d at 247 ("evidentiary requirement of reliability is lower than the merits standard of correctness").[6]

*Daubert* is even more limited at class certification because Rule 23 is a procedural mechanism that does not involve a judgment on the merits, nor an evaluation of whether Plaintiffs' methods will ultimately succeed before a jury.[7]  As the Supreme Court recently explained, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the [class] certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).[8]  The *Daubert* inquiry here is "limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *Actiq*, 2014 WL 3572932, at *17.

Sanofi's *Daubert* motion stands in contravention of these standards for three overarching reasons.  **First**, a large portion of it pertains to merits issues that are not relevant to determining whether the Rule 23 requirements are met. When class members will win or lose on an issue collectively, class certification is appropriate and a court should not resolve it on the merits.  *Amgen*,

---

[6] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attack[ing]" an expert).

[7] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613-14. (8th Cir. 2011) ("Because a decision to certify a class is far from a conclusive judgment on the merits of the case, it is of necessity . . . not accompanied by the traditional rules and procedure applicable to civil trials.") (ellipsis in original); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (court need only resolve expert disputes to the extent necessary to certify the class).

[8] The Third Circuit has cautioned that courts must "avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 324 (3d Cir. 2008); *see also Amgen*, 133 S. Ct. at 1201 (rejecting inquiries into the merits that "necessitate a mini-trial" at class certification, and stating "[s]uch preliminary adjudications would entail considerable expenditures of judicial time and resources, costs scarcely anticipated" by the Federal Rules).

133 S. Ct. at 1191, 1196.[9]   Yet Sanofi spends much of its *Daubert* motion providing reasons that *all* class members should lose.  For instance, Sanofi's primary argument is that Prof. Elhauge's market division analysis—what Sanofi calls "incentive modification theory"—cannot demonstrate anticompetitive harm (Sanofi calls it "loss causation" SD 7) *to anyone*. SD 4-17.  Sanofi is wrong about that.  More importantly here, it is a common issue that supports certification because if Sanofi were right, the class would lose *together*.[10]   ***Second***, Sanofi's motion challenges the correctness of Prof. Elhauge's conclusions, not the reliability of his methods.  To be sure, Sanofi invokes the terms "methods" and "reliability."  But a closer look reveals an attack on the studied *conclusions* of one of the world's leading economic experts.  ***Third***, Sanofi does not mention its expert in the class opposition and references him infrequently in its *Daubert* motion.  The law is clear that expert opinions should not be excluded absent a contrary one. *See Petruzzi's IGA Supermarkets, Inc.   v. Darling-Del. Co., Inc.*, 998 F.2d 1224, 1240 (3d Cir. 1993).

## II.    PROF. ELHAUGE'S QUALIFICATIONS ARE UNQUESTIONED

Prof. Elhauge, the Carroll and Milton Petrie Professor of Law at Harvard University, teaches the economic analysis of antitrust law, health policy, and various other subjects. Elh. Rpt. ¶29, Ex. A.  He is a member of the Advisory Board of the Journal of Competition Law & Economics, and was employed by the FTC as a Special Employee on Antitrust Issues. *Id.*  He is the editor of the RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, author of U.S. ANTITRUST LAW &

---

[9] *See also, e.g., In re Amaranth Nat. Gas Commodities. Litig.*, 269 F.R.D. 366, 385 (S.D.N.Y. 2010) ("defendants' objections go solely to whether plaintiffs' models will in fact demonstrate causation and artificiality, and hence, are unrelated to the requirements of class certification. Indeed, by arguing that plaintiffs' models, as corrected by defendants' expert show that [defendants] did not cause any artificiality during the Class Period, defendants impliedly concede that causation can be evaluated on a class-wide basis.").

[10] As part of that argument, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████. Sanofi's challenge is without merit, but again whether Novartis was sufficiently foreclosed by the challenged conduct to have had an effect on competition is question common to the entire class. *See* CR 4-6.

ECONOMICS, co-author of AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW, and has written extensively about antitrust issues, including the bundling at the center of this lawsuit.  *Id.*  Commensurate with his expertise, the DOJ and FTC recently hosted Prof. Elhauge to discuss the economics of bundling schemes and the anticompetitive market divisions they can create.[11]  Every court that has considered the issue has held that Prof. Elhauge was qualified in the area of antitrust economics. *Id.* ¶30.[12]  Sanofi does not challenge his qualifications here.[13]

## III. PROF. ELHAUGE'S DIVIDED MARKET CONCLUSION COMPORTS WITH THE FACTS, ECONOMIC THEORY, AND ANTITRUST JURISPRUDENCE

Prof. Elhauge has demonstrated based on well-accepted economic analyses that Sanofi's bundling—the MBLC—divided ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████   ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[11]  DOJ/FTC Conditional Pricing Practices Workshop (June 23, 2014) ("Panel Discussion"), https://www.ftc.gov/system/files/documents/public_events/302251/cpp_workshop _transcript.pdf.

[12] Sanofi may cite *It's My Party, Inc. v. Live Nation, Inc.,* 2015 WL 736544, at *5 (D. Md. Feb. 19, 2015), in its reply, but it is inapposite here.  There the court rejected a challenge to Prof. Elhauge's qualifications to testify as an expert in antitrust economics (citing multiple cases that have qualified him), *id*. at *5, but excluded portions of his testimony concerning relevant market analysis—not at issue here.

