Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADRIANA M. CASTRO, M.D., P.A., SUGARTOWN PEDIACTRICS, LLC, and MARQUEZ & BENGOCHEA, M.D., P.A., on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SANOFI PASTEUR INC.,<br><br>*Defendants*. | Civ. No. 11-7178 (JMV)(MAH)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case comes before the Court on the Parties' joint motion for final approval of the settlement in this healthcare-related antitrust class action. Also pending is Plaintiffs' motion for an award of attorneys' fees, reimbursement of expenses, and payment of service awards. The proposed settlement is for $61.5 million in cash and the release of Defendant Sanofi Pasteur's counterclaim. The class is comprised of approximately 30,000 members including pediatricians, physician groups, and other vaccine purchasers. The underlying dispute arose out of a claim made by Plaintiffs against Defendant, a manufacturer of pediatric vaccines including Menactra, the brand name for Defendant's conjugate quadrivalent meningococcal, or MCV4, vaccine. Plaintiffs alleged that Defendant bundled its pediatric vaccines for sale to keep and enhance its monopoly in the market after a competitor planned to produce their own vaccine. Of the class members, only 16 have opted out and none have objected to the settlement.

The Court reviewed the submissions in support of the motions and held a final settlement hearing on October 3, 2017. For the reasons discussed below, both motions are **GRANTED**.

I. **Background & Procedural History**

This settlement represents the culmination of several years of hard-fought and complex litigation. Plaintiffs filed their First Consolidated Amended Class Action Complaint ("CAC" or "Compl.") on January 20, 2012. D.E. 28. The CAC alleged that Defendant, through Menactra, has a 93% monopoly of the meningococcal pediatric vaccine market. Compl. at ¶2. Menactra inoculates against bacterial meningitis. *Id.* After Novartis, the only other producer of a meningococcal vaccine in the U.S., planned to enter the meningococcal vaccine market with its Menveo vaccine, Defendant allegedly bundled its other pediatric vaccines with Menactra to force physicians to buy their vaccines at higher prices. *Id.* at ¶¶1-5. As a result, purchasers of the Menveo vaccine incurred "substantial price penalties" if they bought even small quantities of the drug. *Id.* at ¶3.

On February 27, 2012, Defendant filed a motion to dismiss and a counterclaim against Plaintiff and proposed class members. D.E. 50. After the stand-alone counterclaim was struck, the motion to dismiss was also denied, and Defendant answered and asserted its counterclaim again on August 21, 2012. D.E. 100, 111. Defendants claimed that Plaintiffs and other purported class members had "engaged in unlawful collective action" by forming physician buying groups, or "PBGs," causing the prices of vaccines to fall. D.E. 111.

Discovery has been lengthy, contentious and expensive. Document discovery produced over one million documents, the parties conducted thirty depositions, and the Court eventually appointed a Special Master, Ronald J. Riccio, to resolve discovery disputes. *See* D.E. 191, Declaration of Co-Lead Counsel Eric L. Cramer, Esq. (hereinafter "Cramer Decl.) at ¶12.

Special Master Riccio made several Reports & Recommendations. *See, e.g.*, D.E. 211, 212, 213, 229, 238, 239. Expert discovery was similarly complex and ultimately bifurcated into class and merits phases. D.E. 104. The class certification process was lengthy, and included an appeal by Defendant to the Third Circuit challenging the order certifying the class, which was denied. *See Castro v. Sanofi Pasteur Inc.*, No. 15-8099 (3d Cir. Dec. 8, 2015). The class was defined as:

> All persons or entities in the United States and its territories that purchase Menactra directly from defendant Sanofi Pasteur Inc. ("Sanofi") or any of its divisions, subsidiaries, predecessors or affiliates, such a VaxServe, Inc., during the period from March 1, 2010 through such time as the effects of Sanofi's illegal conduct have ceased ("Class Period"), and excluding all governmental entities, Sanofi, Sanofi's divisions, subsidiaries, predecessors, and affiliates of Kaiser Permanente and the Kaiser Foundation (collectively, "Kaiser"), and an purchases by entities buying Menactra pursuant to a publicly-negotiated price (*i.e.*, governmental purchasers). D.E. 416.