[13] Indeed, Sanofi's counsel in this action—Proskauer Rose—previously retained Prof. Elhauge as an economic expert in antitrust litigation in *In re Cardizem*, Case No. 99-73190 (E.D. Mich.).

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████

Sanofi seeks to exclude what it calls Prof. Elhauge's "incentive modification theory," but it cannot deny that strategy worked as Sanofi intended.  After several years, ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████ Sanofi's challenge here also ignores ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████ Prof. Elhauge also bolstered his findings regarding the "divided market" with multiple independent rigorous and data-intensive statistical analyses.  Elh. Rpt. ¶¶18-19, 211-15.  Sanofi's condemnation of Prof. Elhauge's exhaustive work as "junk" and "pure speculation" is a sign of desperation, not confidence.

### A.    The MBLC Divided the MCV4 Market By Foreclosing Novartis.

Sanofi asserts that Prof. Elhauge's market division analysis is invalid because it is not based on foreclosure of a competitor. SD at 4-7.  Sanofi is wrong.  As Prof. Elhauge consistently observes, Novartis's foreclosure from restricted buyers is what *fueled* the division of the MCV4 market,

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[14] Prof. Elhauge's deposition is P. Ex. 37.



Prof. Elhauge, in fact, demonstrated foreclosure using multiple independent methods, including (a) evaluating the share of the MCV4 market with buyers subject to bundled contracts, *id.* ¶¶216-23, (b) multiple statistical analyses showing that Novartis's ability to gain market share was substantially impaired,

Elh. Rpt. Part V, ¶¶203-06.[15]  Despite all this, Sanofi falsely contends that Prof. Elhauge found no reduction in Novartis's ability to compete. SD 5.  But Prof. Elhauge explicitly found,

Sanofi further asserts—without reference to its expert or economic literature—that there can be no competitive harm unless conduct reduces the "elasticity of supply" of a rival,[16] and that Prof. Elhauge's analysis is inadmissible because it does not make that showing. SD 5.  Sanofi is wrong for two reasons.  ***First***, Prof. Elhauge demonstrates the MBLC *did* reduce Novartis's supply elasticity and harmed its ability to compete.

---

[15]

[16] Reducing elasticity of supply is a technical way of saying that the conduct caused a rival to produce less at every price, and thus diminished its ability to compete effectively.

███████████████████████████████████████████████████████

██████████████ the conduct impairs Novartis's ability to compete.[17]

**Second**, Sanofi is wrong that conduct can be anticompetitive only if it restricts elasticity of supply.  As shown below, conduct that alters rivals' incentives to compete can be just as anticompetitive as conduct that impairs rivals' ability to compete.  Sanofi's contrary assertion relies on an out-of-context quotation from *Schachar v. Am. Acad. of Opth., Inc.*, 870 F.2d 397, 399 (7th Cir. 1989), about *commercial speech*.  SD 5.  But *Schachar* merely stated, "[t]here can be no restraint of trade without a restraint," which is essentially a truism.  *Id.* at 397, 399.[18]  This case involves precisely the kind of "restraint" not present in *Schachar*: the MBLC █████████████████

████████████████████ Bundling has long been considered an anticompetitive restraint capable of being condemned by the antitrust laws.  MTD Op. 16-20.

### B.      It is Well Accepted that "Incentive Modification" Causes Anticompetitive Harm.

Sanofi argues—again without reference to its expert—that conduct that disrupts competition by modifying firms' *incentives* to compete cannot be anticompetitive.  SD 4-6.  Sanofi is wrong.  Incentive modification as a source of anticompetitive harm has long been accepted in economics and law.[19]  Bundling can have two effects on rivals, each of which independently harms competition and

---

[17] ████████████████████████████████████████████████████

[18] *See also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (observing that in *Schachar*, there was no "enforcement mechanism" that constituted a "restraint," and that without one, "commercial speech is not actionable under the antitrust laws"); *Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005) (finding no restraint of trade based upon commercial speech because "consumers were in no way constrained from buying the [rival's] products").

[19] *See, e.g., Citizen Publ'g Co. v. U.S.*, 394 U.S. 131, 135 (1969) (holding that "[p]ooling of profits pursuant to an inflexible ratio at least reduces *incentives to compete* for circulation and advertising revenues and runs afoul of the Sherman Act"); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007) ("A manufacturer with market power, by comparison, might use resale price maintenance to give retailers *an incentive not to sell the products of smaller rivals or new entrants*."); *Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1005 (N.D. Cal. 2008) (allowing claim that pricing deterred entry by "providing little *incentive for competitors* to develop products *to compete* with it," allowing defendant to later "rais[e] prices"); *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 85 (D.D.C. 2011) ("anticompetitive

inflates prices: reducing a rival's (a) ability or (b) incentives to compete. *Schuylkill Health Sys. v. Cardinal Health 200, LLC,* No. 12-7065, 2014 WL 3746817, at *4 (E.D. Pa. July 30, 2014) (bundling case finding that "it is plausible that [the rival] is less able to compete because it has been prevented from growing and has ***less of an incentive to compete*** because Defendants have blocked a significant portion of the market," noting that either "theory of causation" would be cognizable under the antitrust laws). *Schuylkill* recognized that this plausible incentive modification was driven by the "Defendants hav[ing] blocked a significant portion of the market," *Schuylkill*, 2014 WL 3746817, at *4, as Prof. Elhauge shows here. Sanofi in its now dismissed counterclaim alleged that PBG contracts "harmed the competitive process by reducing, eliminating, or restraining *the incentive or ability* for individual physicians and health providers to independently compete." ECF 111 ¶97.