The class period was later amended with an end date of December 31, 2014. D.E. 476.

The Court also conducted a *Daubert* hearing concerning expert testimony on the class. The hearing lasted three days, from September 9, 2009 through September 11, 2001. D.E. 380, 417, 418, 419. The class expert reports totaled over 1,000 pages. Cramer Decl. at ¶25. The merit expert reports were also 1,000 pages, exclusive of appendices and supporting data. *Id.*

On April 24, 2017, the Court granted preliminary approval of the settlement, and approved Rust Consulting as the settlement administrator. D.E. 512. The Court also ordered a notice plan on April 24, 2017. *Id.* The parties also held extensive settlement negotiations, beginning with a private mediation in November 2014. Cramer Decl. at ¶39.

The Court ordered that the notice to class members of the proposed settlement ("Settlement Notice") and the proposed summary form of notice ("Summary Notice") be disseminated in three ways: (1) direct first class mail of the Settlement Notice to class members,

(2) publication of the Summary Notice in the Pediatrics medical journal[1]; and (3) posting the Settlement Notice and Summary Notice on a litigation specific-website established by the settlement administrator. D.E. 514-1, Declaration of Jessica Jenkins Regarding Notice by Mailing and Publication (hereinafter "Jenkins Decl.") at ¶¶4-16. In addition, the settlement administrator created a case-specific website, email address, toll-free phone number, and post office box to facilitate communication with potential class members. *Id.* The website eventually received approximately 1,734 visits, and the hotline received 147 calls. *Id.* at ¶¶14, 16.

The proposed distribution plan will allocate the settlement fund on a *pro rata* basis calculated by each claimant's (class members who timely submit valid claim forms) total Menactra purchases made during the class period. D.E. 515-2, Plan of Distribution of the Net Settlement Fund at 1-2. Sanofi will provide data showing the Menactra purchases made, and the Plan Administrator will mail a Claim Form to each Class Member with the details of their purchases included. *Id.* The *pro rata* share will be calculated by dividing the total volume of Menactra purchases made by a Claimant by the total volume of Menactra purchases for all Claimants. *Id.* That *pro rata* share will then be multiplied by the total net settlement fund amount. *Id.*

---

[1] The Court approved publication of the notice in *Pediatrics*, but as a result of a miscommunication, the notice was published in *AAP News*, published by the American Academy of Pediatrics. D.E. 515, Memorandum of Law in Support of Joint Motion for Final Approval of Class Action Settlement (hereinafter "Joint Motion") at 17. However, because *AAP* has a larger circulation than *Pediatrics* and a similar readership, the Court finds publication in *AAP News* not materially different than in *Pediatrics*. However, the Court also notes that in the future, if such an error occurs, the better practice is to notify the Court immediately and ensure that the Court does not want any corrective action taken.

Approximately 30% of the purchases of Menactra during the class period were made by three national wholesalers of pediatric vaccines: AmerisourceBergen, Cardinal Health, and McKesson. Cramer Decl. at ¶3. All three fully support the settlement terms. *Id.*

## II. Final Settlement Approval

### a. Rule 23

Under Rule 23(e)(2) of the Federal Rules of Civil Procedure, the Court may approve a proposed settlement of a class action after a hearing if the settlement "is fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2). The law encourages and favors settlement of civil actions in federal courts, particularly in complex class actions. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 784 (3d Cir. 1995). As a result, when a settlement is reached on terms agreeable to all parties, it is to be encouraged. *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 & n.16 (3d Cir. 1993).

### b. *Girsh Factors*

In determining the reasonableness, fairness, and adequacy of a proposed settlement for the purposes of Rule 23(e), courts consider the following factors, known as the *Girsch* factors:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and
(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*In re Nat'l Football League*, 821 F.3d at 437 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). The settling parties bear the burden of establishing that the *Girsh* factors weigh in favor

of approval. But the ultimate decision of whether to approve a proposed settlement "is left to the sound discretion of the district court." *Girsh*, 521 F.2d at 157.