Sanofi's claim that Prof. Elhauge and his co-author are the only economists to have advanced a divided market theory of harm, SD 6, is false.[20] Leading economists have adopted this approach, including recently Prof. Salinger (B.U.),[21] and Prof. Farrell (U.C. Berkley),[22] both former directors of

---

[20] Prof. Elhauge's article setting out his own thinking on market division predates the filing of this litigation by two years. Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 J. COMPET. L. & ECON. 189, 218 (2009). Sanofi sarcastically implies that there is something untoward about Prof. Elhauge testifying based upon pre-litigation academic work. SD 1. But the fact that Prof. Elhauge's analysis was not developed for litigation purposes makes it *more reliable*, not less. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."); *In re Unisys Savs. Plan Litig.*, 173 F.3d 145, 166 n.10 (3d Cir. 1999) ("whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation" favors admissibility).

[21] Salinger, Panel Discussion, *supra* n.11 ("So what happens with loyalty discounts? *So the problem here isn't excluding the entrant . . . .* The reason it works is that the all-units discount *confronts the entrant with a very stark choice between taking its allocation share, at what might be a high price*, or, if it wants more than its allocated share, it needs to cut its price quite dramatically. . . . If the incumbent recognizes that it can create this choice for the entrant—it can design the entry scheme—so it leaves *just enough share for the entrant that it can anticipate that the entrant will take the share and take the high price, and then in anticipation of the high price that the entrant will charge, the incumbent can also charge a high*

the FTC Bureau of Economics.[23]   Sanofi attacks Prof. Elhauge because a few economists have criticized the theory. SD 6.  These criticisms are wrong, but in any event, the law does not require universal acceptance for testimony to be admissible.[24]   If it did, few scientific theories would be admissible.

Contrary to Sanofi's assertion, SD 6-7, Prof. Elhauge has empirically tested the applicability of this approach against real world data *in this very case*.



---

*price*. . . . the pricing scheme destroys competition at the margin and *results in less aggressive pricing* . . . this is anticompetitive.").

[22] Farrell, Panel Discussion, *supra* n.11 ("Bilateral vertical restraints, and conditional pricing in particular, can profitably harm competition in ways that are more like collusion than exclusion. . . . There need be no disadvantaging through loss of economies of scale or efficient scale. . . . ***And it leads to price elevation, and is potentially profitable for all parties, except for final consumers***.").

[23] Drs. Farrell and Salinger and Profs. Elhauge and Wickelgren were all invited by the FTC and DOJ to discuss divided markets at the government's Conditional Pricing workshop.  *Supra* n.11.  In fact, the divided market theory has been so well received that Profs. Elhauge and Wickelgren's article has been shortlisted for an Antitrust Writing Award by the Institute of Competition Law.  *See* http://awards.concurrences.com/article/short-listed-articles.

[24] *Daubert*, 509 U.S. at 596; *Green Mtn. Chrysler Plym. Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 332 (D. Vt. 2007) ("*Daubert* requires general, not universal acceptance; even 'substantial criticism as to one theory or procedure will not be enough to find that the theory/procedure is not generally accepted.'").

[25] Sanofi's assertion that antitrust liability cannot be found if "rivals continue to sell" (SD 7, 5), is incorrect, and inconsistent with the law in *this* Circuit and in *this* case.  *U.S. v. Dentsply*, 399 F.3d 181, 191 (3d Cir. 2005) ("[I]t is not necessary that all competition be removed from the market.") (citing *LePage's*, 324 F.3d at 159-60); MTD Op. at n.10 ("Sanofi is incorrect that Plaintiffs must plead that competition was eliminated because of its actions.").  *Schor v. Abbott Labs.*, 457 F.3d 608, 611, 613 (7th Cir. 2006), is inapposite because the allegations there did not involve bundling or exclusive dealing but rather a "price squeeze," and even for price squeezes the full quote recommended no antitrust liability *only* if "rivals continue to sell, *and no second monopoly is in prospect*." Here, a second monopoly (MCV4 and other pediatric vaccines) is not only "in prospect," but exists already.  Elh. Rpt. ¶¶68-100.

12

### C.  Prof. Elhauge Has Proven that Sanofi's Conduct Divided the MCV4 Market.

Sanofi asserts that Prof. Elhauge "assumes" and "does not prove" that the conduct reduced competitive incentives. SD 7-9.  ***Nonsense***. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Sanofi next asserts that Prof. Elhauge's co-author, Prof. Wickelgren, "admitted" there is no key general principle that can be derived from the divided market model. SD 8.  ***False***.  What Prof. Wickelgren said is that there is no substitute for testing economic theories against market realities,[26]

---

[26] Wickelgren, Panel Discussion, *supra* n.11 ("In any particular situation . . . models may potentially fit one particular case or they may not . . . there is really no substitute for taking the various theories that are available, looking at the particular cases or the particular industry, and trying to decide if one of these models fits.").