### 1. Complexity, Expense & Likely Duration of Litigation

The first factor considers "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors.*, 55 F.3d at 812 (quoting *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). Courts must weigh the proposed settlement "against the enormous time and expense of achieving a potentially more favorable result through further litigation." *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 3008808, at *4 (D.N.J. Nov. 9, 2005) (citation omitted). "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming." *Yedlowski v. Roka Bioscience*, 2016 WL 6661336, at *12 (D.N.J. Nov. 10, 2016) (quoting *In re Royal Dutch/Shell Transp. Sec. Litig.*, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008)).

This litigation has already spanned six years. The matter has been exhaustively litigated,[2] with both sides spending literally thousands of hours and millions of dollars. In addition, an "antitrust class action is arguably the most complex action to prosecute." *In re Remeron*, 2005 WL 2230314, at *13 (citations omitted). This case is no exception. Moreover, there was no corresponding governmental action; Plaintiffs developed the case on their own. Continuing this case through summary judgment or trial would undoubtedly result in a great deal more expense. The parties would have to fully brief Defendant's summary judgment motion, and if Plaintiffs were successful, then extensive pretrial motions, a lengthy trial, and (most likely) post-trial motions and appeals would ensue. The first *Girsh* factor favors the proposed settlement.

---

[2] In fact, Defendant filed its motion for summary judgment, D.E. 649, before settlement was reached.

6

## 2. Reaction of Class to Settlement

The second *Girsh* factor "gauge[s] whether members of the class support the settlement." *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998). As such, courts look at the "number and vociferousness of the objectors. . . . [and] generally assume[] that silence constitutes tacit consent to the agreement." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl. Corp.*, 2 F.3d at 1313 & n.15).

To date, there are no objections to the settlement by any class member. Additionally, the three sophisticated national wholesale class members have all joined the settlement and submitted letters in support of its terms. This lack of objection weighs in favor of approving the settlement.[3]

## 3. State of the Proceedings

The purpose of this factor is to determine "the degree of case development that class counsel have accomplished prior to settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001). "[C]ourts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.* (citing *In re Gen. Motors*, 55 F.3d at 813). As noted, there has been extensive class and merits discovery in this case. Over one million documents have been produced, over 30 depositions have been taken, and the Court conducted a multi-day *Daubert* hearing. The parties have litigated this case for six years. They have fully briefed

---

[3] The Court notes that some courts have suggested that the lack of objectors essentially *requires* a finding that the settlement is fair and reasonable. *See, e.g., In re Linerboard Antitrust Litig*, 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003) ("'[T]his unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement'" (quoting *Fisher Bros v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 451 (E.D. Pa. 1985)). The Court does not necessarily agree with this conclusion but recognizes that the lack of objectors provides a strong indication that the settlement is fair and reasonable, particularly where, as here, sophisticated claimants affirmatively support the settlement.

motions to dismiss, the motion for class certification—including an appeal to the Third Circuit—and have engaged in extensive discovery. Accordingly, Lead Plaintiffs are well aware of the relative strengths and weaknesses of their case against Sanofi. *See, e.g., In re Genta Sec. Litig.*, 2008 WL 2229843, at *6 (D.N.J. May 28, 2008). This factor also weighs in favor of approving the settlement.

### 4. Risks of Establishing Liability & Damages

The purpose of these factors is to "balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re Gen. Motors*, 55 F.3d at 814. Where there is a prospect of long, contentious, and uncertain litigation along with a lack of evidence required to support claims in such protracted litigation, these factors weigh in favor of approval. *See In re Cendant Corp. Litig.*, 264 F.3d at 238.

#### a. Liability

Plaintiffs used a novel theory to show liability in this case. Unlike many antitrust matters, Plaintiff did not provide evidence of increased costs to Defendants' competitors. Rather, Plaintiffs, by way of expert testimony, proceeded on a "divided market theory," which no previous court had expressly accepted. Thus, Plaintiffs' ability to prove liability was in no way a certainty.