*precisely* what Prof. Elhauge has done here.[27]   Finally, Sanofi contends that Prof. Elhauge

erroneously failed to "model the actual world" to test his theory. SD 8.  But we *know* what happened

in the actual world—by analyzing all of the evidence set forth above.  The world that needs

"modelling" in antitrust cases is the world without the challenged conduct, and that is what Prof.

Elhauge reliably did here. *See* 1 ABA Section of Antitrust Law, Antitrust Law Developments

783 (7th ed. 2012); Elh. Dep. at 336 ("I created a rigorous model of the but-for world, and I just

compared it to the actual world, rather than trying to model the actual world.").[28]

### D.     Prof. Elhauge Does Not Rely on "Assumptions" About "Price Discrimination."



Sanofi claims a market division would be impossible here—*in theory*.  This is supposedly so

Rather, as Prof. Elhauge explains,

---

[27] Sanofi deceptively quotes Prof. Elhauge as saying his academic "model is not directly applicable" to the facts here.  SD 8.  But the full quote reveals that the reason *that* model was not directly applicable was that the differentiated nature of the MCV4 made anticompetitive effects even *stronger* than the model discussed in his article (which focused on a market where the products were homogeneous).  Elh. Dep. at 367 ("the articles are conservatively assuming an undifferentiated market, which makes it more difficult to have anticompetitive effects. This market [MCV4] obviously is differentiated, which makes anticompetitive effects easier").

[28]





**E.**      **Prof. Elhauge's Menveo Share Regressions Are Reliable.**

As discussed above, Prof. Elhauge presented several forms of classwide proof that the MBLC

foreclosed Novartis's sales. Sanofi contests one aspect of this proof: the Menveo Share Regressions

("MSRs").  These are rigorous statistical analyses comparing ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████        ██████████████

███████████████████████████████████████████████████████████████████

---

[30] Sanofi suggests its own ability to price discriminate has some relevance here.  SD 9 n.5 (citing Wickelgren, TEX. L. REV., at 10 (2013)).  But Prof. Wickelgren was simply pointing out the model does not apply when "buyers do not trust the seller to honor its loyalty commitments" because "there is really no loyalty discount if customers cannot count on a lower price if they are loyal than if they are not." ████████████████████████████████████████████████████████████████████████████

[31] The predicate for Sanofi's claim—*i.e.*, that a market cannot be divided absent an absolute inability to price discriminate—is an out-of-context statement from Prof. Wickelgren.  SD 10.  But in the cited portion, he was actually discussing the assumptions for a *different* model about *single*-product loyalty discounts with "*no* buyer commitment." SD 10 (quoting S. Ex. 99 at 12). Sanofi omits that Prof. Wickelgren did *not* include the "bar on price discrimination" requirement on the preceding page that discussed loyalty discounts *with* "buyer commitment." S. Ex. 99 at 11. Buyer commitments are simply contracts in which customers commit to purchasing a certain share of their products from the seller, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Sanofi's multiple criticisms have no merit. SD 11-17. ***First***, Sanofi focuses on MSRs I and

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

***Second***, Sanofi asserts that the MSRs have a low "$r^2$," which it says indicates statistical bias.

SD 12 & n.10. ***Incorrect***. $R^2$ measures the percentage of variation—here all of the reasons

consumers choose Menveo over Menactra (*e.g.*, price, quality, etc.)—that is explained by the

results. ████████████████████████████████████████████████████

████████████████████████████████

█ ████████████████████████████████████████████████████

███████████████████████ █ ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Moreover, Sanofi's

claim has no support in the economic literature.   Elh. Reb. ¶49; Elh. Supp. ¶126; DAMODAR

GUJARATI, BASIC ECONOMETRICS, 222-223 (2008) ("[A] high $r^2$ is not evidence in favor of the model

and a low $r^2$ is not evidence against it. In fact the most important thing about $r^2$ is that it is ***not***

***important*** in the [classical regression] model."); KENNEDY, A GUIDE TO ECONOMETRICS 380 (6th ed.

2008) ("In general, *do not pay much heed to $r^2$*.").

  ***Third***, Sanofi claims that the MSRs contain "omitted variable bias." SD 13. ***Not so***.   Prof.

Elhauge examined each and every allegedly omitted variable that Sanofi claims correlated with both

█████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ ██████████████ ████ ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ █ ██████████████████

---

[33] In any case, any allegedly omitted variables go to the weight afforded Prof. Elhauge's opinions by the trier of fact. *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Bruno v. W.B. Saunders*, 882 F.2d 760, 773 (3d Cir. 1989) (same); *see also* ABA SECTION OF ANTITRUST LAW, ECONOMETRICS 81 (2d ed. 2014) ("In practice, it is virtually impossible to ensure that every relevant variable has been captured in a regression model."). Nor is it relevant to class certification. *In re EPDM Antitrust Litig.*, 256 F.R.D. 82, 102 (D. Conn. 2009) ("Whether the plaintiffs' multiple regression analysis incorporates the necessary variables/factors to reach the correct economic conclusion is an issue to be reserved for the merits, because it has no bearing on whether the plaintiffs can meet the predominance prong or Rule 23(b)(3) by establishing [] common proof of impact[.]").