#### b. Damages

Proving damages in antitrust cases is difficult and depends on extensive expert testimony, "which can become an esoteric exercise with unpredictable results." *In re Elec. Carbon Prods.*

*Antitrust Litig.*, 447 F.Supp.2d 389, 401 (D.N.J. 2006). Rather than showing either the periods before or after the bundling, or another similarly competitive period in the market, Plaintiffs relied on the "Bertrand price model" to show damages. The differentiated Bertrand model had not been used in this context before, and is normally used instead to illustrate competition after a merger. Professor Elhauge's testimony, especially his use of the Bertrand model to prove damages to Plaintiffs, was hotly contested in this litigation. Moreover, as Plaintiff's counsel points out, Defendant "certainly would have continued to press [their counterarguments] on appeal if Plaintiffs were to prevail at trial." Joint Motion at 32. Plaintiff's counsel also notes that Judge Arleo's Opinion on Defendant's *Daubert* motion to exclude Professor Elhauge's testimony, D.E. 415, "appears to be the first time that a differentiated Bertrand model was found reliable as a means of assessing impact and damages in an antitrust class action." *Id.* at 11.

Both liability and damages were hotly contested and both parties had evidence supporting their respective positions. In sum, the risks associated with both liability and damages lead the Court to conclude that this factor favors approving the settlement.

### 5. Risks of Retaining Class Certification throughout Trial

The risk of losing class certification persists through every litigation; there will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *In re Prudential*, 148 F.3d at 321. Given that this is a risk in any case, this factor weighs in favor of approving the settlement, although not strongly as there was no specific indication for the Court to conclude that the risk was greater in this matter.

### 6. Defendant's Ability to Withstand Greater Judgment

This factor "is concerned with whether defendants could withstand a judgment for an amount *significantly* greater than the [s]ettlement." *In re Cendant Corp. Litig.*, 264 F.3d at 240

(emphasis added). Financially, Defendant can certainly withstand a greater judgment, but this factor cannot be considered in a vacuum, *i.e.* a party's financial resources. Instead, it must be analyzed in light of the context of the actual case. For example, if a plaintiff has a strong case in terms of both liability and damages, but a defendant (who could afford more) proposes an unreasonably low settlement amount, this factor would weigh against approving the settlement. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004). On the other hand, where (as here) the matter is complex and expensive, coupled with risks as to both liability and damages, the Court considers a party's ability to withstand a greater judgment against the likelihood of recovering the greater amount. In this case, the sixth factor does not weigh against approving the settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery & the Attendant Risk of Litigation

These factors aim to "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2006). "In conducting this evaluation, it is recognized that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding to[o] large a settlement based on the court's view of the merits of the litigation." *See In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 484-85 (D.N.J. 2012) (internal quotations omitted). These factors consider "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Pro v. Hertz Equip. Rental Corp.*, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting *In re Prudential*, 148 F.3d at 322).

The Cramer Declaration presents a table comparing the settlement amount to other "analogous healthcare-related antitrust bundling cases," some of which were brought by class

counsel using the same experts and consultants. Cramer Decl. at ¶20. While Plaintiff's experts pointed to a potentially larger settlement, Defendant's experts "yielded much lower results." Joint Motion at 35. Plaintiff's counsel estimates that the total damages of overcharging on purchases of Menactra is $439 million. *Id.* The Settlement represents approximately 14% of those damages, which both parties agree is "within . . . the range of possible settlements." *Id.* at 35-36.

The Court agrees. The settlement is within a reasonable range in light of the risks faced by both parties if the case proceeded to trial and in light of the best possible recovery. In addition to the liability concerns addressed above, Defendant also has expert evidence indicating that the amount of damages should be significantly lower than those sought by Plaintiffs even if Plaintiff prevailed on liability.

### c. *Prudential* Factors

The Third Circuit also requires courts to consider whether the settlement satisfies several additional factors as set forth in *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998). *See, e.g.*, *Yedlowski*, 2016 WL 6661336, at *12 (quoting *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010)). The *Prudential* factors include:

> [1] [T]he maturity of the underlying substantive issues . . . .; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved –for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* The Court does not have to perform analysis on each *Prudential* factor—rather it must address the factors that are relevant to the particular case at hand. *See In re Prudential*, 148 F.3d at 323-324. The *Prudential* factors relevant to this case are factors one, four, five, and six.