[34] Sanofi's citations to the class representatives on this point, SD 14, n.11, are misleading. Dr. Marquez-Brito testified that she had no brand preference, stating that . Menveo and Menactra are "both wonderful products, both [the] same types of polysaccharides. . . . They're both very good products and the same." P. Ex. 51 (Marquez-Brito Dep. at 19-20).  In fact, she specifically testified that it was Sanofi's bundled penalties that drove her purchasing decisions. *Id.* ("I order just maybe for a couple of months the Menveo. And when I ordered the Menveo we used it, same good results. What happened was that then the [Sanofi]



██████████████████████████████████████████

██████████████████████████████████████████

███████████████████  ████

*Fourth*, Sanofi attacks the MSRs as "highly sensitive" to the exclusion of ████ cherry-picked

████. SD 14-15. The economic literature is clear that ██████████████████████████

██████████████ taints the results.  Elh. Supp. ¶¶165-66.[36]  That is a problem

██████████████, not Prof. Elhauge's.  Prof. Elhauge showed that ████████████████

████████████████████████, his regression results virtually never change. *Id.*

¶165; Elh. Reb. ¶¶87-88. ████████████████████████ that Prof. Elhauge's

results are disproven by splicing the MSRs into finer and finer bits, by state and "contract type,"

which produces statistically insignificant results.  SD 17 n.16.[37] █████████████████

---

rep comes, . . . and said, you know Doctor, you have to realize that when you buy vaccines, if you don't
buy [our] other vaccines, the prices are going to change. . . . So I stopped buying–I really stopped buying
the other vaccine [Menveo]."). Dr. Bengochea testified he had no preference between GSK or Sanofi.  P.
Ex. 52 (Bengochea Dep. at 38).  And Dr. Castro simply testified that some buy Sanofi vaccines and others
from GSK.  P. Ex. 53 (Castro Dep. at 40).

[35] Sanofi makes various baseless attacks on Prof. Elhauge's "falsification test" (SD 15-16), which is an
econometric test ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[36] ████████████████████████████████████████████████████

██████████████████ *See* WOOLDRIDGE, INTRODUCTORY ECONOMETRICS 325 (5th
ed. 2012) ("The situation is much different when selection [of the sample] is based on the dependent
variable, y, which is called sample selection based on the dependent variable, and is an example of
endogenous sample selection. If the sample is based on whether the dependent variable is above or below
a given value, bias always occurs[.]").

[37] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ "somewhat misleading," "exaggerat[ing] th[e]

variability" between class members, and failing to pass the "laugh test." *Air Cargo*, 2014 WL

7882100, at *16, 57, 59.[38]

Finally, Sanofi attacks Prof. Elhauge's MSRs II, which, unlike the conservative MSRs I,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

## IV.   DIFFERENTIATED BERTRAND COMPETITION BEST FITS THE MARKET

Prof. Elhauge uses the differentiated Bertrand model—a well-accepted economic model the

DOJ and FTC call their "workhorse"—███████████████████████████████

████████████████████████████████████████████████████

---

customer pays an overcharge, which flows from the *aggregate* restriction on Novartis. Kaplan conceded
that this aggregate effect was what caused the relevant injury.  Elh. Supp. ¶¶145-148; Kaplan Reb. n.53.

[38] *See also, e.g., Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012) (rejecting
defendant's disaggregation of employment data by region and finding that use of nationwide data was
warranted because "the larger aggregate numbers allow for a robust analysis and yield more reliable and
more meaningful statistical results," and the company practices at issue were nationwide); *Paige v. Cal.*,
291 F.3d 1141, 1148 (9th Cir. 2002) ("[I]t is a generally accepted principle that aggregated statistical data
may be used where it is more probative than subdivided data."); *Eldredge v. Carpenters 46*, 833 F.2d
1334, 1339-40 n.8 (9th Cir. 1987) ("[T]he plaintiff should not be required to disaggregate the data into
subgroups which are smaller than the groups which may be presumed to have been similarly situated and
affected by common policies.").

[39] ████████████████████████████████████████████████████

[40] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.*  That Sanofi chose

to denigrate efficient price competition in a world without bundling as "simulating" a "price war," SD 18, reveals more about its attitude toward real price competition than it does about Prof. Elhauge's empirical analysis.