1. **The Maturity of the Underlying Substantive Issues**

As discussed above, there has been full discovery in this case, which itself has been extensively litigated. The underlying substantive issues have been fully developed.

2. **Whether Class Members are Accorded the Right to Opt Out of the Settlement**

Class members were accorded the right to opt out. Moreover, as discussed above, only 16 of the nearly 30,000 class members have elected to opt out of the Settlement.

3. **Whether the Provisions for Attorneys' Fees are Reasonable**

As discussed more fully below, Plaintiff's counsel is requesting one-third of the settlement amount in fees (in addition to its request for expenses). The Court finds this request to be reasonable as is explained below.

4. **Whether the Procedure for Processing Individual claims under the Settlement is Fair and Reasonable**

The proposed procedure is fair and reasonable. Class members were notified by letter mailed on May 15, 2017 that they had until July 10, 2017 to either opt out or object. Class members who did not opt out will be able submit their claim requests using a Claim Form. The form will be mailed to them and also available on the litigation website. Class members can also obtain information via a toll free number. Class Members can also dispute the basis for their *pro rata* share of the settlement.

d. **The Proposed Distribution Plan**

The distribution plan proposed is also fair, reasonable, and adequate. *Pro rata* distributions of settlement funds are "consistently upheld." *In re Ocean Power Techs., Inc.*, No. 14-cv-3799,

2016 WL 6778218, at *23 (D.N.J. Nov. 15, 2016) (citing *Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011)). Because Defendant is providing the purchase details, there will be less room for error in calculating each claimant's *pro rata* share, as the data will come from one source. Yet, claimants will also be able to contest their share if they believe that there has been an error. Additionally, if less than 100% of the class submits claims, the *pro rata* share for those who do will be larger. None of the settlement fund will revert to Defendant.

### e. Notice Plan

*Prudential*, pursuant to the Due Process Clause of the Fifth Amendment and Rule 23(e), requires that adequate notice be provided to potential class members by "the combination of reasonable notice and the opportunity to be head and the opportunity to withdraw from the class." *Prudential*, 148 F.3d at 306. The Court approved the proposed notice plan, which included direct mailing to potential class members and publication. Online and phone resources were also available, including the ability to inspect all pertinent documents. D.E. 476. The notices provided information to potential class members, including the date of the final hearing at which they would be allowed to speak, and how to opt out of the settlement. As to due process, the notices were sufficiently clear, detailed and instructive. The notices indicated the legal claims, the class and class period, the terms of the settlement, the request for fees and expenses, the date and location of the fairness hearing, and the opportunity to opt out or object. The settlement administrator also took reasonable steps to update addresses and re-mail the notice information when initial mailings were returned as undeliverable. Finally, pursuant to the Class Action Fairness Act, 28 U.S.C. §1715, Defendant duly notified regulators of the settlement on February 3, 2017.

### III. Attorneys' Fees, Expenses & Service Awards

Plaintiff's counsel also makes a claim for attorneys' fees of one-third of the settlement amount, or $20.5 million; reimbursement of litigation expenses; and $100,000 service awards for each of the three class representatives. In common fund cases such as this one, attorneys' fees are typically awarded through the percentage-of-recovery method. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). The percentage-of-recovery method provides for attorneys' fees by awarding a reasonable percentage of the common fund. *Id.* The percentage-of-recovery method is preferred in common fund cases because it "rewards counsel for success and penalizes it for failure." *Id.* (quoting *In re Prudential*, 148 F.3d at 333).

The Third Circuit, however, suggests that when district courts use the percentage-of-recovery method, they also employ the lodestar method to cross-check the fee and ensure that it is reasonable. *Id.* at 305. "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* The cross-check occurs by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. If "the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *Id.* at 306 (quoting *In re Prudential*, 148 F.3d at 338-40). A court, however, need not apply these factors "in a formulaic way because each case is different." *Id.* (quoting *In re Rite Aid*, 396 F.3d at 301.