Sanofi argues the Bertrand model is rarely used.  SD 10.  ***Untrue***.  "Simulation" models like Bertrand and its counterpart, Cournot,[41] "are textbook economic methodologies which are generally accepted and widely used by economists to predict prices in various contexts." *See Grand River Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 527 (S.D.N.Y. 2011).  Bertrand and similar models were (a) approved to both define the market and measure impact in *U.S. v. H&R Block, Inc*., 833 F. Supp. 2d 36, 64, 86-88 (D.D.C. 2011);[42] and (b) employed to calculate classwide damages in *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 5429718, at *21 (N.D. Cal. Jun. 20, 2013) (relying in part on "merger simulation").  Indeed, simulation models are so accepted defendants in *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1086 (N.D. Ill. 2012), argued their use was *required*.[43]

---

[41] Bertrand is used when firms primarily compete on price (typically differentiated markets like MCV4) and Cournot is used when the firms compete on output (such is in commodity markets).  *See* Lande & Langenfeld, *From the Surrogates to Stories*, ANTITRUST (Spring 1997), at 5, 7 (discussing "competition based on quantity (Cournot game-theory models) [versus] price (Bertrand game-theory models)").  Here, Bertrand is the appropriate model because the firms compete on price. Elh. Rpt. ¶228.  Cournot has been used to compute damages in antitrust cases multiple times. *See, e.g.*, *Ticketmaster Corp. v. Tickets.com, Inc.*, No. 99-7654, 2003 WL 25781900, at *3 (C.D. Cal. Jan. 27, 2003) (recognizing "application of the Nash-Cournot equilibrium" as an "accepted method[] of economists in attempting to fix anti-trust damages where the task is to fix damages 'but for' the anti-competitive activity found to violate the antitrust laws"); *In re Universal Servs. Fund Tel. Billing Prac. Litig.*, 2008 U.S. Dist. LEXIS 107727, at **68-71 (D. Kan.  June 30, 2008) (no Westlaw cite available) (crediting expert's use of the "well-known" Cournot model in analyzing defendants' collusive conduct).

[42] Sanofi incorrectly cites this case as criticizing the Bertrand model. SD 19.

[43] Bertrand simulations are also regularly used by our antitrust agencies. *See* FTC/DOJ, Commentary on the Horizontal Merger Guidelines 14, 27, 30-31 (2006).  Sanofi's cited cases excluding simulations, SD at

### A.    Sanofi's Proposed Alternatives to Prof. Elhauge's Differentiated Bertrand Model Are Poorer Fits for the MCV4 Market.

As Sanofi's own authorities make clear, "economists have a wide variety of economic techniques available" to compute impact and damages in antitrust cases. ABA SECTION OF ANTITRUST LAW, ECONOMETRICS at 311.  One method is a "before-during control group," which compares the actual world to a period when the market had similar competitive features but not the challenged conduct.  ██████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████  Another method involves using a "yardstick" or "benchmark" control group. This is an analogous market that is "unaffected by the alleged anticompetitive conduct," where there are no "difference[s] in economic conditions between the benchmark and affected markets." *Id.* at 319-20.  And a third includes the use of game theory simulation models, such as Bertrand or Cournot. *Id.* at 273.  Sanofi contends that a yardstick method or an alternative game theory model would have better fit the market. Both suggestions ignore the limitations of these techniques and market realities.

### 1.    "Benchmark" Methods Are a Poorer Fit For This Case.

Sanofi's suggestion that Prof. Elhauge could have used another vaccine market as a "benchmark" to determine but-for prices in the MCV4 market, SD 18, is both legally irrelevant and factually incorrect.  *It is irrelevant* because an expert is required to choose a reliable approach not to

---

18-19, are all inapposite.  *FTC v. CCC Holds. Inc.*, 605 F. Supp. 2d 26, 70-71 (D.D.C.2009), did not condemn the differentiated Bertrand methodology, but rather concluded the particular simulation run there was deficient because of a small sample size, in sharp contrast to the hundreds of thousands of data points used here. Elh. Reb. n.524.  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1047, 1056 (8th Cir. 2000), excluded a simulation that had no relation to the facts or economic theory but rather simplistically assumed an overcharge whenever one of two firms had a market share over 50%.  *Heary Bros. Lightning Prot. Co., Inc. v. Lightning Prot. Inst.*, 287 F. Supp. 2d 1038, 1067 (D. Ariz. 2003), excluded a simulation because the expert improperly applied Cournot when he should have used Bertrand.  Finally, the regression at issue in *In re Se. Milk Antitrust Litig.*, No. 07-cv-188, 2012 WL 947106 (E.D. Tenn. Mar. 20, 2012), was ultimately allowed on appeal.  739 F.3d 262, 283-85 (6th Cir. 2014).

exclude all other possible approaches as unreliable.  Under *Daubert* at class certification, the model must be workable and reliable.  *E.g.*, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 340 (D. Md. 2012) (the question "at class certification is *not* which expert is the most credible, or the most accurate modeler"); *Egg Prods.*, 2015 WL 337224, at *3, 12-15 (methodology must be reliable and useful).  *It is incorrect* because two key prerequisites for a reliable benchmark are (a) the "benchmark[] (the control group) w[as] unaffected by the alleged anticompetitive conduct," and (b) the benchmark must "have similar supply and demand characteristics." S. Ex. 319-320. These would

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. As a result, there is no benchmark market that is wholly undistorted ████████.  Sanofi tellingly fails to identify any vaccine market benchmark that would satisfy its own key criteria.[44]

### 2.   Sanofi's Alternative Models are Economically Unsound.

Relying on foundationless counsel created demonstratives,[45] Sanofi contends that alternative simulation models would be better fits. SD 22, n.20.  Sanofi is wrong.  As Prof. Elhauge explained, neither of the posited alternative models—Cournot and "conjectural variation"—fits the realities of the MCV4 market.[46] Sanofi ran these alternatives without accounting for the MBLC ███████

███████     ████████████     ████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

### 3.   Sanofi's Attacks on the Differentiated Bertrand Model Are Unavailing.

---

[44] ███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████

[45] These and other impermissible submissions are the subject of Plaintiffs' motion to strike.