### A. The Percentage-of-Recovery Method

As discussed, Plaintiff's counsel seeks a fee award of one-third of the settlement fund. When analyzing a fee award under the percentage-of-recovery method, courts consider several factors, including:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
> (3) the skill and efficiency of the attorneys involved;
> (4) the complexity and duration of the litigation;
> (5) the risk of nonpayment;
> (6) the amount of time devoted to the case by plaintiffs' counsel; and
> (7) the awards in similar cases.

*Id.* (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 & n.1 (3d Cir. 2000)). The list is not exhaustive. *Yedlowski*, 2016 WL 6661336, at *19. As such, in *In re Prudential*, the Third Circuit enumerated three additional factors that may be relevant:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations;
> (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and
> (3) any "innovative" terms of settlement.

*Id.*

Here, because the *Gunter* factors substantially overlap with the *Girsch* factors, the Court will refer to its earlier findings when reviewing the fee application. An analysis of these factors supports the requested one-third fee award.

### 1. The Size of the Fund & Number of Persons Benefitted

For this factor, courts "consider the fee request in comparison to the size of the fund created and the number of class members to be benefitted." *Yedlowski*, 2016 WL 6661336, at *20 (quoting *Rowe v. E.I. DuPont de Nemours & Co.*, 2011 WL 3837106, at *18 (D.N.J. Aug. 26, 2011)). Plaintiff's counsel indicates that this settlement is the largest of the comparable healthcare related antitrust bundling cases brought in the last eight years. The Court does not have any information to the contrary. The class consists of almost 30,000 members. The settlement amount is considerable as is the number of persons/entities that will benefit.

15

### 2. Objections to the Fee Request

The class notice included details of the request for attorneys' fees, litigation costs, and service awards. There have been no objections. Notably, none of the three sophisticated class members, who make up almost 30% of the class, object to the motion for fees, reimbursement, and service awards; rather, they have submitted letters in support for the settlement.

### 3. The Skill & Efficiency of the Attorneys

"Lead Counsel's skill and efficiency is 'measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *Yedlowski*, 2016 WL 6661336, at *20 (quoting *Hall v. AT&T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010)). In addition, "[t]he quality and vigor of opposing counsel" is relevant when evaluating the quality of services rendered by Lead Counsel. *Id.* at *21. Judge Arleo specifically lauded counsel on both sides of this case on the record after the *Daubert* hearing, saying: "I just want to thank you for your outstanding presentation . . . it's not lost on me at all when lawyers come very, very prepared. And really, your clients should be very proud to have such fine lawyering." Cramer Decl. at ¶33. Plaintiffs' counsel is experienced in this area, and Defendant's counsel are similarly familiar with these types of cases. Both sides were represented by experienced and well-regarded counsel who vigorously and ably litigated this matter.

### 4. The Complexity and Duration of the Litigation

As discussed, this antitrust class action represent a most complex areas of litigation. This complexity was compounded by the fact that Plaintiffs were advocating positions that had not yet

been formally adopted by the courts. As to the duration of the litigation, it was expansive in terms of time, expense, discovery, and court proceedings.

### 5. The Risk of Nonpayment

"Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees." *Yedlowski*, 2016 WL 6661336, at *21. Counsel lists in their brief a number of antitrust "cases in which plaintiffs succeed at trial on liability but recovered no damages." Plaintiff's counsel certainly accepted the real risk of little or no payment when it undertook the case. This factor weighs in favor of approving the fee request.

### 6. The Amount of Time Devoted to the Case

This factor will be addressed in the Court's discussion of the lodestar cross-check. However it is clear that the hours that Plaintiffs' counsel devoted to this case—43,200—were considerable.

### 7. Awards in Similar Cases

The one-third fee is within the range of fees typically awarded within the Third Circuit through the percentage-of-recovery method; the Circuit has observed that fee awards generally range from 19% to 45% of the settlement fund. *See In re Gen. Motors*, 55 F.3d at 822. Thus, the requested fee in this matter is within the normal range.