[46] That one economist opined that Cournot competition fits "many" vaccine markets, SD at 22, n.20, is no substitute for determining, as Prof. Elhauge has done here, which brand of competition fits *this* vaccine market.  Elh. Rpt. ¶¶226-30; Elh. Reb. ¶243.

Sanofi suggests that some economists have been critical of the differentiated Bertrand model. SD 19-20. This claim is both irrelevant (there is, again, no universal acceptance requirement), and misreads the cited authorities.[47] Sanofi also ignores the economic literature supporting differentiated Bertrand models as the "workhorse" method of antitrust analysis of differentiated markets.[48] Sanofi's assertion that Prof. Elhauge found Bertrand models to be "extreme," SD 21, is false. Sanofi misleadingly cites an article in which Prof. Elhauge discusses *a different type of model*, known as an *undifferentiated* Bertrand model. SD 21. His concerns applied only where products are undifferentiated, like commodities,



---

[47] ███████████████████████████████████████████████████████████████

[48] *See, e.g.*, G.J. Werden, *Simulating the Effects of Differentiated Product Mergers*, 5 GEO. MASON L. REV. 363, 375 (1997) ("Like most economists, I believe that Bertrand competition is a very reasonable assumption in most differentiated product industries."); Werden, *Economic Evidence on the Existence of Collusion*, 71 ANTITRUST L. J. 719, 724 (2004); Rubinfeld, *Econometric Issues in Antitrust Analysis*, JITE, Volume 166, Number 1 at 68 (2010) ("The standard approach in current work is to assume Bertrand competition"); Baker & Reitman, *Research topics in unilateral effects analysis* 25, 51-52, in RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (ed. Elhauge 2013) (concluding empirical studies showed differentiated Bertrand simulations performed well and if anything underestimated anticompetitive effects by 3-7%).



**B.      Prof. Elhauge Properly Calibrated His Differentiated Bertrand Model.**

Sanofi erroneously opines that Prof. "Elhauge skips [a] critical validation step by failing to

calibrate his model to actual world data." SD 20.  Prof. Elhauge calibrated his differentiated Bertrand

model using ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ ██████████████████████████████████████

█████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[51] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[52] Sanofi's cited cases about the need to calibrate, SD 20, are inapposite. *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1072 (E.D. Cal. 2011), a tort case, merely said that the omission of a "scientifically required step" renders analysis unreliable, but Sanofi's unreliable calibration test is not a scientifically required step. *Kaufman v. Motorola, Inc*, 2000 WL 1506892, at *2 (N.D. Ill. Sept. 21, 2000), a securities litigation case, just noted that one should compare economic theory to reality, which is

**C.    There Was No ████████████████████ in the MCV4 Market.**

Sanofi argues that Prof. Elhauge should have assumed that Sanofi and Novartis would have

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  ███████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

        ██████████████████████████████████████████

████████████████████████████████████████████████████████

---

what Prof. Elhauge has done here; moreover, the excluded model in *Kaufman* was one that "has never been accepted by professional economists," a far cry from the workhorse differentiated Bertrand model in this case. *In re Broadcom Corp. Sec. Litig.*, 2005 WL 1403756, at *2 (C.D. Cal. June 3, 2005), another securities litigation case, simply observed that "under the particular circumstances of th[at] case," the modeling technique at issue, unlike differentiated Bertrand simulation, was not accepted by "professional economists." *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 421 (E.D.N.Y. 2013), involved a physically re-creatable event (golf car movements) that could be run as experiments, which is not relevant here. Moreover, in this case, the record evidence—including internal Sanofi and Novartis documents— confirms the effects that economic theory and econometric analyses predict.

[53] █████████████████████████████████████████████

[54] Sanofi's assertion that Prof. Elhauge ignored these documents and testimony is also false. SD 23. Instead, █

████████████████████████████████████████████████████████

        Elh. Supp. ¶197.



*kelihood*, the actual data confirms that Novartis and Sanofi *in fact did not* coordinate.  CR 12-16.

### D.    Differentiated Bertrand Competition Is Rational and Reasonable.

Sanofi inaccurately asserts that the differentiated Bertrand model assumes economic irrationality. SD 24.  The economic literature shows that this model correctly predicts rational pricing. Elh. Reb. ¶168.  Sanofi suggests that because it and Novartis would make less money by pricing below monopoly levels, they would simply refrain from doing so in the but-for world.  SD 24. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████   It is lawyer *ipse dixit*.  All firms *prefer* higher prices and less competition, but under basic economics that is often impossible in competitive markets ████████████████████████████████████████████13.