### 1. Value of Benefits Attributable to Class Counsel

As noted, this case was investigated and brought entirely by private counsel, there was no corresponding government case against Defendant or similar purveyors of pediatric vaccines. Class counsel, along with their experts including Dr. Elhuage, made novel arguments both on the

merits and as to damages. Also, this case marks the first time the Bertrand model has been approved in this context. This factor weighs strongly in favor approving the requested fee award.

### 2. Percentage Fee

As discussed above, a one-third contingency fee is relatively standard, and is supported here by the sophisticated class members, who note that the fee here similar to what would have been privately agreed upon.

### 3. Innovative Terms

This settlement includes standard terms, though counsel notes that the settlement also includes a release of Defendant's counterclaim. The Court finds real value in the dismissal of the counterclaim because, if successful, it would have subjected Plaintiffs to liability (in addition to a lack of recovery).

### B. Lodestar Cross-Check

The lodestar cross-check "ensures that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *In re Cendant Corp. Litig.*, 264 F.3d at 285. Again, to perform the cross-check, a court divides the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006).

Plaintiffs' counsel logged 43,200 hours of work on this case. Counsel will also have to expend additional time, for example, by answering questions concerning the administration of the net settlement fund. Yet, counsel is not seeking any payment for this additional effort. Using their historical rates, counsel cites the lodestar as $22,086,998.45 (the result of multiplying the number

of hours worked by the appropriate hourly rate).[4] As a result, the lodestar multiplier is .928 (the result of dividing the fee amount by the lodestar). This is sometimes referred to as a "negative multiplier," meaning that counsel is receiving less than they would have received if they had instead been paid on an hourly basis. Because the lodestar cross-check results in a negative multiplier, it provides strong evidence that the requested fee is reasonable.

### C. Reimbursement of Expenses

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002). Plaintiff's counsel has asked for reimbursement of $7,199,310.00 in out-of-pocket and unpaid expenses out of the settlement fund before it is distributed to class members. The majority of this amount is the result of the extensive expert testimony solicited by Plaintiff's counsel including from Professor Elhauge and Dr. Leitzinger. The total expenses for "Expert Consultants and Witnesses" was $5,716,357.70. Cramer Decl. at ¶62. The next largest line item was for "hosting and managing the millions of pages of documents" produced in discovery on a secure database; counsel owes a bill of $633,727.04 for document management, the majority of which is for "hosting." *Id.* at ¶¶64-66.

These fees are all properly charged to the class. *See Yedlowski*, 2016 WL 6661336, at *23. The Court finds that these expenses are reasonable and sufficiently documented. As a result, the Court will award the requested amount of $7,199,310.00 for reimbursement of expenses.

### D. Service Awards

---

[4] *See* Cramer Decl. at ¶54 for a table of the historical rates for each firm that contributed hours to this case.

Depending on the circumstances, class representatives may receive incentive awards. *In re Schering-Plough Corp. Enhance Securities Litig.*, 2013 WL 5505744, at *56 (D.N.J. Oct. 1, 2013). Plaintiff's counsel has asked that the Court award $100,000 each to the class representatives, Adriana M. Castro, M.D., P.A., Sugartown Pediatrics, LLC, and Marquez and Bengochea, M.D., P.A. While the requested amount is higher than that awarded in an average case, it is appropriate here. All three were subject to Defendant's counterclaim (thereby exposing themselves to potential liability), and all three participated in the lengthy and onerous discovery process. For example, Marquez and Bengochea were the subject of multi-day depositions. Cramer Decl. at ¶70. In addition, the class representatives aided counsel during written discovery, producing thousands of pages of documents. No objection has been received to this award. The Court finds that given the significant roles the class representatives played throughout the litigation, the service awards are warranted.

### IV. Conclusion

For the reasons stated above, and for good cause shown, is the joint motion for approval of the settlement is **GRANTED**. In addition, Plaintiffs' motion for an award of attorney fees, reimbursement of expenses, and payment of service awards to the class representatives is **GRANTED**. Appropriate Orders accompany this Opinion. One Order addresses the settlement and the other concerns the fee, expenses, and award application.

Dated: October 20, 2017.

John Michael Vazquez, U.S.D.J.