Next, ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[55] *E.g.*, Elh. Rpt. ¶229; Elh. Reb. ¶¶12, 148, 163, 170, 202, 243, 245; Elh. Supp. ¶222; *see also* CR 12-16. Courts have consistently accepted this proposition.  *CCC Holds.*, 605 F. Supp. 2d at 62, 64 ("Without homogeneity [of product offerings] or transparency [in pricing], the market conditions are not conducive to coordinated effects, either tacit or express," coordination unlikely where "key information about specific transactions or individual price or output levels is [not] available routinely to competitors") (brackets in original).) (quoting *U.S.* v. *Oracle Corp.*, 331 F. Supp. 2d 1098, 1166 (N.D. Cal. 2004)); S. Ex. 25 (Novartis documents discussing lack of price transparency); *id.* at NVD-0974982 ("So my challenge is finding GSK and non-loyalists that are not linked to a Sanofi contract or being able to beat the price enough to make up the difference they will lose on the rest of their products."); *id.* at NVD-0974985 (noting that customers "won't give me the exact price"); *id.* at NVD-0974986 ("No one has given me the exact price when I have asked; they just say that Menveo is more. Most of my clinics don't mind talking about price in general terms, but no one is freely giving the exact price they are paying.").



### E.    Prof. Elhauge's Model Implies a Reasonable Amount of Increased Vaccinations.

Relying on two unauthorized and belated declarations, S. Ex. 71, Sanofi argues that Prof.

Elhauge's damages model implies that an implausible increase in but-for sales of MCV4.  SD 26-

27.





### F.   Prof. Elhauge's Opinions on Damages Are Reliable.

Sanofi's attacks on the Bertrand damages estimates, SD 27-28, are without merit. Because this issue is not a methodology challenge, but an attack on particular factual inputs (costs), it is not a proper basis for exclusion.[58] ████████████████████████████████████████

---

[58] Dueling cost characterizations cannot justify exclusion. *Actiq Sales*, 2014 WL 3572932, at *8-9 ("the issue of whether certain costs should have been included in Dr. Rosenthal's analysis is ultimately more a question of the accuracy of her analysis, not necessarily the methodology she used in conducting her analysis"); *ZF Meritor LLC v. Eaton Corp.*, Civ. No. 06-623-SLR, 2013 WL 6729509, at *4 (D. Del. Dec. 20, 2013) (where "expert's estimates rest[] on facts that, although in dispute, could support the assumptions upon which the estimates [are] based, the expert testimony [is] properly admitted").

[59]



## V.  PROF ELHAUGE'S "LIST PRICE REDUCTION CONCLUSION" IS RELIABLE

Sanofi asserts that Prof. Elhauge merely assumed that in the but-for world Sanofi would

████████████████████████████████████████. SD 28.  *False*.  As detailed in the CR 18-21,

Prof. Elhauge ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.

## VI.  STANDARD ECONOMIC THEORY RELIABLY PROVES COMMON IMPACT

Repeating its misstatement that Prof. Elhauge "walked away" from his Bertrand model,

Sanofi challenges Prof. Elhauge's finding that classwide impact could also be proven with reference

to standard economic theory.  SD 29-30.  But Prof. Elhauge "walked away" from nothing.  His point

is simply that, absent anticompetitive restraints, rival entry into a market with a 100% monopoly

████████████████████████████████████████ *some* price drop, and the fact that

─────────────────────

[60] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

instead prices rose is evidence ████████████████████████████████████████. Elh.

Rpt. ¶¶17, 167-68, 226; Elh. Reb. ¶254; Elh. Supp. ¶¶1, 201-02, 227.



## VII.   SANOFI'S ATTACK ON DR. LEITZINGER ALSO FAILS

Sanofi also seeks to exclude Dr. Leitzinger because he purportedly assumes "common impact across all class members . . . rendering his opinion a tautology." SD 30. Dr. Leitzinger has done no such thing. As experts are allowed to do,[62] Dr. Leitzinger relies upon Prof. Elhauge for the level of general price inflation. Leitz. Rpt. ¶¶9, 60, 61.  With that input, he evaluates the record and reaches the following independent conclusions: ████████████████████████████████████ ██████████████████████████████████████ (b) a reliable model is available to compute aggregate damages to the class as a whole. Leitz. Rpt. ¶¶9, 63-67; Leitz. Reb. ¶¶1, 3, 5-11, 22, 29, 30, 39, 40.

---

[61] ████████████████████████████████████████████████████

[62] *See, e.g., Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 286 F.R.D. 266, 271 (W.D. Pa. 2012) ("it is well-settled that one expert may rely upon another expert's opinion in formulating his own").

## CONCLUSION

Based on the foregoing, Sanofi's motion to exclude should be denied.

Dated: March 30, 2015

<div style="margin-left:45%">

s/ Peter S. Pearlman
Peter S. Pearlman
**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Tel: (201) 845-9600
Fax: (201) 845-9423
psp@njlawfirm.com

s/ James E. Cecchi
James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700
Facsimile:  (973) 994-1744

*Interim Co-Liaison Counsel for Plaintiffs
and the Proposed Class*

Eric L. Cramer
Michael J. Kane
Zachary D. Caplan
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
mkane@bm.net
zcaplan@bm.net

Linda P. Nussbaum
Peter A. Barile III
Bradley Demuth
**GRANT & EISENHOFER, P.A.**
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8504

</div>

Fax: (646) 722-8501
lnussbaum@gelaw.com
pbarile@gelaw.com
bdemuth@gelaw.com

*Interim Co-Lead Counsel for Plaintiffs and
the Proposed Class*